# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF ILLINOIS

### EASTERN DIVISION

| | |
|---|---|
| BRIAN MAGNUSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| V. | ) |
| | ) |
| EXELON GENERATION COMPANY, LLC | ) |
| | ) |
| Defendant | )   JURY TRIAL DEMANDED |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |

## COMPLAINT

### I.     INTRODUCTION

1.      This is an action arising under the whistleblower protection provisions of the Energy Reorganization Act, 42 U.S.C. §5851, by Plaintiff Brian Magnuson (hereafter "Magnuson," or "Plaintiff") against his employer, Exelon Generation Company, LLC (hereafter "ExGen" or "Defendant") for unlawfully retaliating against him in the terms and conditions of his employment because he disclosed health and safety threats and regulatory violations to company officials and government agencies.

2.      This action is also maintained under the Illinois Whistleblower Act, 740 ILCS 174/15 and 740 ILCS 174/20, and under Illinois common law prohibiting retaliatory actions against and/or termination of employees who report unsafe and/or unlawful conditions, or otherwise vindicate public policies promoting public health and safety.

## II.        JURISDICTION

3.       This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§1331.  This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C.

§ 1367(a).

## III.        VENUE

4.       Venue is proper in this judicial district pursuant to 28 U.S.C.  §1391 because

Defendant has its Exelon Generation Regional Headquarters in this district wherein Plaintiff both

resides and works for Defendant.

5.        Plaintiff timely filed a whistleblower complaint against Defendant with the U.S.

Department of Labor, Occupational Safety and Health Administration (OSHA) on December 16,

2015, and a second whistleblower complaint against Defendant with OSHA on April 28, 2017.

On January 25, 2017, OSHA dismissed Plaintiff's first complaint after he gave notice of intent to

remove it to federal court.  His second complaint has been pending with DOL without final

resolution for over 365 days and is therefore also ripe for removal to this court pursuant to 42

U.S.C. § 5851(b)(4) and 24 CFR 24.114(a).

## IV.        PARTIES

6.       Plaintiff resides in Wheaton, Illinois and is an employee of ExGen. He was

employed by ExGen from 1983 until November 2016, and again from November 2017 to the

present.

7.       Defendant ExGen is a limited liability company, organized under the laws of the

State of Pennsylvania and doing business in the State of Illinois.  ExGen operates nuclear power

plants in Illinois, New Jersey, Pennsylvania, New York, Maryland, and Nebraska, with corporate

offices in Kennett Square, Pennsylvania and Warrenville, Illinois. ExGen operates its nuclear

power plants pursuant to operating licenses issued by the U.S. Nuclear Regulatory Commission ("NRC").

## V.    BACKGROUND FACTS

### A.  **Plaintiff's Job Position, Duties, and Performance:**

8.      Plaintiff worked at the Quad Cities Nuclear Power Station ("Nuclear Station" or "Station") for 33 years, from 1983 until he was placed on indefinite unpaid leave in November 2016 (hereafter "discharge" or "termination"). He started as a station laborer and rose through the ranks to become an Operations Shift Manager in 2006.

9.      Plaintiff obtained his NRC Reactor Operator License in 1989 and his NRC Senior Reactor Operator License in 2001.

10.     As Operations Shift Manager, Plaintiff was responsible for directing the safe operations of two nuclear reactors, managing an Operations crew, and ensuring that all activities were performed in accordance with state and federal regulations, the Nuclear Station's operating license, and technical specifications.

11.     Over the course of 33 years at the Station, Plaintiff became very knowledgeable about the systems, structures, and components associated with the reactors.  He became a subject matter expert on the Station's Operability Determination program for assessing systems and structures when a degraded or deficient condition was identified, to insure compliance with NRC Technical Specifications (10 CFR 50.36).  He also became a subject matter expert on Emergency Preparedness and authored Emergency Action Level documents in use at the Station.

12.     During the spring of 2015, ExGen was considering Plaintiff for advancement opportunities. In the spring of 2015, then-Site VP Scott Darin sent Plaintiff for a next-level leadership assessment with Right Management, a required step for career progression so that he would be ready for promotion. In May 2015, Operations Director Hal Dodd spoke to Plaintiff

3

about serving as ExGen's representative with the Institute of Nuclear Power Operations (INPO), an organization's whose mission is to promote the highest level of safety and reliability in the operation of commercial nuclear power plants.  During a June 16, 2015 conversation with Site VP Darin, Plaintiff mentioned that he had learned of a promotional position that he was interested in, and Darin advised him to expedite completion of the Right Management assessment process so he would be ready for promotion.

**B.  The Regulatory Environment for Nuclear Power Plant:**

13.     The Nuclear Station is subject to regulation of its operations by governmental agencies including the U.S. Nuclear Regulatory Commission (NRC) and the Illinois Emergency Management Agency (IEMA). Additionally, the NRC relies on licensees to be self-regulated.  Federal and state inspectors from the NRC and Nuclear Facility Division of IEMA are based at the Station to conduct safety inspections and receive reports of nuclear safety issues, among other things. Nuclear operators such as Plaintiff and his crew are required to be licensed and undergo periodic training to maintain their licenses.

14.     The NRC and federal regulations require U.S. nuclear plants to have Corrective Action Programs, a system by which a utility finds and fixes problems at the plant.  It includes a process for evaluating the safety significance of the problems, setting priorities in correcting the problems, and tracking them until they have been corrected.

15.     An Issue Report (IR) is a written notification of a safety issue entered into the plant's Corrective Action Program and one of the ways safety concerns are reported to the NRC. The Station was required at all times to have in place a Corrective Action Program, a system for finding, evaluating, and fixing safety problems at the Nuclear Station.  Under NRC policies,

procedures and inspection practices in place at the Station, IRs implicating actual or potential regulatory violations were  reviewed by the NRC as a matter of course.

## VI.        PROTECTED ACTIVITIES

### A. **First OSHA Complaint Protected Activity (June to December 2015):**

16.     On or about April 13, 2015, Plaintiff directly reported to the NRC via Rob Murray safety and regulatory violations in reference to IR 2484352.  This IR which was one of the three ongoing issues he reported to HR eventually contributed to and/or resulted in the NRC issuing a Violation of Technical Specifications, as documented in the Quad Cities Nuclear Power Plant ("NPP") NRC Inspection Report dated July 30, 2015.

17.     On June 15, 2015, Plaintiff's crew underwent training for requalification of their NRC license. The training involved a simulated nuclear accident referred to as an Out-of-the-Box evaluation, (OBE). During the debriefing discussion following the simulation, the new Operations Director Hal Dodd gave a directive to the crew to wait for an indefinite period of time before taking remedial action in the event of an actual emergency.  When asked by a crew member, Dodd specifically directed the crew to wait for the reactor to depressurize 50 pounds.

18.      Dodd's directive was flawed, dangerous and actually or potentially unlawful in the nuclear emergency environment under NRC rules, regulations, orders and/or guidelines. Said directive would require the crew to unnecessarily wait to take action, during which time adequate reactor core cooling could not be assured.

19.     Based upon his training, education and NRC licenses, Plaintiff reasonably believed that Dodd's directive increased the risk of a core melt sequence and uncontrolled release of radiation, thereby endangering the Station, the surrounding community, and the environment.

20.     After learning that Dodd intended to require Plaintiff to write an unsafe remediation plan, he met with Site VP Darin on June 16, 2015 and reported his concerns that Dodd's directive to wait before remedial action was dangerous, flawed and therefore actually or potentially contrary to NRC rules and regulations.  Darin said he would speak with Dodd.

21.     On or about June 16, 2015, Dodd directed Plaintiff to write a remediation plan directing his crew to follow said directive despite it being dangerous, flawed and therefore actually or potentially contrary to NRC rules and regulations.  Plaintiff refused to do so or to otherwise participate in the actual or potential violation of NRC rules and regulations.

22.     On or about June 17, 2015, a Training Instructor informed Plaintiff and his crew that Dodd had directed him to suppress critical examination information from the OBE.  Based upon this information and upon his own observations, Plaintiff reasonably believed that Dodd was bullying and intimidating his crew contrary to NRC rules and standards mandating ExGen to insure a Safety Conscious Work Environment ("SCWE").

23.     On or about June 18, 2015, a second debriefing was convened.  Dodd falsely claimed that he had not given Plaintiff and his crew any directive to wait before responding in an emergency situation.  Dodd became angry and threatened Plaintiff with words to the following effect: "I'm warning you, I don't want to hear about the 50 pounds again."

24.     As a result of Dodd's directive and Station management's inconsistent statements, licensed operators other than Plaintiff were or would be unclear or confused as to the timing of the appropriate response in the event of an emergency.

25.     To resolve the confusion and lack of clarity, Plaintiff stated to management that he would submit an Issue Report.  He also notified ExGen's Human Resources Department (hereafter "HR") regarding the issue.

26.     On June 23, 2015, Plaintiff initiated Issue Report 2518572 ("Lead Evaluator's Flawed Direction Left Unchecked by Training") documenting his nuclear safety concerns relating to the June 2015 simulated nuclear accident.  This IR 2518572 also identified his concerns regarding the qualifications of non-licensed and/or non-certified Lead Evaluators in actual or potential violation of 10 CFR Parts 50 and 54.

27.     On June 24, 2015, Plaintiff reported to HR his concerns related to the OBE, Dodd's behaviors, and ongoing Issue Reports, including Issue Report 2484352, NRC Questions RCIC MOV 1-1301-61 Op Eval EC 401570. When HR asked Plaintiff if he intended to follow through on this and his other IRs, he informed them that he did.  These three ongoing concerns Plaintiff reported at the plant were all were actual or potential regulatory violations including under 10 CFR 50.36 Technical Specifications, and Appendix A and B to Part 50).  They were referred to in Plaintiff's August 6, 2015 NRC allegation and each was referenced in his August 13, 2015 email to the NRC.

28.     On August 6, 2015, Plaintiff filed his SCWE and regulatory concerns with the NRC. He stated:

> Nuclear safety is dependent upon the training and qualifications of licensed operators.  I initiated IR 2518572 *Lead Evaluator's Flawed Direction Left Unchecked by Training*, based on compelling evidence our training department had been intimidated and suppressed, and as a result, they were, in effect, negligent and irresponsible -compromising the integrity of our accredited Licensed Operator Training and allowing negative direction to be propagated.

Plaintiff also informed his management of his NRC claim.

29.     On August 24, 2015, Plaintiff initiated IR 2545522 ("Response Propagates Flawed Directive") after he discovered a conflicting directive regarding the June 2015 OBE.

B. **Second OSHA Complaint Protected Activity (December 2015 to April 2017):**

30.    On December 16, 2015, Plaintiff filed a complaint with OSHA reporting the retaliation against him by ExGen, as described above and below. OSHA informed ExGen of Plaintiff's complaint.

31.    After Plaintiff was involuntarily reassigned to the Training Department in September 2015, he identified several nuclear safety concerns and potential noncompliance with regulations.

32.    Based on his knowledge, training, experience, and expertise, he reasonably believed that his concerns implicated nuclear safety and actual or potential regulatory violations. Plaintiff documented these concerns and reported them in a series of IRs and reports to the NRC during the period from April through October 2016.

33.    On April 15, 2016, Plaintiff initiated IR 2656377 ("Reactor Core Isolation Cooling Degraded Condition Was Inappropriately Evaluated"). This IR identified Corrective Action Program failures allowing a degraded Primary Containment Isolation Valve and safety system to be placed in service, an actual or potential regulatory violation.  He also communicated these concerns to the NRC, including by emails dated April 28, 2016 and May 27, 2016.  This IR validated the concerns identified in IR 2484352 that were shared by the NRC Senior Resident Inspector.

34.    On August 29, 2016, Plaintiff initiated IR 2709786 (Buried Pipe: DGCWP/RHRSW Common Suction Piping Degradation). This IR exposed the failure to take corrective actions in response to the progressive fouling of all essential cooling water piping at the Station, a condition first identified by the NRC in 2002 but still not fully remediated. Plaintiff reported in the IR that the current level of degradation in the piping had impaired the ability of safety systems to mitigate a nuclear accident, thereby threatening the health and safety

8

of the public, and in actual or potential regulatory violations, including of 10 CFR 50.36

Technical Specifications, Appendices A and B to Part 50, and Part 54 License Renewal.

35.     On September 14, 2016, Plaintiff followed up on his concern and reported actual

or potential regulatory violations and inconsistencies in ExGen's response to IR 2709786, and to

the on-site NRC Problem Identification and Resolution team.

36.     On October 7, 2016, Plaintiff expanded further on IR 2709786 as prompted by

the NRC. Plaintiff was prompted by the NRC during a conference call to write IR 2725625

(Degraded Piping Does Not Satisfy Single Failure Criterion), which implicated actual or

potential regulatory violations.

37.     On October 28, 2016, Plaintiff initiated IRs related to the Ultimate Heat Sink, a

system for assured water supply and atmospheric conditions to absorb reactor decay heat.  This

concerned essential functioning for  reactor shutdown following a design-basis accident. A

design-basis accident is a postulated accident that a nuclear facility must be designed and built to

withstand to ensure public health and safety. Plaintiff filed the following related IRs:

• IR 2734054, UHS: Questionable Design and Structural Integrity

•  IR 2734057, UHS: Potential Inadequate Technical Specifications (NRC
   Allegation No. RIII-17-A-0001)

• IR 2734059, UHS: Unanalyzed Ice Effects

• IR 2734060, UHS: Dam Failure Assumptions

The actual or potential regulations violated in the above matters included but were not limited to

10 CFR §50.36 Technical Specifications, Appendices A and B to Part 50, Parts §50.65, §50.72,

and §50.73, Parts 51 and 54, and related NRC Orders and Commitments.

38.     On November 1, 2016, Plaintiff emailed Site VP Darin, reporting and

documenting acts of discrimination, retaliation and wrongdoing by Shift Operations Supervisor

9

Brian Wake. Plaintiff reported that Wake had passed a crew member who had actually failed a "Critical Task" during a simulator evaluation.  Yet Wake had wrongly and improperly failed Plaintiff on the same evaluation. Passing an employee who actually failed a "Critical Task" was a violation of 10 CFR Part 55.

39.     On November 2, 2016, Plaintiff emailed the Operations Training Manager requesting training documents to support his November 1, 2016 report and critical tasks that were missed in a required NRC regulated Licensed Operator Simulator Evaluation.

40.     Plaintiff filed a complaint for discrimination and retaliation with OSHA on April 28, 2017 based on the ongoing retaliation by ExGen.

### VII.     ADVERSE ACTIONS

**A.  Adverse Actions under First OSHA Complaint (June to December 2015):**

41.     Two days after Plaintiff initiated his IR regarding the unsafe emergency directive, and the day after he informed HR he intended to pursue his IRs, on June 25, 2015 ExGen removed Plaintiff's security clearance, inactivated his NRC license, placed him on suspension.

42.     ExGen also required Plaintiff to submit to a psychological evaluation.  An ExGen manager informed him this was for having submitted "an emotionally-driven IR."

43.     This statement directly tied these adverse actions to Plaintiff's filing of IR 2518572.

44.     After being forced to submit to the psychological evaluation, Plaintiff was cleared to return to work on July 9, 2015.

45.     By August 6, 2015, despite being psychologically cleared, ExGen still had not allowed Plaintiff to return to work.

46.     ExGen did not restore Plaintiff's nuclear security clearance until August 18, 2015, resulting in an eight-week gap in his security clearance that ExGen reported to the nuclear

10

industry Personnel Access Database (PADS).  This PADS report adversely affected Plaintiff's work record.

47.     On August 18, 2015, Plaintiff reported to ExGen's Byron Nuclear Generating Station for reprocessing of his security clearance.  The Byron HR manager pressured Plaintiff to agree that the retaliatory adverse actions against him were simply a "misunderstanding". Plaintiff refused.

48.     When Plaintiff returned to work on August 19, 2015, ExGen demoted him to Unit Supervisor, a position of substantially less authority and which reports to a Shift Manager. Even with this demotion, ExGen still did not permit Plaintiff to actually perform in that role.

49.      ExGen prevented Plaintiff from completing the training necessary to return to Operations in the Operations Unit Supervisor position.

50.      On September 16, 2015, ExGen stripped Plaintiff of his remaining management authority and reassigned him to the Training Department, where he had no supervisory authority and few assignments.

51.     In the Training Department from September 2015 onward, Plaintiff was isolated in small windowless room in a separate building away from Operations with no computer.  His duties included shredding paper.

52.     After roughly 5 months in that room, Plaintiff was moved to a cubicle, referred to as "The Cubical of Shame" by some coworkers.

53.     Plaintiff had no supervisory responsibilities and was given little to do. Occasionally, Plaintiff was asked to review or approve training related material, which led to the discovery of additional instances of noncompliance by ExGen.

B. **Adverse Actions under Second OSHA Complaint (November 2016 to February 2018):**

54.     On November 2, 2016, ExGen revoked Plaintiff's security clearance and removed him from his position.

55.     ExGen terminated Plaintiff's employment on November 2, 2016 by use of an involuntary leave without pay.

56.     Since November 2, 2016, ExGen has refused to allow Plaintiff to take the annual training evaluations and removed him from the Licensed Operator Requalification Training (LORT) Program that is required by the NRC to maintain his Senior Reactor Operator license.

57.     Plaintiff did not receive wages from ExGen between November 2, 2016 and November 13, 2017.

58.     In January 2017, ExGen informed Plaintiff that if he desired to return to work at ExGen, he would be required to formally apply for open positions the same as a new hire.

59.     ExGen made consideration of any application Plaintiff submitted subject to his signing of a commitment to change unspecified "inflexible behaviors."  Plaintiff proposed instead to sign a commitment to follow company policy and all applicable laws.  ExGen rejected Plaintiff's proposal and refused to consider his applications for any positions with the company.

60.     In November 2017, ExGen reinstated Plaintiff to employment, but into a different position located more than 100 miles from the Quad Cities Station, and with substantially less responsibility than attendant to his former position. He had no management responsibility, no supervision of subordinates, nor any licensed nuclear plant responsibilities,

61.     In this new position, Plaintiff was not in a first hand direct position to identify and report safety issues in plant operations.

12

62.     On or about July 25, 2019, ExGen informed the NRC that Plaintiff no longer has a need for maintaining his operating license, thus causing him the loss of his Senior Reactor Operator License and the significant related duties.

63.     Up until the time OSHA dismissed Plaintiff's second complaint in a letter dated February 12, 2018, ExGen was continuing to inflict upon him the adverse actions described above as to his involuntary assignments and reassignments, and the resulting removal of his prior significant duties and reactor operation responsibilities.

## VIII.  DAMAGES SUFFERED BY PLAINTIFF CAUSED BY EXGEN'S ADVERSE ACTIONS

64.     ExGen's adverse actions against the Plaintiff from 2015 up to the present have caused him economic damages for loss of income, wages and benefits.

65.     Additionally, ExGen's adverse actions against Plaintiff will cause him future economic damages for loss of income, wages and benefits.

66.      Defendant's adverse actions against Plaintiff from 2015 up to the present have also caused him to suffer non-economic damages for emotional distress, humiliation, depression, anxiety, and mental pain and suffering.

67.     ExGen's adverse actions against the Plaintiff are and have been reprehensible, intentional, willful, and malicious and/or in reckless disregard for Plaintiff's rights, as described below.

68.     The facts and circumstances of ExGen's adverse actions toward Plaintiff show that their purpose was to silence him and/or damage his reputation and credibility so that his complaints and disclosures about safety would not be believed by state and federal regulators.

69.     ExGen was aware of Plaintiff's financial and emotional vulnerability should he persist with his safety complaints and disclosures.

13

70.     The duration and frequency of ExGen's misconduct was not for an isolated instance, but was repeated over a duration of more than a year, and is still continuing.

71.     The harm ExGen inflicted upon Plaintiff through this protracted misconduct inflicted emotional and mental distress upon him, as a well as financial hardship.

72.     ExGen tried to conceal its misconduct against the Plaintiff by suggesting that mental problems contributed to his determination to pursue his safety complaints and disclosures, and attempting to disguise the true motives for that misconduct by false and fictitious explanations and pretexts that ExGen was acting in the best interest of the company, fellow employees and the public.

73.     ExGen's misconduct toward Plaintiff should not be tolerated but should instead be punished by an award of punitive damages such as to discourage it and other employers from similar misconduct.

### COUNT I - 42 U.S.C. §5851

### Retaliation in Violation of Energy Reorganization Act
### under Plaintiff's First OSHA Complaint

74.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here, and specifically those paragraphs as to his protected activity and adverse actions regarding his first OSHA complaint, said "complaint" consisting of the written complaint itself and all information provide to or acquired by OSHA during its investigation up until the time said first OSHA complaint was dismissed by letter dated April 18, 2017 (hereafter "first OSHA complaint").

75.     ExGen is a licensee of the Nuclear Regulatory Commission (NRC), which is an independent agency of the United States government tasked with protecting public health and safety related to nuclear energy.

14

76.     The NRC's functions regarding Quad Cities Nuclear Power Station include overseeing reactor safety and security, administering reactor licensing and renewal, licensing radioactive materials, radionuclide safety, and overseeing the storage and security of spent fuel.

77.     The Quad Cities Generating Station is licensed by the NRC as a two-unit nuclear power plant located on the Mississippi River. In 2004, the U.S. Nuclear Regulatory Commission (NRC) approved a 20-year license extension for both reactors at this plant.

78.     On June 2, 2016, Exelon announced its intentions to close Quad Cities Station as of June 1, 2018 due to the plant's profitability.

79.     On December 14, 2016, Exelon announced it would keep the Station open due to Illinois taking legislative action reiterating its commitment and support of clean and safe nuclear power.

80.     The Energy Reorganization Act's whistleblower protections prohibited ExGen from terminating or otherwise retaliating against Plaintiff in violation of 42 U.S.C. §5851(a)(1). The Act provides:

> No employer may discharge any employee or otherwise discriminate against any employee with respect to his compensation, terms, conditions, or privileges of employment because the employee (or person acting pursuant to a request of the employee) –
>
> (A) notified his employer of an alleged violation of this chapter or the Atomic Energy Act of 1954 (42 U,S.C, 2011 et seq,);
>
> (B) refused to engage in any practice made unlawful by this chapter or the Atomlc Energy Act of 1954, if the employee has identified the alleged illegality to the employer;
>
> (C) testified before Congress or at any Federal or State proceeding regarding any provision (or proposed provision) of this chapter or the Atomic Energy Act of 1954;
>
> (D) commenced, caused to be commenced, or is about to commence or cause to be commenced a proceeding under this chapter or the Atomic Energy Act of 1954, as amended, or a proceeding for the administration or enforcement of any

requirement imposed under thls chapter or the Atomic Energy Act of 1954, as amended;

(E) testified or is about to testify in any such proceeding or;

(F) assisted or participated or is about to assist or participate in any manner in such a proceeding or in any other manner in such a proceeding or in any other action to carry out the purposes of this chapter or the Atomic Energy Act of 1954, as amended.

81.     Within the terms of the ERA whistleblower protection provisions as to his first OSHA complaint, Plaintiff engaged in the protected activities he has alleged above.

82.     ExGen was actually and constructively aware of all such protected activities under Plaintiff's first OSHA complaint.

83.     ExGen subjected Plaintiff to the listed ongoing adverse actions under his first OSHA complaint.

84.     Plaintiff's protected activities were a contributing factor in said adverse actions under his first OSHA complaint.

85.     Plaintiff suffered economic and non-economic damages as a result of those adverse actions under his first OSHA complaint.

86.     Plaintiff's action de novo in this court upon his first OSHA complaint is timely because it has been filed in this court within five years of OSHA's dismissal on April 18, 2017 based upon his statement of intent to pursue his action in district court, and within five years of all retaliatory adverse actions alleged herein.

### COUNT II - 42 U.S.C. §5851
### Retaliation in Violation of Energy Reorganization Act
### Under Plaintiff's Second OSHA Complaint:

87.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here, and specifically those paragraphs as to his protected activity and adverse actions regarding his second OSHA complaint, said "complaint" consisting of the written complaint itself and all

information provided to or acquired by OSHA during its investigation up until the time said second OSHA complaint was dismissed by letter dated February 12, 2018 (hereafter "second OSHA complaint").

88. Within the terms of the ERA whistleblower protection provisions as to his second OSHA complaint, Plaintiff engaged in the protected activities alleged above.

89. ExGen was actually and constructively aware of all such protected activities under Plaintiff's second OSHA complaint.

90. ExGen subjected Plaintiff to the ongoing adverse actions alleged under his second OSHA complaint.

91. Plaintiff's protected activities were a contributing factor in said adverse actions under his second OSHA complaint.

92. Plaintiff suffered the economic and non-economic damages alleged above as a result of those adverse actions under his second OSHA complaint.

93. Plaintiff's action de novo in this court upon his second OSHA complaint is timely because it is filed in this court following its pendency without resolution in the U.S. Department of Labor for over two years.

## COUNT III - STATE LAW CLAIM - 740 ILCS 174/20

### Violation of Illinois Whistleblower Act for Refusal to Participate in Unlawful Activity

94. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

95. To protect residents from the potentially harmful effects of ionizing radiation and accidents involving a release of radiation from the Quad Cities Generating Station, the Illinois Emergency Management Agency (IEMA) Division of Nuclear Safety, in conjunction and partnership with the NRC, monitors its nuclear power reactors; ensures public and employee safety through inspections and licensing activities.

17

96.     In the event of a radiological accident at the Station or any incident involving the actual or potential release of radiation to the environment, IEMA requires activation of the Illinois Plan for Radiological Accidents (IPRA).

97.     IPRA is a cooperative effort between state agencies, local governments, the NRC and private organizations designed to ensure any radiological accident is quickly and accurately evaluated and the appropriate response to and recovery from any accident are effectively coordinated.

98.     Federal and state inspectors from the NRC and the Nuclear Facility Division of IEMA are located at the Station to conduct safety inspections and receive reports of nuclear safety issues, among other things.

99.     Retaliation against ExGen nuclear power station employees is prohibited by NRC regulations codified in 10 CFR Parts 19, 30, 40, 50, 60, 61, 63, 70, 71, 72, 76, and 150.

100.    It is protected activity under NRC regulations 10 CFR § 30.7(a) and § 50.7(a) for ExGen employees to provide "the Commission or his or her employer information about alleged violations of either of the statutes [the Atomic Energy Act or the Energy Reorganization Act] *** or possible violations of requirements imposed under either of those statutes".

101.    It is protected activity under NRC regulations 10 CFR § 30.7(a) and § 50.7(a) for ExGen employees to "[r]efus[e] to engage in any practice made unlawful under either of the statutes *** or under these requirements if the employee has identified the alleged illegality to the employer".

102.    The NRC mandates that ExGen is responsible for achieving and maintaining a work environment which is conducive to the reporting of safety and regulatory concerns of its employees without fear of retaliation.

103.    The NRC requires ExGen to comply with NRC policies "Freedom of Employees in the Nuclear Industry To Raise Safety Concerns Without Fear of Retaliation" (61 FR 24336), NRC "Safety Culture Policy Statement" (76 FR 34773, June 14, 2011), and "Regulatory Issue Summary 2005-18".

104.    The NRC requires ExGen to maintain a Safety Conscious Work Environment ("SCWE") in accordance with NRC-SECY-04-0111"Recommended Staff Actions Regarding Agency Guidance in the Areas of Safety Conscious Work Environment and Safety Culture" (August 30, 2004).

105.    The NRC requires ExGen to refrain from any action or policy that chills an employee's willingness to identify safety concerns and to elevate those concerns to ExGen senior management and/or the NRC.

106.    ExGen is also required to comply with Confirmatory Order EA-02-124 because of prior violations of 10 CFR §50.7, making further violations also subject to enforcement actions and/or prosecution.  Said order provided in pertinent part:

> The enclosed Confirmatory Order is being issued to Exelon Generation Company, LLC, (Exelon) and AmerGen Energy Company, LLC (AmerGen) (Licensees) in order to confirm certain commitments, as set forth in Section V of the Order, to assure the Licensees' compliance with the Commission's employee protection regulations, 10 CFR 50.7.
> ***
> Pursuant to Section 223 of the Atomic Energy Act of 1954, as amended, any person who willfully violates, attempts to violate, or conspires to violate, any provision of this Order shall be subject to criminal prosecution as set forth in that section. Violation of this Order may also subject the person to civil monetary penalties.

107.    ExGen is required to comply with10 CFR § 30.7(c) and § 50.7, both provide:

> A violation of paragraph (a), (e), or (f) of this section by a Commission licensee, an applicant for a Commission license, or a contractor or subcontractor of a Commission licensee or applicant may be grounds for—(1) Denial, revocation, or suspension of the license. (2) Imposition of a civil penalty on the licensee,

applicant, or a contractor or subcontractor of the licensee or applicant. (3) Other enforcement action.

108.    Defendant ExGen is an "employer" and Plaintiff is an "employee" of ExGen within the meaning of the Illinois Whistleblower Act, 740 ILCS 174/5.

109.    As alleged more fully above, on June 17, 2015 Plaintiff was directed by ExGen management to write a remediation plan instructing his crew to follow the directive to delay emergency action despite it being unsafe and contrary to NRC rules and regulations.

110.    Plaintiff reasonably believed that following management's directive to write said remediation plan would constitute participation in an activity that would violate NRC rules and regulations.  Plaintiff reasonably believed said directive by a non-licensed/non-certified senior manager was an actual or potential violation of 10 CFR Parts 50 and 55.

111.    Plaintiff's refusal to write said remediation plan was protected activity under 740 ILCS 174/20, which provides that an "employer may not retaliate against an employee for refusing to participate in an activity that would result in a violation of a State or federal law, rule, or regulation".

112.    Due to ExGen's violations of his rights under this count, Plaintiff suffered and will continue to suffer all of the economic and non-economic damages alleged above.

**COUNT IV - STATE LAW CLAIM - 740 ILCS 174/15(b)**

**Violation of Illinois Whistleblower Act for Reports of Regulatory Violations to the NRC**

113.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

114.    As described above in paragraphs numbered 16, 27, 28, 32, 35 and 36, Plaintiff reported to the NRC what he reasonably believed to be actual or potential violations of NRC statutes, rules, regulations, orders and/or guidances on numerous occasion, including but not

limited to April 13, 2015, August 6, 2015, August 13, 2015, September 14, 2016 and October 7, 2016.

115.     On August 6, 2015, Plaintiff separately reported to the NRC that he had been retaliated against for raising nuclear safety concerns. Such retaliation violates 10 CFR § 30.7 and § 50.7, and NRC SCWE requirements for a Safety Conscious Work Environment.

116.     ExGen violated 740 ILCS 174/15(b) by taking retaliatory adverse actions against the Plaintiff because he made said reports to the NRC and OSHA.

117.     740 ILCS 174/15(b) provides that an "employer may not retaliate against an employee for disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of a State or federal law, rule, or regulation."

118.     Due to ExGen's violations of his rights under this count, Plaintiff suffered and will continue to suffer all of the economic and non-economic damages alleged above.

### COUNT V - STATE LAW CLAIM – RETALIATORY DISCHARGE

**Common Law Retaliatory Discharge for Reporting Health and Safety Violations Not Actionable under State or Federal Whistleblower Statutes**

119.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

120.      The Illinois Whistleblower Act 740 ILCS 174/15(b) does not protect employees who make internal reports to company managers about threats to public health and safety or violations of rules and regulations.

121.     The Illinois Whistleblower Act 740 ILCS 174/15(b) does not protect employees who make safety reports to government agencies unless said safety reports are of violations of state or federal laws, rules or regulations.

122.     The Energy Reorganization Act, 42 U.S.C. §5851, does not protect disclosures to the employer or to the NRC that do not specifically and definitively relate to nuclear safety and/or to violations of NRC statutes, rule, regulations, orders or guidances.

123.      At all material times, it was, and it remains the clearly mandated public policy of the State of Illinois to promote and preserve federal and state requirements for the safe operation of nuclear power plants within the state, to provide for the health and safety of Illinois' citizens and environment.

124.     It is the clearly mandated public policy of the State of Illinois to promote and preserve NRC regulations and guidelines encouraging employees to report internally to their managers conditions that they reasonably believe constitute threats to public health and safety or actual or potential violations of NRC rules and regulations.

125.     It is also the clearly mandated public policy of the State of Illinois to encourage employees to report internally to their managers conditions that they reasonably believe constitute threats to public health and safety irrespective of whether or not said health and safety concerns indicate actual or potential violations of NRC enforced statutes, or NRC rules or regulations.

126.     Plaintiff engaged in activity protected by Illinois common law in making the above described internal reports regarding health and safety threats and regulatory violations to his managers and Human Resources Department.

127.     ExGen terminated Plaintiff's employment through use of an involuntary unpaid leave in retaliation for said internal reports regarding health and safety threats, and regulatory violations.

128.     Due to ExGen's violations of his rights under this count, Plaintiff suffered and will continue to suffer all of the economic and non-economic damages alleged above.

### COUNT VI - STATE LAW CLAIM – RETALIATORY DISCHARGE

**Common Law Retaliatory Discharge for Reporting Gross Mismanagement and Abuse of Authority**

129.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

130.     The Illinois Commerce Commission, the Illinois Power Agency, the Illinois Environmental Protection Agency, and the Department of Commerce and Economic Opportunity issued a report dated January 5, 2015 titled "Potential Nuclear Power Plant Closings in Illinois" (the Report), which addressed the issues identified by Illinois House Resolution 1146 of the 98th General Assembly for 2013-2014, concerning the availability of affordable energy and the environmental risks of a premature closure of existing nuclear power plants in Illinois, including increased greenhouse gas emissions.

131.     Neither the Illinois Whistleblower Act nor the Energy Reorganization Act protect employees who make internal reports to company managers or external reports to government agencies of gross mismanagement, or abuse of authority against employees, that threaten the continuing efficiency, viability and uninterrupted supply of nuclear power stations, and/or the availability of nuclear power as an affordable and clean source of alternative energy to reduce greenhouse gas emissions.

132.     It is the clearly mandated public policy of the State of Illinois to encourage employees to report internally to their managers and to state and federal nuclear power regulators, gross mismanagement and abuse of authority that threaten the continuing efficiency, viability and uninterrupted supply of nuclear power stations, and/or the availability of nuclear

power as an affordable and clean source of alternative energy to reduce greenhouse gas emissions.

133.    Apart from Plaintiff's disclosures to the employer and to the NRC that specifically and definitively related to nuclear safety and/or to violations of NRC statutes, rule, regulations, orders or guidances, his complaints to ExGen management and the NRC constituted complaints that the Station was being grossly mismanaged and employees were being subjected to abuses of authority that threatened the continuing viability and operations of the Station.

134.    ExGen terminated Plaintiff's employment through use of an involuntary unpaid leave in retaliation for his internal reports to management and external reports to the NRC concerning gross mismanagement of the Station.

135.    ExGen terminated Plaintiff's employment through use of an involuntary unpaid leave in retaliation for his internal reports to management and external reports to the NRC concerning the company's abuses of authority against him in (a) forcing him to submit to a psychological examination as described above in paragraph 42, (b) failing him on a critical task simulation as described above in paragraph 38, (c) requiring him to apply as a new hire in order to return to work as described above in paragraph 58, and (d) confining him to the "Cubicle of Shame" as described above in paragraph 52.

136.    Due to ExGen's violations of his rights under this count, Plaintiff suffered and will continue to suffer all of the economic and non-economic damages alleged above.

## VIII.        PRAYER FOR RELIEF

Plaintiff prays this court to enter judgment in his favor and against Defendant ExGen as follows:

A.  Under all claims and counts, all wages and benefits Plaintiff would have received but for ExGen's unlawful employment practices, including pre-judgment interest as permitted by law, in the minimum amount of $200,000 with the exact amount to be determined by a jury;

B.  Under all claims and counts, reinstatement to Plaintiff's former position as Shift Manager at the Quad Cities Station, with the same seniority status that he would have had but for Defendant's violations, or in lieu of reinstatement, an order of front pay and benefits for a reasonable period of time, in the minimum amount of $1,000,000 with the exact amount to be determined by a jury;

C.  Under all claims and counts, compensatory damages, including damages for emotional distress, humiliation, harm to reputation, enjoyment of life and work, and all other non-economic harms in the minimum amount of $1,000,000 with the exact amount to be determined by a jury;

D.  Under his federal and state statutory whistleblower claims, attorneys' fees and costs, including expert witness costs and fees;

E.  Under all claims and counts, pre and post-judgment interest;

F.  Under his federal and state statutory whistleblower claims, expungement of written warnings, reprimands, negative performance appraisals and other derogatory information and references which have been placed in the Plaintiff's personnel file;

G.  Under his federal statutory whistleblower claims, posting of a notice to Defendant's employees indicating that the Defendant has been ordered to comply with the ERA's anti-retaliation provisions, and to make appropriate non-economic restitution of the Plaintiff's reputational interests;

H.  Under the common law retaliatory discharge claim, punitive damages in the minimum amount of $9,000,000 with the exact amount to be determined by a jury; and

I.  Such other and further relief as the Court deems appropriate.

### IX.  JURY DEMAND

Plaintiff, Brian Magnuson, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

RESPECTFULLY SUBMITTED,

Michael Kanovitz
Attorney for Brian Magnuson

Michael I Kanovitz
Frank Newell
LOEVY & LOEVY
311 N. Aberdeen Street
3rd Floor
Chicago, IL 60607
Tel: (312) 243-5900/Fax 312-243-5902
Email: mike@loevy.com

Stephani L. Ayers, Esq., (*pro hac vice* to be filed)
Thad M. Guyer, Esq. (*pro hac vice* to be filed)
T.M. GUYER AND AYERS & FRIENDS, P.C.
116 Mistletoe St., P.O. Box 1061
Medford, OR 97501
Tel: (202) 417-3910/Fax: 1 (888) 866-4720
Email: thad@Guyerayers.com/stephani@GuyerAyers.com

John A. Kolar, Esq. (*pro hac vice* to be filed)
GOVERNMENT ACCOUNTABILITY PROJECT, INC.
1612 K Street, NW
Suite 1100
Washington, DC 20006
Tel: (202) 408-0034/Fax (202) 408-9855

Attorneys for Plaintiff