UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| **BRIAN MAGNUSON,**<br><br>     Plaintiff,<br><br>vs.<br><br>**EXELON CORPORATION**, a Publicly Traded Company, and **EXELON GENERATION COMPANY, LLC**<br>     Defendants | Case No.: 4:21-cv-04142-SLD-JEH<br><br>**OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>**JURY TRIAL DEMAND** |

Government Accountability Project, Inc.
Washington, DC

and

Stephani L. Ayers, Esq.
Thad M. Guyer, Esq.
T.M. Guyer and Ayers & Friends, P.C.
116 Mistletoe St., P.O. Box 1061
Medford, OR 97501
Tel: (202) 417-3910

and

Michael I Kanovitz
Frank Newell
Loevy & Loevy
311 N. Aberdeen Street, 3rd Floor
Chicago, IL 60607
Tel: (312) 243-5900

Attorneys for Plaintiff

Defendants demand a full do-over of the Court's decision granting Plaintiff the right to file his Supplemental Complaint.  They are not entitled to it.  This Court has already decided that Plaintiff has plausibly plead that his use of whistleblower reporting channels resulted in unlawful adverse actions against him.[1]

**PART I.  ANALYSIS OF THE COMPLAINT AND MOTION TO DISMISS**

**(1) <u>Already Adjudicated Issues:</u>** Every issue save two raised by Defendants pertaining the Sarbanes Oxley claim in the Motion to Dismiss was already raised in their previous Opposition to Plaintiff's Motion to File Supplemental Complaint.[2]  Those issues and the law that applies to the present

---

[1] The Supplemental Complaint identifies two internal reporting channels (ExGen's reporting system and EXC's security office), one external reporting channel (the NRC), and one whistleblower protection channel (the DOL).  ExGen and every NRC licensee is required to operate an employee concerns program (ECP) under rules prescribed by the NRC under the Energy Reorganization Act and Atomic Energy Act. ExGen's ECP is essentially required to protects employee access to three channels for reporting nuclear safety issues: (1) internal channels to the employer, (2) external channels to NRC or DOE "proceedings", or (3) broad public channels in reporting to "Congress or at any Federal or State proceeding". See NRC's "Policy Statement for Nuclear Employees Raising Safety Concerns Without Fear of Retaliation". (See Federal Register Notice, May 14, 1996 (Volume 61, Number 94)).

[2] The two new arguments are: (1) " Exelon Corporation is the wrong party for this employment dispute. *** Exelon Corporation was the mere parent company of ExGen. It has no employees." (2) "At most, Magnuson alleges that he was temporarily laid off by ExGen. That allegation falls far short of a common law retaliatory discharge claim under Illinois law." (Motion to Dismiss, pp. 2-3).

**OPPOSITION TO MOTION TO DISMISS - 1**

motion, have already been decided against the Defendants by this Court's February 1, 2022 order (Doc. # 78), at p. 4:

> The Court has reviewed the proposed supplemental complaint, the Plaintiff's arguments in support of his request for leave to file it, and the Defendant's arguments of futility in support of its request that the Plaintiff's Motion be denied. It is far from certain that the proposed supplemental complaint would not survive a motion to dismiss. See Johnson v. Dossey, 515 F.3d 778, 780 (7th Cir. 2008) (stating a district court "need not allow the filing of an amended complaint . . . if it is clear that the proposed amended complaint is deficient and would not survive a motion to dismiss"). ***Significantly, federal courts require only notice pleading and the motion to dismiss standard is one of facial plausibility, not probability***. See Bausch v. Stryker Corp., 630 F.3d 546, 559 (7th Cir. 2010) ("In deciding whether a complaint can survive a motion to dismiss, we have consistently said: As a general rule . . . notice pleading remains the standard") (internal quotation omitted); Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) ("A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged"). ***Here, if anything, the Plaintiff has included more than necessary, and the Defendant demands too much.***

(Emphasis added). That order was entered upon full consideration, even quotation from the Motion to File Supplemental Judgment, the Opposition thereto, and the Reply. All are literally incorporated by reference in that Order, and hence in this opposition. This table depicts issues previously raised or merely waved-off.

| Argument from Opposition to File Supplemental Complaint (Doc. #75) | Page in Opp. to Supp. Compl. (Doc. #75) | Page in Mo.Dismiss (Doc. #92) |
|---|---|---|
|  |  |  |
| B. The Proposed Supplemental Complaint Fails to Plausibly Allege a SOX Violation | 8 | 7 |
| 1. Plaintiff Fails To Allege a Report of or Subjective Belief That Fraud was Occurring | 9 | 8 |

OPPOSITION TO MOTION TO DISMISS - 2

| | | |
|---|---|---|
| 2. Plaintiff Fails To Allege That Any Belief That Fraud was Occurring Was Objectively Reasonable | 12 | 12 |
| The proposed supplemental complaint asserts that the defendants' alleged adverse actions (commencing a "targeted investigation" of his email usage which Plaintiff found out about on June 2, 2020) occurred before he made "reports and disclosures" from June 2 to July 22, 2020 indicating ExGen made false claims to the legislature that resulted in passage of FEJA. Supp. Compl., ¶¶44-46, 71. | 13 | 3, 13 |
| Plaintiff alleges in the 2019 Complaint that as a result of making these nuclear safety reports, he was *** place[d] on involuntary unpaid leave, *** 2019 Compl., ¶¶ 41-63. | 3 | 14 |
| The new SOX claim is the only claim Plaintiff seeks to bring against Exelon Corporation. | 1-2, FN 1 | 5, FN$^3$ |

## (2) New Issues Raised

**A. Argument that EXC as a Publicly Traded Company without Employees is Insulated from SOX Liability Even if it Jointly Contributes with its Subsidiary to the Adverse Action**

Based upon the fraudulent scheme alleged in paras. 44-46, the following paragraphs of the Supplemental Complaint allege that EXC was not a passive actor, but instead was an active contributor to the adverse actions against Plaintiff:

> 72. *Defendants* attempted to coerce Plaintiff into *accepting EXC's violations of his whistleblower rights* under the ERA and NRC rules…

> 71. *Defendants* conducted a targeted investigation of Plaintiff which he learned of by an email to him from *EXC Vince Genualdi, Senior Physical Security Specialist for Exelon Corporation,* dated June 2, 2020….

---

[3] The ERA, Illinois Whistleblower Act, and Common Law Retaliatory Discharge claims were expressly pleaded only against ExGen. By contrast, the SOX claim is pleaded against both Defendants "jointly".

**OPPOSITION TO MOTION TO DISMISS - 3**

> 112. *Both Defendants* were actually and constructively aware of all such protected activities under Plaintiff's OSHA complaints and federal court complaints.
>
> 113. ExGen and EXC *have jointly and individually* subjected Plaintiff to the above listed ongoing adverse actions since June 2, 2020.

(Emphasis added). As a factual pleading matter, the Motion asserts *first*, that despite the clear language of the above four paragraphs, the Supplemental Complaint does not allege actionable wrongdoing by EXC. That fact challenge must await summary judgment proceedings. And *second*, the Motion insists that during the material times alleged in the complaint, EXC had no employees. Maybe, but because the complaint does not allege EXC had "no employees", but to the contrary identifies *the prominent EXC employee offender by name* in paragraph 71, that fact argument too must await summary judgment.[5]

---

[4] ExGen is liable as an EXC "subsidiary or affiliate whose financial information is included in the consolidated financial statements of such company". Para. 8 of the Supplemental Complaint alleges: "Defendant Exelon Corporation (EXC) is the parent company of Defendant ExGen. ExGen's financial statements and results of operation are reported to the SEC within the filings made by EXC." In its answer, "ExGen admits that prior to February 1, 2022, its financial statements and results of operation were reported to the SEC under Exelon's filings."

[5] EXC pushes its litigant privileges of factual creativity to the brink under the motion's knowledge element heading "B. Magnuson Does Not Plead That Exelon Corporation Knew He Engaged in a Protected Activity" in asserting at p. 12: "Magnuson also does not sufficiently plead the second element of a SOX whistleblower claim because he does not allege that he ever reported any alleged

OPPOSITION TO MOTION TO DISMISS - 4

As a matter of law, EXC defends that it is insulted from SOX liability no matter its role in the discrimination by its subsidiary ExGen employees against Plaintiff. The issue at bar is whether EXC *too* is liable notwithstanding Plaintiff was not an EXC employee.[6] The Supreme Court rejected a similar argument in

---

securities fraud to Exelon Corporation." That contention is, at minimum, spurious in view of these allegations in the Supplemental Complaint:

> 43. Between July 1 and 22, 2020, *Plaintiff reported to both ExGen and EXC officials* that ExGen as a subsidiary of EXC, and EXC independently through its security division, were threatening him with termination because he exported important regulatory information from his company email account to his personal email in order to provide it to his attorneys and the Nuclear Regulatory Commission (NRC), U.S. Department of Labor (DOL), and state regulators. Plaintiff reported the protected activities that involved this regulatory information directly to the Defendants and simultaneously or later with federal and state regulators."
> 
> \*\*\*
> 
> 74. After receiving no reply, Plaintiff followed up with an email to same recipients dated July 22, 2020 stating: "My understanding is that the NRC, SEC, and DOL prohibit companies from enforcing confidentiality provisions that chill the responsible flow of information that regulators and concerned parties need. *Obviously, the company's recent warnings and admonitions to me have the effect of ordering me not provide critical information and documents to regulators and law enforcement agencies directly or through my attorneys*."

(Emphasis added).

[6]ExGen is liable as a EXC "subsidiary or affiliate whose financial information is included in the consolidated financial statements of such company". Para. 8 of the Supplemental Complaint alleges: "Defendant Exelon Corporation (EXC) is the parent company of Defendant ExGen. ExGen's financial statements and results of

OPPOSITION TO MOTION TO DISMISS - 5

*Lawson v. FMR LLC*, 571 U.S. 429, 443 (2014). (Motion to Dismiss, pp. 6-7).

The *Lawson* Court discussed and held as follows:

> FMR is privately held, and maintained that §1514A protects only employees of public companies—*i.e.,* companies that either have "a class of securities registered under section 12 of the Securities Exchange Act of 1934," or that are "required to file reports under section 15(d)" of that Act. §1514A(a). *** The [First Circuit] majority agreed with FMR, however, that "an employee" refers only to employees of public companies and does not cover a contractor's own employees.
> ***
> *FMR's interpretation of the text requires insertion of "of a public company" after "an employee."* But where Congress meant "an employee of a public company," it said so: With respect to the actors governed by §1514A, the provision's interdictions run to the officers, employees, contractors, subcontractors, and agents "of such company," *i.e.,* a public company. §1514A(a).

*Id.* at 438-40. (Emphasis added). The Court majority further reasoned:

> Remarkably, the dissent attributes to Congress a strange design. Under the dissent's "narrower" construction, a public company's contractor may not retaliate against a public company's employees, academic here because the public company has no employees. *** This cannot be right— even if Congress had omitted any reference to contractors, subcontractors, or agents in §1514A, the remaining language surely would prohibit a public company from directing someone else to engage in retaliatory conduct against the public company's employees; *hiring an ax-wielder to announce an employee's demotion does not change the fact that the public company is the entity commanding the demotion.*

---

operation are reported to the SEC within the filings made by EXC." In its answer, "ExGen admits that prior to February 1, 2022, its financial statements and results of operation were reported to the SEC under Exelon's filings."

**OPPOSITION TO MOTION TO DISMISS - 6**

*Id.* at 443-44.  (Emphasis added).  The majority rejected such liability insulation for SEC registrants and filers:

> Virtually all mutual funds are *structured so that they have no employees of their own*; they are managed, instead, by independent investment advisers.  \*\*\*  Under FMR's and the dissent's reading, in contrast, §1514A has no application to mutual funds, for all of the potential whistleblowers are employed by the privately held investment management companies, not by the mutual funds themselves.

*Id.* at 450-51.  (Emphasis added.) This Court must reject that insulation, too.  The rule is clear: publicly traded companies dispatching "ax wielders" like EXC are liable.[7]  That label applies under 12(b)(6) because Plaintiff alleged EXC was indeed an ax wielder.[8]

### B. *Argument that Involuntary Leave without Pay for One Year Is Not Actionable Under Illinois Common Law*

No Illinois published decision supports this argument.  The Supplemental Complaint alleges Plaintiff "was placed on indefinite unpaid leave in November

---

[7] For a good read on how the *Lawson* Court came to discuss "ax wielders" and the George Clooney role in "Up in the Air", see Geoffrey C. Rapp, *Are SOX and Dodd-Frank Securities Law? The Answer is Up in the Air*, 45 Loy. U. Chi. L. J. 537 (2014), available at: https://lawecommons.luc.edu/luclj/vol45/iss3/2

[8] But for want of an ax wielder, the battle was lost in all three cases cited by EXC. See, e.g., *Gyrgav. Henkles & McCoy Grp., Inc.,* No. 19 C 1276, 2019 WL 3573565, at *5 (N.D. Ill. Aug. 6,2019); *Moody v. Am. Nat'l Ins. Co.*, 466 F. Supp. 3d 727, 730–31 (S.D. Tex. 2020), aff'd, 842 F.App'x 875 (5th Cir. 2021); *Lawrence v. Int'l Bus. Mach. Corp.*, No. 12cv8433(DLC), 2017 WL3278917, at *5–6 (S.D.N.Y. Aug. 1, 2017).

**OPPOSITION TO MOTION TO DISMISS - 7**

2016 (hereafter 'discharge' or 'termination')."  (Supp. Compl., para. 9). Para. 63 pleads that this adverse action continued for a year from November 2, 2016 to November 13, 2017.  Supp. Compl. para. 9 pleads as an "adverse action" that ExGen's artifice of "unpaid leave" meant *in fact* that "ExGen *terminated* Plaintiff's employment *by use of* an involuntary leave without pay". (Emphasis added).  The Supplemental Complaint re-pleads that "adverse action" within each claim for relief in paras. 61, 150, 157 and 158. The allegation of "termination" binds the Motion to Dismiss.[9]

**PART II.  THE CONTROLLING AIR21 LEGAL REGIME APPLIED**

"I keep running into the wall of 'common sense'."[10] This must have been a sentiment shared by Javaid Iqbal, a Muslim citizen of Pakistan rounded up with "more than 1,000 people with suspected links to the [9-11] attacks in particular or

---

[9] As Supp. Compl. para. 68 elaborates:

> Since July 2019, Defendants have acted with re-energized animus toward Plaintiff because of his protected activity deriving in part from the 2016 Illinois legislature's "bail out" of the company. Plaintiff has been disclosing the Defendants' persistent and material misrepresentations to the public and regulators as to the safety and financial viability of ExGen.

[10] John Sherman Myers, *Causation and Common Sense*, 5 U. Miami L. Rev. 238 (1951) Available at https://repository.law.miami.edu/umlr/vol5/iss2/4.

OPPOSITION TO MOTION TO DISMISS - 8

to terrorism in general".[11] His complaint alleged torture at the hands of New York City jailers, and Muslim racial profiling by John Ashcroft and high officials. In a bitterly denounced reversal of the Second Circuit, five justices found the complaint "implausible" on causation, rhetorically asking why Ashcroft would want to have Muslim detainee abused rather than simply and reasonably questioned. The pleaded causation, the majority held, defied "common sense". Even Mr. Iqbal's procedural right to be accorded all "reasonable inferences" could not save him. In yet another stain of racism in American jurisprudence,[12] Javaid Iqbal and hundreds of fellow Muslims ran into a wall of "common sense" erected not by the Constitution but in spite of it by Fed.R.Civ.P. 12(b)(6).

---

[11] *Ashcroft v. Iqbal*, 556 U.S. 662, 667 (2009). Mr. Iqbal was a cable tv installer in the wrong place at the wrong time, and innocent of the suspected charges. After a short imprisonment on his guilty plea for immigration fraud, he was deported.

[12] Plaintiff, of course, must accept *Iqbal's* holdings on reasonable inference, plausibility and common sense, which normally will promise plaintiffs viable protections against unjust 12(b)(6) dismissals. The tragedy is the Court selected *Iqbal* to reinforce the *Bell Atlantic* pleading embellishments under Fed.R.Civ.P. 8 and 12. *See*, Sinnar, S, *The Lost Story of Iqbal*, 105 Georgetown L.J. 379 (2017) for Stanford Professor Shirin Sinnar's provocative article comparing *Iqbal* to Japanese internment in *Korematsu v. United States*, 323 U.S. 214, 242–43 (1944) and to the iniquities of evasion of "command responsibility" in war crimes prosecutions.

**OPPOSITION TO MOTION TO DISMISS - 9**

Plaintiff has not run into such a wall in this court. Among the reasons for that is unlike the *Bivens* causation standards Mr. Iqbal faced, SOX plaintiffs are not just fortified but affirmatively promoted by the easiest causation threshold of American law.  In the AIR21 statute, Congress lowered the causation bar with cross-industry whistleblower *affirmative inference reforms for the 21st century* applicable to SOX.[13]  An employer's Rule 12(b)(6) motion to succeed must go through a conveyor belt of agregate graders sifting out the fine distinctions and fact parsing typical of those motions. Under 12(b)(6), only the remaining big plausible chunks of fact will be left to judge. This table depicts the process making 12(b)(6) a tough sell in a SOX case.

---

[13] AIR21 is officially the acronym for the Wendel H. Ford Aviation Investment Reform Act for the 21st Century ("AIR21"), codified at 49 § U.S.C. 42121(b).  The "reform" was nothing less than close air support for whistleblowers being defeated on *McDonnel Douglas* causation and burden of proof battlefields under the Energy Reorganization Act (energy industry), Surface Air Transportation Act (trucking industry), Federal Railway Safety Act (railroad industry) and others. Air21embedded *affirmative inference reforms* into existing statutes via "contributing factor" causation and "reasonable belief" protected activity.  Like SOX, all of these DOL statutes parachuted in AIR21's affirmative inference reforms, i.e., the procedures set forth in section 42121(b), "including (i) 'burdens of proof'," using the virtually identical language contained in SOX 18 U.S.C. § 1514A(b)(1)(B) that the Act "shall be governed by the legal burdens of proof set forth in section 42121(b) of title 49"). See, *Tompkins v. Metro-North Commuter R.R. Co.*, 983 F.3d 74, 79 n.13 (2d Cir. 2020).  This cross-industry AIR21 template has created the modern whistleblower protection regime in the United States, numerous states, and in international tribunals.

**OPPOSITION TO MOTION TO DISMISS - 10**

| Motion 12(b)(6) | Pleaded Facts | Reasonable Inferences | Reasonable Beliefs | Contributing Factors | Common Sense | Mere Probability |
|---|---|---|---|---|---|---|
| Burden always on movant | Rule 12(b)(6) | Rule 12(b)(6) | SOX | AIR21 | Iqbal | Iqbal |
| Burden of Persuasion on Defendant | Pleaded facts are true and immutable | All reasonable inferences reinforce pleaded facts | Reasonable beliefs in facts govern not concrete facts | Small contributing factors meet causation, not preponderant "because of" | Experience and common sense not formalism govern | Plausibility not probability is dispositive |

The AIR21 causation regime is rare in discrimination statutes because it micro-prescribes that causation is fully satisfied upon proving simple "contributing factor". On that showing tethered with a gossamer thread of reasonable inference, reasonable belief, and mere plausibility, the whistleblower has won their case on liability, and can be denied relief only on "clear and convincing evidence" of the employer's same-action affirmative defense. It is because of the rarity of legislated fiat to judges to apply a low standard of causation unknown at common law that judicial resistance sporadically flares up when AIR21 cases land on their benches.[14] It is readily apparent, therefore, that *Iqbal* has limited analytical value-

---

[14] See, Luke K. Cooperrider, *Hart & Honoré: Causation in the Law*, 58 Mich. L. Rev. 951 (1960) at 952:

> That the lawgiver has so rarely chosen to define the attributive nexus in more precise terms must appear as one of the great curiosities of the law unless it be that he nevertheless assumes the phrase "caused by" to convey a meaning sufficient to his ends. *** Judges, on the other hand,

**OPPOSITION TO MOTION TO DISMISS - 11**

added to cases controlled by the AIR21 causation regime. Javaid Iqbal's fate was doomed from the inception not just by a culture of fear, but by the nature of his claim-- a *Bivens* action, the very existence of which shifting court pluralities have questioned over the decades.[15] Borne of *ubi jus, ibi remedium* norms ill-fitted to federal question jurisdiction under 28 USC §1331, its detractors view it as federal common law gone astray, and that common law imposes tort causation of "because of" or "caused by" with a preponderance of the evidence metrics. Hence, judges of an era past made up the *Bivens* claim for relief, prescribed its causation standard, overlaid it with "common sense" and made if fit by embellishing Rule 8 pleading requirements gratis *Bell Atlantic* and *Iqbal*. This is nearly the jurisprudential opposite of Congress' tightly engineered AIR21 reasonable belief and causation regime for judging the sufficiency of a SOX claim for relief.[16] Save an exception

---

> have for many years claimed a common sense rather than a philosophical descent for the concept of cause in its legal aspect. The authors of *Causation in the Law* believe this claim to be sound.

Available at: https://repository.law.umich.edu/mlr/vol58/iss6/18.

[15] This unpopularity is likely due in some measure to *Bivens'* now highly restricted viability being confined to suspects and prisoners.

[16] This legislatively engineered AIR21 causation regime *versus* judge-prescribed common sense can be pedantically expressed by analogy to the conflict between "formal semantics, neoclassical axiomatic choice theory, *** commitment to logical determinacy, a functionalist view of mind, and the idea of ontology driven

OPPOSITION TO MOTION TO DISMISS - 12

for jailed Wall Street tycoons filing prison conditions claims at a "Club Fed", the contexts of *Bivens* and SOX have little jurisprudence in common. As Justice Cardozo addressed the subject:

> This Court has had occasion to point out how futile is the attempt to define a "cause of action" without reference to the context. \*\*\*. What is needed is something of that common-sense accommodation of judgment to kaleidoscopic situations which characterizes the law in its treatment of problems of causation. One could carry the search for causes backward, almost without end.

*Gully v. First Nat'l Bank*, 299 U.S. 109, 117-18 (1936). His plea has gone largely unheeded of late as defendants try to stuff *Bell Atlantic* and *Iqbal* down the throat of every case, thankfully with more and more judges distinguishing out the demands for blind application. As Justice Brennan explained the issue in a legislated claim context:

> It is difficult for us to imagine that, in the simple words "because of," Congress meant to obligate a plaintiff to identify the precise causal role played by legitimate and illegitimate motivations in the employment decision she challenges. We conclude, instead, that Congress meant to

---

by logic" *versus* the "common-sense Cambridge alternative" holding that "vagueness, not formalization, maximizes precision and simplifies our reasoning about the complex phenomena of the economy and society" and law. See, Davis, John B. "Common Sense: A Middle Way between Formalism and Post-Structuralism?", *Cambridge Journal of Economics*, vol. 23, no. 4, 1999, pp. 503–13 (reviewing John Coates, The Claims of Common Sense: Moore, Wittgenstein K, Cambridge University Press, 1996), available at http://www.jstor.org/stable/23600414.

**OPPOSITION TO MOTION TO DISMISS - 13**

obligate her to prove that the employer relied upon sex-based considerations in coming to its decision. *Price Waterhouse v. Hopkins*, 490 U.S. 228, 241-42 (1989).  In his complaint against EXC, lifted by AIR21, Plaintiff here is required to do even less.

### III.  LEGISLATIVE HISTORY WITH A LIFE OF ITS OWN

The Supreme Court has delivered whistleblowers to the safety of both commandment and parable. The former is that prohibitions on silencing whistleblowers must be heeded by both publicly traded companies and all who serve them.  The latter is legislative history for all to understand-- the frauds and oppressions of the Enron era must guide judicial vigilance.[17] The "experience and common sense" prescribed by *Iqbal* in drawing "reasonable inferences" to determine plausibility is required to draw upon the nation's Enron experience.

---

[17] Justice Scalia concurring in *Lawson* was compelled to note that while legislative histories may often deserve to exist only at the far outposts of jurisprudence, still this legislative history is not beyond the norm: *"Since congressional 'intent' apart from enacted text is fiction to begin with*, courts understandably allow themselves a good deal of poetic license in defining it. Today's opinion is no exception." Emphasis added, *Lawson v. FMR LLC*, 571 U.S. at 460. For more parable, *see* Stevens, Souter, Ginsburg and Breyer in *District of Columbia v. Heller*, 554 U.S. 570, 652 n.14 (2008):

> The Court's atomistic, word-by-word approach to construing the Amendment calls to mind the parable of the six blind men and the elephant, famously set in verse by John Godfrey Saxe. *** Each of them, of course, has fundamentally failed to grasp the nature of the creature.

**OPPOSITION TO MOTION TO DISMISS - 14**

Since the Enron awaking, judges know even better what white-collar crime and Wall Street fraud, as well as hidden motive, pretext, obfuscation and stratagem look like. Bernard L. Madoff Investment Securities LLC looked legitimate even after early review by the SEC.

The legislative history of Enron once memorialized is not to be ignored, for as Senator Grassley explained: Members "are more likely to vote . . . based on a reading of the legislative history than on a reading of the statute itself."[18] Whatever else the Enron SOX legislative history institutionalized by *Lawson* might do, it decidedly projects the broad remedial purpose for which SOX was enacted, and rejected the dissent's efforts to taint it with judicial antipathy to private securities fraud litigation.[19] This is right and just, for the "original and enduring American perception of the judicial role sprang not from the philosophy of Nietzsche but from the jurisprudence of Blackston". *Harper v. Va. Dep't of Taxation*, 509 U.S. 86, 107 (1993).

---

[18] See *Dig. Realty Tr., Inc. v. Somers*, 138 S. Ct. 767, 782 n.* (2018) (original elipses), citing Gluck & Bressman, *Statutory Interpretation from the Inside—An Empirical Study of Congressional Drafting, Delegation and the Canons: Part I*, 65 Stan. L. Rev. 901, 968 (2013).

[19] See Geoffrey C. Rapp, *Are SOX and Dodd-Frank Securities Law? The Answer is Up in the Air*, *ibid* at n. 6, for detailed analysis of how Justice Ginsburg and the *Lawson* majority kept private securities fraud precedents out of SOX statutory construction.

**OPPOSITION TO MOTION TO DISMISS - 15**

Respectfully submitted,

_s/Thad M. Guyer_____
Thad M. Guyer
Attorney for Brian Magnuson

## CERTIFICATE OF SERVICE

The undersigned attorney certifies that on April 15, 2022, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

_s/Thad M. Guyer_____
Thad M. Guyer