**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF ILLINOIS**
**ROCK ISLAND DIVISION**

| | |
|---|---|
| BRIAN MAGNUSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Case No. 1:21-cv-04142 |
| | ) |
| EXELON CORPORATION, a Publicly Traded | )   Hon. Sara Darrow |
| Company, and EXELON GENERATION | )   Magistrate Judge Jonathan E. Hawley |
| COMPANY, LLC | ) |
| | ) |
| Defendants. | ) |

**CONSTELLATION ENERGY GENERATION, LLC'S**
**BRIEF REGARDING "CARVED-OUT" DISCOVERY ISSUES**

Constellation Energy Generation, LLC (f/k/a Exelon Generation Company, LLC and hereafter referred to as "ExGen" for consistency in this proceeding) submits this brief with respect to the following issues: (a) whether Plaintiff should be permitted to take the unusual step of deposing Tamra Domeyer, the Associate General Counsel for ExGen's nuclear fleet throughout the period covered by the Supplemental Complaint ("Complaint"); (b) whether ExGen's redactions for privilege should be tested through the unconventional proposal by Plaintiff to question Ms. Domeyer regarding the privileged material, or if there are more appropriate and conventional ways to resolve disputes over redaction for privilege that could be utilized here if there is any reason to question the redactions at all; and (c) why the Rule 30(b)(6) topics identified by Plaintiff are not relevant and proportional to the issues in this case and, therefore, do not warrant additional depositions.[1]

---

[1] On October 4, 2022, pursuant to Magistrate Judge Hawley's Standing Order, the parties advised the Court of their dispute with respect to these issues and were subsequently ordered to file briefs on the issues by October 25, 2022.  See October 4, 2022 Minute Order.

## INTRODUCTION

The Complaint contains numerous claims against ExGen seeking relief for alleged retaliation against Plaintiff, Brian Magnuson, including: (1) claims under the anti-retaliation provisions of the Energy Reorganization Act ("ERA") (42 U.S.C. §5851(a)(1)) and the Sarbanes Oxley Act ("SOX") (18 U.S.C. §1514A); and (2) retaliation claims under Illinois common law and the Illinois Whistleblower Act ("IWA") (740 ILCS 174/20 and 174/15(b)).

All of these claims involve two basic questions: (a) whether Plaintiff engaged in protected activity; and (b) whether, assuming he did, he was subjected to adverse actions because he engaged in protected activity. The federal claims also involve whether ExGen would have taken the alleged adverse actions even in the absence of any protected activity. The discovery now sought by Plaintiff would add nothing new to a determination of these questions.

*First*, with respect to Ms. Domeyer, she is a lawyer for the Company and her communications with respect to issues involving Plaintiff are protected by the attorney-client privilege. In addition, Plaintiff has already obtained information relevant to the matters at issue in this case via discovery from non-privileged sources, making Ms. Domeyer's testimony cumulative and unnecessary. More specifically, all of the decision makers with respect to the alleged adverse actions have been deposed. There are numerous other witnesses involved in discussions regarding Plaintiff whom he could have deposed, but he chose not to do so. Taking Ms. Domeyer's deposition results in nothing more than objections based on the attorney-client privilege on matters about which Plaintiff has already asked the decision makers.

*Second*, ExGen's redactions are appropriate and Plaintiff's proposed process to depose Ms. Domeyer about the redactions is unsupported and inconsistent with the privilege. And, finally, many of the Rule 30(b)(6) topics identified by Plaintiff are either not relevant or not

proportional to the needs of this case. For these reasons, as more fully explained below, Plaintiff's requests should be denied and a protective order should be entered prohibiting Plaintiff from taking Ms. Domeyer's deposition, questioning Ms. Domeyer about redacted documents, and taking Rule 30(b)(6) depositions except for the limited purposes for which ExGen has agreed to provide a corporate representative.

## FACTUAL BACKGROUND

ExGen and its predecessors operate nuclear power generating plants, among other businesses. ExGen has, since 2001, operated nuclear power plants in multiple states.  From 2014 to 2017, ExGen operated 13 nuclear power plants in Illinois, Maryland, New Jersey, New York, and Pennsylvania.

Plaintiff has been employed by ExGen or its predecessors since 1983.  Between 1983 and late 2016, he worked only at the Quad Cities Nuclear Power Plant ("Quad Cities Station") operated by ExGen and its predecessors.  Between 2006 and 2015, he worked as a Shift Manager in the control room of Quad Cities Station. In late 2014 and early 2015, Plaintiff exhibited a series of aberrant, emotionally driven behaviors. In June 2015, in accordance with Nuclear Regulatory Commission ("NRC") regulations, Plaintiff's unescorted access to the protected and vital areas of the nuclear plant, including the control room, was placed on hold pending review of fitness-for-duty by the Medical Review Officer, an independent outside medical doctor, and trustworthiness and reliability.  Approximately 60 days later, after completion of these reviews and the removal of the hold on his unescorted access, Plaintiff returned to work.  After his return to work, Plaintiff himself placed limits on what positions he was willing to perform, eventually leading to what he considered to be an involuntary leave starting in November 2016.  When he returned from that leave in November 2017, Plaintiff was assigned to work on a project in

ExGen's corporate office.  None of these actions was caused by Plaintiff's reports of safety

issues, and all would have been taken even if Plaintiff had not reported safety issues.

Plaintiff nonetheless claims that he was subjected to five principal adverse actions, which

he alleges were taken because he reported safety issues: (1) having his unescorted access

authorization placed on hold (with full pay and benefits), pending an evaluation of his fitness-

for-duty and trustworthiness and reliability in 2015; (2) after the hold was lifted, being

reassigned to duties as a Shift Unit Supervisor (without a loss of title, pay, or benefits); (3) being

assigned to the Training Department later in 2015 (while maintaining his title, pay, and benefits)

after challenging working for the Operations Director; (4) being placed on an 11-month

involuntary leave (with no loss of benefits) in late 2016 after objecting to working in Training

and admitting that it would have been "problematic" to return to Operations; and (5) in 2020,

being subjected to an alleged "targeted investigation" relating to his compliance with ExGen's

email security policy (which resulted in no disciplinary action, loss of pay or benefits, or change

in title or duties). His claims (1)-(4) are based on alleged protected conduct and alleged adverse

actions that occurred at Quad Cities Station in 2015 and 2016. See Complaint at ¶¶ 17-41

(alleged protected activity); ¶¶ 47-65 (alleged adverse actions). His claim in (5) is based on an

alleged adverse action that occurred in 2020, when Plaintiff was working in a different position,

with different management, at a different location (ExGen's nuclear corporate office). *Id*. at ¶¶

66, 71-76.

At the time of and during the period leading up to each of these alleged adverse actions,

ExGen employed Ms. Domeyer, a member of the Legal Department, as its Associate General

Counsel for the ExGen nuclear fleet. See Domeyer Decl. at ¶ 2.  In that capacity, Ms. Domeyer

provided legal advice to the Company on a host of issues, including compliance with the non-

discrimination provisions of the NRC regulations, the Energy Reorganization Act, and other federal and state statutes and employment laws. *Id*. at ¶ 3.  She represented the Company as legal counsel in numerous regulatory proceedings. *Id*.  Her involvement in providing legal advice to the Company with respect to Plaintiff began in the second half of 2014, when Plaintiff made an internal claim that his management had ignored his identification of a nuclear safety issue. *Id*. at ¶ 4.  She continued to provide legal advice in late 2014 and throughout 2015, 2016, and 2017 in response to management concerns about Plaintiff's behaviors under the NRC-required behavioral observation program, Plaintiff's subsequent internal allegations that the Company's actions discriminated against him, and various other matters regarding Plaintiff. *Id*.  Ms. Domeyer represented the Company in the NRC's investigations of Plaintiff's 2015 and 2016 claims of discrimination pertaining to alleged adverse actions at Quad Cities Station and 2020 claims of discrimination regarding Exelon's investigation of his use of its email system to send Company information to his personal email account, the U.S. Department of Labor's investigation of Plaintiff's 2016 and 2017 complaints of discrimination, a 2015 alternative dispute resolution mediation with Plaintiff and his counsel, and a subsequent mediation with Plaintiff and his new counsel in 2017. *Id*. at ¶ 5. As the Associate General Counsel, Ms. Domeyer's sole role and responsibility with respect to Plaintiff was to provide legal advice to the Company. *Id*. at ¶¶ 3, 7.

As a lawyer in good standing who held a position in the Legal Department, Ms. Domeyer did not make business decisions. She was not authorized to make employment decisions other than with respect to her direct reports (two attorneys and an assistant). See Domeyer Decl. at ¶ 7. Nor was she authorized to make decisions regarding unescorted access or determinations of fitness.  *Id*.  Other individuals made the employment or access decisions that Plaintiff now challenges as adverse actions.  *Id*. at ¶ 8.

As reflected in the chart below, Plaintiff has already deposed the decision makers and other fact witnesses with respect to each alleged adverse action:

| DEPONENT | ROLE |
|---|---|
| Scott Darin | Site Vice-President personally aware of Plaintiff's unusual and questionable behaviors and who attended meetings where Plaintiff's behaviors were discussed with Access Authorization and Fitness for Duty Manager; made decision to assign Plaintiff to Training Department in September 2015; made decision to place Plaintiff on involuntary leave in November 2016 |
| Hal Dodd | Quad Cities Operations Director who witnessed Plaintiff's conduct during week of June 15, 2015 referred to Access Authorization and Fitness for Duty Manager; made decision in reorganization of Operations Department to reassign daily duties of Plaintiff and another Shift Manager based on targeted review of all operations management personnel |
| Sue Techau | Access Authorization and Fitness for Duty Manager responsible for decision to refer Plaintiff's unusual behaviors to the Medical Review Officer for a fitness determination and to place Plaintiff's unescorted access on hold in response to Medical Review Officer's requirement that Plaintiff be evaluated through the Employee Assistance Program as part of the fitness determination and to review trustworthiness and reliability |
| Cindy Petersen | Site Human Resources Manager personally aware of and who documented Plaintiff's unusual and questionable behaviors and who attended meetings where Plaintiff's behaviors were discussed with Access Authorization and Fitness for Duty Manager; Director of Human Resources involved in decision to place Plaintiff on involuntary leave in November 2016 |
| Brian Wake | Plaintiff's Shift Operations Superintendent in 2014 and 2015 |
| Drew Bush | Site Human Resources Manager involved in decision to place Plaintiff on involuntary leave in November 2016 |
| Nathan Darrow | Manager of Employee Concerns Program and responsible for investigation of Plaintiff's claims, including claims that nuclear safety concerns were "being ignored" |
| Vince Genualdi | Exelon Security employee who investigated Plaintiff's use of Exelon's email system to send Company information to his personal email account, concluded that Plaintiff violated Exelon policies, and requested that Plaintiff sign an attestation confirming going forward his understanding of, and consequences of violating, Company policies |

6

In its Rule 26 initial disclosures, responses to interrogatories, and document production, ExGen also identified numerous other witnesses with knowledge of the issues about which Ms. Domeyer might have knowledge, whom Plaintiff chose not to depose:

| WITNESS | ROLE |
|---|---|
| Toni L. Williams | Investigation of Plaintiff's June 2015 allegations against Operations Director Hal Dodd regarding simulator exercise the results of which were considered by the Access Authorization and Fitness for Duty Manager prior to removing the hold on Plaintiff's unescorted access |
| Heather Mae Daniels | Participated in targeted selection interview of Plaintiff with Hal Dodd and was involved in process leading to Dodd's decision in a reorganization of the Operations Department to reassign the daily activities of Plaintiff and another Shift Manager based on targeted review of all operations management personnel |
| Jason Smith | First-hand knowledge of Plaintiff's behaviors during simulator exercise and days that followed in June 2015 that were referred to the Manager Access Authorization and Fitness for Duty Manager and behaviors during training scenario in 2016 |
| Jed Ferdinand | First-hand knowledge of Plaintiff's behaviors  during simulator exercise and days that followed in June 2015 that were referred to the Manager Access Authorization and Fitness for Duty Manager |
| Barbara Pohlman, MD, MPH, MRO | Contracted Medical Review Officer and Substance Abuse Expert for the ExGen Access Authorization and Fitness for Duty Program maintained pursuant to NRC regulations who made fitness determinations regarding Plaintiff and recommended that his unescorted access be placed on hold pending her final determination of fitness |

## I.      DEPOSITION OF TAMRA DOMEYER

Plaintiff has improperly noticed the deposition of Ms. Domeyer, as she functioned only as an attorney representing ExGen in connection with Plaintiff and this matter.  The standard applied in this district to evaluate whether to allow an attorney to be deposed is set forth in *Taylor Mach. Works, Inc. v. Pioneer Distribution Inc.*, No. 06-1126, 2006 WL 1686140 (C.D. Ill. June 19, 2006).  After surveying the principal approaches to this issue, the Court concluded

that the factors to be considered included: "the need to take the deposition; the lawyer's role in

the underlying action and in the primary action; the risk of encountering privilege and interfering

in the attorney client relationship; avoiding unnecessary expense; and the means and extent of

discovery already conducted to obtain the information to be gleaned from the attorney." *Id*. at

*3.  Applying this approach, the Court granted a protective order prohibiting the deposition of an

in-house lawyer for Caterpillar Inc. because "any factual knowledge he [had]" about the matters

in issue was "either second hand, meaning that other witnesses [would] have better knowledge,

or [was] privileged."  This approach was adopted by Judge McCuskey in *Powers v. Bd of

Trustees of Univ. of Ill.,* 2010 WL 3834441, at *4 (C.D. Ill. Sept. 23, 2010) (allowing deposition

only after concluding attorney had relevant, non-privileged information not possessed by others

and the deposing party committed to limiting the deposition to that non-privileged information),

and also by Judge Myerscough in *United States v. Dish Network, L.L.C.*, No. 09-3073, 2015 WL

9481571, at *3 (C.D. Ill. Dec. 7, 2015) (precluding testimony of government attorney when

information could be obtained from other witnesses and the questions risked invading the

attorney-client privilege).

  Other courts in the Seventh Circuit have applied the same analysis and quashed

depositions of in-house counsel where the information sought from counsel was available

through other witnesses.  The "deposition of a party's attorney—whether in-house or trial

counsel—does impose more of a burden than the deposition of other fact witnesses." *Espejo v.

Santander Consumer USA, Inc.*, No. 11 CV 8987, 2014 WL 6704382, at *3 (N.D.Ill. Nov. 25,

2014). For this reason, "[w]here the deposition of an attorney can be avoided because the same

information is available from other, non-privileged sources, it is prudent for the parties to pursue

that course of discovery first." *St. Paul Guardian Ins. Co., v. Walsh Construction Co.*, No. 15

CV 10324, 2021 WL 4777337, at *4 (N.D.Ill. Oct. 13, 2021) (quoting *Espejo* and granting protective order to preclude deposition of in-house counsel where other means to obtain information were not exhausted); *Espejo* 2014 WL 6704382 at *3 (granting motion for protective order to quash deposition of defendant's in-house counsel when the information sought from counsel could have been available through other sources); *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, No. 09 CV 7666, 2013 WL 5274296, at *2 (N.D.Ill. Sept. 18, 2013) (applying similar standard in granting motion for protective order to quash depositions of opposing party's trial attorney, general counsel, and in-house counsel). Application of this standard here compels a ruling that Ms. Domeyer should not be deposed.

*First*, there is no "need to take the deposition" because the same information is available from other non-privileged sources: Plaintiff has already deposed individuals with knowledge, including all decision makers, has chosen not to depose others with knowledge, and Ms. Domeyer does not possess factual information that those individuals lack. The individuals who made the decisions Plaintiff challenges —Dodd, Darin, Techau, and Genualdi—have been deposed, as have others who participated in meetings or discussions regarding the decisions that Plaintiff challenges. Questions regarding the facts discussed at these meetings were asked, or could have been asked, during the depositions noted above.

And Ms. Domeyer has no factual information relevant to Plaintiff's claims that is not possessed by individuals that Plaintiff already deposed or could have deposed. She had no direct contact with Plaintiff, other than as a Company lawyer in the administrative proceedings and formal mediation or conciliation sessions attended by Plaintiff and his counsel. See Domeyer Decl. at ¶ 10. She did not work at Quad Cities or in any of the Departments in which the decision makers worked. *Id.* at ¶ 9. She did not witness any of Plaintiff's behaviors that are at issue in

9

4:21-cv-04142-SLD-JEH  # 105  Page 10 of 42

this litigation.  *Id.* at ¶ 11.  All of her knowledge regarding Plaintiff's conduct and behaviors and alleged protected activities is based on reports by those who had firsthand knowledge of same. *Id*.  Plaintiff has either deposed or has had the opportunity to depose everyone with firsthand knowledge of the conduct, behaviors, and decisions at issue.  Plaintiff cannot show that Ms. Domeyer will testify to any matter that was not already discussed with these other witnesses, and therefore, Plaintiff should not be permitted to depose Ms. Domeyer.  See *Marco Island Partners v. Oak Development Corp.*, 117 F.R.D. 418, 419 (N.D. Ill. 1987) (quashing subpoena where there was evidence that 14 other people were present at the relevant negotiations and 9 of them were scheduled to be deposed, and indicating that deposing an attorney would be inappropriate where testimony would be duplicative) (citing Fed. R. Civ. P. 26(b)(1)); *St. Paul Guardian Ins. Co.,* 2021 WL 4777337, at *4 (granting protective order to preclude deposition of in-house counsel where other means to obtain information were not exhausted); *1100 West, LLC v. Red Spot Paint & Varnish Co., Inc.*, 1:05-cv-1670, 2008 WL 4545311, at *3 (S.D.Ind. Oct. 8, 2008) (striking from the witness list the lawyers for the parties where the defendant had not shown that the matters to which the lawyers would testify were not available from other witnesses); compare with *U.S. Bank Nat'l Ass'n v. Londrigan, Potter & Randle, P.C.*, No. 15-3195, 2018 WL 3097086, at *3 (C.D.Ill. Apr. 9, 2018) (permitting deposition only after determining that no means existed to obtain the information sought, given that the party seeking the deposition had unsuccessfully attempted to obtain the information through other depositions).

*Second*, Ms. Domeyer's role in the events underlying this case was that of a lawyer for the Company. See Domeyer Decl. at ¶ 7. Counsel for Plaintiff himself has acknowledged this. See, *e.g.*, Deposition Transcript of B. Wake at 90:5-24 ("do you know Tamra Domeyer, a lawyer for Exelon? . . . Have you ever talked with Ms. Domeyer? I don't want to know what you said or

she said . . . Because attorney-client discussions are confidential, that's what all this redacted is"). See also Deposition Transcripts of C. Petersen [at 26:10-20, 27:20-25, 33:11-15], S. Techau [at 52:24-53:1], and D. Bush [at 19:6-21:13] (discussing the witnesses' receipt of direction/advice from "corporate legal" or "legal counsel" in relation to Ms. Domeyer, and making clear that her only role in this matter was as a lawyer providing legal advice and representation).  Ms. Domeyer also was not a decision maker; although she provided legal advice with respect to the decisions regarding Plaintiff, she did not have authority to make employment decisions regarding Plaintiff or any other employee at Quad Cities.  See Domeyer Decl. at ¶ 7. To be clear, her only role was to provide legal advice, as opposed to making business decisions with respect to the issues in this lawsuit. The meetings in which Ms. Domeyer participated included the decision makers, including Darin, Dodd, and Techau.  *Id.* at ¶ 12.  Plaintiff had the chance to ask those other participants about the meetings in which they participated and where Ms. Domeyer provided legal advice, and did in fact question each, to varying degrees, about what happened in such meetings.  ExGen has also produced numerous documents relating to and arising out of those meetings.  For example, Techau's notes of the meetings that led to her seeking review of Plaintiff's fitness from the Medical Review Officer were produced.  The only information redacted from the meeting notes was information reflecting Ms. Domeyer's comments, because they were privileged attorney-client communications.  See Exhibit 1.

*Third*, based on her role as a lawyer for the Company, a deposition of Ms. Domeyer would create a substantial risk of encountering privileged information and interfering with the attorney role she had.  See *Taylor Mach.*, 2006 WL 1686140, at *1 (deposition quashed where the "matter on which [attorney] is questioned will be largely if not entirely limited by privilege").  The attorney-client privilege exists "to encourage full and frank communication between

11

attorneys and their clients and thereby promote broader public interests in the observance of law and the administration of justice." *Schuler v. Invensys Bldg. Systems, Inc.*, No. 07 C 50085, 2009 WL 425923, at *2 (N.D.Ill. Feb 20, 2009). The utility of the attorney-client privilege extends not only to communications regarding ongoing litigation, but also to legal advice related to preventing litigation by helping "clients to conform their conduct to the law and by addressing legal concerns that may inhibit clients from engaging in otherwise lawful and socially beneficial activities." *Id*. (quoting *United States v. BDO Seidman, LLP*, 492 F.3d 806, 815 (7th Cir. 2007)). The fact that counsel seeks information from her clients to render legal advice does not negate the privilege.  See *Sandra T.E. v. South Berwyn Sch. Dist. 100*, 600 F.3d 612, 619–620 (7th Cir. 2010) ("The attorney-client privilege protects communications made in the course of an attorney's factual investigation when that investigation is made in order to provide legal advice"); *Weeks v. Samsung Heavy Industries Co., Ltd*, 1996 WL 341537, at *3 (N.D.Ill. June 20, 1996) ("documents setting forth business and economic data fall within the scope of the privilege if such data is included merely for the purpose of giving or receiving legal advice"); *Weeks v. Samsung Heavy Industries Co., Ltd*., 1996 WL 288511, at *2 (N.D.Ill. May 30, 1996) ("the case law is clear that the attorney-client privilege is not vitiated simply because the attorney has weighed business considerations in rendering legal advice"). Legal advice and communications made between corporate employees and in house counsel to enable the attorney to provide legal advice are privileged "where those communications rest on confidential information obtained from the client, or where those communications would reveal the substance of a confidential communication by the client." *Schuler* at *2 (citing *Upjohn Co. v. United States*, 449 U.S. 383, 396-97 (1981)). *See also*, *L.G. Electronics, Inc. v. Motorola, Inc.*, No. 10 CV 3179, 2010 WL 4513722, at *2 (N.D. Ill. Nov. 2, 2010) (finding all but one of the withheld emails to be

privileged, including emails created by high-level employees that were shared with counsel where the emails were generated to help counsel provide advice, or expressly seek legal advice).

*Fourth*, in light of the previous factors—particularly that all relevant, non-privileged information has been or could have been obtained from non-lawyers that Plaintiff already deposed or could have deposed—deposing Ms. Domeyer involves unnecessary expense. Plaintiff has taken eight depositions  to date in this case, including the depositions of the decision makers. Additional depositions, including expert depositions and the depositions of the 30(b)(6) witness(es) that ExGen has agreed to produce, also still need to be scheduled.  There is no reason to force ExGen to incur the expense of Ms. Domeyer's deposition when she has no non-privileged information relevant to Plaintiff's claims that is not possessed by individuals that Plaintiff already deposed or could have deposed.

And *fifth*, relatedly, as explained above, there already has been extensive "discovery conducted to obtain the information to be gleaned from the attorney" and that is relevant to Plaintiff's claims—*i.e.*, who took the alleged adverse actions and the reasons for the alleged adverse actions directed to Plaintiff.  For all of the reasons noted above, it is simply not reasonable to believe that Ms. Domeyer can add any additional, non-privileged information as to the decisions made with respect to Plaintiff.  See *Taylor Mach. Works*, 2006 WL 1686140, at *3 (prohibiting in-house counsel's deposition where attorney's knowledge was secondhand or privileged and other witnesses possessed relevant non-privileged information); *Dish Network*, 2015 WL 9481571, at *3 (same).

## II.  PLAINTIFF'S UNSUPPORTED CHALLENGE TO EXGEN'S REDACTION OF DOCUMENTS AND IMPROPER PROPOSAL TO DETERMINE PRIVILEGE

Not surprisingly, given the appropriate involvement of Ms. Domeyer as counsel in this matter following Plaintiff's allegations in 2014, ExGen appropriately withheld certain privileged

13

communications altogether and redacted portions of other documents that contained privileged communications.  ExGen provided a privilege log appropriately reflecting the period from 2014 to November 2017 when Plaintiff returned from leave (with respect to claims based on adverse actions (1)-(4) (*supra*, pp. 3-4) asserted in the original Complaint) and March 2020 to September 2020 (with respect to claims based on adverse action (5) (*supra*, p. 4) asserted in the First Supplemental Complaint). See Exhibit 2. Plaintiff has not asserted that the privilege log is inadequate or that it contains insufficient information for him to assess the assertion of the privileges therein.  Rather, he speculates that ExGen "over-redacted" documents by redacting facts contained in communications to and from Ms. Domeyer in addition to the portions of those communications that explicitly and expressly seek or provide legal advice. He proposes to question Ms. Domeyer about the nature of the material redacted and why it is privileged by requiring Ms. Domeyer to bring unredacted versions of emails reflected on the privilege log and asking her a series of questions, including whether the redacted text: (1) indicates Ms. Domeyer was directing or suggesting a course of action that would affect Plaintiff; (2) indicates that a manager supplied Ms. Domeyer with a proposition or statement of facts; (3) indicates that as to Ms. Domeyer's communication with a manager only legal advice was sought and/or given; and (4) contains any citation to laws or regulations.

For the reasons explained below, ExGen's privilege log provides sufficient information to evaluate the applicability of the privilege, ExGen's redactions to documents are appropriate, and the procedure suggested by Plaintiff for testing the nature of the redactions is unprecedented, based on an improper conception of the privilege, unwieldy, and designed to harass counsel rather than obtain relevant information.

Plaintiff does not appear to challenge the sufficiency of ExGen's privilege log. But even if he had, his challenge would fail. Rule 26(b)(5) of the Federal Rules of Civil Procedure requires a party withholding information on grounds of privilege to "describe the nature of the documents, communications or things not produced or disclosed in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the applicability of the privilege or protection." Fed.R.Civ.P. 26(b)(5); *Allendale Mutual Ins. Co. v. Bull Data Systems, Inc.*, 145 F.R.D. 84, 88 (N.D.Ill. 1992). The accepted means of complying with these standards is the preparation of a document index or privilege log. *Krause v. GE Mortg. Servs., Inc.*, No. 97 C 8589, 1998 WL 409395, at *2 (N.D. Ill. July 14, 1998). See also *Parvati Corp v. City of Oak Forest*, No. 08 C 702, 2010 WL 4792649, at *3 (N.D.Ill. Nov. 18, 2010) (defendants met their burden in establishing that their documents were protected by the attorney-client and common interest privileges based on the privilege log and explanation of the materials); *Crabtree v. Experian Information Solutions, Inc.*, No. 1:16-cv-10706, 2017 WL 4740662, at *2 (N.D.Ill. Oct. 20, 2017) (defendant appropriately designated communications between its non-lawyer employees as privileged where it "provided enough information to conclude that the withheld documents [were] tied, even if indirectly, to legal advice rendered by [in-house] counsel"); *Schuler*, 2009 WL 425923, at *2 (finding the privilege logs at issue to be accurate and sufficient and denying Plaintiff's motion to compel the production of the redacted material, including emails where Plaintiff had expressed disappointment at having been terminated and legal issues relating to that email were then discussed).

ExGen's privilege log, as written, sufficiently establishes that the materials redacted or withheld are in fact privileged or work product. For any given email identified on the log, for instance, the following is provided: the date, sender, recipient(s), persons copied, nature of the

privilege asserted, and a description of the subject matter of the email.  And notably, the subject

matter descriptions are specific.  As one example, the description for document no. 027 reads:

> Consultation with legal counsel regarding the potential effects of decisions
> related to the terms and conditions of Magnuson's employment. Consultation
> with legal counsel regarding discussion topics for meetings with Magnuson
> related to the terms and conditions of Magnuson's employment.

See Ex. 2, item 027.

Without challenging the sufficiency of the privilege log, Plaintiff asserts (with no

support) that the privileged communications contain facts that should not have been redacted.

Counsel communicated the following hypothetical example to illustrate his view of an alleged

improper redaction:

> But the authorities I sent you are clear that facts contained in an otherwise
> privileged communication are not themselves privileged from disclosure unless
> the facts are drawn from a privileged source.  Here is a hypothetical example we
> would put to the judge:
>
> Email from Petersen to Domeyer:  "It was clear from statements made during
> yesterday's EIAC [employee issues advisory committee] (and some
> conversation by phone I had with the SLT [senior leadership team] after the call)
> that the management team greatly distrusts Magnuson as a whistleblower who is
> out to wreck operations, but no one is willing to go on record to do anything about
> it.  So tell us how to get rid of him without any of the SLT becoming his new
> target.  Can we legally just reassign him somewhere else? Needless to say this is
> confidential and I am telling only you because you are our lawyer and we won't
> have to disclose this.  Thoughts?
>
> Our view is none of the underlined text is privileged, only the one green accented
> question is.
>
> We want Domeyer in deposition with the unredacted text to testify "yes, there are
> facts here, they relate to the EIAC or mandatory referral, and state management
> views about Magnuson."  If she says "but those fact statements are privileged"
> then we have a right to ask her why.  Her deposition transcript will then be
> presented to the judge with our motion to unredact documents through in camera
> inspection.

See Exhibit 3.

Even if the questions were relevant to determining privilege, which they are not as explained below, the process proposed by Plaintiff still would be inappropriate.  In the parties' discussions, Plaintiff admitted that he had no authority supporting this procedure.  See Exhibit 3 ("I have never used this protocol before, I have however heard of it being used, but don't presently have any caselaw on it (I will research asap for some)").  Although Plaintiff said he would look for case law, no such authority was ever provided to ExGen.  And ExGen is not aware of any authority supporting such a cumbersome procedure that would inappropriately force counsel to defend redactions in a deposition.  The procedure would not advance a determination of whether the redactions are appropriate and appears calculated to harass rather than determine relevant information.

Moreover, this statement demonstrates that both Plaintiff's assertions about over-redaction and the proposal to depose Ms. Domeyer are based on a fundamental misunderstanding of the privilege. Whether a manager supplied Ms. Domeyer with "fact statements" does not automatically make the communication not privileged.  Communications to counsel made in order to enable counsel to provide legal advice are privileged, even where the communications include facts. See *L.G. Electronics*, 2010 WL 4513722, at *2 (emails created by high-level employees shared with counsel are privileged where the emails were generated to help counsel provide advice or for the client to expressly seek legal advice); *Musa-Muaremi v. Florists' Transworld Delivery, Inc.*, 270 F.R.D. 312, 316 (N.D.Ill. 2010) ("The attorney-client privilege protects communications made in the course of an attorney's factual investigation when that investigation is made in order to provide legal advice"); *Weeks*, 1996 WL 341537, at *3 ("documents setting forth business and economic data fall within the scope of the privilege if such data is included merely for the purpose of giving or receiving legal advice"); *Weeks*, 1996

17

WL 288511, at * 2 ("the case law is clear that the attorney-client privilege is not vitiated simply because the attorney has weighed business considerations in rendering legal advice"); *Crabtree*, 2017 WL 4740662, at *2 (defendant appropriately designated communications between its non-lawyer employees as privileged and protecting the identified "business communications" where "Plaintiff [had] presented nothing beyond speculation to challenge Defendant's" privilege designations).

Stated more generally, Plaintiff's view of the hypothetical scenario and suggested approach reflects an overly narrow view of what is properly redacted in communication from or directed to an attorney, a view that is rejected by the RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS, § 69 cmt.i (2000). According to an example used in the Restatement, if a lawyer writes a letter to a client that gives tax advice, and the letter is based in part on information supplied by the client, in part on information gathered by the lawyer from third persons, and in part on the lawyer's research, the privilege applies to the entire document even if the parts could be separated. *Id.* at illus. 7. See also *Wieboldt Stores, Inc. v. Schottenstein,* 1991 WL 105633, at *3 (N.D.Ill. June 7, 1991) (fact section of memorandum privileged because it "reveals, directly or indirectly, the substance of confidential communications"); *Chicago Fire Fighters Union Local No. 2 v. City of Chicago*, 1990 WL 133464, at *1 (N.D.Ill. Sept. 12, 1990) (raw data compiled for purposes of rendering legal advice privileged); *Sandra T.E.*, 600 F.3d 612, 619 (communications made by employees to counsel for employer acting as such were protected against compelled disclosure); *In re LTV Securities Litigation*, 89 F.R.D. 595, 601-602 (N.D. Tex. 1981) (the attorney-client privilege protects from forced disclosure any communications from an attorney to his client when made in the course of giving legal advice; explaining that the privilege "attaches equally to" in-house counsel who are

also performing services of a legal nature and furnishing legal advice during the course of an investigation, as "Upjohn laid to rest suggestions that House Counsel are to be treated differently from outside counsel with respect to activities in which they are engaged as attorneys").

For all these reasons, the court should rule that ExGen's privilege log sufficiently establishes the privileges asserted therein and reject Plaintiff's proposed approach for evaluating the redacted text.  Should that not be the case, resolution of the validity of the privileges and redactions should be resolved through privilege log revisions or an *in camera* inspection, not Plaintiff's suggested procedure.

## III.    THE 30(b)(6) TOPICS

The standard governing the permissible scope of a Rule 30(b)(6) deposition is the same as that applied to all other non-privileged discovery—*i.e.*, it must be "relevant to any party's claim or defense and proportional to the needs of the case."  Fed.R.Civ.P. 26(b)(1). See also *St. Paul Guardian Ins. Co.*,  2021 WL 4777337, at *2 (explaining that the initial burden of proving relevance is on the party requesting the discovery).  This rule "provides the courts with 'broad discretion to tailor discovery narrowly'," including the power to enter a protective order for good cause shown to shield information from disclosure.  *Id*. (quoting *Crawford-El v. Britton*, 523 U.S. 574, 598 (1998)).  As such, courts are authorized by Rule 26(c) to "limit the time, place, and manner of discovery, or even bar discovery altogether on certain subjects" where the "discovery sought is 'unreasonably cumulative or duplicative, or obtainable from another source that is more convenient, less burdensome, or less expensive.'"  *Id*. (also quoting Fed.R.Civ.P. 26(b)(2)(C)(i)). Aside from ExGen's general objection that the topics are temporally unlimited[2],

---

[2] Unless otherwise stated below, ExGen will consider the topics as limited to the time period from 2015-2016, which coincides with the timing of the principal alleged adverse actions (1)-(4) (*supra*, pp. 3-4) alleged in this case to have occurred while Plaintiff worked at Quad Cities Station.

many of the topics identified by Plaintiff are not relevant to any matter at issue in this proceeding or are not proportional to the needs of this case. In addition, in some cases, the discovery sought is unreasonably cumulative, can be obtained from other, more convenient sources, or Plaintiff had ample opportunity to obtain the information in discovery already.

Upon receipt of Plaintiff's 30(b)(6) deposition notice, ExGen sought to negotiate with Plaintiff a reduction to the scope of the topics. Plaintiff initially committed to providing a proposed stipulation with respect to one of the topics, and to revisiting the scope of others. But for other topics, Plaintiff suggested that the Government Accountability Project ("GAP"), which is apparently underwriting this litigation for Plaintiff, would not permit a reduction in the scope of certain topics. And ultimately, Plaintiff did not provide the proposed stipulation or modify any of the topics. Thus, it appears that the scope of 30(b)(6) depositions sought is not based on what is relevant to this case but rather on the overall agenda of GAP.  ExGen further believes that the SOX claim to which some of the overbroad 30(b)(6) topics are related is both legally and factually baseless; Plaintiff admitted in his deposition that he did not engage in conduct protected by SOX.  (Magnuson Dep., Aug. 9, 2022, pp. 161-68, 177).  At this time, the only relief ExGen is seeking is a protective order with respect to the deposition.

Further confirming the improper strategy to take a deposition for purposes unrelated to the issues in dispute in this lawsuit, a review of the topics for the depositions demonstrates that they are not tailored to seek relevant information that is proportional to the case. In particular, Matter 1 requests designation of a representative regarding "Roles of General Counsel's Office Other than Giving Legal Advice in Pending or Imminent Litigation," including what Plaintiff terms "Non-Anticipated Litigation Roles of ExGen General Counsel" generally and as to Plaintiff.  Not only is such information not relevant to the issues in the case, but the topic is again

20

based on a misunderstanding of the attorney-client privilege and inappropriately seeks the deposition of an attorney.

Matters Nos. 2 through 5 and their sub-matters seek designations of multiple corporate representatives to address topics relating to ExGen's general policies and procedures regarding the counseling or discipline of employees for violating civility rules or being rude or abusive (Matter 2), channels for reporting concerns internally and externally and the audit of those channels (Matter 3), chilling effects letters from the NRC on and training regarding a safety conscious work environment (Matter 4), and the maintenance and audit of the Employee Concerns Program (Matter 5).

- Matter 2 (civility, rudeness, abuse) is not relevant at all. The Complaint lacks any reference to these types of rules and for good reason: ExGen never counseled or disciplined Plaintiff for violating civility rules or being rude or abusive during the period at issue in the Complaint. The civility rules had nothing to do with Plaintiff's alleged protected activity or adverse actions at issue in this matter.

- Matter 3 seeks a corporate representative to testify about various matters related to internal and external reporting channels, but he fails to explain why such information is relevant. Plaintiff raised concerns internally – by reporting concerns to management and the NRC site resident inspector, writing issue reports, and participating in investigations of his concerns by the Employee Concerns Program – and externally – to the NRC and DOL Complaint (and to the SEC much later). He clearly knew how to, and in fact did, raise concerns. Whether other avenues existed for him to raise concerns has no bearing on this matter.

- Matter 4 seeks information about chilling effects letters issued by the NRC and information about ExGen's safety conscious work environment ("SCWE") training, but the Complaint does not refer to chilling effects letters and the topic is not limited in time or scope.

- Matter 5 seeks detailed information regarding ExGen's Employee Concerns Program, but Plaintiff does not take issue with the investigations of his internal concerns conducted by the Employee Concerns Program. He fails to explain how any of these topics in Matter 5 are relevant to his claims or ExGen's defenses and affirmative defenses.

Additionally, each of these designations is significantly overbroad, unduly burdensome and not proportional to the needs of the case for similar reasons, so we address those issues at

once.  In particular, as shown above, Plaintiff's claims and the adverse actions in (1)-(4) relate to his actions and treatment at Quad Cities Station during 2015 and 2016.  Nonetheless, Plaintiff has sought designation of a corporate representative to testify regarding the policies and procedures in Matters Nos. 2-5 without any temporal or geographic limitation.  These topics as drafted potentially require designation and preparation of one or more representatives to address policies and practices over a more than 20-year period at more than a dozen nuclear power plants spread throughout the Midwest and Eastern half of the country.  But given that Plaintiff's nuclear safety claims relate to Quad Cities Station during 2015 and 2016, virtually all of the information sought has no bearing on the case whatsoever.

Finally, Matter 6 is directed solely to the SOX claim. ("MATTER NO. 6. Sarbanes-Oxley Violations of SEC Rules and Misleading Shareholders as to State of Quad Cities and Financial Needs").  ExGen has a pending motion to dismiss the SOX claim.  That motion, together with Plaintiff's admissions in his deposition, demonstrate that he did not engage in conduct protected by SOX and that his SOX claim is therefore factually and legally baseless.  See Magnuson Dep., Aug. 9, 2022, at pp. 161-68, 170-71, 177-79, 186. Furthermore, most of Matter 6 has nothing to do with whether Plaintiff engaged in conduct protected by SOX (he did not) or whether he suffered adverse action because of it.  Rather, it is an inappropriate effort to drag into this case the criminal investigation of an entirely separate company, Commonwealth Edison Company ("ComEd"), and the indictments of several individuals who performed work for ComEd, not ExGen. The ComEd Deferred Prosecution Agreement ("DPA") that resulted from the investigation and the criminal indictments against individuals who performed work for ComEd have nothing to do with ExGen or the issues in dispute in this lawsuit.

Below we specifically address the specific Matters and sub-matters and show why the

Court should preclude or limit the topics as stated.

A.    **MATTER NO. 1. Roles of General Counsel's Office Other than Giving Legal Advice in Pending or Imminent Litigation:**

**MATTER NO. lA. Non-Anticipated Litigation Roles of ExGen General Counsel Generally**

Plaintiff will depose Ex Gen as to any and all reasons and participation involving Tamra Domeyer or any other attorney for ExGen in the organization's reviewing, investigation, and/or assessing of employees who raise safety concerns, write IRs [issue reports], communicate with the ECP [employee concerns program] program, or contact the NRC prior to the date upon which any notice is given by employees that they may or have threatened, suggested or brought any legal action against ExGen .

**ExGen's Response:** ExGen objects to this topic for the reasons set forth in Section I

above and on the additional grounds that it is not relevant to Plaintiff's claim or ExGen's

defense. The very label of the topic – referring to "Non-Anticipated Litigation Roles" – shows

that this Matter 1A and Matter 1B are based on the fundamentally incorrect proposition that in-

house counsel may appropriately be involved and conduct privileged investigations and

communications only after external claims occur.  That is simply wrong.  The attorney-client

privilege extends to legal advice, as here, related to preventing litigation by helping "clients to

conform their conduct to the law and by addressing legal concerns that may inhibit clients from

engaging in otherwise lawful and socially beneficial activities." *Schuler*, 2009 WL 425923, at *2

(quoting *United States v. BDO Seidman, LLP*, 492 F.3d 806, 815 (7th Cir. 2007)).

Further, whether ExGen attorneys, including Ms. Domeyer, are involved in other

circumstances where an employee engages in protected activity by, for example, raising safety

concerns, writing issue reports, communicating with the Employee Concerns Program, or

contacting the NRC, has no bearing on the issues in this case – specifically whether Plaintiff

engaged in protected activity and whether the decision makers took adverse actions against

Plaintiff because he engaged in protected activity.  ExGen identified all decision makers of the alleged adverse actions, and Plaintiff deposed those decision makers. Those decision makers acknowledged their role as decision makers; none of them testified or suggested that Ms. Domeyer made the decision to take the actions Plaintiff challenges as adverse actions. To the contrary, each witness whom Plaintiff asked confirmed Ms. Domeyer's role as providing legal advice as counsel to the Company. *Supra*, pp. 9-10.  Evidence about Ms. Domeyer's or other counsel's general involvement in the matters listed in this topic has no tendency to make a fact of consequence to this action more or less probable and is simply irrelevant.

**MATTER NO. lB. Non-Anticipated Litigation Roles of ExGen General Counsel as to Plaintiff**

 As set forth in the Supplemental Complaint, para. 5, Plaintiff did not file or threaten any whistleblower complaints against ExGen with the U.S. Department of Labor, Occupational Safety and Health Administration (OSHA) until December 16, 2015.[3] Plaintiff will depose ExGen as to any and all reasons and participation involving Tamra Domeyer or any other attorney for ExGen in the organization's reviewing, investigation, and/or assessing of Plaintiff prior to that date.

**ExGen's Response.** ExGen reiterates its general discussion and objections to Matter 1A.

Further, as demonstrated in Section I, the topic of Ms. Domeyer's and any other ExGen attorney's "participation" in reviewing, investigating, and assessing Plaintiff involves privileged communications with counsel.

**B.      MATTER NO. 2. ExGen Written or Unwritten Polices or Practices in Counselling or Disciplining Employees for Lack of Civility or Exhibiting Rudeness or Abuse in Their Communication with Supervisors or Managers:**

**MATTER 2A. Enforcement of Civility Standards not Constituting Abusive Communications.[4]** Plaintiff will depose Ex Gen as to the existence and enforcement of

---

[3] As an initial matter, this assertion is inaccurate. The Complaint reflects that Plaintiff submitted allegations to the NRC on August 6, 2015. See Complaint at ¶ 28.

[4] ExGen further objects that each of the topics in Matter 2 are overly broad and irrelevant because they have no time limitation and because they address policies and documents generally and without relation to the Quad Cities Station where Plaintiff worked.

written policies disseminated to employees stating the employer's requirement that employees maintain decorum and civility that does not arise to the level of abusive and threatening language in their communications with supervisors and managers.

**MATTER 2B. Enforcement of Prohibitions on Abusive Communications.**  Plaintiff will depose Ex Gen as to the existence and enforcement of written policies disseminated to employees stating the employer's prohibition on the use of abusive and threatening language in communications with supervisors and managers.

**ExGen's Response**. For the reasons set out below, the Court should preclude depositions on the topics in Matter 2.  Matters 2A and B in their entirety seek irrelevant information and thus are also unduly burdensome.  There are no allegations in the Complaint that relate to topic 2A or 2B. Plaintiff was not counseled, disciplined, or subjected to any adverse action for failing to "maintain decorum and civility" or, for that matter, for using "abusive and threatening language" in communications with supervisors and managers. And whether the types of policies listed in Paragraph 2A and 2B exist, whether they are disseminated to employees, and whether and how they are enforced generally  has no tendency to show whether Plaintiff engaged in protected activity, he was subjected to the adverse actions he challenges in the Complaint, those actions were indeed "adverse," or the reasons why he was subjected to those actions. There is absolutely no reason to allow depositions on this topic other than to take up time and increase costs.

**MATTER 2C. Records Identifying Employees Subjected to Discipline or Counselling under Civility Policy.**   Plaintiff will depose Ex Gen as to any records or compilations that it possesses or could produce identifying all employees who have been subjected to action, discipline or counselling under any written policies disseminated to employees stating the employer's requirement that employees maintain decorum and civility that does not arise to the level of abusive and threatening language in their communications with supervisors and managers.

**ExGen's Response**.  See Objections to Matters 2A and 2B above.  And because topics 2A and 2B themselves are not relevant to the claims at issue, whether there are such records or compilations relating to the topics is similarly not relevant.

**MATTER 2D. Consistent Application of Civility and Abusive Language Policies.**  Plaintiff will depose Ex Gen as to its training, procedures and practices and

documentation for ensuring that that its policies are applied consistently to all employees regardless of their protected activity as to maintaining decorum and civility, and/or prohibitions on abusive and threatening language, in their communications with supervisors and managers.

**ExGen's Response**.  See Objections to Matters 2A and 2B above. Again,  because topics 2A and 2B themselves are not relevant to the claims at issue, whether such training, procedures and practices are consistently applied is also not relevant.

**MATTER 2E. Preventing Chilling Effects in Application of Civility and Abusive Language Policies.**  Plaintiff will depose ExGen as to how it attempts to prevent impermissible "chilling effects" on employees' for engaging in protected activities in view of its policies regarding employees maintaining decorum and civility, and/or prohibitions on abusive and threatening language, in their communications with supervisors and managers.

**ExGen's Response**. See Objections to Matters 2A and 2B, above. Again, because the topics themselves are not relevant to the claims at issue, any actions ExGen takes to prevent such chilling effects arising out of the irrelevant conduct described is also not relevant.

**MATTER 2F. Disciplinary Proceedings or Counselling of Supervisors for Chilling Safety or Regulatory Reporting.**  Plaintiff will depose ExGen as to any disciplinary proceedings or counselling for any supervisor to determine if they engaged in any act or omission that may have had "chilling effects" on employees' for engaging or seeking to engage in protected activities.

**ExGen's Response**.  See Objections to Matters 2A and 2B, above.  Again, because the topics themselves are not relevant to the claims at issue, whether ExGen has engaged in disciplinary proceedings or counseling for any supervisors relating to such irrelevant matters is also not relevant.

**C.**     **MATTER NO. 3. ExGen Written or Unwritten Polices or Practices in Creating, Maintaining, Monitoring and Auditing Employee Channels for Reporting Unsafe and/or Unlawful Practices:**

**MATTER 3A. Informal Protected Internal Channels.**  Plaintiff will depose ExGen as to any informal protected internal channels it has communicated to employees exist for raising safety or regulatory concerns orally or by email within their supervisory chain. An informal internal channel is one for which ExGen has not established monitoring

procedures to collect usage data on such communications to enable data driven assessments of the effectiveness and supervisory adherence to such channels.

**ExGen's Response.**  ExGen objects to this topic based on its general discussion above (*supra*, pp. 20-22).  Explaining further, it is not relevant because Plaintiff does not challenge the availability of informal protected internal channels for raising safety or regulatory concerns or otherwise claim that he was unaware of or precluded from using such channels. To the contrary, Plaintiff claims that he engaged in protected activity numerous times during the periods covered in the Complaint by raising concerns internally and externally. See Complaint at ¶¶ 17-46. Also, the existence or non-existence and scope of any informal protected internal channels has no tendency to show whether Plaintiff suffered adverse action, or the reasons for any adverse actions.  But without waiving its positions in the general discussion and in this response, ExGen will produce a witness on this topic as it relates to Quad Cities Station employees during the potentially relevant period 2015-2016.

> **MATTER 3B. Formal Protected Internal Channels.**  Plaintiff will depose ExGen as to any formal protected internal channels it has communicated to employees exist for raising safety or regulatory concerns orally or by email within their supervisory chain. A formal internal channel is one for which ExGen has established monitoring procedures to collect usage data on such communications to enable data-driven assessments of the effectiveness supervisory adherence to such channels.

**ExGen's Response.** ExGen objects to this topic based on its general discussion above (*supra*, pp. 20-22).  Explaining further, it is not relevant because Plaintiff does not challenge the availability of formal protected internal channels for raising safety or regulatory concerns or otherwise claim that he was unaware of or precluded from using such channels. To the contrary, Plaintiff claims that he engaged in protected activity numerous times during the periods covered in the Complaint by raising concerns internally and externally. See Complaint at ¶¶ 17-46. The existence or non-existence and scope of any formal protected internal channels has no tendency to show whether Plaintiff  suffered adverse action, or the reasons for any adverse actions. But

27

without waiving its positions in the general discussion and in this response, ExGen will produce

a witness on this topic as it relates to Quad Cities Station employees during 2015-2016.

**MATTER 3C. Formal Protected External Channels within the Exelon Family.**
Plaintiff will depose ExGen as to any formal protected external channels it has communicated to employees exist for raising safety or regulatory concerns orally or by email outside of their supervisory chain but within the "Exelon family of companies" as that term is used in www.exeloncorp.com webpages. A formal internal channel is one for which ExGen and/or Exelon Corporation has established monitoring procedures to collect usage data on such communications to enable data driven assessments of the effectiveness supervisory adherence to such channels.

**ExGen's Response.** This topic is objectionable for the same reasons as Matter 3B. But

without waiving its positions in the general discussion and in this response, ExGen will produce

a witness on this topic as it relates to Quad Cities Station employees during 2015-2016.

**MATTER 3D. Formal Protected External Channels Outside the Exelon Family.**
Plaintiff will depose ExGen as to any formal protected external channels it has communicated to employees exist for raising safety or regulatory concerns orally or by email outside of the "Exelon family of companies" as that term is used in www.exeloncorp.com webpages. A formal external channel outside of the "Exelon family of companies" is one for which ExGen and/or Exelon Corporation has no ability or legal right to monitor or otherwise collect usage data on such communications to enable data-driven assessments of the effectiveness supervisory respect for employees who use such channels. Protected external channels outside of the "Exelon family of companies" include the NRC, SEC, any Federal or State law enforcement or regulatory agency, the U.S. Congress, and/or media.

**ExGen's Response.** This topic is objectionable for the same reasons as Matter 3B and

3C. But without waiving its positions in the general discussion and in this response, ExGen

will produce a witness on this topic as it relates to Quad Cities Station employees during 2015-

2016.

**MATTER 3E. Records of Supervisory Training in Protected Channel Rights.**
Plaintiff will depose ExGen as to any documented initial and/or ongoing training of supervisors as to the existence of and employee rights to use all internal and external channels referenced in above Matters 3A to 3D.

**ExGen's Response.** As shown in the responses to 3A-3D and the general discussion,

questions regarding "protected channel rights" are irrelevant and objectionable. But without

28

waiving its positions stated above,  ExGen will produce a witness on this topic as it relates to

Quad Cities employees for the time period 2015-2016.

**MATTER 3F. Audit and Review of Employee Use of Protected Channels Generally.** Plaintiff will depose ExGen as to any written audits or reviews conducted to document, analyze and evaluate employee use of all internal and external channels referenced in above Matters 3A to 3D.

**ExGen's Response.**  As shown in the responses to 3A-3E and in the general discussion,

questions regarding "protected channel rights" are irrelevant and objectionable.  But without

waiving its positions in the general discussion and in this response, ExGen will produce a

witness on this topic as it relates to Quad Cities Station for the period 2015-2016.

**MATTER 3F. Audit and Review of Plaintiff's Use of Protected Channels.**  Plaintiff will depose Ex Gen as to any written audits or reviews conducted to document, analyze and evaluate Plaintiff's use of any internal and external channels referenced in above Matters 3A to 3D, and the appropriateness of responses by his supervisory chain including but not limited to Scott Darin and Hal Dodd, and by Tamra Domeyer (Legal), Cindy Petersen (Investigations) Nate Darrow (ECP) and Susan Techau (Security).

**ExGen's Response.**  ExGen objects to this topic on the grounds that it is not relevant to

Plaintiff's claims or the Company's defenses. There are no allegations in the Complaint relating

to this issue.  And whether there was an audit or review of Plaintiff's alleged use of such

channels is not relevant to whether Plaintiff engaged in protected activity or suffered an adverse

action or the reasons for those actions.  Tamra Domeyer (Legal), Nate Darrow (ECP), and Sue

Techau (Security) were not in Plaintiff's "supervisory chain," and Plaintiff has already deposed

witnesses who described the reviews performed of complaints raised by Plaintiff through internal

and external channels. Finally, ExGen is not aware of any "audits or reviews conducted to

document, analyze and evaluate Plaintiff's use of any internal and external channels" to report

concerns.

**D.**   **MATTER NO. 4. ExGen Written or Unwritten Polices or Practices in Creating, Maintaining, Monitoring and Auditing Employee and NRC Compliant Safety Conscience Work Environment (SCWE):**

**MATTER 4A. Chilling Effect Letters.** Plaintiff will depose ExGen as to any "chilling effect letters" (CEL) received from the NRC to ensure that ExGen has consistently taken appropriate actions to foster a workplace environment that encourages employees to raise safety concerns and to feel free to do so without fear of retaliation, and otherwise maintaining an ExGen environment as a safety conscious work environment (SCWE).*

\* The matter pertains to CELs as described at https://www.nrc.gov/docs/ML1202/ML12025A055.pdf, or any letters or communication irrespective name to the effect described above.

**ExGen's Response**. ExGen objects to this topic on the grounds that it is not relevant as there are no allegations in the Complaint related to chilling effects letters. In addition, this topic is overbroad and not proportional to the extent it seeks "any" chilling effects letters that may have been received from the NRC at any time for NRC licensed units other than Quad Cities Station where Plaintiff worked.  Each unit is separately licensed by the NRC, and any chilling effects letters would be specific to the licensed units at issue. Nevertheless, ExGen will produce a witness on this topic as it relates to the Quad Cities licensed units (Quad Cities Station) for the period 2015-2016.

**MATTER 4B.  Retaliation Itself as a Safety Threat.**  Plaintiff will depose ExGen as to its SCWE supervisory training, and documents and written training materials thereof, on the specific NRC concept that retaliation is of itself a "nuclear safety issue", as described in NRC publication including but not limited to the NRC "Policy Statement for Nuclear Employees Raising Safety Concerns Without Fear of Retaliation" (Federal Register Notice, May 14, 1996 Volume 61, Number 94).

**ExGen Response.** ExGen objects to this request as overly broad and unduly burdensome to the extent it requires production of a corporate representative witness reflecting all training and training materials across its entire nuclear fleet.  But ExGen will produce a witness with respect to the topic as it relates to Quad Cities Station for the time period 2015-2016.

E.   **MATTER NO. 5. ExGen Maintenance, Monitoring, Evaluation and Auditing of It Employee Concerns Program**

**MATTER 5A. Active and Passive Procedural Components.**  Plaintiff will depose Ex Gen as to its established ECP procedures for employee use in communicating to the ECP, and the ECP promptly investigating harassment, intimidation, retaliation, and

30

discrimination (HIRD) concerns by the reporting employee or by any other purpose or through any other means irrespective of any employee having  transmitted a HIRD concern.

**ExGen's Response.**  ExGen objects to this request as overly broad and unduly

burdensome to the extent it requires production of a corporate representative witness to

Employee Concerns Program procedures at any ExGen facility for any period.  ExGen will

produce a witness knowledgeable of procedures in place at Quad Cities Station during the period

2015-2016.

**MATTER 5B. HIRD Temperature or Pulse Checks Generally.**  Plaintiff will depose Ex Gen as to its documented practices and results in pulsing or temperature checking (SCWE) of the site, communicating any identified concerns to line management, and follow-up with line management to determine that appropriate actions are taken to address the concerns.

**ExGen's Response**.  ExGen objects to this topic on the grounds that it is overly broad

and not proportional to the issues in this case to the extent it seeks production of a corporate

representative witness to testify about practices and results of each pulsing or temperature

checking conducted.  But ExGen will produce a witness with respect to the general practice and

process applicable to conducting SCWE pulsings, communicating any identified concerns to

management, and follow up with management in general at Quad Cities Station during the period

2015-2016.

**MATTER 5C. HIRD Temperature or Pulse Checks re Plaintiffs Tenure in Operations from 2013 to 2016.**  Plaintiff will depose Ex Gen as to its documented practices and results in pulsing or temperature checking SCWE of the Operations Department during Plaintiffs service there from 2013 to 2016. This will including questions regarding ExGen communicating any identified concerns to his line management, and follow-up with his line management to determine that appropriate actions were taken to address the concerns he and other raised, especially regarding Mr. Dodd and Mr. Darin in 2015.

**ExGen's Response**.  ExGen objects to this topic on the grounds that it is overly broad

and not proportional to the issues in this case to the extent it seeks production of a corporate

representative witness to testify about practices and results of each pulsing or temperature

checking regarding the Quad Cities Operations Department for the period 2013-2016.  But

ExGen will produce a witness with respect to practices in effect in the Quad Cities Operations

Department during the period 2015-2016.

> **MATTER 5D. ECP Documentation Practices of Investigations.**  Plaintiff will depose
> ExGen as to its ECP documented methods in recording HIRD concerns and their
> disposition from any passive or active source irrespective of reports or complaints, and its
> ECP maintenance of records concerning decisions to investigate or not investigate, or to
> determine the scope of investigations.

> **ExGen's Response**.  ExGen objects to this topic as overly broad, unduly burdensome,

and not proportional to the issues in this case to the extent it seeks production of a corporate

representative witness to testify about the specifics of any ECP investigation or decision not to

investigate reports or complaints brought at any ExGen site, which would require a review of all

files maintained by ECP to determine the specifics.  ExGen will produce a witness

knowledgeable of the general methods used by ECP to record HIRD concerns and their

disposition for Quad Cities Station for the period 2015 - 2016.

> **MATTER 5E. Participating Officials in ECP Investigations Generally.**  Plaintiff will
> depose Ex Gen as to its policies and practices as to decisions on the scope of ECP
> investigation and participating departments or officials including but not limited to line
> supervision, Legal, Investigations, and Security.

> **ExGen's Response.**  ExGen objects to this topic as overly broad, unduly burdensome,

and not proportional to the needs of this case to the extent it seeks a corporate representative

witness to testify about decisions on the scope of ECP investigation and participating

departments with respect to reports or complaints at any site, which would require a review of

each case file to determine the specifics.  ExGen will produce a witness knowledgeable of

ExGen's policies and practices in general at Quad Cities Station during the period 2015-2016.

> **MATTER 5F. Participating Officials in ECP Investigations re Plaintiff.**  Plaintiff will
> depose ExGen as to its policies and practices as to decisions on the scope of the ECP

investigation(s) of his concerns and those of his co-workers, and the participating departments or officials including but not limited to Scott Darin and Hal Dodd, Tamra Domeyer (Legal), Cindy Petersen (Investigations), and Susan Techau (Security).

**ExGen's Response**. ExGen objects to this topic on the grounds that it is not relevant and is not proportional to the needs of this case. Plaintiff does not challenge in his Complaint or otherwise the scope of the Employee Concerns Program investigations of concerns raised by Plaintiff or his co-workers or claim that the investigations were inadequate. It is overbroad and unduly burdensome to the extent it seeks a corporate representative to testify about policies and practices for decisions regarding the scope of ECP investigations raised by Plaintiff's co-workers at Quad Cities Station at any time.

**MATTER 5G. Retention and Retrieval of ECP Investigations Files Generally.**
Plaintiff will depose Ex Gen as to its policies and practices in archiving closed ECP investigation files, and in retrieval or searching of said archived files to determine any repetitions, patterns, or trends in concerns filed about a type of IR, specific department, supervisor or chain of command that may be related to existing, future or new investigations.

**ExGen's Response**. ExGen objects to this topic as overly broad, unduly burdensome, and not proportional to the needs of this case to the extent it seeks production of a corporate representative witness to provide information about all archived files related to the subject identified in this topic, for any site, without time limitation. But ExGen will produce a witnesses knowledgeable of ExGen's archiving policies and practices in general in place at Quad Cities Station from 2015-2016.

**MATTER 5H. Retention and Retrieval of ECP Investigations Files re Plaintiff.**
Plaintiff will depose Ex Gen as to its efforts to retrieve or search the archive of closed ECP investigation files concerning Plaintiffs IRs and concerns from 2014 to 2018, and specifically as to his concerns and/or allegations regarding Operations supervisors David Kimler, Kevin O'Shea, Wally Beck, Brian Wake, Scott Darin and Hal Dodd; and regarding Nate Darrow (ECP), Cindy Petersen (Investigations), and Susan Techau (Security) or the departments of which said Mr. Darrow, Ms. Petersen and Ms. Techau were attached.

**ExGen's Response.**  ExGen objects to this topic as overly broad, unduly burdensome, and not proportional to the needs of this case. The topic seeks information for the period 2014 to 2018 related to Plaintiff's tenure at Quad Cities Station even though Plaintiff was either on leave or assigned to ExGen's corporate office in 2017 and 2018. In addition, to the extent Plaintiff seeks information about ExGen's "efforts to retrieve or search the archive of closed ECP investigation files" related to Plaintiff's concerns, he seeks information from a fact witness – that is the individual who can confirm whether the investigator searched the archives.  Plaintiff has already deposed Nate Darrow, the corporate ECP manager who investigated concerns raised by Plaintiff that were referred to ECP for investigation. Plaintiff had the opportunity to ask Mr. Darrow questions about the efforts he undertook to retrieve or search the archive of closed ECP investigation files on the subjects described in this topic. ExGen should not be required to produce Mr. Darrow again, as its corporate representative, to testify about the specifics of ECP's investigations regarding Plaintiff's concerns when Plaintiff had every opportunity to ask Mr. Darrow about those specifics during his deposition.

### MATTER NO. 6. Sarbanes-Oxley Violations of SEC Rules and Misleading Shareholders as to State of Quad Cities and Financial Needs

**MATTER 6A. SOX Allegations of Supplemental Complaint.**  Plaintiff will depose ExGen as to the following allegations of the Supplemental Complaint:

> 8. Defendant Exelon Corporation (EXC) is the parent company of Defendant ExGen. ExGen's financial statements and results of operation are reported to the SEC within the filings made by EXC.

> 43. Between July 1 and 22, 2020, Plaintiff reported to both ExGen and EXC officials that ExGen as a subsidiary of EXC, and EXC independently through its security division, were threatening him with termination because he exported important regulatory information from his company email account to his personal email in order to provide it to his attorneys and the Nuclear Regulatory Commission (NRC), U.S. Department of Labor (DOL), and state regulators. Plaintiff reported the protected activities that involved this regulatory information directly to the Defendants and simultaneously or later with federal and state regulators.

44. Plaintiff's reports and disclosures indicated that Exelon made false claims to the Illinois legislature for passage of the Future Energy and Jobs Bill (IL SB 2814). Exelon committed to keeping Quad Cities (and Clinton stations) open for another 10 years in exchange for legislative subsidies. The media reported Exelon's commitment, but it is not explicitly stated in IL SB 2814.

45. In addition to the threat to public health and safety, Plaintiff's disclosures implicated significant financial, regulatory and political consequences which will threaten the ability to operate Quad Cities Station for another 10 years. Since ExGen and EXC knew of these issues prior to making their commitment to operate Quad Cities (and Clinton) for another 10 years, Plaintiff reasonably believed the Defendants made false claims for legislative subsidies of $235M/year (Future Energy and Jobs Bill, IL SB 2814).

46. Quad Cities License Renewal Passage of the Future Energy and Jobs Bill (IL SB 2814) favorably influenced Exelon Corporation's perceived shareholder value and actual stock price (EXC).

**ExGen's Response.**  ExGen objects to this topic on the grounds that the allegations of these paragraphs (8, 43-46) of the Complaint are not relevant in light of the fact that during his deposition, Plaintiff admitted that the concerns he reported to ExGen were nuclear safety concerns and he never informed ExGen or provided it with sufficient information for ExGen to believe that his concerns implicated SOX, impacted ExGen's financial reporting or records or Exelon's shareholders, or indicated that ExGen made false representations to the Illinois legislature.  (Magnuson Dep., Aug. 9, 2022, pp. 161-68, 177). Simply put, Plaintiff admitted he had not reported any such potentially SOX protected activity and did not make any disclosures of the type constituting protected SOX activity at any time prior to the alleged adverse action[5] (the targeted investigation of his use of Exelon's electronic email system to send company information to his personal email account) taken against him.  *Id*.

**MATTER 6B. Exelon Public Statements re Relationship of Nuclear Operations and Shareholder Interests.**  (1) Plaintiff will depose ExGen and Exelon as to why it stated to

---

[5] Plaintiff ultimately contacted the Securities and Exchange Commission ("SEC"), despite the absence of any SOX protected activity, *after* the alleged adverse action occurred. See Magnuson Dep., Aug. 9, 2022, pp. 169-70, 177, 185. ExGen had no knowledge of that contact until Plaintiff was deposed in 2022. The alleged adverse actions could not have been motivated by Plaintiff's outreach to the SEC.

employees including Plaintiff that they "should know" the following statements contained in "Things You Should Know", Inside Nuclear (Exelon Newsletter, September 16, 2016), "Exelon Named to 2016 Dow Jones Sustainability Index":

> Exelon values acting with integrity and being accountable to its communities and the environment. In line with these ideals, Exelon has been named to the 2016 Dow Jones Sustainability Index (DJSI) for North America for the 11th consecutive year.

(2) Plaintiff will depose ExGen and Exelon as to the bases upon which it made the statements on its website under the title, "ComEd Reaches Agreement to Resolve Justice Department Investigation: ComEd resolves previously disclosed matter related to historical lobbying practices and strengthens lobbying and compliance controls" (July 17, 2020)

(3) Plaintiff will depose ExGen and Exelon as to the veracity of the statements contained in the publication In-House Counsel, "Exelon Unit Admits Bribery as Probe Entangles Illinois Speaker," (InHouse Counsel, July 17, 2020)

**ExGen's Response.** ExGen objects to these topics on the grounds that they are not relevant.  In his deposition, Plaintiff admitted that his reported concerns related to nuclear safety, not potential SOX violations, and he had not reported any concerns related to or that could be interpreted as relating to SOX covered activities. (Magnuson Dep., Aug. 9, 2022, pp. 161-68, 177).  Moreover, Exelon being named to a Dow Jones Sustainability Index has nothing to do with the nuclear safety concerns Plaintiff raised or his claims in the Complaint of SOX protected activity that he admitted in his deposition never occurred.   Moreover, ComEd, its former officers, ComEd's DPA, or their indictments have nothing to do with this case. During the period covered by the Complaint and when ComEd reached agreement with the Department of Justice, ComEd and ExGen were (and remain) separate legal entities, with separate leadership and lobbyists. ExGen was not implicated in the ComEd investigation and the Department of Justice identified no violations with respect to ExGen's actions. See DPA, attached as Exhibit 4. In addition, ExGen did not make the "statements" referenced in (2) and (3) of Matter 6B.

**MATTER 6C. Exelon Code of Conduct re Employees and Shareholders**

**A. From the Code of Conduct Verbatim:**  Plaintiff will depose ExGen as to its 2015 Code of Business Conduct with the following statements excerpted from said Code as to the relationship between its nuclear power generation and the best interests of its shareholders:

( 1) [We] make decisions and act in the best interests of Exelon, never allowing our personal interests to get in the way of what's right for our business, our customers or our shareholders.

(2) We maintain complete and accurate records in order to make responsible business decisions and provide truthful and timely information to Exelon shareholders, investors, regulators and other stakeholders.

(3) "Our commitment to environmental stewardship stretches across the entire energy value chain. We proactively manage our environmental footprint, not only because we care about protecting the environment, but also to improve  operational efficiency, maintain our license to operate and enhance our competitive position in the energy marketplace. As a result, we  are able to better serve our customers, create value for our shareholders and employees, and enhance communities."

( 4) Exelon, like many other companies, advocates for legislation we believe will enhance value for our customers, communities, employees and shareholders. Those of us who have contact with legislators, regulators, executive branch officials or their staffs may be involved in lobbying, and must take care to comply with the laws applicable to these activities.

**ExGen's Response**  ExGen objects to this topic on the grounds that it is not relevant.

There are no allegations in the Complaint relating to or implicating any of these statements, let alone alleging that any of these statements are false or that Plaintiff raised their alleged falsity or violations of them to ExGen at any time during his employment.  Moreover, Plaintiff testified at his deposition that his SOX claim is based on nuclear safety concerns that he raised. He admitted that he did not raise any concerns that could be construed as potential violations of SOX. (Magnuson Dep., Aug. 9, 2022, pp. 161-68, 177).

**B. Excerpts of the Code of Conduct from the Indictment in *United States v. Michael McClain, et al*, No. 20 CR 812, ND Ill (11-18-2021):**  Plaintiff will depose Ex Gen as to the following quoted provisions of the 2015 Code of Business Conduct in the indictment in United States v. Michael McClain:

(l) At para. Li:

In or around 2015, the Code of Business Conduct was revised, and from in or around 2015 to in or around 2019 provided that "[b]usiness and financial records are essential to our business operations. Exelon relies on the integrity and accuracy of these records to make strategic decisions and has designed and implemented a series of internal controls-organizational structures, processes, procedures, systems, etc.-to effectively manage financial reporting." The Code of Business Conduct further instructed employees to: "[n]ever keep off-the-book accounts or false or incomplete records"; "[n]ever make an entry in any record that intentionally misrepresents, conceals or disguises the true nature of any transaction, event or condition"; "[r]ecord all business transactions, events and conditions accurately, completely and in a timely fashion";

(2) At para. l .k:

Employees of Exelon and its subsidiaries, including ComEd and Exelon Business Services, were required to annually certify adherence to Exelon's Code of Business Conduct. Employees were also required to promptly report potential violations of the Code of Business Conduct, including but not limited to "[a]ccounting improprieties, internal accounting controls or auditing matters."

**ExGen's Response.** ExGen objects to this topic on the grounds that it is not relevant.

The quoted text from the indictment pertained to the acts of ComEd, a separate legal entity with its own leadership and lobbyists. The indictment did not implicate ExGen or allege any wrongdoing by ExGen. The related DPA's Statement of Facts makes no reference to ExGen.  See DPA, attached as Exhibit 4. ComEd's actions have nothing to do with and no bearing on whether ExGen violated SOX, Plaintiff engaged in SOX protected activity, or ExGen took any adverse actions against him because of that protected activity. More generally, Plaintiff's allegations have nothing to do with auditing, financial controls or the accuracy or proper making and maintenance of business records.  There's no claim that he communicated to ExGen about any

38

such issues, and he admitted in his deposition he did not do so. (Magnuson Dep., Aug. 9, 2022, pp. 161-62). In addition to improperly dragging the indictment of a wholly separate entity into this case, these provisions of the Code of Conduct have nothing whatsoever to do with Plaintiff's claims.

**MATTER 6D. Exelon Public Statements on Bribery and Criminality .** Plaintiff will depose ExGen as to the veracity of the following statements contained in *United States v. Michael McClain, et al,* No. 20 CR 812, ND Ill (11-18-2021) unsealing 2019 Special Grand Jury indictment under Securities Exchange Act 15 USC Sec 78m:

(1) In the subsection entitled "The Illinois General Assembly and Legislation Affecting ComEd's Business, at para. lq:

> On or about December 1, 2016, the General Assembly passed the Future Energy Jobs Act ("FEJA"), which provided for a renewal of the regulatory process that was beneficial to ComEd. After the passage of FEJA, ComEd maintained a continuing interest in advancing legislation in the General Assembly favorable to its interests, and opposing legislation that was not consistent with its operational and financial success.

(2) At para. l.d:

> ComEd was a majority-owned indirect subsidiary of Exelon Corporation ("Exelon"), a utility services holding company that provided energy to customers in multiple states. ComEd and Exelon had a class of securities registered pursuant to Section 12 of the Securities and Exchange Act of 1934 (15 U.S.C. 5 78a et seq.)and were required to file reports with the Securities and Exchange Commission under Section 15(d) of the Exchange Act. ComEd and Exelon were therefore each an "issue/'under the Foreign Corrupt Practice Act

(3) At para. 3:

> It was part of the conspiracy that, for the purpose of influencing and rewarding Pubic Official A in connection with his official duties as Speaker of the Illinois House of Representatives, and to assist ComEd with respect to the passage of legislation favorable to ComEd and its business and the defeat of legislation unfavorable to ComEd and its business

(4) At para.I.h:

> From in or around 2006 through in or around 2015, the Code of Business Conduct provided that "[m]anagement is accountable for establishing and maintaining a system of internal controls within an organization," that management was required to "ensure that there is clear, complete, fair, and accurate reporting of financial and nonfinancial information pertaining to business transactions," and

that management was accountable to the Exelon board of directors for
compliance. The Code of Business Conduct further specified that employees were
accountable for "recording all business transactions, events and conditions
accurately and completely," and were prohibited from "falsifying data,
information or records with respect to the Company's finances or operations,
including those related to, among other things: assets, liabilities, revenues,
expenses and • II earnings.…

**ExGen's Response.** ExGen objects to this topic on the grounds that it is not relevant. The
quoted text from the indictment pertained to the acts of ComEd, a separate legal entity with its
own leadership and lobbyists, and the related DPA's Statement of Facts makes no reference to
ExGen.  See DPA, attached as Exhibit 4.  The indictment did not implicate ExGen or allege any
wrongdoing by ExGen. ComEd's actions have nothing to do with and no bearing on whether
ExGen violated SOX, Plaintiff engaged in SOX-protected activity, or ExGen took any adverse
actions against him because of that protected activity.  More generally, Plaintiff's allegations and
claims have nothing to do with auditing, financial controls or the accuracy or proper making and
maintenance of business records. There's no claim that he communicated to ExGen about any
such issues, and he admitted in his deposition he did not do so.  In addition to improperly
dragging the indictment of a wholly separate entity into this case, these provides of the Code
have nothing whatsoever to do with Plaintiff's claims.

## IV.   CONCLUSION

For the reasons stated above, ExGen requests that the Court enter a protective order: (a)
prohibiting the deposition of Ms. Domeyer; (b) prohibiting a deposition to test the redactions for
privilege made by ExGen given that ExGen's privilege log is sufficient, and the privilege
assertions contained thereon have merit; and (c) limiting the Rule 30(b)(6) deposition topics
identified by Plaintiff to the specific topics on which ExGen has agreed to produce a witness.

Respectfully submitted,

**CONSTELLATION ENERGY GENERATION, LLC (FORMERLY KNOWN AS EXELON GENERATION COMPANY, LLC)**


By: _____*/s/ Richard Winter*_____
         One of Its Attorneys

Richard R. Winter
Kenneth A. Jenero
Melissa Gold
HOLLAND & KNIGHT LLP
151 N. Riverside Plaza, Suite 2700
Chicago, IL  60606
312-263-3600
richard.winter@hklaw.com
kenneth.jenero@hklaw.com
melissa.gold@hklaw.com

**CERTIFICATE OF SERVICE**

The undersigned attorney certifies that on October 25, 2022, I electronically filed the

foregoing with the clerk of the court by using the CM/ECF system, which will send a notice of

electronic filing to all counsel of record.

/s/ Richard R. Winter