# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| **BRIAN MAGNUSON**, | Case No.: 4:21-cv-04142-SLD-JEH |
| Plaintiff, | |
| vs. | **PLAINTIFF'S BRIEF POSITIONS ON DISCOVERY DISPUTES RE DEPOSITION OF IN-HOUSE COUNSEL, PRIVILEGE DESIGNATIONS AND RULE 30(B)(6) MATTERS** |
| **EXELON CORPORATION**, a Publicly Traded Company, and **EXELON GENERATION COMPANY, LLC** | |
| Defendants | **JURY TRIAL DEMAND** |

Government Accountability Project, Inc.
1612 K Street, NW
Suite 1100
Washington, DC 20006

and

Stephani L. Ayers, Esq.
Thad M. Guyer, Esq.
T.M. Guyer and Ayers & Friends, P.C.
116 Mistletoe St., P.O. Box 1061
Medford, OR 97501
Tel: (202) 417-3910

Michael I Kanovitz
Frank Newell
Loevy & Loevy
311 N. Aberdeen Street, 3rd Floor
Chicago, IL 60607
Tel: (312) 243-5900

Attorneys for Plaintiff

## I.  SUMMARY OF DISPUTE AND PLAINTIFF'S POSITIONS

Plaintiff has noticed the deposition of Exelon general counsel Ms. Tamra Domeyer and sought production of documents and emails showing her unprivileged decisions or directed or advised decisions adverse to the Plaintiff. Plaintiff has also noticed a Rule 30(b)(6) deposition setting forth matters related to his contention that Defendants intentionally fail to maintain protected internal and external whistleblowing channels as a means of undermining effective whistleblowing, and making it appear inconsistent and chaotic. Defendants object to this discovery.

With one exception, Plaintiff's counsel has not litigated a case with so much redacting where it is apparent the company lawyer, Ms. Domeyer, actually made or directed and/or ghost wrote in whole or in part the adverse decisions. It will be highly prejudicial to Plaintiff's case if he must prove retaliatory intent of line and HR managers, all of whom deny being *the* decision-maker, yet all whom identify Ms. Domeyer as being involved in Plaintiff's pleaded adverse actions.

Evidence of deficiencies or intentional obstruction in the maintenance and effectiveness of ExGen's internal and external protected channels for reporting and pursuing nuclear safety and financial fraud is core issue.  It is relevant to both the "contributing factor" causation element and "same decision" affirmative defense under both the Energy Reorganization Act and Sarbanes Oxley Act.  Such

deficiencies or obstruction of reporting channel would be strong evidence to resist summary judgment and to present to a jury.

## II.  THE LIMITED SCOPE OF THIS BRIEF

This brief addresses only the most important aspects of a discovery dispute in which Defendants objected to clearly stated discovery requests under Rules 30 and 34.  Resolving the issues briefed herein will likely resolve all related issues. This brief is submitted as part of a pre-motion to compel process under local procedures to obtain expedited guidance or rulings from the Magistrate Judge so that the carved-out discovery can proceed without further delay. Because the abbreviated process is for simultaneous submission of position briefs, neither party knows the precise arguments of the other, and failing to address arguments by other parties therefore cannot constitute wavier or failure to respond.

## III.  THE OPERATIVE LEGAL RULES APPLICABLE TO THIS DISCOVERY DISPUTE

The legal authorities in this circuit are clear that no privilege exists for unprivileged oral and written statements to managers by Ms. Domeyer, except those containing client secrets or management statements to the legal department containing such secrets.  Those legal rules as applied to this case are as follows:

(1) The golden rules of privilege are that legal advice not business advice is protected, and what started as legal advice may mission creep into business advice.

(2) The burden of proof is on general counsel to clearly sustain privilege because of its serious limitations on discovery of the truth; outside counsel is not the authoritative word on asserted privilege by Ms. Domeyer or management.

(3) Over-designation of privilege has become widespread and threatens the integrity of the judiciary. It pervades this case.

(4) There's an epidemic of over-redaction and unfounded claims of privilege that the Seventh Circuit has been trying to control.

(5) Deposing in-house counsel is not just allowable but is judicially efficient because concrete assertions of privilege will occur in the controlled setting of deposition and create the best record for the court to make its decision on answering questions and redactions. Further discovery disputes over privilege need a deposition transcript of Ms. Domeyer as the primary resource.

(6) Requiring unredacted versions of exhibits to be available at depositions is reasonable and a practical necessity so that Ms. Domeyer can authoritatively answer why documents or redacted materials have been designated privileged.

(7) Only narrowly delineated text directly and clearly involving "legal advice" can be redacted on privilege grounds.

(8) Claw-back rules apply only if privilege is clearly established, and not by mere assertion.

(9) District courts have fact-dependent discretion over privilege questions, especially in "close questions".

(10) There is no privilege for general counsel to knowingly or unknowingly assist clients in committing unlawful or tortious conduct by removing a whistleblower from his job duties in order to limit his access to regulatory and safety information.

(11) Maintaining "protected channels" for ERA and SOX whistleblowers is a legal obligation above and beyond prohibitions on retaliation, and Plaintiff has a right to take Rule 30(b)(6) depositions on

the existence and obstructions to the channels Defendants claim they have.

Consistent with circuit law, Ms. Domeyer will be examined on the following privilege factors in addition to the substantive content of statements made:

(A) The nature of any legal advice sought by managers, and the nature of the legal advice given;

(B)  the existence of relevant evidence that those managers used any such legal advice to perpetuate fraud, tort or other intentional wrongdoing against Plaintiff;

(C) whether the redacted language actually used the terms or variations thereof "advised", "under the law", "lawful" or "unlawful", "attorney-client privilege" etc., and whether the redacted content cites any "laws or regulations" or case law;

(D) whether the redacted text included any non-privileged information or facts, i.e., over-redacting; and

(E) whether the redacted text contains statements by counsel directing non-lawyers to take specific actions, inactions, or follow-up on Plaintiff's alleged protected activity and adverse actions.

## IV.  PLAINTIFF NEEDS TO PRESENT MS. DOMEYER'S NON-PRIVILEGED PERSONNEL ADVICE AND ACTIONS ON SUMMARY JUDGMENT, AND TO THE JURY

The causation and affirmative defense whistleblower provisions of the

Energy Reorganization Act (ERA) and Sarbanes Oxley Act (SOX) make Ms.

Domeyer's statements and actions central to Plaintiff's case.  Within the meaning of

these nuclear and corporate whistleblower statutes Plaintiff has the right to

discover who the decision-makers were and how each of them "contributed" to the

adverse actions against him. If her motive for advising managers or ghostwriting their decisions to transfer, reassign, suspend or terminate Plaintiff was to minimize company exposure to liability by thwarting his ERA or SOX whistleblowing by limiting his access to evidence, that would be per se discrimination.

Plaintiff has a right to develop the evidentiary basis for asserted privilege. In particular, Ms. Domeyer must assert with particularity the matters, causes, dates and occasions on which her clients allegedly asked her for legal advice, and the nature apart from the content of client secrets contained in her advice or directives. Attorney-client privilege is not simply an abstraction that external litigation lawyers create in communication with their corporate clients and strategically assert to adverse counsel. In corporate employment law, involvement by in-house lawyers in personnel and business decisions ostensibly made by company managers is routine. Privilege must be determined from the actual communication dynamic that, as in this case, may occur in real time with in-house lawyers contributing to retaliatory decisions. A request for what managers can legally get away with easily morphs into general counsel telling managers practical ways to accomplish their desired ends, even ghost-writing paragraphs or whole documents for transmission to the whistleblower. *Any email, statement or document ghost-written by Ms. Domeyer for transmission to Plaintiff constituted waiver of any privilege.*

## V.  THE FACTS-- GIVEN MS. DOMEYER'S EXTENSIVE INVOLVEMENT WITH AND GHOSTWRITING ADVERSE DECISIONS AGAINST PLAINTIFF, ONLY SHE IS POSITIONED TO EXPLAIN THE FACTS UPON WHICH SHE OR PLAINTIFF'S SUPERVISORS ASSERT PRIVILEGE

None of the ECP, Compliance, Security, Operations, and HR managers Plaintiff has deposed was competent to nor allowed to testify as to privilege *vis* Ms. Domeyer.  Only she can do that. Nor can the deposition of Ms. Domeyer be otherwise avoided because she is subject to deposition based on her *presence* at the several managerial EIAC ("Employee Issues Advisory Committee") meetings that discussed his protected activity and adverse actions.  Plaintiff has a right to discover of her notes and recollections as to all unprivileged statements, emails and documents made by ExGen managers who conducted that meeting.

Defendants counsel of record are secondary sources of the privilege asserted. They issue legal contentions on privilege, but are not the source of facts underlying those contentions.  The factual basis of demarcating Ms. Domeyer's actions as strictly legal require her testimony.  In litigation, most privilege designations and redactions are made by the corporate law firm, not in-house counsel.  As a practical matter, the corporate firm who signs the discovery responses under Rule 11 cannot defer to in-house counsel's privilege designations and work with unredacted documents. Privilege may be asserted by the corporate law firm where in-house client has neither considered nor asserted nor participated in the privilege

designations.  As more district courts are finding, macro privilege designations are getting out of control.  Counsel of record always err on the side or privilege often as in this case wildly so.

### A.  **Managers Asking Ms. Domeyer How to Do Things is not Privileged**:

Adverse actions against Plaintiff announced only nominally in the name of managers may mask the unprivileged legal or business advice of in-house counsel. For example, statements by in-house counsel such as "you can send him for the psyche evaluation", "you can delay reinstating him despite the clean psyce evaluation,  "you can put him on administrative leave before he transmits more company documents to the NRC" enjoy no privilege under circuit precedent.  Nor would an answer given by Ms. Domeyer to a manager asking, "what can we do with Brian?", or "where do we go from here?, or "what are you thoughts?" Yet as set forth below, that was happening in this case.  Nor would a set of employee interview questions formulated or edited by in-house counsel to be asked by compliance or HR investigators be presumptively privileged; nor would email or written decision authored or edited by Ms. Domeyer but transmitted by a manager be privilege. Yet that happened in this case.

In support of his contention that attorney-client privilege has been incorrectly and excessively asserted to limit Plaintiff's discovery rights under FRCP rules 30 and 34, the facts are as follow:

*Plaintiff's Positions on Discovery Dispute*     **8**

(1)  Some or most of the adverse actions taken against Plaintiff pleaded in the Supplemental Complaint were directed or contributed to by Ms. Domeyer which had the effect of limiting his access to operational data that he could use to increase NRC (Nuclear Regulatory Commission) and INPO (Institute of Nuclear Power Operations) oversight over nuclear safety and alleged ExGen deficiencies in meeting NRC SCWE (Safety Conscious Work Environment) guidelines.

(2) Ms. Domeyer had considerable influence on the operations of ExGen's NRC-mandated ECP investigatory function ("Employee Concerns Program") and EIAC ("Employee Issues Advisory Committee") directives to supervisors, HR and Compliance departments as to Plaintiff's protected disclosures.  Ms. Domeyer essentially allowed the legal department to usurp the effectiveness and accountability of ExGen's internal protected channels for the receipt and processing of nuclear safety concerns by whistleblowers.[1]

(3) Similarly, HR manager Drew Bush announced some of the most severe adverse actions against Plaintiff, yet testified in deposition that he did not even know who was writing or inserting text into memos, directives, answers to Plaintiff's questions etc. sent out under his name. Mr. Bush identified these ghost-written documents, and characterized Ms. Domeyer as being involved in almost all of it.[2]

To make potential *in camera* review more fact-focused, judicial economy will be served by having Ms. Domeyer review the unredacted versions of documents produced in discovery in deposition and to be questioned as to the

---

[1] Plaintiff's Attachment A is Exhibit # 12 to the deposition of ECP manager Nathan Darrow.  It shows a perfect storm of Ms. Domeyer's involvement with the EIAC, ECP, SCWE issues in this case.

[2] Attachment B is Bush deposition excerpts, and Exhibits 1, 2, 5, 6, 7 and 8 to his deposition. Notwithstanding that these actions are being taken over his letterhead, he does not know the authorship in whole or in part. Defendants' managers all took the position that all adverse actions against Plaintiff were group decisions discussed in EIAC meeting which Ms. Domeyer attended.

*Plaintiff's Positions on Discovery Dispute*      **9**

unprivileged fact content in those redacted documents, and to explain why the redacted fact content is designated as privileged.  In camera review will be of redacted content, and the parties and court will be best served by having Ms. Domeyer's explanations of those redactions.

### B. <u>Ms. Domeyer is an Essential Rule 30(b)(6) Fact Deponent</u>:

Ms. Domeyer does not work exclusively on employment disputes, but is involved in various business activities including NRC regulatory issues and licensing.  She would therefore be a required deponent to the speak in whole or in part to the following Rule 30(b)(6) matters.[3]

> MATTER NO. 1.  *Roles of General Counsel's Office* Other than Giving Legal Advice in Pending or Imminent Litigation:
>
> MATTER NO. 3.  ExGen Written or Unwritten Polices or Practices in Creating, Maintaining, Monitoring and Auditing *Employee Channels* for Reporting Unsafe and/or Unlawful Practices:
>
> MATTER NO. 5.  ExGen Maintenance, Monitoring, Evaluation and Auditing of Its *Employee Concerns Program*[4]
>
> MATTER NO. 6.  *Sarbanes-Oxley Violations* of SEC Rules and Misleading Shareholders as to State of Quad Cities and Financial Needs.
>
> (Emphasis added).

---

[3] See Attachment C, an excerpt of the most important matters set forth in the Rule 30(b)(6), including the role of the legal department in unprivileged activities, the effectiveness of protected channels and the ECP, and representations by Defendants to shareholders and regulators.

[4] See Attachment A, Darrow Exs. 12, 20-21 showing Ms. Domeyer was significantly involved or controlling Darrow and the ECP investigations in both 2014 and 2015, and Petersen in Investigations as well.

### C.  **Defendants Reliance on the Effectiveness of its Protected Channels**:

As shown in Darrow Exs. 12, 20-21 (Attachment A), Ms. Domeyer was deeply involved with the ECP investigations in 2014-2015 before Plaintiff had even filed an OSHA complaint on December 16, 2015 (Supp. Compl. para. 5).  In response to an external channel complaint to the NRC alleging whistleblower retaliation by ExGen, a referral for investigation was made by the NRC.  ExGen's ECP manager Nathan Darrow conducted that investigation and despite at least two of Plaintiff's co-workers expressing concerns about retaliation, Darrow fully exonerated the company.   He also took the extraordinary action for an "objective investigator" of instructing the interviewees that "while ECP cannot share details surrounding Brian's [involuntary] absence, that *one must trust that it was not in retaliation* for writing an IR [Incident Report re nuclear safety]."[5]  Darrow while in active communication with Ms. Domeyer explicitly based his exoneration of ExGen on the existence and effectiveness of internal and external protected channels:

> In all cases, interviewees conclude that Operations and Training personnel are willing to raise nuclear safety and/or quality concerns, and are *comfortable using* an alternate means such as NOS, ECP or NRC if for some reason they ever felt uncomfortable raising a concern *through a primary channel*.

---

[5] See Attachment D, Darrow's deposition Ex. 24 (Oct 21, 2015) "Investigation Results".

(Emphasis added). He nevertheless made a recommendation which he made no attempt to explain: "Management should *** communicate the Company's policy with regard to being intolerant of retaliation for doing so."

## VIII.  LEGAL AUTHORITES

Plaintiff submits the following legal authorities presented for the propositions in the order listed above in Section III.

**(1) Golden Rules of Privilege: Legal Advice not Business Advice is Protected and What Started as Legal Advice May Mission Creep into Business Advice"**

*United States v. Evans*, 113 F.3d 1457, 1461 (7th Cir. 1997):

> This Circuit has long embraced the articulation of the attorney-client privilege first set forth by Dean Wigmore *** [who] summarized the essential general principles governing the privilege as follows:

> (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived.

*Muro v. Target Corp.*, No. 04 C 6267, 2006 U.S. Dist. LEXIS 86030, at *14-15 (N.D. Ill. Nov. 28, 2006):

> While communications for the purpose of obtaining legal advice and the corresponding conveyance of that legal advice is protected, subsequent communications that evolve into business discussions are not.

**(2)  <u>The Burden of Proof is on General Counsel</u>:**

*In re Grand Jury Proceedings*, 220 F.3d 568, 571 (7th Cir. 2000):

> The privilege, however, is in derogation of the search for the truth and, therefore, must be strictly confined.

*United States v. White*, 950 F.2d 426, 430 (7th Cir. 1991):

> The party asserting the privilege has the burden to establish each element of the privilege.

## **(3) Over-Designation of Privilege Threatens the Integrity of the Judicial Branch**:

*Hamdan v. Ind. Univ. Health N., LLC*, No. 1:13-cv-00195-WTL-MJD, 2014 U.S. Dist. LEXIS 86097, at *5 (S.D. Ind. June 24, 2014):

> The Supreme Court has noted that there is a stark difference between communications to attorneys and the underlying facts of the case; communications are privileged, but a client cannot conceal a fact merely by revealing it to his or her lawyer. *See Upjohn* 449 U.S. at 395-96. The Seventh Circuit has further held that the privilege "should be strictly confined within the narrowest possible limits." *Lawless*, 709 F.2d at 487 (internal quotations omitted). Strict limitations are necessary because the attorney-client privilege has the effect of depriving the fact finder of relevant information. *Fisher v. United States*, 425 U.S. 391, 403, 96 S. Ct. 1569, 48 L. Ed. 2d 39 (1976).

## **(4) There's an Epidemic of Over-Redaction and Unfounded Claims of Privilege:**

*Urban 8 Fox Lake Corp. v. Nationwide Affordable Hous. Fund 4, LLC*, No. 18 C 6109, 2019 U.S. Dist. LEXIS 196474, at *7-9 (N.D. Ill. Nov. 13, 2019):

> Indeed, inappropriate privilege claims are, unfortunately, commonplace in modern litigation, and are often indiscriminately and improperly used "on documents that do not truly qualify for protection." *Towne Place Condo. Ass'n v. Philadelphia Indem. Ins. Co.*, 284 F.Supp.3d 889 (N.D. Ill. 2018). *[Internal citations omitted].*

*Urban 8 Fox Lake Corp. v. Nationwide Affordable Hous. Fund 4, LLC*, 334 F.R.D. 149, 160-61 (N.D. Ill. 2020):

> Second, it appears that Target's counsel did no review to ensure that what it claimed as "legal advice" could even arguably be characterized as such. It appears that Target redacted every entry on every document that had the word "legal" or "law" associated with it, and every marking

*Plaintiff's Positions on Discovery Dispute*     13

its in-house counsel Kristin Watnemo made on a document. \*\*\*
Neither Target's privilege log nor its memorandum in opposition to the
motion give any explanation why that would be "legal advice." Rather,
Target's explanation of its assertion of privilege on its privilege log is a
cut-and-paste formula stating that "handwritten legal advice" from
Watnemo has been redacted.

*Amway Corp. v. P&G, Co.*, Case No. 1:98cv 726, 2001 U.S. Dist. LEXIS 4561, at
\*24-25 (W.D. Mich. Apr. 3, 2001):

The redacted statements do not reflect legal advice or core work
product, but merely the public relations problems that arise from
bringing lawsuits against priests, nuns, and other members of the clergy
who innocently repeated the Satanism rumor. Although these
documents are embarrassing to Procter & Gamble, they do not qualify
as work product. Rather, the redacted portions merely reflect Procter &
Gamble's motivation to look for particularly attractive targets for future
lawsuits and to use litigation for public relations ends.

## (5) Deposing In-House Counsel is Allowable and Judicially Efficient:

*Espejo v. Santander Consumer USA, Inc.*, No. 11 CV 8987, 2014 U.S. Dist. LEXIS
164758, at \*3-4 (N.D. Ill. Nov. 25, 2014):

It is true that some judges in the Northern District of Illinois have used
the *Shelton* test to determine whether to allow the deposition of a party's
attorney.  Others, however, including the district judge precisely in this
matter, employ a more flexible approach that looks at all the
circumstances of the particular case. And, this Court has allowed
the depositions of in-house counsel to proceed, explaining that "not
every communication between a lawyer and a client is automatically
privileged" and that parties can generally be expected to assert
objections during the course of a deposition to protect against
disclosure of privileged information. *Quality Croutons, Inc. v. George
Weston Bakeries, Inc.*, 05 C 4928, 2006 U.S. Dist. LEXIS 60715, 2006
WL 2375460 (N.D. Ill. August 14, 2006) (Schenker, J.) (noting that
attorney's title of "Vice President-General Counsel" could reflect both
business and legal duties).

*Davis Cos. v. Emerald Casino, Inc.*, No. 99 C 6822, 2000 U.S. Dist. LEXIS 7867,
at \*5-6 (N.D. Ill. June 2, 2000):

We find no basis under the facts of this particular case for barring altogether the deposition of Mr. Hanley. He is not trial consul in this case. He is not of record and has not conducted questioning of witnesses. He may very well, as defendants have suggested, have been present during much of the deposition testimony of several witnesses, but deposing him will not in any way interfere with or interrupt defendants' trial preparations. Furthermore, it is common for in-house counsel to be present at business meetings and various corporate events and to be looked upon for advice regarding business rather than legal issues from time to time. The us, Mr. Hanley could very well be a fact witness in this case. As we have pointed out above, plaintiff's recitation of examples of situations in which Mr. Hanley was involved and which are relevant to this case is not particularly convincing. Yet, what we consider today is merely whether or not to allow discovery. In that context we cannot say that there is no reasonable possibility that deposing Mr. Hanley will lead to admissible evidence at the trial of this case. We therefore reject defendants' request for a blanket protective order.

*Caponigro v. Navistar Int'l Transp. Corp*., 93 C 647, 1994 U.S. Dist. LEXIS 6831, at *4-6 (N.D. Ill. May 18, 1994):

Finally, the defendant makes the blanket assertion that any information sought from the four Navistar in-house counsel is protected by the attorney-client privilege, and that "the inherent risks of invading both the privilege and work-product doctrine during the depositions is readily apparent." Such an objection, however is premature at this juncture. Blocking the taking of a deposition on attorney privilege or work product grounds at this stage would "tend to limit or fix the scope of the examination before it began and would usurp the court's role in deciding whether certain questions seek privileged information." *Id.* Thus, we conclude that the more appropriate route would be to allow the plaintiffs to take the depositions sought and permit the attorneys to raise their claims of privilege if and when it becomes necessary. *See Id.*

**(6) <u>Requiring Unredacted Versions of Exhibits to be Available at Depositions is Reasonable</u>:**

*Sport & Wheat v. Servisfirst Bank*, No. 3:20cv5425-TKW-HTC, 2020 U.S. Dist. LEXIS 253083, at *10 (N.D. Fla. July 14, 2020):

> At the end of the day, Synovus's request to see unredacted messages, at least during the questioning, was not unreasonable. Indeed, counsel had no good answer at the hearing as to why unredacted versions were not provided to Synovus's counsel or the witness at the deposition once Synovus objected to the use of redacted documents.

*Krausz Indus. v. Romac Indus.*, No. C10-1204RSL, 2011 U.S. Dist. LEXIS 159426, at *6 (W.D. Wash. Aug. 10, 2011):

> Common sense dictates that the unredacted documents should have been reviewed or, at a minimum, available for review at the deposition. The burden of presenting a prepared witness is on Romac.

**(7) <u>Only Narrowly Delineated Text Directly and Clearly Involving "Legal Advice" Can be Redacted on Privilege Grounds</u>:**

*Kleen Prods. LLC v. Int'l Paper*, No. 10 C 5711, 2014 U.S. Dist. LEXIS 163987, at *13-16 (N.D. Ill. Nov. 12, 2014):

> As a general matter, there is nothing improper about redacting attorney-client privileged material from a larger disclosure; the problem is that RockTenn appears to have adopted an overly capacious view of what constitutes privileged information. For that reason, it is worth emphasizing here that the mere existence of an attorney-client relationship "does not create a cloak of protection which is draped around all occurrences and conversations which have any bearing, direct or indirect, upon [that] relationship." *Matter of Walsh*, 623 F.2d 489, 494 (7th Cir. 1980) (internal quotation marks and parentheticals omitted). Rather, as the Supreme Court has explained, the attorney-client privilege "protects only those disclosures necessary to obtain informed legal advice which might not have been made absent the privilege." *Fisher v. United States*, 425 U.S. 391, 403, 96 S. Ct. 1569, 48 L. Ed. 2d 39 (1976). "If the privilege attaches only to a portion of a document, [then] the document s[hould] be produced with [only] the

privileged portion redacted." *Muro v. Target Corp.*, No. 04 C 6267, 2006 U.S. Dist. LEXIS 86030, 2006 WL 3422181, at *6 (N.D. Ill. Nov. 28, 2006).

*Hamdan v. Ind. Univ. Health N., LLC*, No. 1:13-cv-00195-WTL-MJD, 2014 U.S. Dist. LEXIS 86097, at *5 (S.D. Ind. June 24, 2014):

> However, the Court cannot assume that simply adding an attorney to an email via CC creates an expectation that legal services will be rendered. In fact, as described above, the only explicitly stated reason the attorneys were copied was so that one of them might attend a previously scheduled meeting. Simply copying attorneys on an email chain in order to keep them abreast of HR and other business-related occurrences does not transform the emails into an attorney's investigation with a built-in expectation of legal services to be rendered which would qualify for attorney-client privilege.

*Urban 8 Fox Lake Corp. v. Nationwide Affordable Hous. Fund 4, LLC*, 334 F.R.D. 149, 160-61 (N.D. Ill. 2020):

> There is no case to be made that this email exchange is privileged. No one in the chain requests any legal advice from Mr. Brandstetter and he never offers any. *See Sandra* T.E. v. S. Berwyn Sch. Dist. 100, 600 F.3d 612, 618 (7th Cir. 2010)(party must show legal advice was sought, and communication was related to that purpose ); *United States v. BDO Seidman, LLP*, 492 F.3d 806, 815 (7th Cir. 2007)("Only those communications which 'reflect the lawyer's thinking [or] are made for the purpose of eliciting the lawyer's professional advice or other legal assistance' fall within the privilege.") Email communications do not become protected by attorney client privilege merely because an attorney is cc'd on them. *[Internal citations omitted]*.

## **(8)  Clawback Rules Apply Only if Privilege is Clearly Established, Not Mere Assertion:**

*Urban 8 Fox Lake Corp. v. Nationwide Affordable Hous. Fund 4, LLC*, No. 18 C 6109, 2019 U.S. Dist. LEXIS 196474, at *7-9 (N.D. Ill. Nov. 13, 2019):

> According to defendants, they want to clawback, or redact, "comments made by Ms. Holtz, an employee and Vice President-Asset Manager of Wentwood Capital Advisor's in-house counsel, Brian Brandstetter . . .

." Defendants argue that "Ms. Holtz's thoughts . . . are attorney-client privileged when addressed to Mr. Brandstetter as part of a dialogue about Plaintiff's position . . . ." [Dkt. # 76]. *** Those comments were inadvertently not redacted. After review of the email and inserted comments, without more from defendants and due to the wholesale redactions regarding the context of the annotated email, these comments might as easily have been made for business purposes as to gain legal advice. The former is not privileged. *See Rehling v. City of Chicago*, 207 F.3d 1009, 1019 (7th Cir. 2000)(". . . attorney-client privilege is limited to situations in which the attorney is acting as a legal advisor . . . ."). *** Communication must be for the purpose of obtaining legal advice. *Sandra T.E. v. S. Berwyn Sch. Dist. 100*, 600 F.3d 612, 618 (7th Cir. 2010). Defendants' claims of privilege here are clearly an overreach.

## (9) District Courts Have Fact Dependent Discretion Especially in "Close Questions":

*Rehling v. City of Chi.*, 207 F.3d 1009, 1019 (7th Cir. 2000):

> Rehling finally contends that the district court erred in determining that the substance of conversations between General Counsel Zoufal and members of the CPD was protected by the attorney-client privilege. ***
>
> Rehling argues that the district court incorrectly determined that the attorney-client privilege applied to Zoufal's statements because the City failed to show that a full examination of Zoufal would reveal client confidences. However, the district court determined that Zoufal gave ranking members of the CPD advice about Rehling's placement and the City's obligations under the ADA, and that an examination of Rehling in regard to those issues would reveal that information. This is exactly the kind of legal advice the privilege was meant to protect. ***
>
> Although we regard the applicability of the attorney-client privilege in the context of this case to be a close question, our review of the district court's privilege determination is conducted under the highly deferential clearly erroneous standard.

**(10) Maintaining "Protected Channels" for ERA and SOX Whistleblowers is a Legal Obligation Above and Beyond the Mere Prohibition on Retaliation**

*Tamosaitis v. URS Inc.*, 781 F.3d 468, 474-75 (9th Cir. 2015):

> The anti-retaliation — or "whistleblower" protection — provision of the ERA provides that:
>
> No employer may discharge any employee or otherwise discriminate against any employee with respect to his compensation, terms, conditions, or privileges of employment because the employee . . . notified his employer of an alleged violation of this chapter [Development of Energy Sources] or the Atomic Energy Act of 1954. 42 U.S.C. § 5851(a)(1)(A). This statute "protect[s] workers from retaliation based on their concerns for safety and quality," *Mackowiak v. Univ. Nuclear Sys., Inc.*, 735 F.2d 1159, 1163 (9th Cir. 1984), and ensures that the government agencies charged with monitoring nuclear safety do not see their "channels of information . . . dried up by employer intimidation," *DeFord v. Sec'y of Labor*, 700 F.2d 281, 286 (6th Cir. 1983) (quoting *NLRB v. Scrivener*, 405 U.S. 117, 122, 92 S. Ct. 798, 31 L. Ed. 2d 79 (1972)).

*NLRB v. Scrivener*, 405 U.S. 117, 122, 92 S. Ct. 798, 801 (1972):

> This complete freedom is necessary, it has been said, "to prevent the Board's channels of information from being dried up by employer intimidation of prospective complainants and witnesses." *John Hancock Mut. Life Ins. Co.* v. *NLRB*, 89 U. S. App. D. C. 261, 263, 191 F.2d 483, 485 (1951). It is also consistent with the fact that the Board does not initiate its own proceedings; implementation is dependent "upon the initiative of individual persons." *Nash* v. *Florida Industrial Comm'n, supra*, 389 U.S., at 238; *NLRB* v. *Industrial Union of Marine & Shipbuilding Workers*, 391 U.S. 418, 424 (1968). *Passaic Valley Sewerage Comm'rs v. United States Dep't of Labor*, 992 F.2d 474, 478-79 (3d Cir. 1993):
>
> > Such "whistle-blower" provisions are intended to promote a working environment in which employees are relatively free from the debilitating threat of employment reprisals for publicly asserting company violations of statutes protecting the environment, such as the Clean Water Act and nuclear safety statutes. They are intended

to encourage employees to aid in the enforcement of these statutes by raising substantiated claims through protected procedural channels.

***

Furthermore, the whistle-blower provision of the Clean Water Act mirrors that of several other federal environmental, safety and energy statutes. The legislative history of § 507 indicates that it was patterned after some of these provisions. S. Rep. No. 414, 92d Cong., 2d Sess. 83 (1971), *reprinted in* 1972 U.S.C.C.A.N. 3748. Construing such a whistle-blower statute, the Supreme Court has afforded broad protection to employees, noting that broad protection is necessary "'to prevent the Board's channels of information from being dried up by employer intimidation of prospective complainants and witnesses.'" *NLRB v. Scrivener*, 405 U.S. 117, 122-23, 31 L. Ed. 2d 79, 92 S. Ct. 798 (1972).

## (11)  Privilege is Lost Where the Attorney-Client Communication is in Furtherance of Intentional Wrongdoing, Tort or Fraud:

*Shaffer v. AMA*, 662 F.3d 439, 445-47 (7th Cir. 2011):

We now address one more piece of evidence Shaffer would like to use on remand, a memorandum the district court ruled was protected by the attorney-client privilege. The contents of the document did not play into our analysis of whether summary judgment was proper, but so there is no question on remand, we address the privilege question now. ***. The document in question is a one-page typewritten memorandum from Lynch that on its face is dated November 21, 2008, and entitled "Elimination of staff position." *** The document was inadvertently turned over during discovery, and the district court agreed with the AMA's subsequent assertion that the attorney-client privilege protected it.
***
Finally, Shaffer argues that even if the attorney-client privilege would normally protect the document, the crime-fraud exception should apply here because, he asserts, it was prepared after the fact to justify the termination. "The crime-fraud exception places communications made in furtherance of a crime or fraud outside the attorney-client privilege." *BDO Seidman*, 492 F.3d at 818. This exception comes from

the recognition that when legal advice relates "*not to prior wrongdoing*, but to *future wrongdoing*," the privilege goes beyond what is necessary to achieve its purpose. *United States v. Zolin*, 491 U.S. 554, 562-63, 109 S. Ct. 2619, 105 L. Ed. 2d 469 (1989) (citation omitted). The exception's purpose is to ensure that the confidentiality afforded to communications between attorney and client "does not extend to communications 'made for the purpose of getting advice for the commission of a fraud' or crime." *Id*. at 563 (quoting *O'Rourke v. Darbishire*, [1920] A.C. 581, 604 (P.C.))

*Oil Express Nat'l v. D'Alessandro*, No. 96 C 1528, 1997 U.S. Dist. LEXIS 6815, at *6-7 (N.D. Ill. May 9, 1997):

Here, OE moves for an order barring assertion of the attorney-client and work product privileges based on the crime, fraud, or tort exception to those to privileges. This exception applies when a person consults an attorney to further a continuing crime, fraud, or other misconduct. *Nobelpharma AB v. Implant Innovations, Inc.*, 930 F. Supp. 1241, 1260 (N.D.Ill. 1996). Here, OE contends that the defendants contacted attorney Zarco in furtherance of violation of the Sherman Act, a civil conspiracy, tortious interference with contract, and tortious interference with prospective business relationships.

*Rexnord, Inc. v. Laitram Corp.*, No. 85-C-1039, 1986 U.S. Dist. LEXIS 31623, at *3-4 (E.D. Wis. Oct. 24, 1986):

The following often-quoted passage from *United States v. United Shoe Machinery Corp*., 89 F. Supp. 357, 358-59 (D. Mass. 1950) outlines the requirements that must be met for application of the attorney-client privilege: The privilege applies only if *** not (d) for the purpose of committing a crime or tort***.  The attorney-client privilege, having a tendency to prevent the full disclosure of the truth, "ought to be strictly construed within the narrowest possible limits consistent with the logic of its principle."

## IX.  CONCLUSIONS

The Drew Bush deposition transcript excerpts and exhibits, and the Nathan

Darrow deposition exhibit, together with the Rule 30(b)(6) deposition matters and facts

in the Supplemental Complaint which are presumed true, establish that the testimony of and Rule 34 discovery pertaining to in-house counsel Tamra Domeyer are highly relevant and presumptively discoverable.  Any assertion of privilege by Defendants must be clearly established under their burden of proof.  Every redaction must be justified specifically. Even if Ms. Domeyer started out giving legal advice, it is apparent this morphed into mission creep such that she began directing and coordinating the major departments of Operations, HR, Compliance, Investigations, Security, and Employee Concerns through the Employee Issues Advisory Committee process, to the point that she was ghost-writing decisions and correspondence with Plaintiff.

Respectfully submitted,

_s/Thad M. Guyer_____
Thad M. Guyer
Attorney for Brian Magnuson

## CERTIFICATE OF SERVICE

The undersigned attorney certifies that on October 25, 2022, I electronically

filed the foregoing with the Clerk of the Court by using the CM/ECF system,

which will send a notice of electronic filing to all counsel of record.

_s/Thad M. Guyer_____
Thad M. Guyer
