UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | |
|---|---|
| BRIAN MAGNUSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 4:21-cv-04142-SLD-JEH |
| | ) |
| EXELON CORPORATION and EXELON | ) |
| GENERATION COMPANY, LLC,[1] | ) |
| | ) |
| Defendants. | ) |

ORDER

Before the Court is Defendant Exelon Generation Company, LLC's ("ExGen") partial motion to dismiss, ECF No. 88; Defendant Exelon Corporation's motion to dismiss, ECF No. 91; ExGen's motion for leave to file a reply, ECF No. 96; and Exelon Corporation's motion for leave to file a reply, ECF No. 97. For the following reasons, ExGen's motion to dismiss is GRANTED; Exelon Corporation's motion to dismiss is partially GRANTED and otherwise MOOT; ExGen's motion for leave to file a reply is GRANTED; and Exelon Corporation's motion for leave to file a reply is GRANTED.

BACKGROUND[2]

ExGen operates nuclear power plants in multiple states, including Illinois, pursuant to licenses from the U.S. Nuclear Regulatory Commission ("NRC"). Exelon Corporation is ExGen's parent company.

---

[1] Exelon Generation Company, LLC is now known as Constellation Energy Generation, LLC. *See, e.g.*, Answer First Suppl. Compl. 1 n.1, ECF No. 87.
[2] At the motion to dismiss stage, the Court "accept[s] as true all well-pleaded facts in the complaint, and draw[s] all reasonable inferences in [the plaintiff's] favor." *Pierce v. Zoetis, Inc.*, 818 F.3d 274, 277 (7th Cir. 2016). This background is thus drawn from the allegations in Plaintiff's First Supplemental Complaint, ECF No. 79, unless otherwise indicated.

Plaintiff began working at ExGen's Quad Cities Nuclear Power Station (the "Quad Cities Station") in 1983. Initially a laborer, he later obtained a Senior Reactor Operator License and was promoted to Operations Shift Manager in 2006. In that role, he oversaw an operations crew; developed expertise in reactor systems and emergency preparedness; and was responsible for ensuring compliance with state and federal regulations.

The NRC requires nuclear plants to adopt Corrective Active Programs, which are "system[s] by which a utility finds and fixes problems at the plant." First Suppl. Compl. ¶ 15, ECF No. 79 (explaining that Corrective Action Programs "include[] a process for evaluating the safety significance of the problems, setting priorities in correcting the problems, and tracking them until they have been corrected"). Issue Reports ("IRs")—written notifications of safety issues entered into a Corrective Action Program—are a way in which safety concerns are reported to the NRC, which reviews IRs implicating actual or potential regulatory violations as a matter of course.

I.  **Events Preceding December 16, 2015 Occupational Safety and Health Administration ("OSHA") Complaint**

On or about April 13, 2015, Plaintiff reported safety and regulatory violations to the NRC in reference to an IR referred to as IR 2484352. IR 2484352 "contributed to and/or resulted in" the NRC issuing a Violation of Technical Specifications as documented in a July 30, 2015 inspection report. *Id.* ¶ 17.

On June 15, 2015, Plaintiff's crew underwent training involving a simulated nuclear accident. During the training, Operations Director Hal Dodd gave the crew a directive—"to wait for the reactor to depressurize 50 pounds" before taking remedial action in an emergency—that Plaintiff believed would dangerously "increase[] the risk of a core melt sequence and uncontrolled release of radiation." *Id.* ¶¶ 18, 20. After learning that Dodd intended for him to

2

include the directive in a remediation plan, Plaintiff expressed his concerns to Site Vice President Scott Darin. Plaintiff refused to include the directive in the plan.

On June 17, 2015, Plaintiff learned from a Training Instructor that Dodd had directed the Training Instructor to suppress critical examination information from the training. That led Plaintiff to believe Dodd was "bullying and intimidating his crew contrary to NRC rules and standards mandating ExGen to ensure a Safety Conscious Work Environment." *Id.* ¶ 23. On June 18, 2015, Dodd falsely claimed that he had not given the directive, becoming angry and threatening Plaintiff.

Plaintiff told management he would submit an IR to the NRC to resolve the lack of clarity regarding emergency response protocol. On June 23, 2015, he initiated IR 2518572, documenting his safety concerns related to the training as well as the qualifications of certain non-licensed and/or non-certified employees in potential violation of federal regulations.

On June 25, 2025, ExGen removed Plaintiff's security clearance, inactivated his NRC license, suspended him, and required him to undergo a psychological evaluation. An ExGen manager informed Plaintiff the evaluation was due to having submitted an "emotionally-driven IR." *Id.* ¶ 48 (quotation marks omitted). Plaintiff was cleared to return on July 9, 2015, but his security clearance was not restored until August 18, 2015 and he was not permitted to return to work until August 19, 2015. The eight-week gap in his security clearance adversely affected his record.

On August 6, 2015, Plaintiff filed a claim with the NRC related to IR 2518572, referencing "compelling evidence [the] training department had been intimidated and suppressed." *Id.* ¶ 29 (quotation marks omitted). On August 24, 2015, he initiated IR 2545522,

3

which pertained to "inconsistent and conflicting information the directive [sic] regarding the June 2015 [training] and in ExGen's . . . response to IR 2518572." *Id.* ¶ 30.

Upon returning to work, Plaintiff was demoted to Unit Supervisor. He eventually was reassigned to the training department, where he had no supervisory authority, few assignments, and no paid overtime. First assigned to work in a small windowless room, he later was moved to what coworkers called "The Cubical [sic] of Shame." *Id.* ¶ 58 (quotation marks omitted).

On December 16, 2015, Plaintiff filed an OSHA complaint reporting the discrimination against him. OSHA informed ExGen of Plaintiff's complaint.

## II.     Events Preceding April 28, 2017 OSHA Complaint

From April 2016 to October 2016, Plaintiff identified additional nuclear safety concerns and initiated a series of IRs and reports to the NRC related to those concerns. On April 15, 2016, he initiated IR 2656377, "identif[ying] . . . failures allowing a degraded Primary Containment Isolation Valve and safety system to be placed in service, an actual or potential regulatory violation." *Id.* ¶ 34. On August 29, 2016, he initiated IR 2709786, "expos[ing] the failure to take corrective actions in response to the progressive fouling of all essential cooling water piping," which "impaired the ability of safety systems to mitigate a nuclear accident." *Id.* ¶ 35. On September 14, 2016, he reported actual or potential regulatory violations related to ExGen's response to IR 2709786. On October 7, 2016, he "expanded further" on IR 2709786 and was prompted to initiate IR 2725625. *Id.* ¶ 37. And on October 28, 2016, he initiated four IRs related to the safety of "the Ultimate Heat Sink, an essentialsystem [sic] for assured water supply and atmospheric conditions to absorb reactor decay heat." *Id.* ¶ 38.

On November 1, 2016, Plaintiff reported to Darin that a crew member who had failed a training was passed while Plaintiff was failed despite passing. The next day, ExGen revoked

Plaintiff's security clearance, removed him from his position, and put him on involuntary leave without pay. ExGen informed Plaintiff that, to return to work, he would be required to apply for open positions like a new hire and sign a commitment pledging to change certain behaviors. Plaintiff refused to do so.

On April 28, 2017, Plaintiff filed his second complaint with OSHA based on the ongoing discrimination.

### III. Events Preceding July 24, 2020 and August 21, 2020 OSHA Complaints

"In November 2017, ExGen reinstated Plaintiff to employment." *Id.* ¶ 66. However, he was assigned to a new position involving substantially less responsibility located 100 miles away from the Quad Cities Station. As a result, "Plaintiff was not in a firsthand direct position to identify and report safety issues in plant operations." *Id.* ¶ 67.

Then, in July 2019, Defendants began acting with "re-energized animus toward Plaintiff" due to his disclosures of "persistent and material misrepresentations to the public and [state and federal] regulators as to the safety and financial viability of ExGen," *id.* ¶ 68, which "indicated that [ExGen] made false claims to the Illinois legislature for passage of the Future Energy and Jobs" Act, Illinois Senate Bill 2814, *id.* ¶ 44. According to media reports, ExGen committed to keeping the Quad Cities Station and another plant open for another ten years in exchange for subsidies. Plaintiff's disclosures "implicated significant financial, regulatory and political consequences" threatening ExGen's ability to do so. *Id.* ¶ 45. Because Defendants "knew of these issues prior to making their commitment," Plaintiff "reasonably believed" that Defendants made false claims in exchange for the subsidies, favorably influencing shareholder value. *Id.*

On or about July 25, 2019, ExGen informed the NRC that Plaintiff no longer required licensure, causing him to lose his Senior Reactor Operator License. On November 7, 2019, Plaintiff filed his initial complaint in this action.

At some point, Defendants began a "targeted investigation" into Plaintiff's conduct, which Plaintiff learned of via email from Exelon Corporation Senior Physical Security Specialist Vince Genualdi on June 2, 2020. *Id.* ¶ 71. Defendants demanded Plaintiff sign a gag provision admitting he had exported ExGen documents to lawyers and regulators. On July 22, 2020, Plaintiff responded via email expressing his "understanding . . . that the NRC, [Securities Exchange Commission ("SEC")], and [Department of Labor] prohibit companies from enforcing" such provisions. *Id.* ¶ 74 (quotation marks omitted). Genualdi promised he would address Plaintiff's concerns, but when Plaintiff submitted a revised version of the attestation asserting his right to export documents for the purpose of making protected disclosures, he received no response. Plaintiff subsequently filed two additional OSHA complaints on July 24, 2020 and August 21, 2020.

### IV.     Procedural History

Plaintiff filed this action in the Northern District of Illinois. *See generally* Compl., ECF No. 1. ExGen moved to transfer venue to the Central District of Illinois, which U.S. District Judge Edmond E. Chang, then presiding over the case, granted. *See* Aug. 30, 2021 Order 1, 10, ECF No. 65. On February 1, 2022, Magistrate Judge Jonathan E. Hawley granted Plaintiff leave to file the First Supplemental Complaint. *See* Feb. 1, 2022 Order 1, ECF No. 78.

Plaintiff's original complaint brought claims against ExGen for violations of the anti-retaliation provision of the Energy Reorganization Act of 1974 ("ERA"), 42 U.S.C. § 5851; violations of the Illinois Whistleblower Act, 740 ILCS 174/1–40; and common law retaliatory

discharge.  *See* Compl. ¶¶ 74–136.  The First Supplemental Complaint adds an additional ERA retaliation claim against ExGen as well as a claim alleging that ExGen and new defendant Exelon Corporation violated the anti-retaliation provision of the Sarbanes–Oxley Act of 2002 ("Sarbanes–Oxley" or "SOX"), 18 U.S.C. § 1514A(a).  *See* Mot. File First Suppl. Compl. 1, 13–14, ECF No. 73 (seeking leave to file the new federal claims); *see also* First. Suppl. Compl. ¶¶ 109–15 (Plaintiff's SOX claim).  The instant motions followed.

## DISCUSSION

### I. Proposed Replies

For all motions other than those for summary judgment, the Local Rules provide that "[n]o reply to the response is permitted without leave of Court."  *See* Civil LR 7.1(B)(3).  Replies may be allowed for reasons including the non-movant's "introduc[tion] of new and unexpected issues in his response," *Shefts v. Petrakis*, No. 10-cv-1104, 2011 WL 5930469, at *8 (C.D. Ill. Nov. 29, 2011), and the interest of completeness, *see Vought v. Bank of Am., N.A.*, No. 10-CV-2052, 2013 WL 3336883, at *2 (C.D. Ill. July 2, 2013).

Here, Defendants seek leave to file short replies addressing arguments raised in Plaintiff's response.  *See* Mot. Leave File ExGen Reply 1 ("There are two points made in the [response] which, in ExGen's view, warrant a very brief reply."); Mot. Leave File Exelon Corp. Reply 1 ("Plaintiff[] . . . makes several arguments and admissions which warrant, in Exelon Corporation's view, a brief reply.").  Plaintiff opposes neither motion.  Accordingly, both motions are granted.  The Clerk is directed to file ExGen's reply, Mot. Leave File ExGen Reply Ex. A, ECF No. 96-1 ("ExGen Reply"), and Exelon Corporation's reply, Mot. Leave File Exelon Corp. Reply Ex. A, ECF No. 97-1 ("Exelon Corp. Reply"), on the docket.

7

## II. Motions to Dismiss

### a. Legal Standard

A complaint must contain a "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A party may move to dismiss a complaint if it fails to state a claim upon which relief can be granted. *Id*. 12(b)(6). When analyzing the sufficiency of a complaint, the court "must construe it in the light most favorable to the plaintiff, accept well-pleaded facts as true, and draw all inferences in the plaintiff's favor." *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 826 (7th Cir. 2014). The court must "determine whether [the complaint's well-pleaded factual allegations] plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). These allegations must "raise a right to relief above the speculative level." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1084 (7th Cir. 2008) (quotation marks omitted); *see also Carlson*, 758 F.3d at 826–27 ("A claim must be plausible rather than merely conceivable or speculative, meaning that the plaintiff must include enough details about the subject-matter of the case to present a story that holds together." (citations and quotation marks omitted)).

### b. Analysis

#### i. The Parties' Briefing

ExGen and Exelon Corporation have filed separate, but similar, motions to dismiss. ExGen's partial motion to dismiss seeks to dismiss Plaintiff's SOX claim. Mem. Supp. ExGen Mot. Dismiss 1, 15, ECF No. 89. ExGen argues Plaintiff does not state a claim because his allegations do not suggest he engaged in activity protected by SOX. *Id.* at 5, 8–15. Exelon Corporation likewise seeks to dismiss the SOX claim,[3] Mem. Supp. Exelon Corp. Mot. Dismiss

---

[3] Exelon Corporation also seeks to dismiss what it perceives to be Plaintiff's common law retaliatory discharge claim against it. *See* Mem. Supp. Exelon Corp. Mot. Dismiss 1, ECF No. 92. It advances several arguments to

1, ECF No. 92, arguing it fails as a matter of law because it was not Plaintiff's employer, *id.* at 5–6. Like ExGen, Exelon Corporation also maintains Plaintiff's claim fails because he fails to allege that he engaged in protected activity. *Id.* at 7–13.

Plaintiff filed a single response. He contends that the majority of Defendants' arguments have already been adjudicated in his favor, Opp. Mot. Dismiss 1–3, ECF No. 95, so he responds to only the "[n]ew [i]ssues [r]aised" in Defendants' motions, *id.* at 3–8. He then argues that Federal Rule of Civil Procedure 12(b)(6) is "a tough sell" in SOX cases because "legislated fiat" imposes "a low standard of causation" at summary judgment and/or trial, *id.* at 10–11 & 10 n.13 (discussing the "burden of proof battlefields" in whistleblower cases); highlights criticism of the Supreme Court's decision in *Iqbal*, *id.* at 8–9, 13–14; and urges the Court to consider SOX's "broad remedial purpose" and "draw upon the nation's Enron experience," *id.* at 14–17. Along the way, he recommends literature on topics ranging from war crimes prosecutions, *id.* at 9 n.12, to "neoclassical axiomatic choice theory" and "the idea of ontology driven by logic," *id.* at 12–13 n.16 (quotation marks omitted).[4]

At least some of this must be untangled before proceeding to the merits of Defendants' motions. First, "[t]his Court" has never determined that Plaintiff has plausibly alleged a SOX

---

support dismissal, including that Plaintiff's allegation of "temporary dismissal" by ExGen is insufficient to "allege that he was actually discharged." *Id.* at 13–14. In his response, however, Plaintiff clarifies that his retaliatory discharge claim "w[as] expressly pleaded *only* against ExGen." Opp. Mot. Dismiss 4 n.3, ECF No. 95 (emphasis added). Although Plaintiff responded to Exelon Corporation's temporary dismissal argument, *id.* at 7–8, that argument was not raised by ExGen, s*ee generally* Mem. Supp. ExGen Mot. Dismiss, and nothing before the Court indicates that ExGen seeks to dismiss the retaliatory discharge claim against it, *see, e.g.,* ExGen Mot. Dismiss 1 ("Defendant . . . moves to dismiss Plaintiff's Second Federal Claim: Discrimination In Violation Of The Sarbanes Oxley Act with prejudice." (quotation marks omitted)); *see also generally* ExGen Reply. Accordingly, the Court will confine its analysis of Defendants' motions to Plaintiff's SOX claim. Exelon Corporation's motion to dismiss is moot to the extent that it seeks dismissal of a retaliatory discharge claim.

[4] The Court does not doubt that the various articles gestured at by Plaintiff throughout his response are "good read[s]," Opp. Mot. Dismiss 7 n.7. But it is not the Court's obligation to comb through this material to determine its potential relevance. *Cf. United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs."); *Dal Pozzo v. Basic Mach. Co.*, 463 F.3d 609, 613 (7th Cir. 2006) ("An advocate's job is to make it easy for the court to rule in his client's favor . . . .").

claim or ever considered Defendants' arguments under that umbrella. *See id.* at 1–3. Rather, Judge Hawley granted Plaintiff leave to file a supplemental complaint *adding* a SOX claim. Feb. 1, 2022 Order 2, 5. Judge Hawley, however, took no position on the ultimate viability of that claim. *Id.* at 4 ("It is far from certain that the proposed supplemental complaint would *not* survive a motion to dismiss"); *cf.* 28 U.S.C. § 636(b)(1)(A) (providing that a magistrate judge generally has no authority to resolve 12(b)(6) motions). Plaintiff's intimation that Judge Hawley "full[y] consider[ed]" and rejected Defendants' arguments, *see* Opp. Mot. Dismiss 2, is further belied by Judge Hawley's explanation of his own reasoning: Given "the standard . . . to *liberally* allow amendment," he would not "fully delve into the parties' arguments" but instead exercise his "broad discretion" to grant Plaintiff's motion, *see* Feb. 1, 2022 Order 4–5.

As a practical matter, Plaintiff's response does not address the majority of Defendants' arguments. *Cf.* Opp. Mot. Dismiss 1–3 (reasoning that those arguments "have already been decided against . . . Defendants"). Nevertheless, Plaintiff addressed similar arguments in his reply to ExGen's response opposing his motion for leave to file the First Supplemental Complaint. *See generally* Pl.'s Reply, ECF No. 77. Because Plaintiff intends to "incorporate[] by reference" that reply into his response, Opp. Mot. Dismiss 2, the Court will consider Plaintiff's reply here. But the Court cautions him that incorporation by reference is, for good reason, disfavored. *See Miller UK Ltd. v. Caterpillar, Inc.*, 292 F.R.D. 590, 592–93 (N.D. Ill. 2013) ("Adopting by reference arguments in documents other than in the brief dealing with the particular point under consideration not only provide[s] an effective means of circumventing the page limitations on briefs . . . [but] unnecessarily complicate[s] the task of [the] . . . judge." (alterations in original) (quotation marks omitted)); *see also Slaven v. Great Am. Ins. Co.*, No. 11 C 7993, 2014 WL 4470723, at *2 (N.D. Ill. Sept. 11, 2014) ("While purportedly designed to

avoid repetition, [incorporation by reference] simply compound[s] the difficult[y] of keeping things straight . . . ."). Going forward, the Court will not hesitate to disregard improperly presented arguments. *Cf.* Civil LR 7.1(B)(2), (4).

### ii. Sufficiency of Plaintiff's SOX Claim

Congress enacted Sarbanes–Oxley "to prevent and punish corporate and criminal fraud, protect the victims of such fraud, preserve evidence of such fraud, and hold wrongdoers accountable for their actions." *Lawson v. FMR LLC*, 571 U.S. 429, 432, 434 (2014) (quotation marks omitted). SOX enshrines protections for employees who break the "corporate code of silence" to expose certain types of misconduct. *See id.* at 434–35 (quotation marks omitted). Specifically, it proscribes publicly traded companies from retaliating against employees who

> provide information, cause information to be provided, or otherwise assist in an investigation regarding any conduct which the employee reasonably believes constitutes a violation of [the federal statutes prohibiting mail fraud, wire fraud, bank fraud, or securities or commodities fraud], any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders . . . .

18 U.S.C. § 1514A(a)(1). To state a SOX retaliation claim, an employee must allege "(1) the defendants' involvement; (2) that she engaged in a type of protected activity set forth in 18 U.S.C. § 1514A(a)(1); (3) that she suffered an adverse employment action . . . ; and (4) that the adverse employment action was sufficiently motivated by [her] protected activity." *Bishop v. PCS Admin. (USA), Inc.*, No. 05 C 5683, 2006 WL 1460032, at *1 (N.D. Ill. May 23, 2006); *cf. Verfuerth v. Orion Energy Sys., Inc.*, 879 F.3d 789, 793 (7th Cir. 2018) ("[To prevail on a SOX claim, a] plaintiff must prove that he engaged in protected whistleblowing, that his employer knew he engaged in protected whistleblowing, and that his whistleblowing was a contributing factor in some unfavorable action taken by the employer against the employee.").

11

Crucially, not all whistleblowing constitutes protected activity under SOX. As the Seventh Circuit has explained, SOX only "protects employees who reveal evidence of certain types of fraud, such as securities fraud or wire fraud." *Verfuerth*, 879 F.3d at 793. Moreover, "[w]histleblowing is protected . . . only if the employee subjectively believed fraud was occurring *and* was objectively reasonable in holding that belief." *Id.* Courts will dismiss a SOX retaliation claim without factual allegations supporting subjective belief and/or objective reasonableness. *See, e.g.*, *Nielsen v. AECOM Tech. Corp.*, 762 F.3d 214, 222–24 (2d Cir. 2014); *Wiest v. Lynch*, 710 F.3d 121, 134–38 (3d Cir. 2013); *Fuqua v. SVOX AG*, No. 14 C 216, 2014 WL 3811047, at *7 (N.D. Ill. Aug. 1, 2014); *Bishop*, 2006 WL 1460032, at *9.

Plaintiff defines his protected activities broadly and somewhat inconsistently. *Compare* First Suppl. Compl. ¶ 111 (alleging Plaintiff's protected activities consisted of "filing and pursuing" his OSHA complaints, "all information provided to or acquired by OSHA" in its investigations, and this action), *with* Pl.'s Reply 3–7 (discussing "exporting important regulatory information," "protected activities related to this regulatory information," and Plaintiff's July 22, 2020 email objecting to the proposed gag provision as protected activities). This ambiguity is itself problematic.[5] *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (explaining that the federal pleading rules exist "in order to give the defendant fair notice of what the claim is and the grounds upon which it rests" (quotation marks omitted) (alteration omitted)). For purposes of the instant analysis, the Court ascertains the relevant activities as (1) Plaintiff's IRs, safety

---

[5] The structure of the First Supplemental Complaint perhaps compounds this ambiguity. A section of the First Supplemental Complaint is titled, in relevant part, "SOX Complaint Protected Activity (June 2[, 2020] to July 22, 2020)," *see* Pl.'s Reply 3–4 n.3 (quotation marks omitted), which led ExGen to argue previously that Plaintiff was "rel[ying] on protected activity that allegedly occurred [between those dates] to support his SOX claim," Opp. Mot. File First Suppl. Compl. 2, ECF No. 75. However, Plaintiff explained that those dates "were not intended to delineate or describe protected activities" but rather to correspond to the dates of the adverse actions. *See* Pl.'s Reply 3–4 n.3. Thus, although Plaintiff "first received notice of the investigation against him" on June 2, 2020, the protected disclosures at issue occurred prior to that date. *See id.* at 5–6; *see also id.* at 4 n.2 (suggesting that the protected disclosures occurred in 2018, 2019, and 2020).

reports to the NRC, and any adjacent activity (including exporting information) directly related to those reports; (2) any other "reports and disclosures [(including exporting information)] indicat[ing] . . . false claims" were made pertaining to SB 2814, First Suppl. Compl. ¶ 44; and (3) Plaintiff's July 22, 2020 email. The Court addresses each in turn.

First, Plaintiff's IRs and related reports to the NRC—as well as any exporting of information related to those activities—cannot sustain a SOX claim because those disclosures pertain to nuclear safety issues beyond SOX's ambit. Moreover, no allegations in the First Supplemental Complaint suggest Plaintiff undertook those actions due to a subjective belief that Defendants had committed fraud of the sort SOX contemplates. One case cited by ExGen is especially persuasive on this point. *See* Mem. Supp. ExGen Mot. Dismiss 8–11. In *Gauthier v. The Shaw Group, Inc.*, No. 3:12–cv–00274–GCM, 2012 WL 6043012 (W.D.N.C. Dec. 4, 2022), the plaintiff alleged retaliation after challenging an audit report concealing a defective steel shipment. *Id.* at *1–2. But the court dismissed his SOX claim, finding that his allegations "reflect[ed] that he held no objective or subjective belief that his employer's conduct related to a relevant securities violation." *Id.* at *6. The Court explained that

> Plaintiff's objective words and actions as well as his subjective beliefs reflect[ed] that he did not believe he was complaining of conduct that would constitute a fraud against Defendants' shareholders at the time he communicated his concerns to his employer. His complaints were clearly aimed at rectifying conduct that raised nuclear safety concerns and constituted possible violations of NRC regulations or the ERA.

*Id.* Other courts have dismissed SOX claims on similar analysis. *See, e.g.*, *Portes v. Wyeth Pharms., Inc.*, No. 06 Civ. 2689(WHP), 2007 WL 2363356, at *5 (S.D.N.Y. Aug. 20, 2007) ("[Plaintiff's] disclosures . . . were concerned exclusively with violations of regulations governing the manufacture of pharmaceuticals. The circumstances of the disclosures do not suggest a concern that [his employer] was being unfair to its investors . . . [or] that its lack of

compliance with FDA regulations might have implications for its reports to investors and the SEC . . . ."); *Neely v. Boeing Co.*, CASE NO. C16-1791 RAJ, 2018 WL 2216093, at *4 (W.D. Wash. May 15, 2018) ("Plaintiff made complaints regarding [his employer's] alleged failure to comply with [aviation] regulations, but [he] does not allege that he reported his belief that these actions were defrauding . . . shareholders to [his employer] or to any other federal agency.").

Here, too, Plaintiff's words, actions, and the animating beliefs he alleges overwhelmingly demonstrate that a concern for nuclear safety, not fraud, motivated his IRs and related disclosures to the NRC. *See, e.g.*, First Suppl. Compl. ¶¶ 24, 27, 29, 32–38. The absence of a SOX claim based on these protected activities in Plaintiff's initial complaint also "militates against him having the belief at the time he engaged in . . . protected activity, . . . suggest[ing] instead that he acquired that belief thereafter." *See* Mem. Supp. ExGen Mot. Dismiss 9 (quoting *In re Leak v. Dominion Res. Servs.*, Case No: 2006-SOX-12, 2006 WL 6576804 (U.S. Dept. of Labor SAROX May 12, 2006)).

Second, as to Plaintiff's reports and disclosures indicating that ExGen made false claims about its viability to the state legislature, it is not clear from the First Supplemental Complaint if Plaintiff is alleging that *his IRs and reports to the NRC themselves* indicated that those false claims occurred or if Plaintiff made additional, separate disclosures. *Compare* First Suppl. Compl. ¶ 44 ("Plaintiff's reports and disclosures indicated that [ExGen] made false claims to the Illinois legislature . . . ."), *with id.* ¶ 68 ("Plaintiff has been disclosing the Defendants' persistent and material misrepresentations to the public and regulators as to the safety and financial viability of ExGen."). If it is the latter, then the First Supplemental Complaint lacks any factual specificity about those disclosures. *Cf. Wiest*, 710 F.3d at 137 (emphasizing the plaintiff's failure to "specify anything about the nature or content of his communications" in resolving the

14

defendant's motion to dismiss). However, Plaintiff appears to be alleging the former. *See* Pl.'s Reply 7–8 (arguing that Plaintiff's "*prior* protected reports . . . not only presented a threat to public health and safety, but also implicated significant financial, regulatory, and political consequences" (emphasis added)). And insofar as that is the case, the problems discussed above also apply here. Plaintiff fails to even allege that he made those disclosures due to a belief that fraud was occurring. *See Colesanti v. Becton Dickinson*, C.A. No. 18-491WES, 2019 WL 4043957, at *10 (D.R.I. July 19, 2019) (characterizing the absence of an allegation that the plaintiff "ever formed . . . a belief" that he "revealed conduct amounting to fraud" as a "threshold deficiency" in his SOX claim). And his allegations do not support that inference: As previously explained, Plaintiff's allegations, particularly when coupled with the timeline of this litigation, do not suggest that his disclosures were motivated by a subjective belief that he was reporting fraud within SOX's purview but rather demonstrate a concern for nuclear safety.

      Relatedly, although Plaintiff broadly references "persistent and material misrepresentations to the public and regulators as to the safety and financial viability of ExGen," First Suppl. Compl. ¶ 68, he fails to explain how his reports "implicate[] any of the enumerated provisions in § 1514A," *Nielsen*, 762 F.3d at 223 (emphasis omitted). Though he appears to allege shareholder fraud, First Suppl. Compl. ¶ 46, he fails to "discuss the elements of shareholder fraud or demonstrate how . . . [to] connect the dots to conclude he had a reasonable belief—or a reasonably mistaken belief—that shareholder fraud was occurring." *Erhart v. BofI Holding, Inc.*, Case No. 15-cv-02287-BAS-NLS, 15-cv-02353-BAS-NLS, 2020 WL 1550207, at *21 (S.D. Cal. Mar. 31, 2020); *see also Bishop*, 2006 WL 1460032, at *9 ("Plaintiff does not support her conclusory contentions with an explanation of how exactly the compliance program with which she disagreed violated § 1341, § 1343, or an SEC regulation related to fraud.").

15

Absent those basic details, the First Supplemental Complaint does not sufficiently allege that Plaintiff possessed an objectively reasonable belief that SOX-contemplated fraud occurred, nor does it present "a story that holds together," *Carlson*, 758 F.3d at 826–27 (quotation marks omitted). *Cf. Swanson v. Citibank, N.A.*, 614 F.3d 400, 405 (7th Cir. 2010) ("A more complex case involving financial derivatives, or tax fraud that the parties tried hard to conceal, or antitrust violations, will require more detail, both to give the opposing party notice of what the case is all about and to show how, in the plaintiff's mind at least, the dots should be connected.").

Finally, Plaintiff's July 22, 2020 email does reference a concern related to potential SEC rule violations. First Suppl. Compl. ¶ 74. But Defendants, citing *Bishop*, argue that email cannot sustain a SOX claim because the implicated rule does not involve fraud against shareholders and no adverse action postdates the email. *See* Mem. Supp. ExGen Mot. Dismiss 14–15; Mem. Supp. Exelon Corp. Mot. Dismiss 11, 12–13. Plaintiff does not appear to respond to the latter argument, and as to the former, he merely states that Defendants are "wrong on the law," Pl.'s Reply 3. Even if Defendants are wrong, Plaintiff must do more than assert it: He must cite authority to support that contention or explain why Defendants' authority should be disregarded. "It is not the Court's responsibility to find arguments, facts, and supporting case law for the parties." *Sanders v. JGWPT Holdings, Inc.*, No. 14 C 9188, 2016 WL 4009941, at *11 (N.D. Ill. July 26, 2016); *see also Kirksey v. R.J. Reynolds Tobacco Co.*, 168 F.3d 1039, 1041 (7th Cir. 1999) ("If [judges] are given plausible reasons for dismissing a complaint, they are not going to do the plaintiff's research and try to discover whether there might be something to say against the defendants' reasoning.").

## CONCLUSION

Accordingly, Defendant Exelon Generation Company, LLC's ("ExGen") partial motion to dismiss, ECF No. 88, is GRANTED; Defendant Exelon Corporation's motion to dismiss, ECF No. 91, is GRANTED in part and otherwise MOOT; ExGen's motion for leave to file a reply, ECF No. 96, is GRANTED; and Exelon Corporation's motion for leave to file a reply, ECF No. 97, is GRANTED.  Plaintiff's Sarbanes–Oxley Act of 2002 claim against Defendants is DISMISSED with prejudice.  *See Indep. Tr. Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 943 (7th Cir. 2012) (affirming the district court's dismissal with prejudice where the plaintiff "did not request the opportunity to amend . . . [and] did not offer any meaningful indication of how it would plead differently").  The Clerk is directed to file both replies and terminate Exelon Corporation as a party on the docket.

Entered this 28th day of February, 2023.

s/ Sara Darrow<br>
SARA DARROW<br>
CHIEF UNITED STATES DISTRICT JUDGE