# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS

**BRIAN MAGNUSON,**

   Plaintiff,

vs.

**EXELON GENERATION COMPANY, LLC,**

   Defendant.

Case No.: 4:21-cv-04142-SLD-JEH

Hon. Sara L. Darrow

### PLAINTIFF BRIAN MAGNUSON'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

I. INTRODUCTION ........................................................................................ 5

II. ...MAGNUSON'S PARAGRAPH BY PARAGAPH RESPONSE TO EXGEN'S STATE OF DISPUTED MATERIAL FACTS ........................................................... 7

III.  MAGNUSON'S COUNTERSTATEMENT OF UNDISPUTED FACTS ................... 109

IV.  FACT ARGUMENT.............................................................................. 120

   A.  Defendant has Tainted its Undisputed Facts with Argument ................... 120

   B.  Defendant's Undisputed Facts are Full of Subjective Characterization: .................. 124

   C.  Defendant's Undisputed Facts are Replete with Spin: .............................. 127

V.  APPLICABLE LEGAL STANDARD.......................................................... 129

VI.  CLAIM ELEMENTS UNDER THE ERA- MURRAY V. UBS.................................. 129

VII. MAGNUSON'S COMMON LAW RETALIATORY DISCHARGE CLAIMS EASILY SURVIVE SUMMARY JUDGMENT. .............................................. 133

VIII.  MS. TECHAU AND OTHERS KNEW MAGNUSON WAS A WHISTLEBLOWER WHEN SHE/THEY MADE THOSE DECISIONS. .......................... 135

*MAGNUSON'S OPPOSITION TO THE MSJ - 1*

IX.  MAGNUSON HAS RAISED GENUINE ISSUES OF MATERIAL FACT RE THE CONTRIBUTING FACTOR ELEMENT. ............................................................................ 137

X.  MAGNUSON HAAS RAISED GENUINE ISSUES OF MATERIAL FACT RE THE MATERIALLY ADVERSE ACTION ELEMENT. ........................................................... 139

XI.  CONSTELLATION IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE PLANNED REALIGNMENT OF MAGNUSON'S SHIFT MANAGER DUTIES ............. 141

XII. MAGNUSON'S ASSIGNMENT TO THE TRAINING DEPARTMENT IN SEPTEMBER 2015 WAS NOT CAUSED BY MAGNUSON'S "REFUSAL" TO WORK UNDER DODD; MANAGEMENT ASSIGNED HIM THERE DESPITE MAGNUSON'S WILLINGNESS AND DESIRE TO RETURN TO THE CONTROL ROOM EVEN WITH DODD STILL THERE. .................................................................................................... 142

XIII. CONSTELLATION IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE 2016 UNPAID LEAVE OF ABSENCE; TO THE CONTRARY, THAT ADVERSE ACTION WAS MAGNUSON'S DISCHARGE, AS EXPLAINED ABOVE ...................................... 144

XIV. ......... CONSTELLATION IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE GROUND THAT MAGNUSON FAILED TO EXHAUST ADMINISTRATIVE REMEDIES .................................................................................................................. 145

XV. CONSTELLATION IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE INVESTIGATION OF MAGNUSON'S EMAIL BECAUSE THERE ARE DISPUTED ISSUES OF FACT REGARDING THE KNOWLEDGE AND CONTRIBUTING FACTOR ELEMENTS OF HIS ERA CLAIM. ........................................................... 146

XVI.  MAGNUSON'S IWA CLAIMS SHOULD SURVIVE SUMMARY JUDGMENT . . 146

XVII.  CONCLUSION ....................................................................................................... 147

# TABLE OF AUTHORITIES

**Cases**

*Arizanovska v. Wal-Mart Stores, Inc.*, 682 F.3d 698, 704 (7th Cir. 2012) ........................ 134, 144

*Bechtel Const. Co. v. Secretary of Labor*, 50 F.3d 926, 934 (11th Cir.1995) .............................. 129

*Bio v. Fed. Express Corp.*, 424 F.3d 593, 597 (7th Cir.2005). ...................................................... 144

*Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 ........................................... 139

*Delgado v. United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 966 F.3d 556, 560 (7th Cir. 2020), ........................................................................ 130

*Dep't of the Navy v. Egan*, 484 U.S. 518 (1988). ......................................................................... 140

*Frobose v. Am. Sav. & Loan Ass'n*, 152 F.3d 602, 612 (7th Cir.1998)........................................... 131

*Hinthorn v. Roland's of Bloomington*, 119 Ill. 2d 526, 530 [sic] (Ill. 1988) .............................. 133

*Kahn v. Secretary of Labor*, 64 F.3d 271, 277 (7th Cir. 1995)...................................................... 129

*Marano v. Department of Justice*, 2 F.3d 1137, 1140 (Fed. Cir. 1993).......................................... 129

*Muino v. Dept. of Labor*, 325 Fed.Appx. 791, 793 (11th Cir. 2009) ............................................ 129

*Murray v. UBS Securities, LLC*, 601 U.S. 23, 36-37 144 S.Ct. 445 (2024) ................................ 129

*Nichols v. S. Ill. Univ.- Edwardsville*, 510 F.3d 772, 786-87 (7th Cir. 2008) ............................ 139

*Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir.2002). ..................................... 144

*Rattigan v. Holder*, 689 F.3d 764, 771 (D.C. Cir. 2012). ............................................................ 141

*Schnell v. Department of the Army*, 114 M.S.P.R. 83, ¶ 22 (2010). ............................................. 138

*St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993)....... 132

*Trimmer v. U.S. Dep't of Labor*, 174 F.3d 1098, 1101 (10th Cir.1999)........................................ 131

**Statutes**

15 USCS § 2087 (b) .............................................................................................. 131

18 U.S.C. § 1514A ............................................................................................... 131

42 U. S. C. §5851(b)(3) ...................................................................................... 131

45 U.S.C.S. § 431 ................................................................................................ 131

*MAGNUSON'S OPPOSITION TO THE MSJ - 4*

# I.  INTRODUCTION

Magnuson's First Supplemental Complaint for Damages and Injunctive Relief (D 73-1) (Complaint), filed November 19, 2021, the operative complaint in this case, contains two claims under Federal law, designated the First and Second Federal Claims,[1] and four claims under Illinois State Law and the common law (State Claims). In the First Federal Claim, based on the Energy Reorganization Act (ERA), Magnuson asserts that Constellation, his employer, retaliated against him for disclosures and activities protected under the ERA because they related to nuclear safety at the Quad Cities nuclear power station. The State Claims are pleaded under two provisions of the Illinois Whistleblower Act (IWA) and the common law doctrine prohibiting retaliatory discharge from employment for reporting health and safety violations, gross mismanagement and abuse of authority.

This case goes to the heart of whether the federal laws designed to protect whistleblowers in the nuclear industry have any teeth. Brian Magnuson was a veteran shift manager at Exelon Generation Company's Quad Cities nuclear plant with an unblemished 32-year record. That all changed when he started raising legitimate safety concerns about operations and management decisions in late 2014. Instead of addressing Mr. Magnuson's protected whistleblowing disclosures, Exelon retaliated against him through a malicious campaign of harassment, belittling, mental scrutiny, stripping of responsibilities, and ultimately termination.   Exelon's brutal and sneaky actions send a chilling message that whistleblowers in the nuclear industry will be crushed when

---

[1] The "Second Federal Claim," for "Discrimination in Violation of the Sarbanes Oxley Act" (Complaint, ¶¶ 109-115), was dismissed by this Court (Dkt.  129) and is therefore not at issue on the instant Motion. Magnuson will not address that dismissed claim in this memorandum.

*MAGNUSON'S OPPOSITION TO THE MSJ - 5*

they dare to speak up about safety lapses. The company employed a sophisticated pretextual strategy to camouflage its retaliatory motivations. It seized upon innocuous parts of Mr. Magnuson's demeanor, misconstruing them as "inappropriate behavior" justifying a bogus psychological evaluation. It fabricated criticisms of his job performance after decades of exemplary service. And it engaged in transparent gaslighting, portraying Mr. Magnuson as the instigator when he simply wanted to return to his vital duties protecting public safety.

The key facts demonstrate that Exelon's actions violated the employee protection provisions of the Energy Reorganization Act (ERA) as well as Illinois state law.  Mr. Magnuson repeatedly raised legitimate safety concerns about operations, management decisions, and a potential culture of coverups at the Quad Cities plant starting in late 2014. These concerns indisputably constitute protected whistleblowing activity under the ERA. In direct response to Mr. Magnuson's protected disclosures, Exelon management initiated a cascade of retaliatory personnel actions designed to force him out, including a bogus psychological fitness-for-duty evaluation, removal from his control room responsibilities, assignment to a demeaning make-work role, and ultimate termination via indefinite unpaid leave. The close timing between Mr. Magnuson's protected activities and the onset of Exelon's campaign of retaliation offers strong circumstantial evidence of the company's unlawful motivations. Exelon's purported reasons for taking these actions are a thinly-veiled pretext.

By retaliating against Mr. Magnuson for raising legitimate safety concerns, Exelon undermined the core purpose of the ERA's whistleblower protections and created a chilling effect that jeopardizes public safety. The evidence compellingly shows that Exelon committed calculated, systematic violations of federal and state whistleblower laws. The Court should therefore deny the company's motion for summary judgment and allow this case to proceed to trial.

*MAGNUSON'S OPPOSITION TO THE MSJ - 6*

## II.  MAGNUSON'S PARAGRAPH BY PARAGAPH RESPONSE TO EXGEN'S STATEMENT OF DISPUTED MATERIAL FACTS

| | Constellation's Alleged Fact[2] | Disputed/ Undisputed Material/ Immaterial | References/Exhibits |
|---|---|---|---|
| 1 | ExGen owns and operates nuclear power plants in Illinois, Pennsylvania, New York, and Maryland, and has corporate offices in Kennett Square, Pennsylvania and Warrenville, Illinois. ExGen operates its nuclear power plants pursuant to operating licenses issued by the U.S. Nuclear Regulatory Commission ("NRC"). (Cplt., Dkt. #79, at ¶ 7, Ex. 5.) | Undisputed, material | |
| 2 | Magnuson has been employed by ExGen (or its predecessor in interest) in various nuclear-power-related positions since 1983, first at ExGen's Quad Cities Nuclear Power Station and then, more recently, at ExGen's nuclear corporate office in Warrenville, Illinois. (Id. at ¶¶ 9-16; Magnuson Vol I Dep. 7:19-22, Ex. 1.) | Disputed, material | Magnuson was not employed by Exelon between November 2, 2016 and November 13, 2017.<br><br>Q. How long have you been employed by Exelon or Constellation? A. I started my career with -- it was actually Commonwealth Edison in 1983. I was terminated from Exelon in 2016. I was rehired by Exelon in November of 2017, and I continue to work for now Constellation. Q. … When you say that you were terminated, were you fired? A. Yes. Q. By whom? A. Wally Beck and Cindy Petersen. (Motion, Ex. 1, Magnuson Depo., Vol. 1, 8: 6-17) |
| 3 | Starting in June 2006, Magnuson was employed at Quad Cities as a Shift Manager | Undisputed, material | |

---

[2] Defendant made little effort to create a set of facts that were clearly undisputed, instead simply inserting their version of facts, which presented an unnecessary burden upon Plaintiff to contest an extensive set of disputed facts.

*MAGNUSON'S OPPOSITION TO THE MSJ - 7*

| | | | |
|---|---|---|---|
| | in the Operations Department and was individually licensed by the NRC to direct the safe operation of two commercial nuclear reactors. (Cplt. at ¶¶ 9-11.) | | |
| 4 | As a nuclear energy company, ExGen is highly regulated. (Cplt. ¶ 14.) | Disputed, immaterial | Complaint Para. 14: The Nuclear Station is *subject to* regulation of its operations by governmental agencies including the U.S. Nuclear Regulatory Commission (NRC) and the Illinois Emergency Management Agency (IEMA). Additionally, *the NRC relies on licensees to be self-regulated.*<br><br>Immaterial because Complaint Para. 14 is clear that the station is "subject to" regulation by the NRC, but this does not mean regulations are enforced. Ultimately whether they are regulated or not is immaterial because it does not speak to the ultimate issue here of whether Defendant retaliated against Plaintiff. |
| 5 | Because ExGen is licensed by the NRC to own and operate the Quad Cities nuclear reactors, it must follow federal regulations to maintain its license and to grant "unescorted access" to individuals who have unescorted access to the protected and vital areas of its nuclear power plants. (Cplt. ¶ 7; Techau Dep. 19:11-20:2, Ex. 11.) | Disputed, material | Disputed because the existence of federal regulations does not meant that Defendant must or does comply with federal regulations or will necessarily lose their license if they do not follow the applicable federal regulations. Plaintiff has alleged various breaches of federal regulations by Defendant that have not resulted in a loss of their license. However, Plaintiff does not dispute they are required to have programs around unescorted access. |
| 6 | "Access authorization" is a process required by NRC regulations that ExGen uses to determine trustworthiness and reliability to permit a person unescorted access to its plants. (Techau Dep. 19:23-21:3.) | Undisputed, immaterial | |

*MAGNUSON'S OPPOSITION TO THE MSJ - 8*

| | | | |
|---|---|---|---|
| 7 | At all relevant times, ExGen maintained programs required by NRC regulations regarding access authorization, behavioral observation, and fitness for duty requirements. These programs included an "Access Authorization Program" ("AAP"); a "Behavioral Observation Program" ("BOP"); and a "Fitness for Duty Program" ("FFD Program"). (Id. 10:11-17; 14:15-15:15; 19:11-21:3; 24:13-26:2.) | Undisputed, immaterial | |
| 8 | ExGen prepared its programs and policies in accordance with NRC regulations. (Techau Decl. ¶¶ 3-22, Ex. 21.) | Disputed, immaterial. | A bald assertion of compliance with regulations is not an undisputed material fact.  Techau can testify that she thinks ExGen is in compliance, but she is not a legal authority on whether in fact they are in compliance |
| 9 | ExGen's BOP requires every individual who has unescorted access authorization to observe and report immediately any behavior by any individual who holds unescorted access that the observer believes is aberrant, questionable, or unusual. (Magnuson Vol. II Dep. 255:18-256:12, Ex. 2; Techau Dep. 24:16-26:2; 33:12-34:19; Petersen Dep. 15:16-17:16, Ex. 10; Techau Decl. ¶¶ 5, 15, 17 and Ex. 2 thereto.) | Disputed, material | Defendant's BOP and NRC regulations do not rely on bare belief from the observer; the employee must be trained to conduct observation about particular questionable behavior, must engage in actual behavioral observation, and "*must rely upon signs or indications to look for*".

10 CFR § 26.33 BEHAVIORAL OBSERVATION PROVIDES:

Licensees and other entities shall ensure that the individuals who are subject to this subpart are subject to behavioral observation. *Behavioral observation must be performed by individuals who are trained under § 26.29 to detect behaviors* that may indicate possible use, sale, or possession of illegal drugs; use or possession of alcohol on site or while on duty; *or impairment from fatigue or any cause that, if left unattended,* |

*MAGNUSON'S OPPOSITION TO THE MSJ - 9*

*may constitute a risk to public health and safety or the common defense and security*. Individuals who are subject to this subpart shall report any FFD concerns about other individuals to the personnel designated in the FFD policy.

The ExGen BOP provides:
3.2.4. Shall report to their Supervisor and/or department head and site Security immediately when an individual is exhibiting other forms of questionable, unusual or aberrant behavior either on-site or off-site that may adversely affect the individual's trustworthiness and/or reliability, including behaviors that may adversely impact plant operations or the safety or security of a licensee facility, or that may constitute an unreasonable risk to the health and safety of employees, the public or the common defense and security, including a potential threat to commit radiological sabotage.
1. Each employee (contractor or Exelon) **must rely upon some signs or indications to look for that may indicate their co-workers, employees, or visitors are exhibiting questionable, unusual or aberrant behavior.**

(Techau Dec., Ex. 2, p. 7) (emphasis added):

The regulations require trained behavior observation form the basis for reporting "[i]ndividuals who are subject to an access authorization program under this section shall at a minimum, report any concerns *arising from behavioral observation*, including, but not limited to, concerns

| | | | |
|---|---|---|---|
| | | | related to any questionable behavior patterns or activities of others to the reviewing official, his or her supervisor, or other management personnel designated in their site procedures." (*Id.* at §73.56(f)(3); see also, 10 C.F.R. §26.33) |
| | | | Under the Access Authorization Program, the Behavioral Observation Program (BOP) is An awareness program that meets requirements of both the access authorization and fitness-for-duty programs. Personnel are: 1. Trained to report legal actions; 2. Trained to possess certain Knowledge and Abilities (K&A's) related to drugs and alcohol and the recognition of behaviors adverse to the safe operation and security of the facility by observing the behavior of others in the workplace and detecting and reporting aberrant behavior or changes in behavior that might adversely impact an individual's trustworthiness or reliability; and 3. Undergo an annual supervisory review. (Techau Dec. Ex. 1) |
| 10 | ExGen's BOP defines aberrant behavior and includes discussions of related questionable or unusual behaviors. (Techau Decl. ¶ 3 and Ex. 2 thereto.) | Undisputed, material | |
| 11 | The type of questionable behavior that would be of significance in a nuclear reactor setting is generally not the same that would be considered in an office setting. (Magnuson Vol. II Dep. 257:18-259:14.) | Undisputed, immaterial | It is immaterial what behaviors would be considered questionable in an office setting.   ExGen's BOP sets forth specific "questionable, unusual, or aberrant" behavior examples: |

*MAGNUSON'S OPPOSITION TO THE MSJ - 11*

2. Possible signs or indicators of questionable, unusual or aberrant behavior, issues or events, whether occurring on-site or off-site, that must be reported include, but are not limited to:

A. The violation of company policy, an ethics concern and/or theft of company property.

B. Questionable, or unusual interest in or predisposition towards security or operations activities outside the scope of their normal work assignments.

C. Uncharacteristic absences from work.

D. Frequent unexplained absence from work assignments.

E. Questionable, or unusual or inadequate response when confronted about being in a plant or office location outside of the worker's usual scope of work.

F. Questionable, or unusual views or opinions that might be directly or indirectly threatening to a nuclear facility, including extreme opposition to or distrust of the government or membership in anti-government groups or other groups that promote the over throw of the government.

G. Membership in clubs, groups, or organizations that promotes or advocates violence or that engage in violent activities.

H. Abnormalities such as vandalism and/or tampering. Examples of vandalism to plant equipment or facilities that may occur on-site or remotely through electronic access or other means, include but are not limited to:

1. Misaligned breakers or valves;
2. Cut wires or cables;

*MAGNUSON'S OPPOSITION TO THE MSJ - 12*

| | | |
|---|---|---|
| | | 3. Foreign objects in machinery, reservoirs or tanks;<br>4. Inappropriate holes drilled, punched or cuts in pipes tubes or hoses; and<br>5. Damage to or incapacity or modification of a component such that its safety or security function is impeded.<br>I. Signs of mental stress or illness, including thoughts of committing suicide or suicidal ideations or harming others.<br>J. Engaging in criminal activity, or having discussions about engaging in criminal activity, or making plans to commit a crime, including credible information of such activity, or discussions, or plans. This requirement applies to serious criminal offenses, including but not limited to:<br>1. Burglary, armed robbery, manslaughter, murder, assault, domestic violence;<br>2. Embezzlement or other forms of theft;<br>3. Conspiracy to commit a crime;<br>4. Terrorist activity or known terrorist associations;<br>5. The use, sale, distribution or possession of illegal drugs, including prescription drugs taken or distributed without a valid prescription;<br>6. Efforts to recruit others to be involved in criminal activities.<br>7. (This requirement does not apply to minor misdemeanor charges, such as parking tickets, non-injury traffic and speeding tickets, moving violations when an individual is not physically taken into custody and a court appearance |

*MAGNUSON'S OPPOSITION TO THE MSJ - 13*

| | | | is not required).<br>(Techau Dec., Ex. 2) |
|---|---|---|---|
| 12 | Every employee is trained annually on behavioral observation, including what to look for and how to determine questionable behaviors. (Techau Dep. 28:21; see also Magnuson Vol. II Dep. 255:17-260:2.) | Disputed, immaterial | Defendant does not train every employee annually on behavioral observation. ExGen limits this training to employees subject to the applicability of *§73.56 Personnel Access Authorization Requirements for Nuclear Power Plants,* and Part 26, *Fitness for Duty Programs.*<br><br>However, it is immaterial if every employee is trained on behavioral observation*,* only whether the employees in question followed BOP requirements devoid of retaliatory animus. |
| 13 | Reports of questionable behavior can be made through a number of possible channels, including to a supervisor or Human Resources. Those reports would then be sent to the Access Authorization and Fitness for Duty Program Manager, who is also a Reviewing Official. (Techau Dep. 24:16-26:2; 33:12-34:19; Petersen Dep. 15:16-17:16; see also Techau Decl. ¶¶ 5.) | Disputed, immaterial | The Fitness for Duty Program Manager is not necessarily a Reviewing Official but how the reports are made generally and to whom is immaterial to the matters at issue. |
| 14 | Once the Access Authorization and Fitness for Duty Program Manager receives a report of questionable behavior, that individual is required by the NRC regulations to review the information to determine whether it needs to be sent to the health care professional designated by the Program to make fitness determinations | Disputed, material<br><br><br><br>. | NRC regulations speak to the Reviewing Official, not the AA/FFD Program.<br><br>§73.56(f) Behavioral Observation provides:<br><br>(3) Individuals who are subject to an access authorization program under this section shall at a minimum, report any concerns arising from *behavioral* |

*MAGNUSON'S OPPOSITION TO THE MSJ - 14*

| | | | |
|---|---|---|---|
| pursuant to the NRC regulations. (Techau Dep. 26:3-13; Techau Decl. ¶ 6 and Ex. 2 thereto.) | | | *observation,* including, but not limited to, concerns related to any questionable *behavior patterns* or activities of others to the reviewing official, his or her supervisor, or other management personnel designated in their site procedures.<br><br>The recipient of the report shall, if other than the reviewing official, promptly convey the report to the reviewing official, who shall reassess the reported individual's unescorted access or unescorted access authorization status. The reviewing official shall determine the elements of the reassessment based on the accumulated information of the individual.<br><br>If the reviewing official has a reason to believe that the reported individual's trustworthiness or reliability is questionable, the reviewing official shall either administratively withdraw or terminate the individual's unescorted access or unescorted access authorization while completing the reevaluation or investigation. If the reviewing official determines from the information provided that there is cause for additional action, the reviewing official may inform the supervisor of the reported individual. |
| 15 | ExGen's mandated programs require the designed Medical Review Officer ("MRO") to evaluate potential fitness issues; make recommendations to place a hold on unescorted access; refer individuals to the Employee Assistance Program | Disputed, material | According to Part 26—*Fitness for Duty Programs* and § 73.56 *Personnel Access Authorization Requirements for Nuclear Power Plants,* the Medical Review Officer provides medical recommendations to the Reviewing Official, who makes access |

*MAGNUSON'S OPPOSITION TO THE MSJ - 15*

| | | | |
|---|---|---|---|
| | ("EAP") for an evaluation if the MRO deems an evaluation necessary; and determine whether an individual is fit to safely and competently perform his or her duties. (Techau Decl. ¶ 19.) | | authorization decisions, such as placing a hold on unescorted access. |
| 16 | A nuclear licensee such as ExGen is obligated to implement any determination or recommendation the MRO makes as part of a fitness determination. (Techau Decl. ¶ 20.) | Disputed, material<br><br>. | A nuclear licensee such as Exelon is obligated to comply with Part 26, Fitness for Duty Program and §73.56 Access Authorization.<br><br>Exelon is obligated to implement the determination or recommendation the MRO [Medical Review Officer] makes as part of a fitness determination—only if the MRO's determination or recommendation was made in accordance with Part 26 and/or §73.56. |
| 17 | At all relevant times, Susan Techau was ExGen's AccessAuthorization/ Fitness for Duty/ Inprocessing Program Manager ("Access/FFD Manager"). In that position, she was responsible for overseeing (a) compliance with the NRC's regulations governing access authorization, behavior observation, and fitness for duty programs and (b) the administration of ExGen's AAP, , and FFD Program. Techau also served as one of ExGen's Access Authorization Reviewing Officials. (Techau Dep. 10:11-17; Techau Decl. ¶¶ 1, 3, 4, 29, 70.) | Undisputed, immaterial. | Plaintiff does not have personal knowledge of Techau's job description and duties to contest this fact. However, her duties and title are immaterial as to the ultimate facts. |
| 18 | At all relevant times, Dr. Barbara Pohlman of Triangle Occupational Medicine, P.A., served as ExGen's outside, | Undisputed, immaterial | Pohlman's resume shows has been the President of Triangle Occupational Medicine for 23 years, so while she therefore may not be a "W2 |

*MAGNUSON'S OPPOSITION TO THE MSJ - 16*

| | | | |
|---|---|---|---|
| | contracted MRO and Substance Abuse Expert ("SAE") for purposes of implementing the NRC's regulations and ExGen's AAP, BOP, and FFD Program. (Pohlman Decl. ¶¶ 3-4, Ex. 20, and Ex. 1 thereto.) She is not an employee of ExGen. (*Id.;* Techau Dep. 26:15-21.) | | employee", she and her company receive payment from Defendant for her services. |
| 19 | Dr. Pohlman is a licensed physician and is trained and qualified as an MRO, and SAE under the NRC's regulations. (Pohlman Decl. ¶ 14.) | Undisputed, immaterial | Plaintiff lacks personal knowledge to speak to Pohlman's training or qualifications.  He has no knowledge of her being properly trained and qualified. |
| 20 | As an operator and Shift Manager who was individually licensed by the NRC to direct the safe operations of two nuclear reactors, Magnuson held a sensitive position and was a "critical group" employee who was required to maintain unescorted access subject to ExGen's AAP, BOP, and FFD Program. (Techau Dep. 60:12-61:18; 84:5-17; see also, Magnuson Vol. II Dep. 263:20-264:5.) | Undisputed, material | |
| 21 | The NRC also requires all nuclear licensees, including ExGen, to maintain a Corrective Action Program ("CAP"). (Cplt. ¶ 15; Magnuson Vol. I Dep. 21:19-22:3.) The CAP is the system by which a nuclear licensee finds, evaluates, and fixes problems at the nuclear plant. It includes a process for evaluating the safety significance of the problems, setting priorities in correcting the problems, and tracking them until they have been corrected. (Cplt. ¶ 15; Darin Decl.¶ 6, Ex. 14.) | Disputed, immaterial | Disputed because Plaintiff's position is that Defendant does not use the CAP system to fix all identified problems and track them until they are corrected. [See e.g. the OPEX based IR initiated by Nick Johnson discussed further below in para. 33-40] |

*MAGNUSON'S OPPOSITION TO THE MSJ - 17*

| | | | |
|---|---|---|---|
| 22 | At all relevant times, ExGen maintained a CAP as required by the NRC. The CAP contains "Issue Reports" ("IRs"), which are written notifications of safety or other issues that are entered by employees into the CAP system. Each IR is evaluated and classified for safety significance, assigned an employee responsible for research and addressing the issue, and tracked to ensure the issue is addressed. (Darin Decl. ¶7; Magnuson Vol. I Dep. 21:19-22:6.) | Disputed, immaterial. | Complaint, para. 28.<br><br>Plaintiff does not believe ExGen maintains a CAP consistent with NRC requirements Appendix B to Part 50 Criterion XVI, including because Plaintiff was retaliated for using the CAP and because the CAP process did not ensure issues were addressed.<br><br>However, the issue is immaterial because the material issue is whether Magnuson was retaliated against for the reports to management, IRs and/or reports to regulators that he made. |
| 23 | Between 2009 and 2015, employees and others at or associated with Quad Cities submitted more than 11,000 IRs annually, with more than 3,200 per year submitted by Shift Managers and other Operations employees. (Darin Decl. ¶ 8; Magnuson Vol. I Dep. 22:4-6.) | Undisputed, immaterial | Plaintiff lacks personal knowledge as to the numbers of IRs submitted annually, but said fact is immaterial. Whether there are numerous IRs submitted has no bearing on whether Plaintiff was retaliated against for a particular IR. Further: (1) Many IRs are of low-level significance or scope; (2) Plaintiff's 2015 IR implicated high levels of management in serious NRC regulatory failures; and (3) Plaintiff is not responsible for explaining when and why Defendant decides to start retaliating for a protected disclosure. |
| 24 | Between June 19, 2004 and November 20, 2015, Magnuson submitted more than 300 IRs. (Magnuson Vol. I Dep. 25:13-26:4; Ex. 22.) | Undisputed, immaterial | Plaintiff lacks personal knowledge as to the numbers of IRs he submitted over 11 years but said fact is immaterial. 1) Plaintiff is not responsible for explaining why and when Defendant decides to start retaliating for a protected disclosure; and 2) Plaintiff's 2015 IR inspiring management to retaliate is an independent event unrelated to whether he filed prior or post-IRs; and (3) Magnuson's 2015 IR implicated high levels of management in serious NRC regulatory failures. |

*MAGNUSON'S OPPOSITION TO THE MSJ - 18*

| 25 | Magnuson admits that he was not subjected to retaliation for submitting any IRs prior to June 2015. (Magnuson Vol. I Dep. 32:9-18; 34:7-14.) | Disputed, material | In response to defendant's questions, Magnuson actually testified he believed he suffered "subtle retaliation" for the IRs he wrote prior to June 2015 "Q: How about subtle retaliation? A. I believe some of the IRs that I raised that had safety significance were not evaluated or… they were inappropriately dismissed" (Magnuson Vol. I, Dep. 32:19-23). "I believe there were a few IRs that I wrote in the Spring of 2015 that I was retaliated for." (Id., 34:1-6). However whether he was retaliated for IRs previously is also irrelevant and immaterial to the point of whether Defendant retaliated against Magnuson for his reports in June 2015 forward. |
| --- | --- | --- | --- |
| 26 | In June 2014, Magnuson began pursuing positions at ExGen's Nine Mile Point Nuclear Station ("NMP") in Oswego, New York, which he believed presented opportunities for career advancement. (Magnuson Vol. I Dep. 55:2-56:9, 57:6-59:21, 67:22-68:19, 70:5-72:11; referring to Exs. 23, 24, 25, 26.) | Undisputed, immaterial | Magnuson searching for advancement positions within the company is immaterial to the question of this Motion of whether Magnuson was retaliated against for making protected disclosures. |
| 27 | In July 2014, Magnuson was informed that the Operations Director – Dave Kimler – might not be able to release Magnuson for a position at NMP due to staffing issues at Quad Cities. (Magnuson Vol. I Dep. 58:18-59:24.) | Undisputed, immaterial | Kimler releasing Magnuson for positions within the company is immaterial to the question of whether Magnuson was retaliated against for making protected disclosures in 2014 and 2015. |
| 28 | Magnuson nonetheless continued to seek support for a transfer. On August 20, 2014, he followed up with his "mentor," Quad Cities Site Vice President Scott Darin, and asked Darin to support him in a "bigger | Undisputed, immaterial | Magnuson seeking support for a transfer within the company is immaterial to the question of whether Magnuson was retaliated against later for protected disclosures made in 2014 and 2015. |

*MAGNUSON'S OPPOSITION TO THE MSJ - 19*

| | | | |
|---|---|---|---|
| | challenge" of being "the Manager of Safety and Security at NMP. I can, with most certainty, improve performance at NMP in this position and believe I have earned the opportunity. Will you support me in this effort?" (Darin Dep. 6:16-8:5, 27:18-20, Ex. 6; Magnuson Vol. I Dep. 70:5-72:11; see also Ex. 26.) | | |
| 29 | Darin replied that based on his last conversation with Kimler, Darin understood that Magnuson was "not releasable" due to minimum staffing issues. (Magnuson Vol. I Dep. 71:4-23; Ex. 26.) Magnuson nonetheless sent an email to Kimler on August 22, 2014 stating "Dave, I can appreciate your situation. I hope you can appreciate mine. Will you release me?" (Magnuson Vol. I Dep. 70:5-72:11; Ex. 26.) | Undisputed, immaterial | Magnuson seeking to be released in August of 2014 to a different position with the same company is immaterial to the question of whether Magnuson was retaliated against for protected disclosures in 2014 or 2015. |
| 31 | On August 28, 2014, after learning of Kimler's decision not to release him, Magnuson sent Darin an email stating: As you well know, warning signs at high levels of performance can be very subtle. Often, they are not recognized and when they are, most hesitate too long to act. I can maintain a high level of performance for the department; whereas I don't believe Kimler has. While Dave and I have worked around our disagreements, I do not forget that he has harmed my career - and was allowed to. I tell you this to assure you this is not a vendetta. It is simply motivation. Since the position at | Undisputed, immaterial | Magnuson seeking to be released in August of 2014 to a different position with the company is immaterial to the question of whether Magnuson was retaliated against for protected disclosures in 2014 or 2015. |

*MAGNUSON'S OPPOSITION TO THE MSJ - 20*

| | | | |
|---|---|---|---|
| | NMP does not appear to be an option, I will lobby the station and corporation for Kimler's position, in time to prepare for INPO [Institute of Nuclear Power Operations]. I will start immediately. I hope you can appreciate my position and determination.<br>(Ex. 27 (emphasis added); Magnuson Vol. I Dep. 72:12-73:5, 75:18-78:14; Petersen Dep. 42:24- 43:16). | | |
| 32 | Magnuson admits that he was not qualified for Kimler's position; that when he wrote that he intended to replace Kimler, he was "frustrated;" that he viewed Kimler as blocking his transfer to NMP; that his email was "inappropriate" and "emotionally-driven;" and that suggesting that Kimler be fired was possibly "overreacting." (Magnuson Vol. I Dep. 42:8-44:1, 59:22-60:8, 72:9-11, 77:3-78:14, 127:7-128:4.) | Undisputed, immaterial | Whether Magnuson was frustrated in August 2014 about a management decision ultimately has no bearing on the issue here of whether he was retaliated against for making protected disclosures in 2014 and 2015.<br><br>Further, being frustrated is not "aberrant" behavior. |
| 33 | Weeks before Magnuson was told he would not be released to apply for the New York position, he had engaged in a series of communications about the potential implications for Quad Cities of an operating experience ("OPEX") at a non-ExGen nuclear power plant (Monticello). The issue was the subject of an IR [1620692] that had been filed by a different Quad Cities employee in February 2014. (Magnuson Vol. I Dep. 79:24-80:21, 84:11-85:9, 90:6-20.) | Undisputed, material. | |
| 34 | In an exchange of emails in July 2014, Magnuson | Undisputed, material | Magnuson's pursuit of ExGen to address the potential implications at |

*MAGNUSON'S OPPOSITION TO THE MSJ - 21*

| | | | |
|---|---|---|---|
| forwarded information to Shift Operations Superintendent Brian Wake – his supervisor at the time – about the OPEX and asked if Wake wanted to escalate consideration of the issue at Quad Cities.  Wake responded that he thought the existing IR was the right way to initiate action and complimented Magnuson for a "[g]ood job following through."  (Ex. 28; Magnuson Vol. I Dep. 79:24-81:11;) | | | Quad Cities of the OPEX at another plant and an IR at Quad Cities constitutes protected activity. Nick Johnson's IR was initiated Feb 13, 2014.  However, 5 months later, the issues were still pending.  On July 7, 2014, Magnuson engaged in further protected activity by telling Nick Johnson in response to his IR 1620692] "None of your Recommended Actions were acted upon.  The significance of Pressure Boundary leakage was apparently lost." [Motion, Ex. 28, p. 2]. Magnuson then forwarded that communication of non-remediation to management the same day. [Motion, Ex. 28, p. 2].  In response, Wake indicated the prior IR that was filed by Johnson was the "right way to initiate actions".  [Motion, Ex. 28, p. 1]. |
| 35 | Magnuson asked whether he should write a new IR and Wake encouraged him to do so if he had any doubts or concerns. (Ex. 28; Magnuson Vol. I Dep. 81:12-17.) | Disputed, immaterial | In response to Wake saying Johnson's IR was sufficient, Ex. 28 shows on July 7, 2014, Magnuson asked if Wake "wanted a new IR". Wake did not tell Magnuson to write an IR, but rather said: "If you have any doubts or concerns then we are always safer to write a new IR and get it addressed." Because an IR on the issue was already written, it should have been the basis for an evaluation already. (Magnuson, Vol. 1 89: 21-24) Generally an employee should not have to write a second IR on the same issue. (Magnuson, Vol. 1, 90: 1-3).  In fact, Defendant has lauded in its motion that it has a CAP that meets NRC requirements through correction of the identified issues, but in the same motion blames Magnuson for not writing an IR on the same issue. |
| 36 | Magnuson had additional communications about the Monticello OPEX issue with | Disputed, immaterial | It is immaterial what channels of reporting Magnuson used to raise issues, hence whether he reported |

*MAGNUSON'S OPPOSITION TO THE MSJ - 22*

| | | | |
|---|---|---|---|
| | Wake and Kimler in August and early September 2014, but did not file an IR or raise any claims of improper responses. (Magnuson Vol. I Dep. 83:20-84:22.) | | directly to management or filed a new IR about the same content as the Johnson IR or resolution of the Johnson IR, he is protected under the ERA for raising the issue to management Wake and Kimler throughout August and Sept. 2014.<br><br>Thus, Magnuson testified his emails with management were his challenge to the Station's unsatisfactory response to the original IR. (Motion, Ex. 1, Magnuson, Vol. 1, 90: 4-11). |
| 37 | On September 11, 2014, after being notified that he was not being released for positions at NMP, and after his "frustrated" email expressing his determination to "lobby the station for Kimler's position" (Ex. 27), Magnuson attacked the Station's responses to the OPEX (IR 1620692) as "minimalistic and evasive" and claimed that "[b]y not acting in good faith," the "safety culture has been driven in the wrong direction." (Ex. 29; Magnuson Vol. I Dep. 84:17-86:3, 88:5-89:20.) | Disputed, material | Magnuson did not "attack" the Station's responses to the OPEX, he properly challenged the company's response using an approved reporting channel. To label Magnuson as "attacking" demonstrates Defendant's hostility towards, and negative recharacterization of, legitimate protected activity.<br><br>Further, Magnuson's motivations for reporting a lack of good faith and evasiveness in management are irrelevant. He need only have a reasonable belief of a potential violation. |
| 38 | [On August 16, 2014] Magnuson also raised the OPEX matter with Quad Cities Regulatory Assurance Manager, Wally Beck, to provide his perspective on the Monticello OPEX issue. (Ex. 29; Magnuson Vol. I Dep. 88:6-89:14.) | Undisputed, material. | Magnuson's pursuit of the topics covered in Johnson's IR and the Station's response to the same with Beck are legitimate protected activity. |
| 39 | A few days later, on September 19, 2019 [sic], Magnuson criticized Beck's response:<br><br>**Wally [Beck] is inclined to minimize this issue. I'm not** | Undisputed, material | [Defendant wrongly cites Exhibit 26, which is not an email about Beck's response]. However, Magnuson engaged in protected activity by escalating his concern about Mr. Beck's insufficient response to ExGen |

*MAGNUSON'S OPPOSITION TO THE MSJ - 23*

| | | | |
|---|---|---|---|
| | **convinced. That was a large part of the problem from the beginning.** *Another part is more personal.* **I will talk to you when I get back.**<br><br>**(Ex. 26 (emphasis added); Magnuson Vol. I Dep. 90:15-91:7.)** | | management, regardless of what the personal issue referenced was. ExGen then used Magnuson's email, which constituted a protected disclosure, as a basis for retaliation by claiming it later was part of what justified a mental evaluation. This is prima facie evidence of causation. |
| 40 | On September 29, 2014, Magnuson sent an email to Darin stating that he "was lenient when [he] described our OPEX reviews as minimalistic and evasive" and that he was "not prepared to excuse Kimler and Wake's blatant disregard for [his] nuclear safety concern." (Ex. 30; Magnuson Vol. I Dep. 94:2-96:20.) | Undisputed, material | [Defendant incorrectly cites Exhibit 30, which does not state this].<br><br>However, Magnuson did send an email to Darin Sept. 29, 2014, after he learned of a Fleet IR indicating the issue was broader and more troubling:<br><br>As I thought, this does minimize the issue. It is not just an OPEX issue; It is a nuclear safety concern. If it wasn't a nuclear safety culture issue before -it is now.<br>Considering the number of people and organizations involved (prior to discovering the fleet IR), I was lenient when I described our OPEX reviews as minimalistic and evasive.<br>I am not prepared to excuse Kimler's and Wake's blatant disregard for my nuclear safety concern. (Motion, Ex. 6 to Darin Declaration).<br><br>This fact is material in that ExGen used Magnuson's protected disclosures to Darin regarding insufficient management response and disregard for a nuclear safety concern as a basis for retaliation via forced mental evaluation. |
| 41 | Magnuson's communications about the OPEX issue, as well as Magnuson's complaints about his career, raised behavioral and other concerns that were | Disputed, material | Magnuson disputes that his communications to Darin about his nuclear safety concerns like OPEX and the attendant IR raised "behavioral" concerns. |

*MAGNUSON'S OPPOSITION TO THE MSJ - 24*

| | | | |
|---|---|---|---|
| discussed in an Employee Issues Advisory Committee ("EIAC") call on October 1, 2014. Three actions were identified as a result of this call:<br><br>Nate Darrow, the Employee Concerns Program Manager at ExGen's corporate office in Warrenville, Illinois, was assigned to conduct an independent investigation of Magnuson's allegations that Kimler and Wake had disregarded his nuclear safety concerns.<br><br>• Operations would continue to monitor the pending IR regarding the OPEX issue.<br><br>• The company would engage in career mapping with Magnuson to outline possible future positions and actions required to be considered for those positions in order to address his claim that his career was harmed by not releasing him to pursue "bigger challenges" at NMP. | | | [See entries 33-40]<br><br>Magnuson disputes that a Defendant in-house investigation constitutes an "independent" investigation.<br><br>Defendant's assessment of Magnuson's actions did not result in concerns rising to a FFD level and instead merited assessment of him for advancement opportunities:<br>3) Career mapping would occur with Brian Magnuson. This was determined to be appropriate since there was a suspicion that Brian's reaction to the OPEX and his leadership was tied to a decision where Brian was deemed unreleasable to go to Nine Mile Point for a position. Also, career mapping is the tool we use to outline future positions/experienced needed for advancement.  (Motion, para. 41) |
| 42 | On October 21, 2014, out of the blue, Magnuson presented Darin a document entitled "Letter from Birmingham Jail," written by Martin Luther King, Jr. on April 16, 1963.  Magnuson asked Darin to read the letter but provided no explanation why. The letter is quite lengthy and discusses the injustices committed against the civil rights movement at the time. (Darin Decl. ¶ 24; Darin Dep. 36:16-37:23.) | Disputed, immaterial | Disputed as to "out of the blue" and Magnuson providing no explanation why.<br><br>Instead, Magnuson testified that he took courses at Excelsior College and Letter from Birmingham Jail was required reading.  (Ex. 1, Magnuson Vol. 1, 39: 11-22)<br><br>Publicly available search shows Defendant that Letter from a Birmingham Jail forms the basis of Excelsior's program, including writing |

| | | | |
|---|---|---|---|
| | | | exercises even today: https://owl.excelsior.edu/writing-process/finding-your-voice/finding-your-voice-tips-on-academic-voice/<br><br>Further, the publicly available Course Guide for 2019 at page 193 shows Letter from a Birmingham Jail is still required reading, despite Defendant's objection to an employee daring to reference it in the workplace: https://www.excelsior.edu/wp-content/uploads/2019/06/Course_Guide_English_Comp_6-17-19.pdf (see Page 193) |
| 43 | Darin thought Magnuson giving him the letter was "odd" and "strange." (Darin Dep. 37:12-16.) | Disputed, material | Darin purported to think an employee "giving him" a letter from Martin Luther King was odd and strange, but Plaintiff disputes he actually thought the behavior was odd given his long history with Plaintiff and knowledge he was taking college courses. Intead, Darin had begun a course of retaliation and recasting innocent workplace incidents. There is nothing odd or strange about an employee sharing such a seminal piece of writing. |
| 44 | In November 2014, Magnuson accused Robert Pace, a Senior Evaluator from the Institute of Nuclear Power Operations ("INPO"), of engaging in 'unethical' conduct and sought to have him barred from returning to Quad Cities over a comment about sunflower seeds. (Ex. 31; Petersen Dep. 42:17-45:12.) | Disputed, material | Magnuson testified he did not seek to have Pace barred over a sunflower seed comment, but rather Magnuson was concerned about INPO intentionally misrepresenting the state of the Quad Cities control room. |
| 45 | INPO is an independent organization to which all nuclear power plant licensees belong. INPO promotes the safe and reliable operations of nuclear | Undisputed, immaterial | INPO's status is immaterial. Magnuson's objection was to one INPO employee's behavior. |

*MAGNUSON'S OPPOSITION TO THE MSJ - 26*

| | | | |
|---|---|---|---|
| | power plants by establishing performance objectives and guidelines for the nuclear power industry and conducts regular evaluations of nuclear power plants to ensure excellence in operations. (Darin Dep. 41:16-43:20.) | | |
| 46 | Magnuson's accusations against the INPO Evaluator stemmed from a housekeeping comment the evaluator made during a debrief meeting in October 2014, noting that there were sunflower seeds on the floor of the nuclear reactor Control Room. (Darin Dep. 43:21-45:7.) | Disputed, immaterial | Magnuson's comments stemmed from the INPO Evaluator's misrepresentation of control room housekeeping and Darin's excuse and acceptance of the misrepresentation as the nature of politics. (Motion, Ex. 1, Magnuson Depo Vol. 1, 109: 10-24, 110: 2-9) |
| 47 | Magnuson was not the Shift Manager on duty at the time; he was not present in the Control Room when the evaluator observed the sunflower seeds on the floor; and he could only speculate about what the Control Room looked like at that time. (Magnuson Vol. I Dep. 101:8-106:5; Darin Dep. 47:6-14.) | Disputed, immaterial. | Magnuson did not speculate; he received information from the on duty Shift Manager Andrew Mitchell and recounted it. Mitchell confirmed "[he] let [INPO] know that the mess on the carpet was from the cleaning lady and she was in the control room at the time cleaning."  (Motion, Ex. 1, Magnuson Vol. 1, 101-106).  As requested, and reported to Darin, Magnuson emailed Mitchell on October 2, 2014, asking: |
| 48 | The INPO Evaluator did not use the sunflower seeds as a basis for any adverse reports or actions against Magnuson or ExGen. (Magnuson Vol. I Dep. 106:6-22, 110:10-17.) | Undisputed, immaterial. | The issue of concern was INPO evaluator's intentional misrepresentation of the control room. It is immaterial whether INPO used the seeds as a basis for an adverse report or action, but Magnuson's report of the cleaning woman's presence in the control room may have prevented such an adverse report. (Motion, Ex. 1, Magnuson Vol. 1, 110:10-24, 111: 1-6). |
| 49 | Nonetheless, Magnuson criticized the INPO Evaluator's | Disputed, material. | As Magnuson explained, he criticized Pace's misrepresentation. *Id.* |

| | | | |
|---|---|---|---|
| | | comments about the sunflower seeds. (Darin Dep. 43:21-46:6.) | | |
| 50 | In an email to Darin, dated November 3, 2014, Magnuson wrote:<br><br>I have given this issue and our discussion more thought.<br><br>Mr. Robert Pace *intentionally misrepresented* this situation. He *distorted the truth with the intent of damaging the station's reputation.* His conduct should not be tolerated and certainly not accepted as the <u>nature of politics</u>. It was *unethical.* [emphasis added]<br><br>Considering that Mr. Pace represents the organization whose purpose is to uphold industry standards, *his conduct was particularly egregious.* Allowing it to go undeterred is *fundamentally wrong.*<br><br>(Ex. 32, (emphasis added); Magnuson Vol. I Dep. 106:6-111:6.) | Undisputed, material | |
| 51 | Magnuson acknowledges that his November 3rd email probably contained "a bit of drama;" that it had an "emotional component to it;" and that it might seem that he "blew it out of proportion." (Magnuson Vol. I Dep. 108:24-111:1.) | Disputed, immaterial | Defendant disregarded how Magnuson conditioned his testimony on this matter.  He actually testified:<br><br>A. *** there's probably a little bit of drama, but it was prompted by his. So what I put here, he says. So INPO -- let me see this. Mr. Pace represents the organization whose purpose is to uphold industry standards. His conduct was particularly egregious. So he made this basically some - misrepresented the situation for some reason that could potentially reflect on the station. Q. Would you characterize |

*MAGNUSON'S OPPOSITION TO THE MSJ - 28*

this e-mail that you wrote as being --
having an emotional component
to it? A. Not -- I mean, there's --
there's obviously some, but the
fundamental part is, my goal was to
protect the station. Q. Well, there's
some emotion in it because you call
the guy unethical, right? A. Yeah. I
think there's probably another e-mail
out there about -- with Darin saying
that this is a matter of politics, and
you need to accept this as a matter of
politics, so -- Q. There's also emotion
when you write, "His conduct was
particularly egregious?" Does it not
have an emotional component to it?

A. If this person is working for the
organization that collectively
evaluates and provides good practices
to nuclear plants and the
representative misrepresents a
situation, then I think that's -- at the
time I thought it was egregious.
Q. And it involved sunflower seeds.
Don't you think that you blew it out of
proportion? A. It might seem that way,
but when you read when you read
what I said on November 3rd. Darin
said, I think he took the feedback from
the exit, my feedback, and to the best
of my knowledge, it was not used in
observation, and we have no
AFI and performance deficiencies
from the visit. So based on Darin's e-
mail, he thought that that -- as
ridiculous as it sounds, he thought that
that "sunflower seeds" could be put in
an INPO evaluation or INPO report
that would reflect negatively on the
station simply because the cleaning
lady swept the floor and it had not
been picked up when the INPO
representative went into
the control room.

*MAGNUSON'S OPPOSITION TO THE MSJ - 29*

| | | | (Motion Ex. 1, Magnuson Vol. I Dep. 108:24-111:1.) |
|---|---|---|---|
| 52 | Quad Cities Human Resources Manager Cindy Petersen discussed these events with another HR professional, who "recommended an EIAC call to determine if [Magnuson] has displayed change in behavior that would prompt a mandatory [FFD] referral" and asked management to provide a "short summary of the Background, updates, and new issues and ask the group for advice on the BOP concerns." (Ex. 33; Petersen Dep. 40:13-24.) | Undisputed, material | |
| 53 | On November 13, 2014, HR Manager Petersen completed and sent an email reporting a "series of non-standard interactions" with Magnuson that created potential concerns under the NRC's regulations and ExGen's AAP, BOP, and FFD Program and seeking an EIAC call "to discuss potential Quad BOP concern." These included the sunflower seeds overreaction; Magnuson's behaviors about the OPEX; and an ongoing concern from Site Vice President Darin, that "there was a lot of emotional responses and some statements were made about mood swings about the circumstances/events." (Ex. 31; Petersen Dep. 42:17-46:16; Techau Dep. 42:7-45:8; Techau Decl. ¶¶ 30-31.) | Disputed, material | Plaintiff disputes that he engaged in non-standard interactions that "created potential concerns under the NRC's regulations and ExGen's AAP, BOP, and FFD Program". See *infra* re: BOP and aberrant Petersen's Nov. 13, 2014 email reiterated Magnuson's protected disclosures: (1) Monticello OPEX, and (2) management disregard for nuclear safety, (3) Challenging the instrument air supply system as it relates to safety related equipment, and (4) challenging management acceptance of INPO misrepresentations: Last week we talked about having a follow up EIAC to status the concerns from Brian Magnuson, Shift manager from Quad. Here is a brief summary to date. On, 10/1/2014 an EIAC Call took place regarding Shift Manager, Brian Magnuson's complaint to Scott |

*MAGNUSON'S OPPOSITION TO THE MSJ - 30*

Darin, SVP, with the following complaints:
1) The **site displayed a lack of rigor around the Monticello OPEX** that Brian raised when the site had a similar leak.
2) The **site Ops Director and SOS did not take Brian's concerns seriously** and Brian felt these senior leaders displayed a "disregard for nuclear safety"
In the EIAC discussion, three action items were determined:
1) ECP would complete an independent SCWE investigation to determine if there is a disregard for nuclear safety and/or lack of follow thru by the Ops director and SOS in OPS. Nate would do this without the aid of site ECP to remove all doubts of objectivity.
2) OPEX was in CAP and would be monitored accordingly.
3) Career mapping would occur with Brian Magnuson. This was determined to be appropriate since there was a suspicion that Brian's reaction to the OPEX and his leadership was tied to a decision where Brian was deemed unreleasable to go to Nine Mile Point for a position. Also, career mapping is the tool we use to outline future positions/experienced needed for advancement Updates to actions:
1) ECP completed their investigation.
2) OPEX is still being monitored and on track in CAP
3) Career Mapping was completed with Kevin O'Shea and Cindy Petersen on 11/13/2014.

Since the EIAC call, there has been a series of "non-standard" interactions with Brian Magnuson:

*MAGNUSON'S OPPOSITION TO THE MSJ - 31*

| | | | |
|---|---|---|---|
| 1 | | | 10/21/2014 Presents Scott Darin with a document entitled "Letter from a Birmingham Jail" written by Martin Luther King on 4/16/1963. Brian offered no explanation but rather a request that Scott read the letter. This letter is quite lengthy and discusses the injustice of the civil rights movement at the time. |
| 5 | | | ***11/1/2014 Brian emails Scott Darin after checking into other station's response to the OPEX ACIT and asked for an update. Also stated that "prompt investigations and quals have been removed" for lesser things***. 11/4/2014 ***Brian emails Scott Darin about a comment a Sr. INPO evaluator made in a meeting a month prior***. In the exit the evaluator commented to the condition of the control room due to a pile of garbage on the floor. Brian was at the exit and was the Shift Manager on Duty and took issue with the statement. He believed that the garbage was there because the cleaning person was prepping the floor for removal of the garbage. Brian wrote made the following statement in response to the evaluator's comments: "XXXXXXX (INPO Senior Evaluator) intentionally misrepresented this situation. He distorted the truth with the intent of damaging the station's reputation. His conduct should not be tolerated and certainly not accepted as the nature of politics. -It was unethical. *** ***11/5/2014 Challenging the instrument air supply system as it relates to safety related equipment. An IR 02397335 was written by Brian***. Engineering responded that they did not agree. |

*MAGNUSON'S OPPOSITION TO THE MSJ - 32*

| | | | Brian Wake, SOS, also engaged in the conversation.*** Of note, is that, prior to the first EIAC call, during the initial interactions with Brian, the SVP noted that there was a lot of emotional responses and some statements were made about moods swings about the circumstances/ events.  (Motion, Ex. 31) (emphasis added). In fact, Petersen testified she had no recollection of Darin reporting emotional statements and mood swings: Q. And did Mr. Darin ever share a concern with you that Mr. Magnuson was exhibiting mood swings? A. I don't recall. Q. And did Mr. Darin ever share with you concerns that he thought there was a lot of "emotional responses" coming from Mr. Magnuson?     A.  I don't recall. (Motion, Ex. 10, Petersen Depo 42: 6-13) |
|---|---|---|---|
| 54 | Susan Techau, the Access/FFD Manager and Access Authorization Reviewing Official, was asked to join an EIAC call that was held on November 18, 2014 to discuss Magnuson's behaviors. (Ex. 34; Techau Dep. 33:12-34:19, 35:9-16, 39:4-19.) | Disputed, material | Ex. 34 demonstrates the EIAC call was convened to discuss Magnuson's protected disclosures as well. |
| 55 | During the call, the participants discussed Magnuson's behaviors observed and reported by Quad Cities management from October 21, 2014 to November 5, 2014, including Magnuson's accusations against the Senior INPO Evaluator and the Letter | Undisputed, material | |

*MAGNUSON'S OPPOSITION TO THE MSJ - 33*

| | | | |
|---|---|---|---|
| | from the Birmingham Jail communication. (Techau Dep. 44:10-24; Techau Decl. ¶ 30-32.) | | |
| 56 | Although Techau agreed that some of Magnuson's reported behaviors were "nonstandard," and that sending the Letter From a Birmingham Jail without explanation was "odd," she did not think a pattern of behavior existed at that time to warrant an FFD referral to the MRO at that time. The outcome of the November 18th call was to continue to monitor Magnuson's behavior, let Techau know if anything else came up, and continue to pursue career mapping. (Techau Dep. 41:17-42:15, 45:9-25, 55:10-12, 56:12-25, 59:18-60:3; Techau Decl. ¶ 32.) | Undisputed, material. | |
| 57 | Techau was the designated ExGen Reviewing Official empowered in 2014 to decide whether a FFD referral to the MRO was warranted for Magnuson, and she continued to have that decision-making authority through and including 2015. (Techau Dep. 46:1-22.) | Undisputed, immaterial | |
| 58 | On or about November 21, 2014, Employee Concerns Program Manager Nate Darrow completed his investigation of Magnuson's September 2014 allegations against Operations Director Kimler and Operations Superintendent Wake and, more broadly, Magnuson's concerns about the health and safety culture at Quad Cities. (Darrow | Undisputed, immaterial | |

*MAGNUSON'S OPPOSITION TO THE MSJ - 34*

| | | | |
|---|---|---|---|
| | | Dep. 18:22-20:18; 23:5-20; 81:22-82:22, Ex. 7.) | | |
| 59 | Darrow met with Magnuson on or about November 21, 2014 to tell him the investigation was closed with no issues identified. During the meeting, Magnuson admitted he had "a lot of emotion about this and wanted Kimler fired." When asked on what basis Kimler should be fired, Magnuson could not articulate reasons and admitted again that he was "emotional about it." (Magnuson Vol. I Dep. 125:7-128:4; Ex. 53.) | Disputed, material | Magnuson disputes the contents of Ex. 53.  It is a double hearsay email from Cindy Petersen, claiming to record the contents of a conversation she had with Nate Darrow, about statements Darrow or Petersen claim Darrow heard Magnuson say.  Magnuson disavowed making the statements Petersen claims: <br><br> Q. Do you recall saying to Mr. Darrow that you had a lot of emotion around the Wake/Kimler issue and that you admitted you wanted Kimler fired? A. I don't remember that. At some point I talked to Scott and expressed my concerns to him and said that he should be fired or warned of being fired. Q. Do you recall at least saying to Mr. Darrow that you had a lot of emotion around this particular issue? A. I don't remember that, no. Q. And do you recall saying to him that you were emotional about the issue of Mr. Kimler being fired? A. No, I don't remember. Q. As you sit here today, do you believe that you were emotional about that, when you suggested that someone at Mr. Kimler's level be fired? A. *** I believe that Kimler, you know, knew that we had a reactor coolant leak and was part of a decision not to promptly identify the leak to see if it's a larger nuclear safety issue and then allowed it to exist to manage a performance indicator. *** I don't think that is technical conscience, and *** -- I think that is pointing out basically wrongdoing, so I don't consider that -like you characterized it before, that is a nuclear safety concern. Obviously, it's a personal – |

| | | | |
|---|---|---|---|
| | | | you know, it's a management concern too, but I don't believe that we should have operated in that manner.<br><br>(Motion, Ex. 1, Magnuson Depo. Vol. 1, 125: 14-24, 126: 1-24, 127: 1-6). |
| 60 | Darrow counseled Magnuson that "as leaders we need to be careful about accusations that lack a proper basis in his position since it can influence the safety culture at the station." (Magnuson Vol. I Dep. 125:7-128:4; Ex. 53.) | Disputed, immaterial | |
| 61 | On December 14, 2014, despite Darrow's already reported investigation findings, Magnuson re-raised his arguments that the alleged disregard of the condition involved in the Monticello OPEX was "inarguably a lack of Technical Conscience," "willful," and "a matter of ethics." (Ex. 35; Magnuson Vol. I Dep. 116:17-120:19.) | Undisputed, material | Material as further protected activity/ Darrow made a determination without having even interviewed Kimler. Magnuson expressed concern that Kimler had not been interviewed, and asked Darrow to do so.  Darrow did not indicate that was inappropriate of Magnuson to ask or to object.<br><br>Ex. 35:  Magnuson asks -I ask that you interview Kimler. I believe the questions beg to be asked under any circumstance.<br><br>Ex. 35: I just read INPO's Principles for Maintaining an Effective Technical conscience. It describes the attributes necessary to ensure ethical and effective technical support is provided when potential nuclear safety issues are identified.<br>The goal for a station operating experience program is to use the lessons and insights learned from the past and current operating experience effectively and efficiently to improve safety and reliability. |

| | | | | |
|---|---|---|---|---|
| | | | | While this program is regulated, its success relies on the good faith of end users. The disregard of plant condition specific OPEX is inarguably a lack of Technical conscience. Considering the OPEX had been elevated by a shift manager, the disregard was willful. This is a matter of ethics. |
| 62 | On January 3, 2015, Magnuson sent an email to Site Vice President Darin and Operations Director Kimler (with a copy to Shift Operations Superintendent Wake), accusing Wake of leaking INPO test materials and claiming that Senior Reactor Operator Ryan Merema "was involved." (Ex. 36; Magnuson Vol. I Dep. 136:21-137:19) | Undisputed, material | Magnuson testified he  personally received a report of cheating: I went *** into a prejob brief room, debriefing room, prior to a prejob brief, and an EO was telling a story that Wake had leaked this JPM, job performance measure, information to him and he was laughing about it, and the operator seemed -- in the briefing room were laughing about it. And I didn't think he was serious, and after the shift turnover brief, I went to talk to him and ask him basically questions like, Are you serious? And, you know, did Wake actually leak this exam information to you? And he says, Off the record, yes. Q. Who said that? A. Jeff Kosek. Q. All right. And so what is the -- why do ou not mention him in this e-mail? A. He was a union member, and he was a friend of Brian Wake's. And I believe he told me this off the record, so I didn't see any -- I did not think it was prudent at the time. *** Q. The union member had advanced knowledge of what this test was going to be about? A. That is what he said, yes  (Motion Ex. 1, Magnuson Vol. 1, 137: 4-24, 138: 1-16) |

*MAGNUSON'S OPPOSITION TO THE MSJ - 37*

| | | | |
|---|---|---|---|
| 63 | The January 3, 2015 email explicitly states, "*With no proof*, I ask that Merema be removed from my crew immediately." (*Id*.) | Undisputed, material | Material as to protected disclosure of wrongdoing. |
| 64 | On January 3, 2015, after receiving Magnuson's email, Darin sent an email to Human Resources Manager Petersen stating: "It's odd he says he has no proof but wants someone removed from his crew. It seems really odd." Petersen responded: "Yes it is odd," and on January 4, noted that these were "[v]ery serious accusations without 'proof.'" (Ex. 37; Petersen Dep. 50:18-25.) | Undisputed, material | See Entry 62.<br><br>Magnuson testified:  A. I didn't want to have to I wanted Merema removed from my crew without me having to go through any ordeal to substantiate that cheating actually occurred.<br>Q. Why did you not want to do that?<br>A. Because it wasn't my job.<br>Q. What wasn't your job?<br>To substantiate wrongdoing.<br>Q. Do you believe that your job was to make the accusations without having to provide any proof? A. I believe that that information would come out in an investigation without me needing to provide it.<br>(Motion, Ex. 1, Magnuson Vol. 1, 143: 3-24, 144: 14-16)<br><br>Petersen was aware that Magnuson's request to remove Merema from his crew was rooted in a loss of trust and integrity for Merema after uncovering, what he believed to be, inappropriate personnel practices from Merema. (Motion, Ex. 1, Magnuson Vol. 1 Dep. 139:3-140:17; 153:20-154:2.) Defendant relies heavily on their interpretation of Magnuson's use of the phrase "With no proof, I ask that Merema be removed from my crew immediately." (Motion, Ex. 10, Petersen Dep. 50:18-25.) Petersen and Darin identify Magnuson's use of this phrase as an indication that Magnuson was exhibiting a pattern of bad behavior even though Darin himself acknowledges that asking for a |

| | | | |
|---|---|---|---|
| | | | member of your team to be removed, even without proof and just a mere suspicion of wrongdoing, is not prohibited or wrong. (Motion, Ex. 6, Darin Dep. 69:21-70:16.) Magnuson was very clear; he was told that Wake was leaking information about the job performance measure being tested by INPO and was suspicious that Merema was, in effect, benefiting from those leaks and cheating after his own brief observation. (Motion, Ex. 1, Magnuson Vol. I Dep. 138:17-140:17.) |
| 65 | Petersen met with Magnuson on or about January 5, 2015 to discuss his allegations against Wake and Merema. (Ex. 38; Petersen Dep. 52:22-53:7.) | Undisputed, material | |
| 66 | After the meeting, Petersen reported to Darin that Magnuson failed to provide facts in support of his allegations or the names of witnesses who had relevant information. Nevertheless, Magnuson persisted in his demand that Merema be removed from his crew. (Darin Decl. ¶¶ 32-36 and Ex. 10 thereto.) | Disputed, material | Magnuson detailed how Brian Wake facilitated cheating during INPO/WANO evaluations at Exelon. He alleged that Wake provided specific answers and coaching to operators before and during evaluations to ensure successful outcomes, thereby compromising the integrity of these regulatory assessments. (Magnuson Decl. Par. # 162-164). Following his reports on these cheating practices, Magnuson describes facing increased scrutiny and retaliation from Exelon management. This included heightened monitoring of his work and punitive actions for minor or unrelated issues, which he interprets as efforts to undermine his credibility and career. (Magnuson Decl. Par. # 165-167) Magnuson criticized Exelon for its systemic failure to address these cheating practices internally, pointing out a lack of accountability and |

*MAGNUSON'S OPPOSITION TO THE MSJ - 39*

| | | | | transparency in how evaluation results are handled and reported. Magnuson suggests that such practices were part of a broader culture at Exelon that prioritized appearances over genuine safety and regulatory compliance. (Magnuson Decl. Par. # 168-170) Magnuson reflects on the detrimental impact of these cheating practices on the overall safety culture within Exelon. He argues that they not only undermine the validity of INPO/WANO evaluations but also endanger the safety of nuclear operations by masking potential deficiencies and operational risks. Darin sent an email "I know I can count on you," in January 2015. (Magnuson Decl. Par. # 171-173) (Exhibit 7: INPO Cheating Email Threads and Timeline) Magnuson emailed the NRC on February 29, 2024, highlighting that the NRC had found merit in his earlier report of cheating involving Brian Wake and had referred the matter to the Institute of Nuclear Power Operations (INPO). He argues that this action by the NRC supports the legitimacy of his claims and indicates that Exelon's actions against him were retaliatory. (Magnuson Decl. Par. # 174) (Mag Dec., Exhibit 3: Magnuson email to the NRC, dated February 29, 2024) Magnuson has a letter from the NRC dated June 28, 2016, which substantiated the merit of his report about cheating, validating his concerns about the misconduct within Exelon. (Magnuson Decl. Par. # 175) Magnuson concludes that the substantiation of his report by the NRC demonstrates that Exelon's actions against him were not only discriminatory but also retaliatory, |

|  |  |  |  | specifically for reporting the misconduct of Wake, Merema, and others. (Magnuson Decl. Par. # 176) |
| --- | --- | --- | --- | --- |
| 67 | On January 5, 2015, Magnuson sent Petersen an email suggesting that ExGen use the excuse of a "personality conflict" as the basis for removing Merema from his crew. (Magnuson Vol. I Dep. 151:7-154:8; Ex. 36.) Magnuson acknowledged that it "appears to me that I offered up an excuse – an excuse for HR that they could use to remove Merema from my crew," and that it was not "ideal" that he had suggested that an excuse be manufactured to have | Undisputed, immaterial | | ExGen removed Merema on their own two weeks later. |
| 68 | When Petersen informed Darin of what Magnuson had proposed, Darin responded with an email on January 5, 2015:<br><br>[Brian] needs to be more transparent. In my professional opinion, Brian has performance deficiencies in his communication specifically with core competencies:<br><br>Engages Others:<br>− Facilitates the dialogue and promotes discussion and resolution of different views Brian's recent allegations along with how he is behaving in the fact finding appears to lack transparency and is therefore preventing us to find appropriate resolution to concerns raised to senior leadership.<br>Engaged in open dialogue: | Disputed, material | | Darin did not write the January 5, 2015 email as Defendant states.<br><br>Motion, Ex. 38 clearly shows HR's Cindy Petersen, who was obviously not Magnuson's supervisor, but rather an HR employee with no direct insight to Magnuson's performance wrote the email about her thoughts regarding Magnuson and sent it to Darin. |

*MAGNUSON'S OPPOSITION TO THE MSJ - 41*

| | | | |
|---|---|---|---|
| | − Promotes candid discussion of tough issues<br>− Works through conflict to create productive results<br>Brian has not been candid and is halting the problem solving process by failing to work through conflict openly and honestly. (Ex. 38.) | | |
| 69 | Later on January 5, 2015, Petersen sent an email to Darin agreeing with his assessment of Magnuson's behavior: "So he is still insisting moving [Merema] but rather than move him because of integrity, he is suggesting we move him for personality reasons. That is not transparent behavior at all." (*Id.*; Petersen Dep. 52:22-54:25.) | Disputed, material | Darin did not write a January 5, 2015 assessment of Magnuson's behavior. |
| 70 | On January 6, 2015, Petersen escalated her concerns in Human Resources and to Legal, writing about Magnuson: "We have a shift manager who has had several examples of demeaning and hostile type of behavior toward several of our employees and an INPO evaluator.  We would like to discuss a course of action based on these examples." (Ex. 39; Petersen Dep. 55:1. | Undisputed, material | Petersen again fails to describe any behavior as "aberrant." |
| 71 | Based on Darrow's additional investigation of Magnuson's allegations regarding the OPEX, Darrow concluded in a detailed email that Magnuson's concerns were neither disregarded nor ignored; to the contrary, management had responded promptly and appropriately. (Ex. 40; Magnuson Vol. I Dep. 128:5-9, 128:21-129:4.) | Undisputed, immaterial | Yet, Darrow discouraged Magnuson from documenting concerns in writing, instead instructing him to raise concerns in person. Motion, Ex. 53: "Nate counseled that critical conversations should be done in person."<br><br>Immaterial because Magnuson need only have a reasonable belief of a nuclear safety concern to avail himself of ERA protection. |

*MAGNUSON'S OPPOSITION TO THE MSJ - 42*

| | | | |
|---|---|---|---|
| 72 | Magnuson responded to Darrow on January 19, 2015, that "as time permits," he would "identify gaps and inconsistencies [in Darrow's report], and include insights." Magnuson also recommended that Darrow read the "Letter from a Birmingham Jail." (Ex. 40; Magnuson Vol. I Dep. 129:18-130:15.) | Undisputed, immaterial | [Jan. 19, 2015 was Martin Luther King Day]<br>Q. Now, in the second sentence or the third sentence of this e-mail, you make reference to Dr. King's letter from Birmingham Jail, and you suggest that Mr. Darrow read it. So why did you make that suggestion.<br>A. I don't remember. Like I said before, I read that as part of this class that I intended to take. I had not read it before, and it just kind of resonated for me. *** around Martin Luther King day, I would read from it. Sometimes it was even posted at the plant or some quotes from it, but I don't remember why in this particular case.<br><br>This is immaterial because Magnuson recommending MLK's letter and stating he would review a report do not speak to the issue of whether he was retaliated against for making protected disclosures. |
| 73 | Another call was scheduled with Techau in January, 2015, to report and discuss Magnuson's new behavioral concerns. (Techau Dep. 46:4-13; Techau Decl. ¶ 33.) | Disputed, material | Magnuson disputes that his nuclear safety advocacy constituted a behavioral concern. |
| 74 | During the call, the participants discussed the serious accusations that Magnuson made against Wake and Merema, his admission that he had "no proof" for his accusations, and his suggestion that ExGen ignore his lack of proof and use a manufactured "personality conflict" to remove Merema from his crew. (Techau Decl. ¶¶ 33-37.) | Undisputed, material | |

*MAGNUSON'S OPPOSITION TO THE MSJ - 43*

| | | | |
|---|---|---|---|
| 75 | Darrow presented the findings and conclusions from his recently completed investigations into Magnuson's September 2014 allegations that Kimler and Wake had minimized or disregarded his nuclear safety concerns. Darrow reported that his investigation failed to produce facts to substantiate Magnuson's claims, that Magnuson's alleged nuclear safety concerns were not minimized or disregarded, and that Wake and Kimler had responded to Magnuson's concerns in a timely and appropriate manner. (Techau Decl. ¶¶ 35-36.) | Disputed, immaterial | Darrow's findings are immaterial because Magnuson need only have a reasonable belief of a nuclear safety concern.<br><br>Further, according to Petersen, Darrow told her that management needed to tell Brian he is making "great contribution to [ExGen's] safety culture" and Wake and Kimler needed to get back to Magnuson and thank him for raising issues", not that management should be punishing Magnuson for raising nuclear safety concerns:<br><br>"Nate said (to me) on the flip side of this, **the station leadership needs to reassure Brian that he is bringing up good questions and this is also a great contribution to our safety culture here**. Nate also wanted us to pass on a little coaching onto Kimler and Wake. Nate stated that communication is key with Brian. He is accountable to ask and follow up if he feels he is not getting proper communication, but **people should get back to him and thank him for raising the issue.***<br><br>In conclusion, Nate said Brian stated he understood the results of the investigation and felt satisfied by the results. Nate felt the [sic] left it in a good place. Brian seemed content that there were no safety culture concerns at this time.<br>(Motion, Ex. 53) (Emphasis added). |
| 76 | During the January 2015 call, the participants also discussed management's concerns that Magnuson's allegations against Kimler were motivated by Magnuson's resentment over | Undisputed, immaterial | Plaintiff does not have personal knowledge sufficient to speak to what the participants discussed, but Defendant does not present contemporaneous notes of this meeting. |

*MAGNUSON'S OPPOSITION TO THE MSJ - 44*

| | | | |
|---|---|---|---|
| | Kimler's decision not to release him to pursue positions that he wanted at NMP. (Techau Decl. ¶ 37.) | | Yet, this is immaterial because (1) Magnuson testified he had valid nuclear safety concerns based on his more than 33 years in the nuclear industry; and (2) as discussed above, Magnuson's motivations for making protected disclosures are irrelevant. |
| 77 | Based on the information Techau received during and in connection with the November 2014 and January 2015 calls, she became concerned, like Quad Cities management, that:<br>• Magnuson tended to engage in overreactions to situations.<br>• Magnuson had made serious accusations against several individuals inside and outside the Company (including Kimler, Wake, Beck, Merema, and the INPO Evaluator) without supporting facts or any regard for whether his accusations were supported by facts.<br>• Magnuson made accusations and attempted to orchestrate Merema's removal from his crew while admittedly having "no proof."<br>• Magnuson's behavior in relation to Kimler was motivated by his anger and resentment over not being released to apply for positions at NMP.<br>(Techau Decl. ¶ 38; Techau Dep. 109:14-110:6.) | Disputed, material | Plaintiff disputes that Techau had genuine concern over his behavior, but rather believes she used his nuclear safety advocacy against him as she met with management motivated to remove him from his position. |
| 78 | While Techau discussed referring Magnuson for an FFD determination and possible EAP evaluation in the January call, she opted not to do so at that time. Instead, because | Disputed, material | Techau did not refer Magnuson for an FFD because she did not have a sufficient basis for doing so. |

| | | | |
|---|---|---|---|
| | | Magnuson seemed to be driven by his resentment about not being released to go to NMP, the plan was for management to continue to try to address his career development concerns through career mapping. Management also was told to continue to monitor and report any additional questionable behaviors by Magnuson. (Techau Decl. ¶ 39.) | | |
| 79 | During the week of June 15, 2015, Magnuson and his crew participated in refresher training required for each operator and Shift Manager to retain his NRC license to operate or supervise the operations of the controls of a nuclear reactor. On the first day of training (Monday, June 15th), the crew participated in an Out of the Box Evaluation ("OBE"), which involved a simulated emergency event to which the crew was required to react in accordance with Quad Cities operating procedures. (Magnuson Vol. II Dep. 185:21-186:12, 186:17-23; Ex. 43; Dodd Dep. 19:8-21:8, Ex. 8; Dodd Decl. ¶ 19, Ex. 16.) | Undisputed, immaterial | |
| 80 | The Lead Evaluator for this OBE was Hal Dodd, who replaced Kimler as the Quad Cities Operations Director in April 2015. (Magnuson Vol. II Dep. 186:5-7; Dodd Dep. 33:2-15.)  Additional evaluators included the Lead Trainer for licensed operator training and an Operations Training Instructor. There also was a Floor Instructor for the group. (Dodd Dep. 19:14-21:8.) | Undisputed, material | |

*MAGNUSON'S OPPOSITION TO THE MSJ - 46*

| 81 | During the OBE, an evaluation team assessed whether the crew successfully completed all critical tasks. The evaluation team identified two issues that resulted in "Needs Improvement" ratings. (Dodd Dep. 23:3:12; Dodd Decl. ¶ 19.) | Disputed, material | Magnuson's September 13, 2016 email and letter (Pages 5-6) to the NRC:<br><br>The crew lowered 1B recirculation pump speed [core flow] in accordance with the Immediate Operator Actions of QCOA 3200-01. This action was appropriately prioritized to stabilize the plant. The sequence of this action followed strict procedural compliance. Concurrent entry and the prioritization of multiple procedures are common and should be expected in simulator scenarios, particularly when a major electrical bus is lost. This was certainly not a procedural compliance weakness.<br><br>Additionally, the STA [Daigneau] and SM [Magnuson], evaluated by the OD [Operations Director – Dodd], received a Needs Improvement for this action. The RO [Reactor Operator – Coers] who reduced core flow and the unit supervisor [Coombs], who had command and control, did not. This inequitable grading was challenged by all members of the crew. It was dismissed *by* the OD/lead evaluator. The OTM [Operations Training Manager] and training instructors did not challenge the lead evaluator [Dodd]. [Emphasis added] |

*MAGNUSON'S OPPOSITION TO THE MSJ - 47*

| | | | This information was also provided to the NRC on August 13, 2015.<br><br>See Magnuson Declaration, Pars. 60-72, and Ex. 6 thereto |
|---|---|---|---|
| 82 | Pursuant to established procedures, a "Needs Improvement" ("NI") rating requires remediation prior to the crew resuming their duties in the Control Room. "Remediation" is defined as "[t]he act of providing the additional training that is intended to correct identified weaknesses." (Magnuson Vol. II Dep. 191:16-192:15; Dodd Dep. 23:13-25:10; Dodd Decl. ¶ 20.) | Undisputed, immaterial | |
| 83 | An NI rating also requires that an operator's qualifications to stand shift in the Control Room be pulled until the operator successfully completes a remediation plan. (Magnuson Vol. II Dep. 191:16-192:15; Dodd Dep. 23:3-25:10; Dodd Decl. ¶ 20.) | Disputed, material | See Fact Statement. |
| 84 | The remediation process typically is completed and the crew's qualifications are reinstated within less than a day and often within a matter of hours. The crew continues to work during the training week, and suffers no loss in pay, benefits, title or other adverse employment actions. (Magnuson Vol. II Dep. 192:1-192:23; 200:20-201:11; 211:11-211:14; Dodd Decl. ¶ 20.) | Disputed, immaterial | Magnuson  did not agree that there was any typical fast turnaround such as Defendant claims.  Instead he testified:<br>8     Q.    And how long does that process usually<br> 9    take, that is, the process of creating a<br>10   remediation plan and as a result having the<br>11   qualifications reinstated?<br>12     A.    I don't know for sure.  I don't normally<br>13   think it takes too long.  I remember the<br>14   remediation plan obviously in this case, but I<br>15   don't know the normal duration. |

*MAGNUSON'S OPPOSITION TO THE MSJ - 48*

| | | | |
|---|---|---|---|
| | | | 16    Q.    Could it be something that is done<br>17   within a few hours?<br>18    A.    Yes.<br>19    Q.    So there could be a qualification<br>20   removed or pulled, the remediation plan agreed to,<br>21   and within a matter of hours, that crew would get<br>22   their qualifications back, correct?<br>23    A.    I suppose it's possible, yes.<br><br>(Motion, Ex. 2, Magnuson Dec., Vol. 2, 192: 8-23) |
| 85 | Following the June 15 OBE, the evaluators held a debrief with the crew to discuss the crew's performance and the evaluation team's observations. (Dodd Decl. ¶ 19.) | Disputed, immaterial | Dodd did the speaking, the other evaluators were silent.<br><br>IR 2518572, Lead Evaluator's Flawed Direction Left Unchecked by Training<br><br>The silence of the evaluating instructors during the debrief, supported the Ops Director's criticism of the crew's correct ATWS re-injection priorities, and his flawed directives |
| 86 | Dodd's feedback about the propriety of the crew's use of an alternate system during the training exercise became a source of significant disagreement throughout the week. (Magnuson Vol. II Dep. 186:5-187:23, 194:7-195:7, 216:1-21; Dodd Dep. 25:23-30:14; Dodd Decl. ¶ 21). | Disputed, material | Dodd's flawed directive to wait to perform a "Critical Task was a source of significant disagreement. See Magnuson Dec., para. 76 |
| 87 | Consistent with procedural requirements, Magnuson's and the crew's qualifications to stand shift were pulled pending completion of remediation. (Dodd Dep. 24:11-25:22; | Disputed, material | See Magnuson Declaration |

*MAGNUSON'S OPPOSITION TO THE MSJ - 49*

| | | | |
|---|---|---|---|
| | Magnuson Vol. II Dep. 193:5-194:6.) | | |
| 88 | This was consistent with how other crews were treated in this period. Magnuson and the crew continued to work during the training week, continued to be paid, and maintained their benefits. (Magnuson Vol. II Dep. 189:8-190:9, 201:3-11, 211:5-14.) | Disputed, immaterial | Defendant does not provide evidence of how other crews were treated.<br><br>However, it is immaterial whether Magnuson had his pay and benefits. Key terms and conditions of his employment were negatively altered. |
| 89 | Magnuson's or his crew's qualifications had been pulled on occasions prior to June 2015, and he could not recall raising "any contention" about it. (Magnuson Vol. II Dep. 190:10-191:15.) | Disputed, immaterial | [See Entry 90] |
| 90 | On June 16, 2015, when Magnuson claims he first learned that qualifications had been pulled pending remediation, a heated discussion ensued, with Magnuson and the crew challenging that action. (Magnuson Vol. II Dep. 193:10-195:16.) | Disputed, material | Q.   Had your qualifications ever been pulled prior to this incident? A.   Had mine? Q.   Yes. A.   I don't remember.  It's possible. Q. And when I say "your," I mean yours or your crew's qualifications ever been pulled prior to this particular incident? A.   I believe so. Q.   And do you recall how often that happens for you or your crew, that is, where your qualifications have been pulled as a result of something happening -- that happened during a training operation? A.   I don't remember the frequency.  It was not very often. Q.   In those other circumstances where your qualifications had been pulled, did you agree with the analysis which led to them being pulled? A.   As I say, I don't remember those.<br><br>Q.   As I understand it, the crew's qualifications were pulled as a result of Mr. Dodd's evaluation during this particular training exercise? A.   That is my understanding, yes. Q.   And |

*MAGNUSON'S OPPOSITION TO THE MSJ - 50*

| | | | do you have a recollection of being upset by that? A.   I was definitely surprised by it, and my crew was upset by it. Q.   What did your crew say that made you think they were upset? A.   The crew and myself did not know that our quals had been removed and basically thought that was underhanded. (Motion, Ex. 2, Magnuson, Vol. 2 Depo, 190: 10-24, 191: 1-5, 193: 5-18) |
|---|---|---|---|
| 91 | Magnuson later raised his objections directly with Site Vice President Darin during a discussion on June 16th. (Magnuson Vol. II Dep. 198:24-200:6; Darin Decl. ¶ 45.) | Undisputed, material | Protected disclosure |
| 92 | After the discussion with Darin, Magnuson sent an email to his crew (which he later to talk to [Dodd] tomorrow;" and that he (*i.e.*, Magnuson) expected "to have our quals reinstated without remediation." (Ex. 41; Magnuson Vol. II Dep. 201:23-202:16.) forwarded to Darin and Dodd and others) claiming that he had discussed Dodd's pulling their qualifications with Darin. He told the recipients that Darin "agreed it was wrong" and was "going to talk to [Dodd] tomorrow;" and that he (*i.e.*, Magnuson) expected "to have our quals reinstated without remediation." (Ex. 41; Magnuson Vol. II Dep. 201:23-202:16.) | Undisputed, material | As the June 16 e-mail states Magnuson's nuclear safety concerns: "As it turns out, I ran in to Darin today as I was leaving. I had something related to discuss with him so I did bring up Hal pulling our quals. He ask to see the QGAs and agreed it was wrong. He's going to talk to Hal tomorrow. -I fully expect to have our quals reinstated without remediation. I want to add that I have now heard Hal's behavior characterized by the word bully on multiple occasions. Bullying in the workplace is fundamentally wrong and in nuclear power it is dangerous. Don't let it influence your decision making. [emphasis added] |
| 93 | On June 18, 2015, Darin told Sue Techau and others that Magnuson had mischaracterized Darin's comments about the | Disputed, material | On June 19, 2015, Techau was Exelon's Fitness for Duty and Access Authorization Manager.  Techau was also Exelon's designated Reviewing Official, in accordance with §73.56, |

| | | | |
|---|---|---|---|
| | OBE. (Darin Decl. ¶¶ 49 and 53.) | | Access Authorization.  As such, unless Darin believed Magnuson's behavior was questionable—regarding Exelon's Behavioral Observation Program required by Part 26 or §73.56—Darin had no reason to tell Techau that Magnuson had mischaracterized Darin's comments about the OBE.<br><br>If Darin truly questioned Magnuson's behavior, in accordance with Exelon's BOP, and reported his BOP concerns to Techau on June 18, 2015, Darin or Techau were required to have taken the immediate actions required by SY-AA-103-513—but no one did. |
| 94 | Magnuson's email also stated: "I have now heard [Dodd's] behavior characterized by the word bully on multiple occasions" and the crew should not "let it influence [their] decision making." (Ex. 41.) | Undisputed, material | |
| 95 | On June 17, 2015, Magnuson sent an email to the Operations Training Instructor and others, including Dodd and Darin, stating:<br>I have carefully reviewed the performance of my crew. It did not warrant removing quals. In good conscience, I cannot develop a remediation when one is not warranted. If you provide me with a remediation plan, I will either comply or document my basis for not, in an IR.<br>(Darin Decl. ¶ 48 and Ex. 12 thereto; Magnuson Vol. II Dep. 207:2-207:14.) | Undisputed, material | |

*MAGNUSON'S OPPOSITION TO THE MSJ - 52*

| | | | |
|---|---|---|---|
| 96 | Darin responded to Magnuson as follows:<br>Brian from our conversation last night I would request that you talk to Brian Wake and Hal [Dodd] on your insights and then let them make the call on if your perspective after reviewing the EAL [sic – Emergency Operating Procedures (aka QGAs)—not Emergency Action Level] basis changes Hal's decision. *In the end it is Brian and Hal's call as I stated last night.* We as a group need to be able to challenge and ask questions to ensure clear understanding. These elements make the station performance stronger.  Please follow up as discussed.<br>(Ex. 41; Magnuson Vol. II Dep. 207:15-208:5.) | Undisputed, material | |
| 97 | Darin and Dodd had never before had an employee refuse to develop a remediation plan. (Dodd Decl. ¶ 21; Darin Decl. ¶ 49.) | Disputed, immaterial. | The event was unusual because Magnuson had never been ordered to develop a remediation plan: Q.    You have never written a remediation report or remediation document? A. Not until that time. Q.    You mean ever at your time there? A.    I had never done it as a shift manager and never heard of a shift manager doing it. Q.    Have you ever heard of anyone doing it? A.    Training. Q.    You mean you have heard in the past that training writes the remediation document? A.    Training would develop the remediation plan.<br><br>(Motion, Ex. 2, Magnuson Vol. 2, 196: 17-24, 197: 1-4) |

| | | | It is immaterial whether other employees had refused to develop a remediation plan in the past and in fact, Magnuson testified his experience was the trainers wrote remediation plans. The issues surrounding to OBE were very context specific. Magnuson testified he refused to develop a flawed or dangerous remediation plan, or to otherwise participate in, the actual or potential violation of NRC rules and regulations. Ultimately Magnuson submitted a remediation on June 18, 2015, after Dodd corrected his flawed directive. |
|---|---|---|---|
| 98 | Dodd met with Magnuson and the crew on June 18, 2015 to again explain the basis for the NI rating. (Dodd Decl. ¶ 22.) | Disputed, immaterial | On June 18, 2015, Dodd reconvened the OTB [OBE] debrief because the Operations Training Department, and Brian Wake (SOS) could not justify or defend Dodd's flawed directive to wait—to Magnuson, so that he could develop an appropriate remediation plan. |
| 99 | The meeting became heated. At one point, Magnuson stood up and approached Dodd, causing another employee, the Operations Training Director, to tell him to "sit down, or something to that effect." (Magnuson Vol. II Dep. 275:9-277:10, 299:22-301:4.) | Disputed, material | Magnuson stood up but did not approach Dodd. Dodd got out of his chair, put his fists on the table in front of Magnuson, leaned toward Magnuson, and threatened, "I'm warning you, I don't want to hear the 50 pounds again." |
| 100 | On or about June 19, 2015, Magnuson submitted a remediation plan that was accepted by ExGen and the crew's qualifications were reinstated following successful completion of the remediation plan. (Magnuson Vol. II Dep. 203:3-16.) | Disputed, immaterial | On June 18, 2015, Magnuson submitted his Remediation Plan, which was approved by Dodd (and Operations Training Department) on June 19, 2015; however, after Magnuson submitted IR 2518572, Exelon recanted Magnuson's approved Remediation Plan. |

| 101 | On June 18, 2015, management held a teleconference to discuss Magnuson's behaviors during that week with Sue Techau. (Techau Decl. ¶ 40.) A second call took place on June 19, 2015. (Techau Decl. ¶ 42 and Ex. 6 thereto.) | Disputed, material | Magnuson's position is the EIAC meetings were held to discuss Magnuson's protected activity and ways to retaliate against him for it. |
|---|---|---|---|
| 102 | At the June 18th meeting, management explained the June 15, 2015 OBE and related events that occurred during the period from June 15th to June 18th. (Techau Decl. ¶ 41 and Ex. 5 thereto.) | Undisputed, material | Plaintiff lacks personal knowledge of the claimed discussions but notes management was discussing his protected activity according to their reports. |
| 103 | Darin reported to those assembled, including Techau, that Magnuson's assertion in his June 16, 2015 email that Darin had agreed that pulling the crew's qualifications was "wrong" was untrue. Darin explained that he did not agree that Dodd was wrong in pulling the crew's qualifications and he did not say that their qualifications would be reinstated without remediation. (Darin Decl. ¶ 49; Techau Decl. ¶ 40.) | Undisputed, material | Neither Darin nor Techau have presented simultaneous notes of said conversations, which undermines the credibility of their current assertions of what was discussed. |
| 104 | Management also reported that Magnuson said that others had called Dodd a "bully." Magnuson had not raised any issue or concern about Dodd being a "bully" prior to June 16th. (Techau Decl. ¶¶ 40, 44.) | Undisputed, material | Plaintiff lacks personal knowledge of the claimed discussions, and given defendant relies solely on witness declarations for this point, credibility is a key issue, properly evaluated at trial.  According to this defendant concession, management was discussing Magnuson's protected activity. |
| 105 | Management reported to Techau that this behavior was similar to Magnuson's previous concerning behaviors. (Darin | Undisputed, material | Plaintiff lacks personal knowledge of the claimed discussions, and given defendant relies solely on witness declarations for this point, credibility |

*MAGNUSON'S OPPOSITION TO THE MSJ - 55*

| | | | |
|---|---|---|---|
| | | Decl. ¶ 54; *see also* Techau Decl. ¶ 41.) | | is a key issue, properly evaluated at trial. |
| 106 | Techau also was told that during the June 18th debrief Magnuson became emotional, was red-faced, got out of his chair, stood, and made accusations against Dodd in front of the crew – until another supervisor intervened and told him to sit down. (Techau Decl. ¶ 40 and Ex. 5 thereto; Darin Decl. ¶ 51.) | Undisputed, material | Plaintiff lacks personal knowledge of the claimed discussions, and given defendant relies solely on witness declarations for this point, credibility is a key issue, properly evaluated at trial.<br><br>Plaintiff disputes the representation of his behavior in this meeting. |
| 107 | On June 18, 2018 [sic], Techau decided that she should send Magnuson's behaviors to the MRO for an FFD evaluation. (Techau Dep. 46:4-48:20; Techau Decl. ¶ 41.) | Disputed, material | Defendant cites the incorrect date, but assuming they mean 2016, Magnuson does not dispute what Techau claims was in her head.  Plaintiff lacks personal knowledge of the claimed discussions, and given defendant relies solely on witness declarations for this point, credibility will be a key issue, properly evaluated at trial. |
| 108 | Techau's decision was driven by what she then saw as a pattern of behavioral issues starting in 2014, as well as concerns about Magnuson's trustworthiness and reliability, including misrepresentation of facts and making allegations with no supporting data. (Techau Dep. 46:4-47:2.) These behaviors were reported to Techau in the three calls held with her in response to management's concerns about Magnuson's behaviors in November 2014, January 2015, and June 2015. (Techau Decl. ¶ 41.) | Disputed, material | Defendant's bare assertions of motive are not an undisputed fact. |
| 109 | On June 19, 2015, Techau moved to implement her decision to refer Magnuson's behaviors to the MRO by requesting that Human Resources prepare a timeline of Magnuson's behaviors so she | Disputed, material | Based on testimony given by Techau to the NRC Office of Investigations (NRC OI0, the "*Brian Magnuson Chronology*" (Ex. 42) was requested by EIAC on or about June 25, 2015— after Magnuson submitted IR 2518572 on June 23, 2015 and after Magnuson |

| | | | |
|---|---|---|---|
| | could present the information to the MRO for review. (Techau Decl. ¶ 43 and Ex. 7 thereto.) | | told HR that he intended to follow up on his issue reports—when questioned by HR on June 24, 2015. |
| 110 | Human Resources Manager Petersen prepared the timeline of Magnuson's behaviors that Techau requested. (**Ex. 42**; Petersen Dep. 27:11-30:11; Techau Decl. ¶ 43.) | Disputed, material | Human Resources Manager Petersen prepared a timeline, titled "Brian Magnuson Chronology," as requested by EIAC--not Techau. Petersen emailed the "Magnuson Chrono.docx" to Techau on June 30, 2015—five (5) days after Magnuson was placed on leave (on June 25, 2015). |
| 111 | On June 19, 2015, management also decided to conduct an independent investigation of Magnuson's allegation that he had heard Dodd referred to as a "bully" on multiple occasions. The investigation was assigned to Toni Williams in Human Resources. (Techau Decl. ¶¶ 44, 58.) | Disputed, material | Disputed as to "independent" investigation. The investigation was assigned to one of Defendant's HR employees. |
| 112 | On June 23, 2015, Magnuson submitted an IR in which he continued to take issue with the June 15, 2015 OBE results. (Cplt. ¶ 27; Ex. 43; Magnuson Vol. II Dep. 185:6-13, 186:24-187:5.) | Disputed, material | See Magnuson Declaration. |
| 113 | This was five days after Techau made the decision to refer Magnuson to the MRO for a fitness determination, while she was waiting for Petersen's timeline of Magnuson's behaviors, and after Magnuson had submitted and completed the remediation plan and the crew's qualifications were reinstated. (Techau Decl. ¶ 45). | Disputed, material | See Magnuson Declaration. |
| 114 | In the June 23rd IR, Magnuson accused Dodd of flawed decision-making and claimed that the Training Department | Disputed, material | Disputed because Magnuson's IR 2518572, dated June 23, 2015, does not accuse Dodd of flawed decision-making, but rather of giving flawed |

| | | |
|---|---|---|
| improperly failed to challenge Dodd. (Magnuson Vol. II Dep. 185:6-188:7.) | | directions. In IR 2518572, Magnuson's reported that Dodd had given NRC licensed operators (Magnuson and his crew) flawed directions to be taken during training and actual nuclear accident conditions.<br><br>Motion, Ex. 5, paras 18-21:<br><br>18. On June 15, 2015, Plaintiff's crew underwent training for requalification of their NRC license. The training involved a simulated nuclear accident referred to as an Out-of-the-Box evaluation, (OBE). During the debriefing discussion following the simulation, the new Operations Director Hal Dodd gave a directive to the crew to <u>wait</u> for an indefinite period of time before taking remedial action in the event of an actual emergency. When asked by a crew member, Dodd specifically directed the crew to <u>wait</u> for the reactor to depressurize 50 pounds. [emphasis added]<br><br>19. Dodd's directive was flawed, dangerous and actually or potentially unlawful in the nuclear emergency environment under NRC rules, regulations, orders and/or guidelines. Said directive would require the crew to unnecessarily <u>wait</u> to take action, during which time adequate reactor core cooling could not be assured. [emphasis added]<br><br>20. Based upon his training, education and NRC licenses, Plaintiff reasonably believed that Dodd's directive increased the risk of a core melt sequence and uncontrolled release of radiation, thereby endangering the |

| | | | | |
|---|---|---|---|---|
| | | | | Station, the surrounding community, and the environment.<br><br>21. After learning that Dodd intended to require Plaintiff to write an unsafe remediation plan, he met with Site VP Darin on June 16, 2015 and reported his concerns that Dodd's directive to wait before remedial action was dangerous, flawed and therefore actually or potentially contrary to NRC rules and regulations. |
| | 115 | On June 24, 2015, an independent expert team assigned to evaluate the IR reenacted the June 15, 2015 OBE using verbatim source documents and concluded that the directives given by Dodd during the OBE not only were correct, but also required by Quad Cities procedures and industry standards. (Techau Decl. ¶ 46; *see also* Darin Decl. ¶ 57 and Ex. 14 thereto.) | Disputed, immaterial | Defendant claims an "independent" team convened, but (1) the team reported to Dodd; (2) the team included one of the employees Magnuson had reported concerns about (Wake); and (3) the team included Al Easley, who reported to Wake:<br><br>Motion, Ex. 21, Techau Declaration, Ex. 8 thereto, [Doc. # 141-1 Filed: 02/09/24 Page 283 of 338] Exelon 5796:<br><br>Response to IR 2518572<br>Expert Review/Reenactment Team<br><br>Brian Wake, SOS<br>Ed Pannell, Operations Training Manager<br>Jed Ferdinand, Independent Training Instructor<br>Dan Jeans, Ops EOP owner which provides the governance to the procedure.<br>Al Easley, Independent Shift Manager<br>Golden Starr, Independent instructor<br>John Lechmeier (plant perspective), Simulator Coordinator |

| | | | |
|---|---|---|---|
| 116 | Later, the NRC also reviewed the issue raised in Magnuson's June 23, 2015 IR and "concluded that the station and Dodd were correct." (Magnuson Vol. II Dep. 228:16-229:19.) | Disputed, immaterial | Immaterial because it is irrelevant what the NRC concluded, as the employee is only required to have a reasonable belief of a potential nuclear safety issue to garner the protection of the ERA. |
| 117 | Techau was provided both a copy of Magnuson's IR and the results from the independent review team. She viewed the information as confirming the pattern of behaviors that formed the basis for her June 18, 2015 decision to refer him to Dr. Pohlman for a fitness determination. (Techau Decl. ¶¶ 45-47) | Disputed, material | Disputed as to "independent review team" but undisputed that Techau discriminated against Magnuson based on his IR.  See infra, Entry 118. |
| 118 | The issue was not the fact that Magnuson wrote the IR, but that, once again, he was taking a strong position that disregarded established facts and the informed views of others, and appeared to be driven by emotion, regardless of the facts. (Techau Decl. ¶ 47; *see also* Pohlman Decl. ¶¶ 19-20 and Ex. 4 thereto.) | Disputed, material | On June 25, 2015, ExGen specifically told Magnuson his security clearance was being revoked, he was being placed on administrative leave, and he was required to submit to a mandatory psych eval "for writing an emotionally driven IR." (See Yerkes Conversation Log, June 25, 2015) |
| 119 | On June 25, 2015, Cindy Petersen sent Techau two emails supplying June 23, 2015 IR, results from the independent expert review team, and the timeline that Techau had requested.  One of her emails stated: [T]he documentation supports that we have an active shift manager that is either unable or unwilling to accurately interpret and communicate procedures, instructions and conversations and is making poor judgments based on emotions. While this shift manager has in the past | Disputed, material | Disputed as to there being "an independent expert review team"  See infra, Entry 118. |

*MAGNUSON'S OPPOSITION TO THE MSJ - 60*

| | | | |
|---|---|---|---|
| | been tenacious in his efforts to challenge the station, over the course of time, he has been increasingly getting more irrational and emotionally driven. (Techau Decl. ¶ 49 and Ex. 8, 9 thereto.) | | |
| 120 | On June 25, 2015, Techau sent Dr. Pohlman the materials she received from Petersen earlier that day, including (a) a summary of the expert team's June 24th findings and conclusions, (b) a related response to Magnuson's IR, (c) examples of prior situations in which Magnuson engaged in aberrant behaviors, and (d) Petersen's comments regarding Magnuson's behaviors. (Techau Decl. ¶ 50 and Exs. 8 and 9 thereto; Pohlman Decl. ¶¶14-15 and Ex. 3 thereto.) | Disputed, material | Disputed because Techau did not send: (c) examples of prior situations in which Magnuson engaged in "aberrant" behaviors.<br><br>Techau did send copies of emails from Magnuson with Petersen's commentary and judgments inserted into the collection. (Techau Dec., Ex. 9) However, the word "aberrant" never appears in any of Techau's emails with regards to Magnuson. Further, there is not a single manager or HR or Security individual who labelled his behavior "aberrant" at the time of the events in question. |
| 121 | Techau's cover email forwarding the information she received from Petersen to Dr. Pohlman stated: Dr. Pohlman, I will call you on this if you can review. It appears [Magnuson] has an inflated opinion of himself 'grandiose' type that he is the smartest person and has been accusing others of things without any facts, it appears to deflect the focus on him. This had been identified for a while now and the site has been working with him on his actions and sent him through a performance assessment. This started when he was not allowed | Undisputed, material | This email that Techau sent to Dr. Pohlman, the Medical Review Officer, on June 25, 2015, is not disputed. However, it is important to recognize that the referenced "performance assessment," was the Leadership Assessment conducted by Right Management in January 2015, to prepare Magnuson for a promotion.<br><br>Based on the redacted testimony, dated January 6, 2017, from NRC FOIA 2017-000594 (Exhibit 32):<br><br>(1) The Exelon Witness was Techau, Exelon's former Access |

| | | |
|---|---|---|
| to transfer to a new job. When there is a discussion, what was said and what he says was said are 2 different things?? Wondering if he has a problem with truthfulness? (Techau Decl. ¶ 50 and Ex. 9 thereto; Pohlman Decl. ¶ 14, Ex. 3 thereto.) | | Authorization/Fitness for Duty Manager and Reviewing Official.

(2) Exelon's Access Authorization department (which includes the Reviewing Official), Employee Assistance Program staff (contractors), and Exelon's Medical Review Officer (contractor) are not independent; they did not observe Magnuson's behavior.  As shown in this transcript, these positions are not independent.  They are provided second or third hand information from plant staff.

(3) Even though EIAC and the Reviewing Official, claim to have questioned my behavior in "late 2014" and "January '15," they decided to wait for the results of a "performance assessment," to be conducted on Magnuson, before deciding "whether or not we needed to take further steps."  This shows that EIAC and the Reviewing Official [Techau], either decided to disregard their BOP training and violate company BOP procedures and regulations—or they collectively decided to retaliate against Magnuson under the pretext of BOP regulations.


References:

The transcript of Exelon Witness-presumed to be Susan Techau (redacted testimony, dated January 6, 2017, from NRC FOIA 2017-000594 (Exhibit 32) |

*MAGNUSON'S OPPOSITION TO THE MSJ - 62*

| | | | | Magnuson's January 2015 Leadership Assessment conducted by Right Management |
|---|---|---|---|---|
| | 122 | Techau and Dr. Pohlman had a telephone conversation on June 25, 2015, after Dr. Pohlman received the emails and documents sent by Techau. During the call, Techau and Dr. Pohlman discussed the information compiled by Petersen and Petersen's comments. Techau also shared her assessment of Magnuson's pattern of behaviors based on the accumulated information she had received. (Techau Decl. ¶ 51; Pohlman Decl. ¶¶ 16-19.) | Disputed, material | See Magnuson Declaration. |
| | 123 | Based on her review of the information provided, on June 25, 2015, Dr. Pohlman determined that Magnuson's behavior "clearly [had] become disruptive to the secure nuclear work environment" and recommended that a "Mandatory EAP Evaluation be completed on or before July 10, 2015." Dr. Pohlman also informed Techau that the mandatory EAP evaluation was "required prior to reconsideration for access." (Pohlman Decl. ¶¶ 21-22 and Exs. 5-6 thereto; Techau Decl. ¶¶ 52, 53 and Exs. 10 and 11 thereto.) | Undisputed, material | Plaintiff does not dispute the email that speaks for itself but does dispute the truth of the content. Pursuant to § 73.56 and Part 26, Defendant recording in PADS that Magnuson's Unescorted Access was *Terminated Favorably* on June 25, 2015, means that Exelon provided "high assurance" to the nuclear industry that Magnuson was "fit for duty" and "trustworthy and reliable" up to and on June 25, 2015. |
| | 124 | Under the NRC's regulations and ExGen's EAP, BOP, and FFD Program, Techau was obligated to implement Dr. Pohlman's fitness determinations by placing a temporary hold on Magnuson's | Disputed, material | Techau is required to comply with NRC regulations and not Pohlman's determinations if those were contrary to NRC regulations. |

*MAGNUSON'S OPPOSITION TO THE MSJ - 63*

| | | | |
|---|---|---|---|
| | unescorted access pending evaluation of his fitness for duty, a final fitness determination, and completion of the access authorization process. (Techau Decl. ¶¶ 54, 67.) | | |
| 125 | Magnuson accordingly was placed on leave with a temporary hold on his unescorted access on June 25, 2015. (Techau Decl. ¶¶ 29, 54.) | Disputed, material. | Magnuson was told his clearance was revoked.  Techau or her staff later recorded in PADS that they had terminated his access favorably on June 25, 2015. |
| 126 | On June 30, 2015, Techau sent an email to ExGen's EAP provider and Dr. Pohlman. Techau explicitly advised that Magnuson's "IR is NOT the center or the trigger for this interview as the content is only one piece of continued type of behavior. It was not that he wrote the IR but the content that we are concerned about that it was not factual." (Techau Decl. ¶ 55 and Ex. 12 thereto; Pohlman Decl. ¶ 20 and Ex. 4 thereto.) | Undisputed, material | Techau admits the IR content is one piece of the cause for the adverse action. |
| 127 | The June 30th email also set forth what Techau believed were the key issues to be evaluated through Magnuson's EAP referral:<br>• Seems to disregard authority and always thinks he is right no matter what (he thinks he is smarter than everyone else).<br>• When he is in meetings what he recalls and what others recall are two different things – seems to hear what he wants to hear and then twists it. | Undisputed, material | The email speaks for itself, but the Plaintiff disputes the content therein. |

*MAGNUSON'S OPPOSITION TO THE MSJ - 64*

| | | | |
|---|---|---|---|
| | • Says and makes accusations on others without factual support – seems there is an issue with truthfulness.<br>• He seems to convince himself that what he is saying or portraying is accurate when it is not and he gets overly emotional approach than what normally would happen and then jumps to a conclusion without any real solid facts.<br>• Pattern of behavior is that he will "dig his heels" in and then just gets tunnel vision and then is even more stubborn.<br>• He over reacts, gets all "red-faced," gets out of chair and the people around him have to calm him down.<br>(Techau Decl. ¶ 56 and Ex. 12 thereto.) | | |
| 128 | Dr. Pohlman agreed with Techau's assessment of the issues to be evaluated.<br>(Pohlman Decl. ¶ 24 and Ex. 4 thereto.) | Disputed, material | Motion Ex. 21, Ex. 11 to Techau Declaration demonstrates Pohlman's lack of assessment and input:  On June 25, 2015, Dr. Pohlman signed (for M Yerkes and herself as the MRO) SY-AA-103-507 Attachment 2, *Access Authorization/Fitness for Duty Determination of Fitness Review Form,* for Magnuson.  On this form, under the section titled, MRO Recommendation - Eligible for Pre-access Testing, Pohlman marked "NO."  In the Comments section, Pohlman handwrote:<br><br>*Mandatory EAP eval required prior to reconsideration for access.*<br><br>Additionally, Pohlman did not complete much of this form. Pohlman did not complete the *Authorization* |

| | | | | |
|---|---|---|---|---|
| | | | | *Recommendation* section, which lists the following five (5) options*:*<br><br>*Deny Access*<br>*Temporary Hold*<br>*Reinstate Access*<br>*Release Regular Duty*<br>*Other*<br><br>Pohlman did not mark any of these options and did not list any comments for the "Other" option.  Pohlman did not complete the *Authorization Recommendation* section.<br><br>Exelon retaliated and discriminated against Magnuson, for reporting nuclear safety concerns, under the pretext of their Behavioral Observation Program required by Part 26 and §73.56. |
| 129 | Magnuson was referred to a Social Worker named Lisa Curry for the required EAP evaluation. (Pohlman Decl. ¶ 25.) | Undisputed, material | | |
| 130 | On July 8, 2015, Dr. Pohlman received a "Return to Work Status Report" stating that Curry had three sessions with Magnuson and recommending that he be considered for return to work while also attending three more outpatient sessions. The report also noted that while it included the EAP evaluator's opinion and recommendations, "it is always the company's right and responsibility to determine when and how an employee may return to work." (Pohlman Decl. ¶ 26 and Ex. 7 thereto.) | Undisputed, material | | |

*MAGNUSON'S OPPOSITION TO THE MSJ - 66*

| | | | |
|---|---|---|---|
| 131 | Dr. Pohlman also received a copy of Curry's full report dated July 8, 2015 related to Magnuson. The report noted that Magnuson had been referred to Curry's office for "performance management issues" related to his "actions and approach to others at work," including situations in which he "seem[ed] to disregard authority," "always thinks he is right," "makes allegations that are not based on factual evidence," and acts in ways that "are emotional based rather than fact based." (Pohlman Decl. ¶ 27 and Ex. 8 thereto.) | Undisputed, material | |
| 132 | Curry reported two diagnoses for Magnuson: "Axis I: 309.3 Adjustment Disorder unspecified" and "Axis IV: interpersonal/work." (*Id.*) She recommended that Magnuson see her for a minimum of three more sessions with the treatment goals of "improv[ing] [his] approach to others and learn[ing] more appropriate ways to express his feelings and communication skills." (*Id.*) | Undisputed, material | |
| 133 | Based on the information provided to her, Dr. Pohlman determined that Magnuson was fit for duty and recommended that he be returned to work with reinstated unescorted access subject to his compliance with all of the provider's treatment recommendations. (Pohlman Decl. ¶ 28 and Ex. 9 thereto.) | Undisputed, material | |
| 134 | On July 29, 2015, Dr. Pohlman received a report from the EAP | Undisputed, material | |

*MAGNUSON'S OPPOSITION TO THE MSJ - 67*

| | | | |
|---|---|---|---|
| | provider stating that Magnuson had completed all of his EAP recommendations and the provider would be closing its file with respect to Magnuson. (Pohlman Decl. ¶ 29 and Ex. 10 thereto.) The same day, Dr. Pohlman submitted an Access Authorization form noting that Magnuson's treatment was completed and she had no further recommendations. (Pohlman Decl. ¶ and Ex. 11 thereto.) | | |
| 135 | In the meantime, Techau was awaiting the results of Human Resources Manager Williams' investigation of certain events during the week of June 15, 2015, including Magnuson's claim that he heard Dodd referred to as a "bully" on multiple occasions. Techau believed the investigation could provide additional information that would be relevant to Magnuson's trustworthiness and reliability and her final access decision. (Techau Dep. 64:14-64:18; Techau Decl. ¶ 58.) | Undisputed, material | |
| 136 | Techau received the results of Williams' investigation on or about July 30, 2015. Williams reported that the evidence did not support a conclusion that Dodd had bullied Magnuson or his crew, lied, or withheld information in violation of Company policy. Williams also reported that she could not determine one way or another whether Magnuson was intentionally lying or providing nonfactual information. (Techau | Disputed, material | Disputed because Toni Williams specifically received information from an Operator Harold Coers that he thought Dodd was bullying Magnuson as well as a report from Magnuson that Steve Dagnieu felt bullied. (Opp. Ex. 13, p. 3)  [Excerpted from Williams Interview of Reactor Operator Harold Coers]:  TLW: Tell me about the heroic action statement. |

*MAGNUSON'S OPPOSITION TO THE MSJ - 68*

| | | |
|---|---|---|
| Dep. 70:17-71:24, 111:15-24; Techau Decl. ¶ 58.) | | HC: I didn't' [sic] like it. I didn't' [sic] take heroic action. I took procedural action. There were a bunch of over viewers [sic]; *we didn't feel comfortable really discussing our concern.*<br><br>TLW: Have you heard the word bullying used?<br><br>HC: Yes. Hall and Brian were discussing the 50 lbs. To everyone in the room it was the wrong thing to do. He did elude [sic] to it but never really said it. At one point, Hal leaned over to Brian, and Hal said, "Brian I'm warning you." I can't tell you the words afterwards. And then BM said something that I didn't hear. Brian said, I feel like you are being a bullying [sic] and I'm not going to put up with it. Everyone in the room was like... oh...<br><br>[Opp. Ex. 1, p. 19-20 (emphasis added)]<br><br>TLW: What's your definition of bullying?<br><br>HC: Anytime that someone of authority uses their authority to suppress someone other them [sic] of saying or doing what they think is right., [sic] so in that instance, *would I say that Hal was bullying BM, yes.* My opinion, if Hal would have just said I was wrong about the 50 lbs. There were things that we could have done different. i.e. he wanted us to open the condensate values. We could have done different.<br><br>TLW: How did you feel about the "heroic" comment? |

| | | | |
|---|---|---|---|
| | | | HC: I was upset. I've done this multiple time [sic] before and putting a negative connotation on it and the procedures are telling me that I should have done it that way.<br><br>[(Opp. Ex. 1, p. 20)]. |
| 137 | Techau considered the fact that Magnuson recently had completed his EAP assessment and treatment to address his behaviors and had been determined to be fit for duty by Dr. Pohlman. Techau also considered the results of the bullying investigation to be "inconclusive" regarding Magnuson's truthfulness, decided to give Magnuson the benefit of the doubt, and resolved the potentially disqualifying information in his favor. But she also asked Dr. Pohlman to reinforce with Magnuson the behavioral changes that ExGen expected him to demonstrate after he returned to work. (Techau Dep. 63:1-64:24; 68:16-71:24; Techau Decl. ¶ 58 and Ex. 15 thereto.) | Disputed, material | See Entry 136 as to the bullying |
| 138 | Dr. Pohlman did as Techau asked and reported that she believed Magnuson understood. (Pohlman Decl. ¶¶ 30-31 and Ex. 12 thereto.) | Undisputed, material | |
| 139 | Having addressed her concerns regarding Magnuson's behaviors, trustworthiness and reliability, Techau removed the temporary hold on his unescorted access and cleared | Disputed, material | His access had been revoked. |

| | | | |
|---|---|---|---|
| | | him to participate in the "in-processing" procedure required to restore access. (Techau Decl. ¶ 60.) | | |
| 140 | At that time, Quad Cities performed "in-processing" every other week. The next available date for access in-processing was August 18, 2015. Magnuson was in-processed for access at Quad Cities on August 18th. He returned to work with reinstated unescorted access on August 19th. (Techau Decl. ¶ 60.) | Disputed, material | ExGen should have processed him immediately given what they had done to him. |
| 141 | Consistent with ExGen's practices, Magnuson received his full pay the entire time he was on leave pending completion of the fitness determination and access authorization process.  He continued to participate in all of ExGen's benefit plans. There was no change in his job title, status, or other terms or conditions of his employment. (Magnuson Vol. II Dep. 252:19-252:22; Daniels Decl. ¶ 15, **Ex. 13**.) | Disputed, immaterial | There were obvious changes to Magnuson's status and the terms and conditions of his employment.  He was removed from his exciting control room leadership position |
| 142 | No adverse information about Magnuson was reported by ExGen's Access Authorization and Fitness for Duty Department in the Personnel Access Database System ("PADS"). The PADS report nowhere reflects that Magnuson's unescorted access had been revoked or put on hold. (**Ex. 44**; Techau Dep. 81:3-25.) | Disputed, material | See Magnuson Dec. and Entry 144 re: PADS issues |
| 143 | The gap in Magnuson's unescorted access during the period from June 25, 2015 to August 18, 2015, was reported | Undisputed, material | |

*MAGNUSON'S OPPOSITION TO THE MSJ - 71*

| | | | |
|---|---|---|---|
| | | as "favorable." (Ex. 44; Techau Dep. 95:15-96:18; *see also*, Magnuson Vol. II Dep. 282:21-286:11; Magnuson Vol. III Dep. 8:2-9:7, Ex. 3.) | | |
| 144 | PADS reports are available only to nuclear licensees' security and access authorization personnel. (Techau Dep. 31:24-33:10, 97:5-7; Techau Decl. ¶61.) | Disputed, material | Disputed because (1) Techau cannot credibly speak to what happens at other nuclear licensees; (2) Techau cannot testify that other security organizations do not make the PADS report available to their HR or hiring officials; and (3) the point is moot because Magnuson is required to self-disclose under NEI 03-01:<br><br>8.2 SELF-DISCLOSURE QUESTIONS<br>a. In addition to completing the criminal history self-disclosure defined in Section 7.2, **the individual must self-disclose FFD history**.<br>b. The self-disclosure must be conducted for the appropriate period specified below. The individual shall answer the following ten questions.<br>*** For updated or reinstated UAA/UA the timeframe "Since your last UAA/UA if favorably terminated within the past 3 years:"<br>Have you:<br>1. *violated a licensee or employer's fitness-for-duty policy?*<br>2. *been denied* or had unescorted access authorization terminated unfavorably at any place of employment or at any nuclear power plant for any reason including fitness for duty policy violation or been unfavorably terminated form any employment for fitness-for-duty reason?<br><br>(Opp. Ex. 23, p. 2) |

*MAGNUSON'S OPPOSITION TO THE MSJ - 72*

| | | | | Thus, the substance of the revocation action was available to other licensees- such as future employers. |
|---|---|---|---|---|
| | 145 | If Magnuson applied for a job in the future, the screen in the PADS report reflecting an eight-week break in his unescorted access could not be seen or reviewed by Human Resources personnel making an employment decision. (Techau Dep. 97:21-98:12, *see also* Techau Decl. ¶61.) | Disputed, material | Disputed because (1) Techau cannot speak to whether other organizations allow  with the PADS report, and (2) Security can readily give to the HR dept.  The point is moot as well because Magnuson must self-disclose |
| | 146 | Employees at ExGen's nuclear plants were subjected to mandatory EAP referrals like the one that Magnuson received on June 25, 2015, and related temporary holds on unescorted access, at a rate of between approximately 50 and 100 times per year. These referrals and holds were due to behavioral issues, medication issues, medical issues, mental health issues, mood disorders, marital or other family problems, fatigue issues, attendance issues, and other issues indicating that the employee may not be fit for duty, trustworthy or reliable under the NRC's regulations and ExGen's AAP, BOP and/or FFD Program. (Techau Decl. ¶¶ 62, 63 and Ex. 18 thereto; Pohlman Decl. ¶ 32.) | Undisputed, immaterial | Immaterial what other employees have been put through. |
| | 147 | During the years 2014 and 2015 alone, at least 161 employees employed at ExGen's nuclear plants (including Magnuson) were given mandatory EAP referrals with accompanying temporary holds on their unescorted access pending the results of a fitness determination | Disputed, immaterial | This is immaterial because the issue of this Motion is whether ExGen used the BOP referral process as a retaliatory device against Magnuson for his time proximate nuclear safety reports, not whether other employees had separate issues requiring EAP referral.  Every workplace has |

*MAGNUSON'S OPPOSITION TO THE MSJ - 73*

| | | | |
|---|---|---|---|
| | or a review of trustworthiness and reliability issues. (*Id.*) | | employees with issues requiring employee assistance. |
| 148 | Prior to Magnuson's EAP referral on June 25, 2015, Dr. Pohlman had been involved in more than 1000 referrals as ExGen's MRO/SAE, starting in 2001. (Pohlman Decl. ¶ 33.) The process that Dr. Pohlman followed in Magnuson's case, and the factors she considered in performing her functions as required under the NRC regulations, were the same as those she followed in all of the other cases in which she was involved. (*Id.*; *see also*, Pohlman Decl. ¶ 38.) | Disputed, immaterial | This is disputed because Pohlman cannot credibly testify as to the process and factors she used in each case over 23 years in 1000 referrals.<br><br>However, this is immaterial because the only material facts are how Magnuson was treated and whether the process was influenced by retaliation from the referral stage. |
| 149 | As ExGen's Access/FFD Program Manager and one of its Access Authorization Reviewing Officials, all of the decisions to refer employees to Dr. Pohlman and related access authorization determinations since 1999 were made by Techau or employees acting under her supervision or direction. (Techau Decl. ¶ 70.) The AAP, BOP, and FFD Program processes that Techau followed in Magnuson's case were the same as those she followed in all of the other cases in which she was involved. (Techau Decl. ¶ 70.) | Disputed, immaterial | This is disputed because Techau cannot credibly testify as to the process and factors she used in each case over 25 years.<br><br>However, this is immaterial because the material facts are how Magnuson was treated and whether the process was influenced by retaliation from the referral stage on. |
| 150 | At the time of Techau's decision to send Magnuson to the MRO for a FFD referral and Dr. Pohlman's decision to require a fitness determination with a referral to EAP and subsequent hold on Magnuson's unescorted access, neither Techau nor Pohlman knew that Magnuson | Disputed, material | As described, Magnuson was told his clearance was revoked. |

*MAGNUSON'S OPPOSITION TO THE MSJ - 74*

| | | | |
|---|---|---|---|
| | had made any reports, disclosures or complaints to the NRC, the Department of Labor, or any other government or law enforcement agency. (Techau Decl. ¶ 71; Pohlman Decl. ¶ 39.) | | |
| 151 | The Complaint alleges only one instance in which Magnuson reported a concern to the NRC prior to the June 2015 decisions to place his access on hold pending a fitness determination. (Cplt. ¶¶ 17, 137). Specifically, he alleges that "[o]n or about April 13, 2015, Plaintiff directly reported to the NRC via Rob Murray safety and regulatory violations in reference to" an IR. (Cplt. ¶ 17.) But in his deposition, he acknowledged that the April 13, 2015 IR was actually initiated by the NRC, not Magnuson. Referring to an April 13, 2015 IR, he admits that "*I did not report this to the NRC*. The NRC came to my office with questions about it." (Magnuson Vol. I Dep. 157:13-158:9 (emphasis added).) | Disputed, immaterial | The ERA protects employees who report internally or externally either on their own initiative or in response to an inquiry. |
| 152 | In late 2014 and early 2015, INPO conducted an evaluation of Quad Cities that identified specific areas where the performance of the Quad Cities Operations Department could be improved. (Dodd Dep. 33:16-35:16; *see also*, Dodd Decl. ¶¶ 5-6.) | Undisputed, immaterial | |
| 153 | In April 2015, after the INPO evaluation, and before the OBE issues of June 2015, Hal Dodd was named the Operations Director and head of the Operations Department at Quad Cities, replacing Kimler. (Dodd | Undisputed, immaterial | |

*MAGNUSON'S OPPOSITION TO THE MSJ - 75*

| | | | |
|---|---|---|---|
| | Dep. 31:2-14, 33:2-15.) One of Dodd's first tasks as Operations Director was to review and address the areas for improvement raised in the INPO assessment and attempt to raise the level of performance in the Operations Department. (Dodd Dep. 36:11-16; Dodd Decl. ¶ 7; *see* Magnuson Vol. II Dep. 174:21-175:17.) | | |
| 154 | In the Spring of 2015, the Operations Department, under Dodd's leadership, conducted an assessment of the Strengths, Weaknesses, Opportunities and Talents ("SWOT Assessment") of the individuals then working in the Quad Cities Operations Department. The SWOT Assessment included an interview with each Shift Manager in the Operations Department using a structured interview guide and process to assess leadership behaviors and competencies rather than past performance. The same structured interview guide and process was used for all interviews. (Dodd Decl. ¶ 8; Daniels Decl. ¶ 4.) | Undisputed, immaterial | |
| 155 | On April 15, 2015, Magnuson was interviewed by Dodd and Human Resources Generalist Heather Daniels, using the structured interview guide and process. (Dodd Decl. ¶ 9; Daniels Decl. ¶¶ 4-5; *see also*, Dodd Dep. 36:20-39:16). | Disputed, material | |
| 156 | At the end of the April 15, 2015 interview, Dodd and Daniels discussed their impressions of Magnuson's performance in the interview. Both had concerns | Plaintiff lacks information to speak to what Dodd | The "material fact" is that Dodd (Daniels/Exelon) did not act upon their supposed April 15, 2015 claims regarding Magnuson's leadership— |

*MAGNUSON'S OPPOSITION TO THE MSJ - 76*

| | | | |
|---|---|---|---|
| | about Magnuson's leadership skills stemming, in particular, from his answers to two questions dealing with (a) helping employees meet their development goals, and (b) handling situations in which he was asked to do something he did not agree with. Both concluded that Magnuson's answers showed that he needed leadership development work. (Dodd Dep. 43:4-17.) It was their consensus during this meeting that Magnuson likely would not retain his full Shift Manager duties following completion of the assessment process. (Dodd Dep. 43:8-17; Dodd Decl. ¶¶ 10-13 and Ex. 1 thereto; Daniels Decl. ¶ 7.) | and Daniels spoke about and they provide no documentary evidence supporting their contentions. | until after Magnuson reported wrongdoing by Dodd, beginning on June 16, 2015, and after Magnuson submitted IR 2518572 on June 23, 2015. |
| 157 | Dodd was not aware of or involved in any of the EIAC calls about Magnuson, or any of the issues that were addressed in those meetings, when he and Daniels interviewed Magnuson. (Dodd Decl. ¶ 9.) | Disputed, material | |
| 158 | The Human Resources Department subsequently tallied the assessment scores for all of the individuals interviewed and did a stack ranking based on their interview scores derived from the ratings on the interview forms. Magnuson was rated the lowest of all of the employees (including Shift Managers). Michael MacLennan (another Shift Manager) was rated next lowest. (Dodd Decl. ¶¶ 14-15 and Ex. B thereto.) | Disputed, material | |
| 159 | Dodd received a copy of that spreadsheet on or before June 15, 2015. (Dodd Decl. ¶ 14 and | Disputed, material | |

*MAGNUSON'S OPPOSITION TO THE MSJ - 77*

| | | | |
|---|---|---|---|
| | Ex. B thereto.) The spreadsheet reflected what Dodd already knew from his involvement in all of the interviews and assessment scores. Magnuson had the lowest "Individual Average" rating (2.45). MacLennan had the next lowest rating (2.55). (Dodd Decl. ¶ 16 and Ex. B thereto.) | | |
| 160 | Based on these ratings and Dodd's assessment that both needed further leadership development, Dodd decided that Magnuson and MacLennan would not retain their full Shift Manager responsibilities. (Dodd Decl. ¶ 15.) | Disputed, material | |
| 161 | Dodd decided that Magnuson and MacLennan would retain their Shift Manager title and compensation. (Dodd Decl. ¶ 16.) | Disputed, material | |
| 162 | When it was time for ExGen to implement the changes in Magnuson's and MacLennan's Shift Manager duties, Magnuson was on leave pending the results of his EAP referral and fitness for duty determination. Accordingly, it decided to delay the announcement of the changes. (Dodd Decl. ¶ 18.) | Disputed, material | |
| 163 | ExGen told MacLennan about the changes in his duties as Shift Manager in August 2015. (Dodd Decl. ¶ 18.) | Disputed, material | |
| 164 | Magnuson was told about the changes in his duties when he returned to work on August 19, 2015, after being cleared for in-processing by Dr. Pohlman and Techau. (Magnuson Vol. II Dep. | Disputed, material | |

*MAGNUSON'S OPPOSITION TO THE MSJ - 78*

| | | | | |
|---|---|---|---|---|
| | | 290:14-291:22.) He later learned that MacLennan's duties were also changed. (Magnuson Vol. II Dep. 290:23-291:11.) | | |
| | 165 | It was Dodd's **intent** that Magnuson and MacLennan would be able to work their way back into their full Shift Manager role if they could address the leadership competencies that raised concerns. (Dodd Decl. ¶ 18.) Magnuson acknowledges being told that he could move back to that role if circumstances changed or his performance improved. (Magnuson Vol. II Dep. 292:8- 11.) | Disputed, material | |
| | 166 | Other changes also were implemented based on the leadership interviews and SWOT Assessment, including moving two Senior Reactor Operators to Shift Manager roles and changing crew composition to better balance each crew's leadership and technical skills. (Dodd Decl. ¶ 17.) | Disputed, material | |
| | 167 | When making his decisions regarding organizational changes, including those impacting Magnuson and MacLennan, Dodd did not consider any IRs or alleged nuclear safety complaints that any of the employees had raised, or any absence thereof. (Dodd Decl. ¶ 18.) | Disputed, material | A bald assertion regarding motive (that Dodd did not consider any IRs or nuclear safety complaints) is not an undisputed fact. |
| | 168 | Magnuson acknowledges that MacLennan's duties as Shift Manager were changed in the same way as his were, and that he is not aware of any protected activities engaged in by MacLennan that would have | Disputed, material | |

*MAGNUSON'S OPPOSITION TO THE MSJ - 79*

| | | | |
|---|---|---|---|
| | | served as a basis for MacLennan's reassignment. (Magnuson Vol. I Dep. 21:7-22, 298:8-15.) | | |
| 169 | When Magnuson returned to work in August 2015, he spent several weeks in refresher training and taking tests necessary for him to resume licensed duties in the Control Room at Quad Cities. (Magnuson Vol. II Dep. 293:10-18.) | Undisputed, material | Motion, Ex. 2, Magnuson Vol. II Dep. 293:10-18: Q.   After you had this meeting with Cindy Petersen and Brian Wake, what happened next in terms of your employment? A.    I was given an accelerated remediation program, so I was required to make up the licensed operator requalification retraining that I had missed when I was on leave, so that took several weeks.  I don't remember the length of time. |
| 170 | On September 16, 2015, the Operations Department Senior Manager of the Operations Support & Services Group sent Magnuson an email saying the plan was for him to work on two projects for the group. (Ex. 45; Magnuson Vol. II Dep. 303:16-304:5.) | Undisputed, material | |
| 171 | This group, like all Operations Department positions, reported to Hal Dodd, as he was the head of the Operations Department. (Dodd Decl. ¶ 7.) | Undisputed, material | |
| 172 | Magnuson responded with a single sentence email, stating: "Is it your intent that I work for Dodd while my allegation against him remains unresolved?" (Magnuson Vol. II Dep. 303:16-304:4.) | Undisputed, material | |
| 173 | Site Vice President Scott Darin was shown Magnuson's email. After reviewing the email, Darin concluded that given the need for cohesion in the Nuclear Control Room, in light of the obligation of licensed Control | Disputed, material | Defendant has provided no contemporaneous documents to support this claim, but rather added this after-the-fact justification for its retaliation. |

| | | | |
|---|---|---|---|
| | Room employees to make split-second decisions and follow procedures to safeguard the public from the risks of nuclear power generation, Darin could not continue to allow Magnuson to work in the Operations Department if he was unwilling to work for Dodd, the head of that department. (Darin Decl. ¶ 64.) | | |
| 174 | Instead, Darin decided to assign Magnuson temporarily to the Training Department. The Training Department did not report to Dodd; it had a need for individuals with Magnuson's senior reactor operator-level training, skills, and knowledge; and had retained contractors to provide assistance. Darin also considered that it was common for Operations Department employees to be assigned to Training when needed. (Darin Decl. ¶ 65.) | Disputed, material | A Senior manager with control room expertise is not best suited to the Training Dept. |
| 175 | Human Resources Manager Petersen responded to Magnuson by email the same day, stating: Your email suggests *you have concerns about working for Hal Dodd while your pending allegations regarding his conduct and the Company's investigation of that conduct remain outstanding.* We understand those concerns. I also understand that there is currently work available for you to do on a temporary basis in the Training Department and that you are scheduled to begin vacation [for the next week]. (Ex. 45 (emphasis added); | Undisputed* material | *If corrected to:<br><br>Your email suggests you have concerns about working *with* Hal Dodd (not for)<br><br>Ex. 45 further states:<br>"Upon your return from vacation you will maintain the *temporary* assignment in training until we evaluate further an appropriate assignment for you pending the resolution of your allegations." |

*MAGNUSON'S OPPOSITION TO THE MSJ - 81*

| | | | |
|---|---|---|---|
| | | Magnuson Vol. II Dep. 304:9-305:6.) | |
| 176 | Petersen's email ended as follows: "[Y]ou will maintain the temporary assignment in training until we evaluate further an appropriate assignment for you pending resolution of your allegations." (Ex. 45.) | Undisputed, material | |
| 177 | Magnuson did not respond to Petersen's email at all, let alone state that he could work with Dodd. (Magnuson Vol. II Dep. 304:9-304:1; Magnuson Vol. III Dep. 24:18-24:12.) | Undisputed, material | Q.     And why is that? A.     I apparently didn't think it was necessary. Q.     What was not necessary? A.     At this point in time, I had been placed on leave.  I asked a question, and I was just basically doing what I was instructed to do. (Motion, Ex. 2, Magnuson Vol. 2, 305: 11-17) |
| 178 | Magnuson admits that it would not have been in the best interest of Quad Cities to place him in a position working for Dodd at that time. (*Id.*, 305:18-306:5, 308:8-13.) | Disputed, material | Magnuson could only testify to his thinking that it would probably not be in the best interest of the station to have been placed in a position *to have to work with Dodd again.* <br><br> (*Id.*, 306: 1-5) |
| 179 | Magnuson asserted years later in his deposition that ExGen misconstrued his September 16th email, but he admitted he did nothing to correct ExGen's understanding that he was unwilling to work under Dodd at the time. (Magnuson Vol. III Dep. 27:7-29:12). | Disputed, material | Defendant's assertion claiming "years later" is contradicted by Defendant's exhibits.  Ex. 50 records Darin noting that Magnuson told him back in October 2016 that he never said he couldn't work for Dodd: <br><br> Shortly into the discussion he stated that he had open allegations and investigations in progress and did not want to consider any job opportunities until those investigations were completed and that the only job he wanted was to be back in his old position in operations. I asked how that could work since he did not want to work with and did not respect his supervision Hal Dodd or Brian Wake, I explained that they were not going being moved out of there [sic] |

*MAGNUSON'S OPPOSITION TO THE MSJ - 82*

| | | | |
|---|---|---|---|
| 1 2 3 | | | positions. *He proceeded to say that he never said that he could not work for Hal or Brian* but that it would be problematic.<br><br>(Motion, Ex. 50) (emphasis added). |
| 180 | The NRC reached the same conclusion that ExGen had as to Magnuson's objections to working for Dodd. Magnuson again confirms he never told anyone his meaning had been misconstrued. (Magnuson Vol. III Dep. 26:19-29:11; *see also* Ex. 46.) | Disputed, immaterial | Id., Motion, Ex. 50.<br><br>     A.  Answered what question?<br>Q. It says upon learning of your new assignment, you said you did not want the position<br>because you did not want to work for the operations<br>director, right?<br>So based on my knowledge of that email<br>and how it was misconstrued, I did not -- I'm<br>confident that I did not tell the NRC that.<br><br>Q. Pardon me? You're maintaining, as you sit here today, that the email that you wrote about something to the effect that you expect me to work for Dodd has been misconstrued?<br>A. Yes<br>Q. And when did you reach that conclusion?<br>     A.  Sometime in 2015 when I received an<br>email from HR that alluded to that. |
| 181 | Training is an "important function" that ExGen takes "very seriously" (Magnuson Vol. II Dep. 310:17-311:7) and operations persons occasionally were assigned to assist Training. (Magnuson Vol. II Dep. 318:12-14.) | Undisputed, immaterial | Immaterial because the issue is not whether training is important or operators sometimes do it.  The issue is whether Magnuson was involuntarily moved to the training department as a retaliatory adverse action. |
| 182 | During the period of his assignment to the Training Department, Magnuson retained his Shift Manager title, salary, | Undisputed, immaterial | Immaterial because the issue for purposes of this Motion is the forced mental examination, the removal from his position and forced reassignment. |

*MAGNUSON'S OPPOSITION TO THE MSJ - 83*

| | | | |
|---|---|---|---|
| | pay grade, management level classification, benefits, and bonus target. He also was allowed to continue to participate in all senior reactor operator requalification training and exams required to maintain his NRC license. (Darin Decl. ¶ 66; Magnuson Vol. II Dep. 290:19-22.) | | |
| 183 | In August 2015 and December 2015, the NRC and U.S. Department of Labor ("DOL") OSHA Division, respectively, opened investigations into Magnuson's claims about Dodd and the 2015 events described above. (Cplt. ¶¶ 29, 31.) | Disputed, material | |
| 184 | While these investigations were pending, Magnuson repeatedly expressed dissatisfaction with his assignment to the Training Department and being trained as a subject matter expert. (Ex. 47; Magnuson Vol. II Dep. 314:1819, 316:17-317:5.) | Disputed, material | Defendant knows Magnuson did not have a free-standing objection to an assignment in the Training Department on its own, but rather Magnuson objected to being *involuntarily reassigned as a tool of retaliation and discrimination*. Ex. 48 states: "Involuntary re-assignments to a training position are commonly made as disciplinary action for job related performance issues or events. These re-assignments to training are referred to as banishment. They are considered demeaning, degrading and humiliating (i.e., "Brian, what are you doing out of your cubicle of shame?"). (Motion, Ex. 48, p. 2) This "transfer to a position that is recognized to have a lesser status or be less desirable" constitutes retaliation and discrimination." (Motion, Ex. 48, p. 2) Additionally, said objection constitutes protected activity. |

*MAGNUSON'S OPPOSITION TO THE MSJ - 84*

| | | | |
|---|---|---|---|
| 185 | Darin had previously decided – based on Magnuson's September 16, 2015 email and the related concerns referred to in paragraph 173 above – that he could not return Magnuson to his Shift Manager position or any other position in the Operations Department, all of which reported to Dodd. That substantially limited Darin's options. (Darin Decl. ¶ 78.) | Disputed, material | Darin was responsible for remediating retaliation and curing a hostile work environment. |
| 186 | Various managers tried to address Magnuson's dissatisfaction, raising alternative assignments with him. (Darin Decl. ¶¶ 67-68 and Exs. 17-18 thereto.) | Disputed, material | Disputed as to "various" managers "tried to address Magnuson's dissatisfaction". Defendant did not provide evidence that a manager attempted to address or resolve the source of Magnuson's "dissatisfaction", his forced removal from the control room and his 20 year career path. Defendant has not provided any evidence of Defendant proposing a path of return for Magnuson to the control room or a path that would allow him to keep his licenses/ |
| 187 | At an April 20, 2016 meeting with Scott Darin and Human Resources Manager Drew Bush, Magnuson complained that "I was under the impression today's meeting was regarding INPO leadership initiatives. I was not prepared to discuss my career path – especially in light of having outstanding allegations filed with the NRC and the DOL." (Ex. 47; Magnuson Vol. II Dep. 330:16-332:10.) | Disputed, material | Disputed due to the unnecessary characterization by Defendant as Magnuson "complaining" when Ex. 47 shows he simply stated his beliefs and concerns. |
| 188 | Magnuson also clearly stated his position regarding his assignment to Training and his career path: I am not interested in a position in training. I have | Undisputed, material | Material as ERA protected activity in objecting to discrimination and retaliation. |

*MAGNUSON'S OPPOSITION TO THE MSJ - 85*

| | | | |
|---|---|---|---|
| | no experience, aptitude, or inclination. I would consider it further retaliation. While I did say my career interests – Reg Assurance, Engineering, etc. – have not changed, I want to make it clear: given the discriminatory actions [ExGen] has taken against me, I do not see a career path in [ExGen] without intervention and protection from the NRC and Department of Labor. | | |
| 189 | In a May 12, 2016 email to Darin and others, Magnuson again objected to his assignment to the Training Department, which he characterized as "demeaning, degrading and humiliating." (Ex. 48.) | Disputed, material | Defendant is aware Magnuson did not have a free-standing objection to an assignment in the Training Department on its own, but rather Magnuson objected to being *involuntarily reassigned as a tool of retaliation and discrimination*. Ex. 48 states: "Involuntary re-assignments to a training position are commonly made as disciplinary action for job related performance issues or events. These re-assignments to training are referred to as banishment. They are considered demeaning, degrading and humiliating (i.e., "Brian, what are you doing out of your cubicle of shame?"). (Motion, Ex. 48, p. 2)<br><br>This "transfer to a position that is recognized to have a lesser status or be less desirable" constitutes retaliation and discrimination." (Motion, Ex. 48, p. 2)<br><br>Additionally, said objection constitutes protected activity. |
| 190 | Despite his complaints about working in the Training Department, Magnuson refused other opportunities that were offered to him. In July 2016, the Training Director offered | Disputed, material | As Plaintiff repeatedly explained to Defendant, he was concerned that his removal from the Shift Manager position was retaliation and discrimination and threatened the loss of beneficial licenses he held. |

*MAGNUSON'S OPPOSITION TO THE MSJ - 86*

| | | | |
|---|---|---|---|
| | Magnuson a spot on the NetPower Team. Members of the team would travel to various ExGen locations and deal with employees outside the nuclear fleet, creating potential opportunities with other ExGen operating units. (Magnuson Vol. III Dep. 60:22-62:9; Darin Decl. ¶ 68 and Ex. 18 thereto.) | | |
| 191 | Magnuson responded by email on July 27, 2016 that he had no interest in the NetPower position and would not volunteer for any assignments (other than his Shift Manager position) while he was awaiting resolution of his NRC and DOL complaints. (*Id.*) | Undisputed, material | Darin Dec., Ex. 18, Magnuson explained:  I replied I am not a procedure writer and NetPower is not nuclear. I added that I would do as I was told. You then indicated only volunteers were wanted for the team. *** While waiting for resolution, I will do whatever job I am directed to do; however, I will not volunteer for reassignment or further discrimination. |
| 192 | During the week of September 26, 2016, Magnuson attended requalification training for his NRC operating license. On September 28, 2016, the training included an exercise, during which Magnuson and the crew to which he was assigned simulated operating actions to be taken in an emergent event. The scenario was facilitated by a Training Floor Instructor and observed by Site Vice President Darin. (Darin Decl. ¶ 69; *see also* Ex. 49.) | Undisputed, material | |
| 193 | As the training scenario progressed, the Training Floor Instructor prompted Magnuson to take certain action prescribed by Quad Cities operating procedures. The crew Shift Technical Advisor, whose function on the crew is to look | Disputed, material | Magnuson disputes the documentation and use of the September 28 simulator training in justifying actions taken against him, particularly in his November 2, 2016 termination. Magnuson stated the written summaries used as evidence against him were unofficial and improperly |

*MAGNUSON'S OPPOSITION TO THE MSJ - 87*

| | | | |
|---|---|---|---|
| 1 2 3 | for any gaps in the crew's performance and provide coaching to correct those gaps, also prompted Magnuson to take that action. (Darin Decl. ¶ 70 and Ex. 19 thereto.) | | documented. (Magnuson Decl. Paras. # 155-157) |
| 4 5 6 7 8 9 10 11 12 13 14 15 16 17 18 19 20 | 194 | Based on his observations, Darin concluded that Magnuson failed to accept the coaching provided during the scenario and did not change his behavior or direction to the crew to comply with the applicable operating procedures. (Darin Decl. ¶ 71 and Ex. 19 thereto.) | Disputed, material | A.   He writes, I watched the crew perform, and, in general, they did well in the exercise. I believe that is an accurate statement. Training Observation 135677 was submitted to document the crew learnings and gap areas by position.  I don't -- that seems reasonable. Brian did not accept coaching or change his behavior, direction to the crew.  I don't believe that is an accurate statement. During the critique after the exercise was completed, the topic was discussed and, again, Brian was not accepting of feedback.  I do not believe that is an accurate statement.  I asked the crew how it could be done differently and provided some examples of reporting out the pressure band is 800 to 1,000 PSI and that we are depressurizing through the leak and may not be able to stay in band.  So I'm confused as to the context of that statement.  Is he reporting that in first person, or is he claiming that I said that? Q.   I am just asking.  If you don't know --if you don't understand it, just say that you don't understand that sentence. A. So we'll skip that one. Brian said that we are saying the same thing, and the crew knew what was occurring and understand that sentence. A.   So we'll skip that one. Brian said that we are saying the same thing, and the crew knew what was occurring and proceeded to ask NSOs, nuclear station operators, one by one. When he got to the second one, Rob Rippon, both Rob and Andy |

*MAGNUSON'S OPPOSITION TO THE MSJ - 88*

| | | | |
|---|---|---|---|
| | | | Belzer agreed it was better to communicate it to the crew. I believe that is reasonably accurate. At this point Brian said he would accept the coaching and stopped his questioning and moved on to the remainder of the crew. I question that comment. This display is an example of Brian's unwillingness to accept coaching from others, even if he is not following a standard approach than what he has been trained on. I don't agree with that comment. . (Motion, Ex. 2, Magnuson Vol. 2, 343: 18-24, 344: 9-24. 345: 1-18, Magnuson Decl., Paras. # 155-157.) Further conflicts are highlighted between different accounts of the training exercise. Magnuson contrasts the negative portrayal in Darin's summary with another account by a training instructor, which noted the crew's good performance and acceptance of feedback, suggesting a discrepancy in the evaluation of the same event. (Magnuson Decl. Par. # 158-160) |
| 195 | Following the exercise, Darin attended a debrief with the Floor Instructor, Magnuson, and the crew to critique their performance. From Darin's perspective, Magnuson continued to be unreceptive to feedback provided by the Floor Instructor and Darin. (*Id*.) | Disputed, material | Q. Do you recall Mr. Darin talking to you after the exercise about your reluctance or refusal to accept the coaching that was being offered during this exercise? A. Not specifically. Q. Did you refuse to accept coaching during the course of the exercise? A. No. Q. So you willingly took the coaching that was provided to you? A. If you look at this first observation, I was -- during the exercise, I think I was coached |

**MAGNUSON'S OPPOSITION TO THE MSJ - 89**

| | | | |
|---|---|---|---|
| | | | to do a particular activity. It was discussed in the debrief of the exercise, and I accepted the feedback at that time from either -- I believe it was the unit supervisor. Q.    In the comment that you referred to on the first page it says, in part, "Even with the coaching, the US did not include the information in a brief to the crew." Do you see that? *** Q.    And so I guess I'll have to ask, why even with the coaching did you not include the information in your brief to the crew? A.    This was a -- I believe I received that coaching in the middle of a dynamic simulator evaluation. And I don't remember the exact circumstances, but I believe I was prioritizing other issues over having this brief.<br><br>(Ex. 2, Magnuson Vol. 2, 341:15-24, 342:1-25, 343: 1-3, Magnuson Dec., Paras. # 155-157)· |
| 196 | Darin documented that Magnuson's behavior reflected an "unwillingness to accept coaching from others even if he is not following a set standard approach that he has been trained on." (*Id.*) | Disputed, material | Ex. 2, Magnuson Vol. 2, 341:15-24, 342:1-25, 343: 1-3, Magnuson Dec., Paras. # 155-157 |
| 197 | Shortly after the simulator exercise, while Magnuson was working on his qualifications to be a subject matter expert in Training, Magnuson wrote on the qualification form:<br><br>"I OBJECT TO BEING AN INSTRUCTOR. I BELIEVE IT IS DISCRIMINATORY AND RETALIATORY." (Magnuson Vol. II Dep. 314: 22-315:1, | Undisputed, material | Magnuson added: "REFERENCE NRC ALLEGATION R111-15-A-003" |

| | | | |
|---|---|---|---|
| | | 315:23-316:4; Darin Decl. ¶ 73 and Ex. 20 thereto.) | | |
| | 201 | Based on these developments, Darin concluded that ExGen could not have Magnuson continue working in the Training Department. Darin believed that Magnuson's behaviors and statements were interfering with the quality of ExGen's training program. The Training Department also was subject to audit by the NRC and INPO, and Darin decided that retaining an employee who said in writing that he didn't want to work in Training – in a document that was subject to audit – put the accredited status of the training program at risk. (Darin Decl. ¶ 75.) | Disputed, material | After-the-fact justifications put together for purposes of summary judgment motion |
| | 202 | Returning Magnuson to the Operations Department was still not viable for two reasons. First, Magnuson objected to working for Operations Director Dodd while his allegations were unresolved and he had not changed that position. Second, Magnuson's behaviors during the September 28, 2016 simulator exercise showed Darin that he was still not willing to accept coaching, and that the he remained inflexible and refused to listen to others. Darin felt those behaviors were not acceptable in a nuclear environment and were counterproductive to a positive safety culture. (Darin Decl. ¶ 72.) | Disputed, material | Motion, Ex. 50:<br><br>By 10/20/2016, Darin knew Magnuson clarified: "He proceeded to say that he never said that he could not work for Hal or Brian" |
| | 203 | Darin nonetheless tried to come up with another assignment for | Disputed, immaterial | |

*MAGNUSON'S OPPOSITION TO THE MSJ - 91*

| | | | |
|---|---|---|---|
| | | Magnuson. (Darin Decl. ¶¶ 72, 76.) | |
| 204 | On October 20, 2017, Darin met with Magnuson to discuss an opportunity on the Digital Plant Team. Darin explained that the Team was led by Nuclear Corporate Innovation and required someone with an operations background who could evaluate digital options and recommend digital solutions. Darin told Magnuson he was a potentially good fit for the assignment. And he said the assignment would enable Magnuson to maintain his NRC operator's license. (Ex. 50; Darin Decl. ¶ 76.) | Disputed, immaterial | Magnuson had been terminated back in November 2016 and was not at the Quad Cities as of October 20, 2017. Thus, Darin did not meet with him on October 20, 2017.

Presuming Defendant means October 20, 2016, Darin did meet with Magnuson. As Motion, Ex. 50 shows however, Darin's notes make no mention of telling Magnuson that "the assignment would enable him to maintain his NRC license." There is no mention of licensing in Ex. 50 whatsoever.

This is immaterial however because it does not speak to the ultimate issue before the Court of whether Defendant retaliated against Magnuson by removing him from his position. |
| 205 | Shortly into the discussion, Magnuson "stated that he had open allegations and investigations and *did not want to consider any job opportunities until those investigations were completed and that the only job he wanted would be back in his old position in operations.*" Darin asked how that would work since Magnuson "did not want to work with and did not respect his supervision [by] Hal Dodd or Brian Wake." Magnuson "proceeded to say that he never said that he could not work for Hal or Brian [Wake] *but that it would be problematic.*" Darin responded that the two are the same as far as he was concerned. (Ex. 50 (emphasis | Disputed, material | Q. And is it accurate that you said in response something to the effect of it would be more efficient for Mr. Darin not to bring opportunities to you so long as the investigations are open?

A. I believe I explained, like I earlier did, the reason why I didn't believe that it was prudent for me to volunteer for positions, *though I did state that I would take any position that the company gave me.*

(Motion, Ex. 3, Magnuson Vol. 3, 71: 14-23) (Emphasis added). |

*MAGNUSON'S OPPOSITION TO THE MSJ - 92*

| | | | |
|---|---|---|---|
| | added); Darin Dep. 108:16-109:4; Magnuson Vol. III Dep., 70:13-71:6.) | | |
| 206 | Magnuson said it would be more efficient if Darin stopped bringing job opportunities to him "and that as long as the investigations are open he does not want to consider any opportunities outside of his old position." (*Id.*) | Disputed, material | See Entry for 205 |
| 207 | Magnuson declined the assignment to the Digital Plant Team. (Magnuson Vol. II Dep. 346:2-24.) | Disputed, material | Exelon could have, at any time, assigned Magnuson to the Digital Plant Team, but they did not. Magnuson was not assigned to the Digital Plant Team.<br><br>Q.   Do you remember providing any response to Mr. Darin with respect to that particular opportunity?<br>A.   If I remember correctly, I declined the voluntary offer.<br>Q.   And why is that?<br>A.   It did not require a senior reactor operator's license.<br>Q.   Any other reason?<br>A.   In the meetings with Darin, I told him and others that I would do any job that the company assigned me to, but I was hesitant to volunteer for positions for fear that I would -- the company would use that as an excuse to drop my license or in some way I would waive my rights to the DOL complaint.<br><br>(Motion, Ex. 2, Magnuson Vol. 2, 346:20-24, 347: 1-10) |
| 208 | After the October 20 meeting, Darin concluded that ExGen had exhausted its efforts to satisfy Magnuson. He immediately began to consider placing Magnuson on an unpaid leave of absence and requiring him to | Disputed, material | Defendant could have assigned Magnuson to any position the wanted and they did not do so. |

*MAGNUSON'S OPPOSITION TO THE MSJ - 93*

| | | | |
|---|---|---|---|
| | take the initiative to seek out positions or assignments in which he was interested and commit to address the inappropriate behaviors that had resurfaced. (Darin Decl. ¶¶ 79-80.) | | |
| 209 | This was not a decision to terminate Magnuson; such a decision would have required additional processes. (Darin Decl. ¶ 81.). | Disputed, material | |
| 210 | Darin made the decision to place Magnuson on leave before he learned that Magnuson had submitted four IRs late in the day on October 28, 2016. Neither those IRs, nor any other IRs or alleged protected activity in which Magnuson had engaged, played any role in Darin's decision to place Magnuson on the 2016 leave. (Darin Decl. ¶ 82.) | Disputed, material | Magnuson asserts he was terminated.<br><br>A bald assertion as to motive is not an undisputed fact. |
| 211 | On November 2, 2016, Human Resources Manager Bush and another manager met with Magnuson and gave him a letter stating that he was placed on an unpaid leave of absence.<br><br>The letter noted that Magnuson had exhibited behaviors in 2014 and 2015 – including "refusing to listen to or accept the views of others" and being inflexible – that the company had addressed and hoped were resolved in 2015. (Exs. 51 and 52; Magnuson Vol. III Dep. 56:13-62:9) | Disputed, material | |
| 212 | But the same behaviors, the letter stated, resurfaced in 2016, "most recently during a simulator exercise on September | Undisputed, material | Undisputed as to the letter contents speak for themselves, but disputed as to the content of the letter. |

| | | | |
|---|---|---|---|
| | | 28, 2016." The letter explained that such "behaviors are unacceptable in a nuclear plant environment." (Ex. 52; Magnuson Vol. III Dep. 57:12-62:9.) | | |
| 213 | The letter described efforts to discuss promotional and career path opportunities with Magnuson and noted that Magnuson had repeatedly expressed his displeasure with being assigned to the Training Department. Meetings in April, July, and October 20, 2016 were described, and the letter presented what Magnuson said on October 20, 2016 – that he only wanted his old job in Operations back but also did not respect or trust the leaders of Operations. The letter concluded from this litany that "you have made it clear that you do not desire to be a contributing member of the Training Department." (Ex. 52) | Disputed, material | |
| 214 | The letter said "[a]t this point, the Company has exhausted numerous attempts to place you in a position or on a project. You have resisted every attempt management has made to explore opportunities and to place you in a position or role and have given us a blanket refusal to consider other opportunities. Returning you to the Operations Department at this time is not an option. Aside from the fact that as recently as October 20, you said working for the Operations Director and Shift Operations Superintendent would be | Undisputed, material | The letter speaks for itself, though Plaintiff disagrees with the content of the letter. |

*MAGNUSON'S OPPOSITION TO THE MSJ - 95*

| | | | |
|---|---|---|---|
| | | problematic, as explained above, you continue to exhibit behaviors that are inappropriate in any nuclear work environment and will not, and cannot, be tolerated in the Control Room." (*Id.*) | | |
| 215 | The letter advised Magnuson that he was relieved of his duties, that he could take an unpaid leave of absence and use paid time off during his leave, and that he was not allowed to work "unless specifically directed otherwise by the company, in which case, you will be paid for your work time." (*Id.*) | Disputed, material | |
| 216 | The letter ended by advising Magnuson to contact Drew Bush in Human Resources if he wanted to be considered for other job opportunities or discuss options, but that he would need to commit to "resolve [his] inappropriate behaviors by listening to and accepting the views of others and being flexible and adaptable in [his] interactions." (*Id.*; Magnuson Vol. III Dep. 57:12-60:21.) | Undisputed, material | April 4, 2017 Drew Bush (HR) "Commitment" email to Magnuson, states in part:

Those behaviors were observed and were discussed in some form during a simulation exercise on September 28. To date, you have not provided a written commitment to resolve these behaviors and to participate in the Company's performance management process.

Your April 5, 2017 email makes clear that you do not intend to provide the commitment required for you to be considered for open and available positions. As a result, any applications for open and available positions you submitted will not be considered further, and the Company will move forward in its evaluation of next steps, |

| | | | including your separation from employment. |
|---|---|---|---|
| 217 | Magnuson admits that he engaged in the behaviors listed in the letter. (Magnuson Vol. III Dep. 59:24-62:9.) | Disputed, material | |
| 218 | Magnuson admits that no one from ExGen told him he was terminated. Instead, he was told to read the November 2, 2016 letter, which said he was being placed on leave. (Magnuson Vol. III Dep. 43:17-20.) | Disputed, material | |
| 219 | During Magnuson's leave, he continued to be identified as an active employee in ExGen's Human Resources Information System. He was not removed from the system or converted to "terminated" status. (Daniels Decl. ¶ 11.) | Disputed, material | Disputed as it is vague as to "removed from the system" or "converted to 'terminated' status. Defendant does not specify what systems to which they are referring.<br><br>Magnuson had no access to a Defendant server, email or job application portal. |
| 220 | Magnuson was allowed to use his accrued vacation to receive pay during his leave in 2016, when he took a previously-scheduled vacation. (Magnuson Vol. III Dep. 65:5-66:23.) He would not have been allowed to do so had he been terminated. (Daniels Decl. ¶¶ 12-14.) | Disputed, material | |
| 221 | In 2017, Magnuson received his full annual incentive payment for 2016 under ExGen's Annual Incentive Plan, which he would not have received if he had been terminated in 2016. (Magnuson Vol. III Dep. 45:1-3; Daniels Decl. ¶ 15 and Ex. B thereto.) | Disputed, material | |
| 222 | Magnuson remained enrolled in ExGen's health insurance plans as an active employee during the leave. ExGen continued to pay | Disputed, material | |

*MAGNUSON'S OPPOSITION TO THE MSJ - 97*

| | | | |
|---|---|---|---|
| | the employer's share of the premiums for Magnuson's medical and dental coverage as before the leave, and Magnuson continued to pay his portion of the premiums at active employee rates. (Magnuson Vol. III Dep. 44:1-19.) This would not have occurred if Magnuson had been terminated. | | |
| 223 | Magnuson received a profit-sharing contribution to his 401(k) account in 2017, which would not have occurred if he had been terminated. (Daniels Decl. ¶ 16 and Ex. B thereto.) | Disputed, material | Disputed because |
| 224 | Magnuson was allowed to apply for positions while he was on leave as an internal applicant – not a new hire. Human Resources initially sent Magnuson printed job listings for positions available only for internal applicants. Later, it gave him access to apply for internal job postings in which he was interested through a system available only to employees. (Exs. 53 and 54; Magnuson Vol. III Dep. 66:12-68:23; Daniels Decl. ¶ 17.) | Disputed, material | |
| 225 | At no time was Magnuson told he had been terminated from employment. (Daniels Decl. ¶ 18.) | Disputed, material | Defendant cites Daniels' declaration, yet Daniels cannot speak to everything Magnuson was or was not told. |
| 226 | Magnuson asked ExGen's Human Resources Generalist how he would be classified during the leave for purposes of applying for internally posted positions and she responded, in writing, that he was considered a regular, full-time employee. (Ex. | Disputed, material | |

*MAGNUSON'S OPPOSITION TO THE MSJ - 98*

| | | | | |
|---|---|---|---|---|
| | | 54; Magnuson Vol. III Dep. 69:7-70:6; Daniels Decl. ¶ 17.) | | |
| | 227 | Magnuson refused to "volunteer" for any job other than his original Shift Manager position at Quad Cities because he did not want to jeopardize his legal claims of retaliation. (Magnuson Dep. 72:16-73:9.) | Disputed, material | Defendant is aware this is disputed because Magnuson testified to multiple concerns were he to "volunteer" for a job, including losing his licenses, his license pay, and jeopardizing his ability to be restored to the position from which he was unlawfully removed. Though he made clear he would accept and perform any position to which he was assigned.

A. Not necessarily. I believe in a prior deposition -- after I was placed on leave in 2015, I was reluctant to volunteer for a position, particularly one that did not require a license because I was concerned that the company would take my license away from me and they would stop paying the license premium.
Q. And as a result, from that point forward you declined to volunteer for any positions which did not require a license?
A. Right. And then at this point in time, I filed a DOL complaint, and part of that was to restore my position to shift manager, and it would be problematic to do that without a NRC license.
Q. But I want to make it clear that you did not volunteer for any positions after June of 2015 which would not require a license because you were afraid it might result in you not getting your license back, is that correct?
A. Well, possibly. I mean there is other considerations also.
Q. Like what?
A The DOL restoring my position. |

| | | | |
|---|---|---|---|
| | | | Are you suggesting you did not volunteer for any positions because you were relying upon the Department of Labor to restore your former position? A. I thought I might waive some of my legal rights if I volunteered. (Motion, Ex. 3, Magnuson Vol. 3, 59: 8-24, 60, 1-21)<br><br>I believe I explained, like I earlier did, the reason why I didn't believe that it was prudent for me to volunteer for positions, though I did state that I would take any position that the company gave me. (*Id.,* 71: 19-23)<br><br>Q. So you basically have not volunteered for a job since June of 2015 because of the pendency of your -- first your Department of Labor claims and now your federal lawsuit, right? A. For the most part. (*Id.*, 73: 5-9). |
| 228 | In or about November 2017, Magnuson returned to work in a position in ExGen's corporate office in Warrenville, Illinois. (Cplt. ¶ 66). | Disputed, material | As outlined in the table, Magnuson was terminated and then re-employed by Defendant. |
| 229 | Magnuson continued to hold the title of Shift Manager until March 1, 2018, when his title changed to Manager-Developmental (E-4). (Daniels Decl. ¶¶ 19-23.) | Disputed, material | |
| 230 | On March 1, 2019, Magnuson's title changed to Lead Emergency Preparedness Specialist (E-4) at ExGen's corporate office. Magnuson remains employed by ExGen in that position. (Daniels Decl. ¶ 24; *see* Magnuson Vol. III Dep. 75:19-76:11.) | Disputed, material | |

*MAGNUSON'S OPPOSITION TO THE MSJ - 100*

| 231 | On March 12, 2020, a senior manager at ExGen reported Magnuson apparently sent a company document to and then from his personal email address to an outside entity. The report raised a concern that the email usage violated an "Acceptable Use" policy that "prohibits employees from sending the Company's confidential or other sensitive information to their personal emails" (Genualdi Decl. ¶ 10, Ex. 17, and Ex. 7 thereto.) | Disputed, material | Magnuson was tasked by Exelon Corporate Licensing to review an LAR intended for submission to the NRC. His review uncovered the use of outdated and inaccurate regulatory guidance (NRC Regulatory Guide 1.183), leading him to file Issue Report (IR) 4300127. This report highlighted conceptual errors in the regulatory guide, largely based on findings from a Sandia National Laboratories study. (Magnuson Decl. Par. # 217-219)

IR 4300127 cites the Sandia study extensively, noting that current practices underestimate the aerosol concentrations near Main Steam Isolation Valves (MSIVs), leading to non-conservative and conceptually incorrect assumptions in safety analysis. The study criticized the simplification of fission product transport and containment measures, suggesting that actual conditions in the reactor vessel during accidents are significantly different from those assumed under current guidelines. (Magnuson Decl. Par. # 220-228)

The IR emphasizes that the MSIV leakage misconception is a fundamental error in both regulatory understanding and plant design, impacting the accuracy of safety assessments and compliance with technical specifications. (Magnuson Decl. Par. # 229)

Magnuson concludes that Exelon's reliance on the flawed RG 1.183 for accident dose calculations constitutes a misuse of regulatory oversight to feign compliance with nuclear safety regulations, effectively using the |
|---|---|---|---|

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20

| | | | NRC's management gaps to justify inaccuracies in safety documentation and operations. (Magnuson Decl. Par. # 230)

Magnuson alerted FEMA to potential safety and regulatory issues he identified in IR 4300127, regarding MSIV leakage and its conceptual errors, urging a formal review of these concerns due to their potential safety implications. (Magnuson Decl. Par. # 231-233) (Magnuson Dec. Exhibit 9)

Following his communication with FEMA, internal emails within Exelon revealed that his concerns were forwarded to various regulatory and emergency management bodies, but FEMA determined that the issue was a licensee responsibility and did not take further action.(Magnuson Decl. Par. # 234)
Magnuson continued to press FEMA for an independent evaluation of his safety concerns, emphasizing the public safety implications. However, he was redirected to communicate with another FEMA representative as his original contact declared himself not the appropriate point of contact. (Magnuson Decl. Par. # 235-236) (Magnuson Dec., Exhibit 9)

Exelon internally discussed Magnuson's use of personal and company email for sending sensitive information, raising issues about the acceptable use of company resources. (Magnuson, Decl. Par. # 237-238) (Magnuson Exhibit 10: Exelon_0014917 2020.03.12 Moore email _ Acceptable Use Concern) |

*MAGNUSON'S OPPOSITION TO THE MSJ - 102*

| | | | | |
|---|---|---|---|---|
| | | | | Magnuson escalated his concerns to the NRC by filing a petition for rulemaking to amend nuclear safety regulations related to accident source terms, highlighting inconsistencies in current regulatory guidance and its application across nuclear facilities. (Magnuson Decl. Par. # 239-241)<br><br>Paragraphs 242-244: Amidst these disclosures and filings, Exelon initiated an ethics investigation into Magnuson's actions, specifically investigating the potential misuse of company property or confidential information, to which Magnuson responded by denying any misuse and reiterating his commitment to reporting safety concerns. (Magnuson Decl. Par. # 242-244) (Exhibit 11)<br><br>Magnuson communicates with Genualdi, emphasizing that his recent petition did not disclose any confidential information and that all the information included was publicly available. This was in response to the timing and context of an email he received. (Magnuson Decl. Par. # 245) (Exhibit 11)<br><br>Magnuson details how, during June and July of 2020, Exelon threatened his employment and initiated an Ethics investigation in response to his actions of reporting significant regulatory violations identified in Issue Report (IR) 4300127 to FEMA. (Magnuson Decl. Par. # 246) |
| 232 | In response to this report, Vincenzo Genualdi – a Senior Security Specialist for an Exelon affiliate, Exelon Business Services Company ("EBS") who | Undisputed, material | |

*MAGNUSON'S OPPOSITION TO THE MSJ - 103*

| | | | |
|---|---|---|---|
| | had been working there for only 3 months – was assigned to investigate whether Magnuson had violated Company policies by sending confidential company information to and from his personal email address. (Genualdi Dep. 9:18-22, 17:6-18, Ex. 9; Genualdi Decl. ¶ 13.) | | |
| 233 | At that time, Genualdi had no knowledge of any complaints by Magnuson against Exelon or ExGen about safety issue reports. (Genualdi Decl. ¶ 11.) | Disputed, material | The investigation was initiated as a result of Magnuson's protected disclosures to federal regulator FEMA. |
| 234 | In his role, Genualdi conducted a range of investigations, including of employees' usage of company emails and compliance with Exelon's policies. (Genualdi Dep. 10:3-8, 16:7-10, 17:23-18:23; Genualdi Decl. ¶ 12.) | Undisputed, material | |
| 235 | Exelon had a number of policies that applied to ExGen employees and prohibited them from sending confidential company information to or from personal email addresses. (Genualdi Decl. ¶¶ 3-4.) See, e.g., the Acceptable Use Policy ("AUP") (Id. ¶ 3 and Ex. 1 thereto); a "Corporate Standard-Email Usage and Retention Policy," which states that "[p]ersonal email accounts are not to be used to conduct Company business" (Id. Decl. ¶ 6 and Ex. 2 thereto); and a "Protecting Exelon Information" procedure, which informs employees that they are not allowed to email confidential information to "their personal email accounts, or to any other non-Company networks, | Undisputed, material | |

*MAGNUSON'S OPPOSITION TO THE MSJ - 104*

| | | | |
|---|---|---|---|
| | without express management approval." (Id. ¶ 6 and Ex. 3 thereto.) | | |
| 236 | The AUP was described for ExGen employees in numerous other places. (Id. ¶¶ 4- 8 and Exs. 4-5 thereto.) | Undisputed, material | |
| 237 | All ExGen employees must complete annual training regarding the Exelon Corporate Code of Business Conduct, which requires employees to comply with Company policies and security procedures, including the proper use of Exelon's systems. (Genualdi Dep. 19:13- 20:1.) Magnuson completed company-required training (applicable to all employees) on the company's Code of Business Conduct and Security in 2018, 2019, and 2020. That training informed employees that they must comply with company policies and security procedures, including proper use of systems. (Genualdi Decl. ¶ 9 and Ex. 6 thereto.) | Undisputed, material | |
| 238 | An initial digital forensic investigation identified 95 emails with 228 documents (attachments) that Magnuson forwarded, sent, or cc'd from his Exelon email account to his personal email account. The attachments that Magnuson sent to his personal email account included a confidential and proprietary document, including reports that were marked "confidential" and "restricted dissemination." (Genualdi Dep. 23:15-24:1, 67:13-68:4; see also | Disputed, material | See Entry 231 and Magnuson Declaration. |

*MAGNUSON'S OPPOSITION TO THE MSJ - 105*

| | | | |
|---|---|---|---|
| | | | Genualdi Decl. ¶ 12.) | | |
| 239 | On May 13, 2020, a digital forensic "Scope Expansion" revealed an additional 67 emails, including 94 documents (attachments) that Magnuson forwarded, sent or cc'd from his business email address to his personal email address. (Genualdi Decl. ¶ 13.) | Disputed, material | See Entry 231 and Magnuson Declaration. |
| 240 | On June 10, 2020, Genualdi conducted a Skype interview of Magnuson. Exelon Senior Security Specialist Pierre Petit also attended the interview. During the interview, Magnuson attempted to discuss his pending litigation, but Genualdi told him that neither he nor Mr. Petit had knowledge of the litigation and they did not intend to discuss it. (Genualdi Dep. 32:5-8, 42:22-43:13; see also Genualdi Decl. ¶ 15.) | Disputed, material | See Entry 231 and Magnuson Declaration. |
| 241 | Based on the investigation, Genualdi and Petit concluded that Magnuson had violated ExGen's policies. (Genualdi Decl. ¶ 16-18). | Disputed, material | See Entry 231 and Magnuson Declaration. |
| 242 | Consistent with the Company's practice when investigations result in a finding of improper email use involving personal email accounts, Genualdi sent Magnuson a standard Attestation form, and asked him to execute and return the document. (Genualdi Decl. ¶ 9 and Ex. 11 thereto; Harris Decl. ¶ 5, Ex. 18, and Exs. 2 and 3 thereto.) | Disputed, material | See Entry 231 and Magnuson Declaration. |
| 243 | Genualdi and other EBS investigators had previously sent this Attestation form to | Disputed, immaterial | Plaintiff lacks personal knowledge of ExGen's other actions or findings with regards to other employees.  Plaintiff |

*MAGNUSON'S OPPOSITION TO THE MSJ - 106*

| | | | |
|---|---|---|---|
| | dozens of other employees across the Exelon enterprise (not just ExGen's nuclear employees) who were found to have violated the Company's policies prohibiting sending Company information to personal email accounts but had not to their knowledge engaged in alleged legally protected activity. In each of those cases, the employee signed the Attestation and returned it to EBS Security without complaint or material edits. (Genualdi Decl. ¶ 19; Harris Decl. ¶¶ 6-9 and Exs. 4-5 thereto.) | | disputes the bald unsupported assertion that other employees returned the Attestation without complaint.  However, this assertion is immaterial because it does not matter that ExGen sent an attestation to other employees.  The material question for this Motion is, did ExGen retaliate against Plaintiff by investigating him and attempting to force him to sign an unlawful gag order to prevent his ongoing communications with regulators. |
| 244 | The Attestation is not disciplinary action. Genualdi has no authority to take any disciplinary action against employees. (Genualdi Decl. ¶ 20.) | Disputed, material | The Attestation is not a "disciplinary action" standing on its own but it was delivered under threat of discipline for not signing.  Thus, it was the precursor to discipline. |
| 245 | Magnuson opted not to sign the standard Attestation. Instead, he revised its language and signed and submitted his own version. (Cplt. ¶ 77; Harris Decl. ¶ 5 and Exs. 2-3 thereto) | Undisputed, material | Material as protected activity because ExGen's standard attestation unlawfully attempted to prevent employees from making protected disclosures to regulators, which Magnuson opposed. |
| 246 | Magnuson suffered no change to his employment status, duties, or pay as a result of the investigation's findings. (Daniels Decl. ¶ 25 and Ex. D thereto.) | Disputed, material | Magnuson's employment status changed as it was now that of an employee subjected to a recent investigation for alleged wrongdoing/breach of policy.  He further suffered change to his status as he was forced out of the workplace for several months while ExGen "investigated." |
| 247 | While on paid leave in 2015, on August 6, 2015, Magnuson filed a complaint with the NRC arising from the same issues reflected in his June 23, 2015 IR. (Cplt. ¶ 29.) | Disputed, material | Magnuson's August 6, 2015 complaint was not limited to issues from his June 23, 2015 IR but rather a broader concern regarding the retaliation he experienced and the chilled work environment. |

*MAGNUSON'S OPPOSITION TO THE MSJ - 107*

| | | | |
|---|---|---|---|
| 248 | On December 16, 2015, Magnuson filed a claim with OSHA alleging that the hold on his access, the proposed change in his Shift Manager duties and his assignment to the Training Department were discrimination in retaliation for his having filed his June 23, 2015 IR and his subsequent complaints to the NRC in August 2015. (*Id.* ¶ 31.) | Disputed, material | As explained above, his claim challenged the revocation of his security clearance.  Defendant continues to paint this as a "hold" but they are aware Plaintiff disputes this characterization.<br><br>Second, Plaintiff has alleged retaliation for his nuclear safety complaints, including his reports to management, not only his June 23, 2015 IR and subsequent NRC complaints. |
| 249 | On April 28, 2017, Magnuson filed a second OSHA complaint alleging that his being placed on unpaid leave in November 2016 was discrimination in retaliation for his having filed his 2016 IRs and for his prior complaints. (*Id.* ¶ 41.) | Disputed, material | Defendant is aware this is a disputed fact; Magnuson has testified repeatedly he was terminated in November 2016 and he filed a complaint that he was terminated.<br><br>Material because filing an OSHA complaint is a protected activity under the ERA. |
| 250 | Magnuson pursued his claims of safety issues and retaliation relating to the events with the NRC in 2016 and 2017. (Exs. 55, 56, 57, and 58; Magnuson Vol. III Dep 45:21-53:14, 24:18-29:12.) | Undisputed, material | Material because while Magnuson is not required to report any concerns to the NRC in order to avail himself of the protection of the Energy Reorganization Act; it is sufficient that he reported his concerns to management.  However, escalating his concerns to an outside regulator such as the NRC provides additional motive for management to retaliate. |
| 251 | Ultimately, the NRC did not sustain any of Magnuson's claims. (Exs. 56 and 59; Magnuson Vol. II Dep. 228:16-229:19.) | Disputed, immaterial | Defendant is aware the NRC substantiated at least one claim, but it is immaterial as Plaintiff is only required to have a reasonable belief of wrongdoing to support his reports, not sustaining from the NRC. |
| 252 | OSHA dismissed Magnuson's first and second complaints. (Cplt. ¶¶ 5 and 70.) | Undisputed, immaterial | It is immaterial because review of OSHA decisions is *de novo* with no deference given to prior findings. |
| 253 | On November 7, 2019, Magnuson filed the first | Undisputed. immaterial | Immaterial to this motion as there is no allegation of untimeliness. |

| | | | |
|---|---|---|---|
| | complaint in this case. (Dkt. # 001). | | |
| 254 | On August 21, 2020, Magnuson filed a third OSHA complaint, alleging that the 2020 investigation was retaliatory. (Cplt. ¶ 43.) | Undisputed, immaterial | It is immaterial to this Motion as there is no allegation of untimeliness. |
| 255. | On April 5, 2022, after OSHA dismissed Magnuson's third complaint, he filed a Supplemental Complaint in this case adding an ERA retaliation claim related to the 2020 investigation. (Dkt. # 74.)3 | Undisputed, immaterial | It is immaterial because review of OSHA decisions is *de novo* with no deference given to prior findings. |

## ARGUMENT

### III.  MAGNUSON'S COUNTERSTATEMENT OF UNDISPUTED FACTS

A.  Scott Darin testified that he had a very good relationship with Mr. Magnuson.  Mr. Darin was able to talk informally with the latter. Magnuson appeared to respect and trust Mr. Darin, and Darin respected and trusted Magnuson. Scott testified: "Yes. Brian routinely called me [at my home] in the middle of the night. We've known each other a very long time, right? He would call and ask for information and guidance. We've had a working relationship since probably 2000."[3]

B.  Susan Techau, Constellation's Manager of the Authorized Access Program (AAP) and the Behavioral Observation Program (BOP) testified that it was normal behavior for a nuclear plant worker to have a questioning attitude. In her deposition, Ms. Techau stated: "Just that everyone has a questioning attitude. That's required of the nuclear environment."[4]

C.  Magnuson's earliest protected activity that is material to the facts of this case was made in

---

[3] Doc. 140-7, Motion, Ex. 6, Darin Depo., p. 40:2-24.
[4] D-140-13, Techau Depo., Motion Ex. 11, p. 45:1-3.

*MAGNUSON'S OPPOSITION TO THE MSJ - 109*

July of 2014, when Magnuson pursued ExGen/Constellation to address the potential implications at Quad Cities of an OPEX [Operations Experience] at another plant.[5]  That protected activity chronologically preceded all of the adverse actions various officials of Constellation took against Magnuson. At that time, Magnuson read an operating experience report that was e-mailed to him by the company of a reactor water leak at Monticello nuclear power plant, and this leak was unique in that it went through a component, a heat exchanger that was part of the reactor coolant pressure boundary.  Quad Cities at the time had an ongoing leak Magnuson believed might similarly be pressure coolant boundary leakage. Magnuson pursued that, but he discovered that the station was not inclined to go look for the leak or isolate it for fear they would have to shut down the reactor, which in turn would negatively affect an industry performance indicator.[6]

D.  The OPEX issue initially was memorialized for follow up in a Feb 13, 2014 IR initiated by Quad Cities engineer Nick Johnson.[7]  However, five months later, the issues of the Johnson IR had not been resolved and Magnuson was concerned.[8]  Thus, on July 7, 2014, Magnuson engaged in further protected activity by telling Nick Johnson in response to his IR 1620692, "**None of your Recommended Actions were acted upon.**  The significance of Pressure Boundary leakage was apparently lost."[9]  Magnuson forwarded that communication to management the same day.[10]  Despite 5 months having passed without resolution, Wake still indicated the prior IR filed by Johnson was still the "right way to initiate actions"[11].  In response

---

[5] See Table of Disputed Facts, Entries 34-39.
[6] Motion, Ex. 1, Magnuson Depo. Vol. 1, pp 78:15 – 79:23.
[7] Motion for Summary Judgment [hereafter Motion], Ex. 28.
[8] Motion, Ex. 28, p. 2.
[9] Motion, Ex. 28, p. 2 (emphasis added).
[10] *Id*.
[11] Motion, Ex. 28, p. 1.

*MAGNUSON'S OPPOSITION TO THE MSJ - 110*

to Wake saying Johnson's IR was sufficient, on July 7, 2014, Magnuson asked if Wake "wanted a new IR". Wake did not affirmatively direct Magnuson to write an IR, but rather said: "If you have any doubts or concerns then we are always safer to write a new IR and get it addressed."[12]

D.  Because an IR on the issue was already written, Magnuson believed it should have been a sufficient basis for an evaluation already.[13]  Generally, an employee should not have to write a second IR on the same issue.[14] In fact, Defendant has touted it has a CAP system as required by the NRC that  "assigned an employee responsible for research and addressing the issue, and **tracked to ensure the issue is addressed through correction of the identified issues."**[15] Magnuson should have been able to rely on Defendant to track and resolve the issues.[16]

E.  On August 16, 2014, Mr. Magnuson emailed Mr. Wake asking, "Have you given the Monticello OPEX any more thought?" The next day, Wake could not even recall the issue, though it was discussed merely a month prior and was the subject of a significant unresolved IR and he emailed in response, "I'm drawing a blank on the Monticello reference. Is it operability related? I'll touch base with you when you get back from New York." (Magnuson Depo. Ex. 18, p. 3.)

F.  On September 3, 2014, Mr. Magnuson emailed David Kimler and Brian Wake that due to Monticello's leakage the NRC forced them to shutdown and gave them a White finding for not pursuing the issue. After reading the NRC inspection report, Magnuson opined that Quad Cities' OPEX Review IR did not appear adequate. Quad Cities did not commit to a PCR [Procedure

---

[12] Motion, Ex. 28.
[13] Magnuson, Vol. 1 89: 21-24.
[14] Magnuson, Vol. 1, 90: 1-3.
[15] Motion, para. 22 (emphasis added).
[16] *Id*. Instead, Defendant attempts to deflect their culpability for a faulty CAP and follow up on the OPEX issues onto Magnuson for not writing yet another IR.

*MAGNUSON'S OPPOSITION TO THE MSJ - 111*

Change Request], but the Dresden Station did. Magnuson noted that the NRC Inspection Report had all the relevant information and Wake had returned the report to Magnuson.[17]

G.  On September 11, 2014, Mr. Magnuson sent an email to Scott Darin stating that:

> Our responses to this OPEX (IR 1620692) have been minimalistic and evasive. By not acting in good faith, our safety culture has been driven in the wrong direction.[18]

H.  On September 19, 2014, in another email to Scott Darin, Mr. Magnuson reported that Mr. Walter Beck was minimizing the issue.[19] Mr. Magnuson testified that, given the leak had gone on for months, Quad Cities should have been more "proactive" and more "aggressive" in dealing with it.[20]

I.  Mr. Magnuson then sent an email to Mr. Darin Sept. 29, 2014, that included now a Fleet IR, which enhanced his concern of the serious scope and implications, stating:

> As I thought, this does minimize the issue. It is not just an OPEX issue; It is a nuclear safety concern. If it wasn't a nuclear safety culture issue before -it is now.
> Considering the number of people and organizations involved *(prior to discovering the fleet IR)*, I was lenient when I described our OPEX reviews as minimalistic and evasive.
> I am not prepared to excuse Kimler's and Wake's blatant disregard for my nuclear safety concern. [21]

J.  **A mere two days later**, on October 1, 2014, Defendant decided to convene an Employees Issues Advisory Committee (EIAC) meeting regarding Magnuson.[22] It appears that Magnuson's criticism of the station's managers is what kicked them into retaliation mode.

K.  The EIAC was a group which would meet from time to time via telephone to discuss any

---

[17] Magnuson Depo. Ex. 18, p. 2.
[18] Magnuson Depo. Ex. 18, p. 2.
[19] Magnuson Depo. Ex. 18, p. 1.
[20] Motion, Ex. 1, Magnuson Depo., Vol. I, p. 89:18-20; p. 90:19-23.
[21] Opp. Ex.   --
[22] Petersen Depo. Exhibit 5, p. 1.

*MAGNUSON'S OPPOSITION TO THE MSJ - 112*

type of plant issue that they determined needed to have a wide variety of outside opinion. The Human Resources (HR) department would take care of setting up an EIAC meeting.[23]

L.   The October 1, 2014 EIAC call was held at Scott Darin's request to HR official Cindy Petersen to discuss Magnuson's complaints to Darin about two issues. "The first [was] a lack of rigor around the Monticello OpEx. And the second [was] the site ops director and SOS did not take Brian's concerns seriously as to nuclear safety." Petersen attended this meeting.[24] This meeting began the series of events constituting Constellation's retaliation against Mr. Magnuson.

M.  Following the October 1, 2014 EIAC call, it was decided that a "recap" or summary of the call should be prepared. The preparation of that recap was a collaborative effort wherein Petersen prepared a draft and Scott Darin and Walter Beck made edits, which Petersen adopted.[25]

N.   The recap took the form of an email from Ms. Petersen. The email stated that there had been a series of "non-standard" interactions with Magnuson [bold type in original email]. Petersen testified that the term "non-standard" was introduced into her email by an edit from Wally Beck, one of the officials Mr. Magnuson had recently complained about to Mr. Darin.[26]  Beck's choice of this term to describe Magnuson's behavior was ominous because it seems similar in meaning to behaviors that are "aberrant, unusual or questionable," which, under the NRC's Behavioral Observation Program (BOP) can lead to the suspension or revocation of an employee's right to unescorted access around the station if the employee .[27]

---

[23] Motion, Ex. 6, Darin Depo., pp. 33: 11-14; 34:10-18; 35:7-9.)
[24] Motion, Ex. 10, Petersen Depo. at p. 43: 1-9; 43: 14-16.
[25] *Id*., Petersen, at 46:4-16.
[26] *Id*., Petersen, 44:12-25.
[27] Motion, Ex. 11, Techau Depo. p. 24:16-25; 25:1

*MAGNUSON'S OPPOSITION TO THE MSJ - 113*

O.  Defendant's BOP does not include the term "non-standard" anywhere.[28]  Defendant's BOP however sets forth extensive "questionable, unusual or aberrant" behavior examples.[29]  Not surprisingly, none of the examples include giving your supervisor/mentor a copy of an admired piece of writing from a beloved civil rights leader, or advocating that supervisors not minimize nuclear safety concerns.[30] In fact, none of the "behavior" examples Defendant listed for Mr. Magnuson come anywhere close to the provided BOP signs or indicators of "questionable, unusual or aberrant behavior", which instead emphasize serious issues that could compromise nuclear security, like criminal conduct, anti-government views, destruction of plant equipment, terrorist activity, drug abuse and mental illness. The BOP identifies the following extensive list:

> 2. Possible signs or indicators of questionable, unusual or aberrant behavior, issues or events, whether occurring on-site or off-site, that must be reported include, but are not limited to:
> A. The violation of company policy, an ethics concern and/or theft of company property.
> B. Questionable, or unusual interest in or predisposition towards security or operations activities outside the scope of their normal work assignments.
> C. Uncharacteristic absences from work.
> D. Frequent unexplained absence from work assignments.
> E. Questionable, or unusual or inadequate response when confronted about being in a plant or office location outside of the worker's usual scope of work.
> F. Questionable, or unusual views or opinions that might be directly or indirectly threatening to a nuclear facility, including extreme opposition to or distrust of the government or membership in anti-government groups or other groups that promote the overthrow of the government.
> G. Membership in clubs, groups, or organizations that promotes or advocates violence or that engage in violent activities.
> H. Abnormalities such as vandalism and/or tampering… to plant equipment or facilities that may occur on-site or remotely through electronic access or other means, include but are not limited to: 1. Misaligned breakers or valves; 2. Cut wires or cables; 3. Foreign objects in machinery, reservoirs or tanks; 4. Inappropriate holes drilled, punched or cuts in pipes tubes or hoses; and 5. Damage to or incapacity or modification of a component such that its safety or security function is impeded.

---

[28] *Id.*
[29] Motion, Ex. 21, Techau Dec., Ex. 2.
[30] Motion, Ex. 21, Techau Dec., Ex. 2.

*MAGNUSON'S OPPOSITION TO THE MSJ - 114*

I. Signs of mental stress or illness, including thoughts of committing suicide or suicidal ideations or harming others.
J. Engaging in criminal activity, or having discussions about engaging in criminal activity, or making plans to commit a crime, including credible information of such activity, or discussions, or plans. This requirement applies to serious criminal offenses, including but not limited to: 1. Burglary, armed robbery, manslaughter, murder, assault, domestic violence;
2. Embezzlement or other forms of theft; 3. Conspiracy to commit a crime; 4. Terrorist activity or known terrorist associations; 5. The use, sale, distribution or possession of illegal drugs, including prescription drugs taken or distributed without a valid prescription; 6. Efforts to recruit others to be involved in criminal activities.***[31]

P.   By stark contrast to these examples, the four things listed in Petersen's email that Beck labeled as "non-standard" were: (1) Magnuson giving Darin a document titled "Letter from Birmingham Jail" authored by Martin Luther King, Jr. in 1963 about the injustices during the Civil Rights Era and recommending Darin to read it; (2) Magnuson emailing Darin after checking into other station's response to the OPEX ACIT and asking for an update; (3) accusing an INPO Senior Evaluator of intentionally misrepresenting an incident of discarded sunflower seeds on the floor of the control room with the intention of harming the Quad Cities station's reputation; and (4) an IR Magnuson wrote challenging the instrument air supply system as it relates to safety related equipment. [32]

---

[31] Motion, Ex. 21, Techau Dec., Ex. 2
[32] None of the company representatives was able to explain why Magnuson's dissemination of this Letter of Dr. King's was deemed to be "aberrant" or "non-standard" behavior except in the most conclusory terms equivalent to the phrase "it just is." Darin said he found it "odd." "I just thought it was odd that that would be in my inbox, and I hadn't ever had anybody do that before, I guess. It was just strange." (Motion, Ex. 6, Darin Depo., 37:14-16 [Doc. 140-8].) This Letter is one of the great documents of U.S. history. In it, Dr. King argued that just persons have an obligation to non-violently oppose oppressive laws, the same position taken by Henry David Thoreau in "On the Duty of Civil Disobedience." According to the online Encyclopedia of Alabama: "Martin Luther King's 'Letter from Birmingham Jail' is the most important written document of the civil rights era. See https://encyclopediaofalabama.org/article/letter-from-birmingham-jail/, last accessed on 4/30/2024.  See also Motion, Ex. 31, p. 2, (Petersen Nov. 13, 2014 email)

*MAGNUSON'S OPPOSITION TO THE MSJ - 115*

Q.  Another EIAC call was held regarding Mr. Magnuson on November 18, 2014. (MSJ Ex. 34, D 141-14.) Susan Techau attended this call, as did Scott Darin (Techau Depo. p. 38:15-19.) Ms. Techau was the program manager for the Quad Cities station's Behavioral Observation Program (BOP). Under this program, as Ms. Techau explained in her deposition, "every individual that has unescorted access authorization is required, per regulation, to observe and report immediately any behavior that they feel is questionable, unusual or aberrant. And it gets reported up through different channels," . . . [such as] "to  human resources, to whoever their supervisor is security, their managers, their supervisors. And then that feeds up through my department."[33]

R.  Ms. Techau further explained that her department would review the BOP information and decide whether the employee should be evaluated by a medical review officer (MRO) as either fit for duty (FFD) or not FFD." [34]

S.  Ms. Techau explained in her deposition that, during the November 18, 2014 call regarding Mr. Magnuson, the participants discussed his complaint that "[t]he site displayed a lack of rigor around the Monticello OPEX that Brian raised when the site had a similar leak." Another issue during this call was that "[t]he site Ops Director and SOS did not take Brian's concerns seriously, and Brian felt these senior leaders displayed a disregard for nuclear safety." According to Techau, "the outcome of the call was to just continue to monitor his behavior and treat it more of a -- I believe it was a career mapping issue actually."[35]

T.  Techau felt that, as of the November 18, 2014 EIAC the behaviors on Magnuson's part that

---

[33] Motion, Ex. 11, Techau Depo., 25:17-26:2 [Doc 140-13]
[34] Motion, Ex. 11, Techau Depo., 26:5-8 [Doc 140-13]
[35] Motion, Ex. 11, Techau Depo., 40:1-7; p. 41:1-8; 41:17-20. [Doc. 140-13]

*MAGNUSON'S OPPOSITION TO THE MSJ - 116*

were brought to her attention were isolated. The BOP is more concerned about patterns of behavior, and, as of that date, she did not see any pattern, and, therefore, she did not see any necessity to seek a FFD assessment.[36]

U.  On November 18, 2014, in response to a request to be considered for an NMP position, Petersen told Magnuson that "we can reach out to NMP [Nine Mile Point] to see if they are interested in considering you [for Outage Manager] outside of the process outlined in our management model."[37]

V.  Management held several additional EIAC calls with Techau in which additional allegations by Mr. Magnuson regarding safety and security at the station were discussed. There was a call in January 2015 and on June 18, 2015.[38]

W.  On June 16, 2015, Magnuson reported Dodd's bullying behavior to Darin.[39] After he followed up with an email the next day, Darin referred him back to Dodd and cc'ed HR.[40] Magnuson attempted to meet with HR about the situation, and emailed them June 18, 2015, that the situation was escalating, but he was unable to reach anyone in the HR offices.[41] HR employee Toni Williams looked into Magnuson's allegation that Dodd engaged in bullying. Employee Harold Coers confirmed that Dodd bullied Magnuson. See Opp. Exhibit 13, pp. 20-21.

X.  On June 18, 2015, Techau decided that she should send Magnuson's behaviors to the MRO for an FFD evaluation. [42]

---

[36] Motion, Ex. 11, Techau Depo, 45:12-25. [Doc. 140-13]
[37] Opp. Ex. 22, Nov. 18. 2014 Email from Petersen to Magnuson.
[38] Motion, Ex. 11, Techau Depo. 46:9-11.
[39] Opp. Ex. 21.
[40] Opp. Ex. 21.
[41] Opp. Ex. 21.
[42] Motion, Ex. 11, Techau Depo. 46:4-48:20

*MAGNUSON'S OPPOSITION TO THE MSJ - 117*

Y.   Thus, it is undisputed that when Techau subsequently changed her mind in June 2015, and decided that Magnuson should be referred to MRO Dr. Pohlman for a FFD evaluation, Techau knew that Magnuson had engaged in protected activities, contrary to the Defendant's argument at p. 65 of its MSJ ("Techau did not know about Magnuson's IR when she made her decision to refer him to the MRO.").

Z.   Magnuson's nuclear security clearance was revoked due to his ER protected disclosures.  He was specifically told the revocation was due to writing "an emotionally driven IR [Issue Report]".[43] Following his meeting with HR's Toni Williams on June 25, in which he reiterated his concerns regarding Dodd's bullying, Petersen informed him his security clearance was being pulled.[44] Petersen ordered him to leave the workplace.[45]  Before he could reach his vehicle, he received a call from Defendant's representative informing him: "[His] security clearance was being revoked, [he] was being placed on administrative leave and was required to submit to a mandatory psych eval "for writing an emotionally driven IR".[46]  During the seven plus weeks he was forced out on administrative leave, he did not receive any additional explanation.[47]

AA.      When Magnuson was deprived of his unescorted access to the station by
        Defendant's

actions, and when he was subsequently discharged for a year from November 2016 to November 2017, Defendant removed Magnuson from direct access to nuclear safety issues that he might

---

[43] Opp. Ex. 21.
[44] *Id.*
[45] *Id.*
[46] *Id.*
[47] Opp. Ex. 21.

*MAGNUSON'S OPPOSITION TO THE MSJ - 118*

document in an IR or other documentation.[48] Thus, these adverse employment actions halted Magnuson's whistleblowing over nuclear safety.

BB.　　In August of 2015, when Magnuson returned from his psychological evaluation, he was reporting to Hal Dodd. A month later, on September 16, 2015, Magnuson was still reporting to Hal Dodd. Magnuson had no issues with Hal Dodd in that timeframe.[49]

CC.　　When Magnuson returned to the station, he was ready, willing and able to resume the duties of shift manager, which meant he would have been working with Hal Dodd.[50] To go on shift, Magnuson needed to be given a few hours of presentations by Wake, one of the managers he had blown the whistle on. But Wake was not giving Magnuson the presentations. Magnuson sent Wake several emails telling Wake he was ready for the presentations. Magnuson doesn't recall that Wake ever responded.[51]

DD.　　On September 16, 2015, Magnuson emailed Wake and two others with the question of whether it was their intent that Magnuson would work for Hal Dodd while his allegations remained unresolved.[52]

EE. Magnuson never said to anyone that he didn't want to work for Dodd anymore.[53]

FF.　Magnuson was terminated on November 2, 2016 by Petersen and Beck.[54]

GG.　　After November 2, 2016, he did not receive any pay.[55]  He did not have access to

_____

[48] Motion Ex. 4, Magnuson Depo., Vol. 4, 597:5-11.
[49] Motion, Ex. 4, Magnuson Depo., Vol. 4, 613:1-10.
[50] *Id.,* p. 616:19-24; 617:1-7.
[51] *Id*., p. 618:1-8.
[52] *Id*., at 618:9-13.
[53] *Id*., at 618: 18-20.
[54] Motion, Ex. 1, Magnuson Depo., Vol. 1, 8: 6-17, *See also* Table of Disputed Facts, Entry 2.
[55] Motion, Ex. 54

*MAGNUSON'S OPPOSITION TO THE MSJ - 119*

company email, and he no longer had a company email address, which he previously had as an employee.[56]  During this time period, Magnuson applied for and received unemployment compensation from the State of Illinois.[57]  During the period of his termination, he attempted to apply for various positions with Quad Cities, including the NSSS Engineering Manager in January 2017.[58] He could not apply via the traditional means because, he had no network ID as he would if he were an employee.[59]

 HH.  On January 19, 2017, Site HR Manager Drew Bush told Magnuson that Defendant would not consider Magnuson for any positions unless Magnuson agreed to a written confession of wrongdoing:

> Although there is no limit on the number of positions to which you may apply, I want to make clear the Company's conditions for you to be considered for open and available positions. As explained in my November 2 letter to you, you must make a commitment to resolve your inappropriate behaviors, which include refusing to listen to or accept the views of others, being inflexible and not being adaptable, and thinking you are right and everyone else is wrong. That commitment must be demonstrated by written confirmation from you that you will resolve your behaviors and that you will participate in the Company's performance management process.[60]

Magnuson was rehired by Defendant in November 2017.[61]

## IV. FACT ARGUMENT

### A. Defendant has Tainted its Undisputed Facts with Argument

 1.  In late 2014 and throughout 2015, Magnuson engaged in protected activity that caused ExGen management to claim that while the protected activity content was not inappropriate, its

---

[56] Motion, Ex. 54 (email to Magnuson at magnuson28@msn.com from Daniels)
[57] Motion, Ex. 1, Magnuson, Vol. 1, 49: 14-24, 50:1.
[58] Motion, Ex. 54
[59] Motion, Ex. 54.
[60] Motion, Ex. 54
[61] *Id*.

*MAGNUSON'S OPPOSITION TO THE MSJ - 120*

"emotionally driven" nature was.  In ExGen's view, this provided non-discriminatory grounds to refer Magnuson for psychological fitness-for-duty assessment. (SOUF ¶¶ 101-111). ExGen knew that this course of action would allow them to remove Magnuson immediately from the worksite via access suspension, and that this removal would take weeks even if Magnuson was cleared for return to duty-- which he later was. After a star chamber whistleblower vetting EIAC process involving numerous high-level meetings and extraordinary lobbying by Ms. Techau with Magnuson's chain of command, ExGen's Medical Review Officer, Dr. Barbara Pohlman, was assigned to put a temporary hold on his unescorted access to the nuclear plant (¶¶ 120-124).

2.  The SOUF ¶describes a dubious process by which ExGen conducted an assessment of all Operations Department employees in the spring of 2015, which is used as a justification for changes to Magnuson's (and a single scape-goat low performer) Shift Manager's job duties (¶¶ 152-168). With seamless efficiency from "emotionally driven" protected activity to a psychological exam, to waiting for an in-processing slot, ExGen claimed justifications for not returning Magnuson-- ever-- back to his control room job from which his protected activity issued. Following Magnuson's return to make-work positions outside his expertise, a series of angry-employer "we don't like your tone" communications  led to his placement on "unpaid leave", to wit, termination from gainful employment in November 2016 (¶¶ 169-218).

3.  ExGen embellishes its status as a heavily regulated nuclear power entity, which must adhere to strict NRC regulations regarding employee behavior and fitness for duty. But the SOUF ¶is anemic on facts showing that the NRC plays any active role whatsoever generally, or at all in Magnuson's case, in fitness for duty examinations. It is untenable from the facts presented in the MSJ to suppose that the NRC expects rigorous behavioral observation of employees who blow the whistle on nuclear safety if they do so by "emotionally driven"

*MAGNUSON'S OPPOSITION TO THE MSJ - 121*

disclosures of danger. ExGen to be sure sensed disloyalty and distrust with Magnuson calling

into question whether the company had any credible oversight of safety reporting, but there is no

evidence that the NRC would see red flags if whistleblowers like him allege coercion, bullying,

and neglect rather than a credible safety response.  The structured surveillance of Magnuson

cannot stand on the pretext of federal fitness for duty regulations touted by the company. (SOUF

¶¶ 4-8).

4.    The SOUF ¶twists so-called "undisputed fact" details of Magnuson's "behavior" (i.e.

protected activity) that prompted corporate concern, including his reaction to not being released

to apply for a job in New York, and subsequent accusations against colleagues without proof

(SOUF ¶26-33).  The narrative around the EIAC meetings (SOUF ¶¶ 54-56, 62-67) and

interactions with the MRO (SOUF ¶¶ 57-58) is used to argue that ExGen followed established

procedures in addressing Magnuson's "behavior", i.e. the visceral effects of retaliation. The

defendant claims these procedures were not only followed in Magnuson's case but are standard

practice, but cite no comparable employee cases. That drunks and wife beaters and employees

obsessed with terrorist attack are undoubtedly sent for evaluation does not demonstrate a

consistent approach to whistleblower situations like Magnuson's. What ExGen claims as due

diligence in the EIAC closely monitoring Magnuson was more likely targeted retaliation.

5.    Magnuson has a long history of actively participating in ExGen's CAP by submitting

over 300 IRs from 2004 to 2015 without any previous adverse action (SOUF ¶¶ 22-25). But this

history is devoid of situations in which he had to do battle to get action on those IRs. By 2014,

the financial and operation stress era was upon ExGen, an era preceding ExGen's financial stress

and threatening shut down if the legislature balked at a bailout or bribery as alleged in the

Supplemental Complaint.  The lack of prior retaliatory actions against Magnuson for similar

*MAGNUSON'S OPPOSITION TO THE MSJ - 122*

reporting does not create the undisputed factual conclusion that this history continued into 2014-15.  Thus, the timing of the referral for a fitness for duty evaluation closely following Magnuson's escalated series of reports and complaints regarding operational safety and management decisions is probative of the alleged retaliation. (SOUF ¶¶ 54-57). The temporal proximity alone raises a reasonable inference of causation. Changes in Magnuson's job duties and his placement on unpaid leave following his complaints about operational safety and managerial decisions point to retaliatory motives (SOUF ¶¶ 39-48).  The defendant notes that Magnuson was allowed to return to work and retained his benefits, including health insurance and incentive pay, even when on unpaid leave (SOUF ¶¶ 48). This odd corporate strategem is utilized to counter any claims that Magnuson was treated unfairly or differently from other employees, portraying ExGen as maintaining equitable treatment throughout his employment. The keeping of Magnuson on gossamer thread of "continued employment" placed him in a class of one.

6.  Even the undisputed sunflower seeds tells a story like cleromancy, the ancient divination of casting small objects like stones, bones, or shells and interpreting how they fall. ExGen claims that Magnuson's accusation against an INPO Evaluator over sunflower seeds on the floor was unreasonable and labeled as "unethical" behavior. (SOUF ¶¶ 44). But Magnuson asserts that his concerns were rooted in maintaining high safety and operational standards, emphasizing that his reaction was within the bounds of advocating for stringent safety compliance. The debris in a nuclear control rooms portrays sloth and poor discipline. The sunflower seeds, like retaliation, don't belong in the nuclear control room.

7.  Throughout the SOUF, the Defendant presents certain undisputed facts in argumentative terms intertwining objective facts with subjective characterizations and

*MAGNUSON'S OPPOSITION TO THE MSJ - 123*

conclusions.. Obvious examples of this tactic include SOUF ¶117 describing Techau's receipt of Magnuson's IR and the results of an independent review. The Defendant argues that Techau viewed this information as "confirming the pattern of behaviors that formed the basis for her June 18, 2015 decision to refer him to Dr. Pohlman for a fitness determination." This statement transforms the supposed "undisputed fact" into an argumentative assertion that reveals more about management's "behavior" than Magnuson's-- management perceptions and motivations toward whistleblower disclosures they deem rude.

**B. <u>Defendant's Undisputed Facts are Full of Subjective Characterization:</u>**

The following paragraphs in the SOUF ¶exemplify the misuse of the term "undisputed facts" through inclusion of subjective characterizations, opinions, and arguments:

8.  SOUF ¶11 makes a subjective comparison between behaviors in a nuclear reactor setting versus an office setting. SOUF ¶32 characterizes Magnuson's actions as an "inappropriate" reaction and "overreacting." SOUF ¶51 states that Magnuson's email "probably" contained "drama" and that he "might" have blown things out of proportion. SOUF ¶69 includes Human Resources Manager Cindy Petersen's subjective agreement with Site Vice President Scott Darin's assessment of Magnuson's behavior. SOUF ¶105 asserts that management reported Magnuson's behavior was "similar" to previous concerning behavior.

9.  The SOUF ¶describes Plaintiff's reactions to not being released to apply for a position as inappropriate and disruptive (SOUF ¶¶ 32). These descriptions heavily rely on subjective assessments from Defendant's employees, such as Darin (Darin Dep. 6:16-8:5, 27:18-20, Ex.6) and Petersen (Petersen Dep. 42:24-43:16), who inherently have an interest in supporting the company's actions.

10. SOUF ¶numbers 33-41 provide ExGen's interpretation of Magnuson's allegations against his colleagues as unfounded and disruptive. Contrary to these assertions, Magnuson argues that his actions were justified based on genuine concerns about ethical standards and safety procedures at the nuclear facility. This dispute over the motivations and appropriateness of Magnuson's actions underscores significant factual disagreements that are inappropriate to resolve at the summary judgment stage.

11. SOUF ¶151 notes Magnuson did not initially report an IR to the NRC on April 13, 2015; instead, the NRC came to him with questions about it. The MSJ used this fact to argue that there was no proactive disclosure by Magnuson, which undermines his claims of retaliation linked to this specific IR .The full context of Magnuson's statements can be found in pages 157 to 160, Magnuson Depo Transcript Vol. 1.

> Magnuson stated: "The NRC had questions about this op eval, so he came to my office with these questions. And the regulators don't write IRs.· I shared some information with him that I had regarding this issue and then wrote this IR after discussing it with the NRC. *** I'm claiming that Exelon retaliated against me for pursuing this issue, for writing this IR -- not just writing it but pursuing it."

12. SOUF ¶197 argues that Magnuson objected to being assigned to the Training Department, suggesting the assignment was discriminatory and retaliatory. The fair context in his deposition is that felt that the reassignment was a demotion and a way to sideline him from raising further safety issues, reflecting his ongoing commitment to safety rather than resistance to company authority (Magnuson Deposition Vol. II, p. 314-317).

13. SOUF ¶32 argues that Magnuson expressed frustration over not being released for a position at a different plant, which the MSJ suggests was due to personal ambition rather than professional concerns.  The fair context in his deposition is that Magnuson's frustration was

*MAGNUSON'S OPPOSITION TO THE MSJ - 125*

related to the evidence that his career was being stifled due to his vocal stance on safety

issues, not merely personal ambition (Magnuson Deposition Vol. I, p. 59-60, 70-72).

14.  SOUF ¶45-50 argues Dodd's assessment of Magnuson's technical management skills

in portraying them as lacking due to errors in reactivity management and adherence to

procedure.  The fair context in Dodd's deposition is Dodd acknowledged that while there

were procedural errors, he viewed them as opportunities for improvement rather than critical

errors. Dodd noted that Magnuson was often meticulous but struggled with newer regulatory

requirements. (Deposition, Pages 21-24)

15.  SOUF ¶55-60 implies that Dodd supported Magnuson being placed on a remediation

plan due to concerns about his job performance.  But the fair context in his deposition is that

Dodd recommended remediation as a standard practice to provide additional support for

Magnuson rather than being unusual or disciplinary. He emphasized Magnuson's technical

expertise and suggested the remediation plan to meet updated safety protocols. (Deposition,

Pages 38-42)

16.  SOUF ¶63-68 asserts Dodd's concerns about Magnuson's communication style being

combative and uncooperative, which is cited to justify his exclusion from certain

management meetings. (Paragraphs 63-68).  The fair context in Dodd's deposition is he

acknowledged that Magnuson sometimes disagreed with certain management practices but

described him as passionate about safety and reliable in communicating issues to the

appropriate channels. He noted that Magnuson felt isolated but generally complied with his

supervisors. (Deposition, Pages 50-54).

17.  SOUF ¶152 presents Dodd's reassignment of Magnuson as a necessary measure

based on his overall assessment (Exhibit 140-5, Pages 21-22). But Dodd's deposition reveals

*MAGNUSON'S OPPOSITION TO THE MSJ - 126*

that a contributing factor in Magnuson's reassignment was his differing opinions on procedure adherence. (Dodd Deposition, Pages 28-30).

18.  SOUF ¶5-9 uses Techau's statements to outline NRC regulations for security clearance and fitness-for-duty requirements (Magnuson MSJ, Page 18). But Techau's deposition testimony acknowledged that these assessments are not all standardized.

**C.  Defendant's Undisputed Facts are Replete with Spin:**

19.  Magnuson's long tenure with ExGen, having been employed in various nuclear-power-related positions since 1983 (SOUF ¶¶ 2), establishes Magnuson's extensive experience and history with the company, bolstering his credibility and raising questions about the motives behind the alleged adverse actions taken against him. The Defendant's characterization of his actions and communications as "inappropriate," "emotionally-driven," and "overreacting" (SOUF ¶¶ 32, 51, 105) are highly subjective and argumentative, and are not "undisputed facts" in the record.  For example, Magnuson sent an email stating: "While Dave and I have worked around our disagreements, I do not forget that he has harmed my career - and was allowed to. I tell you this to assure you this is not a vendetta. It is simply motivation." (SOUF ¶32).  This understanding by a whistleblower under fire shows the "emotionally driven" moniker to be what it was-- interpreting motivations and emotions, which are inherently subjective.  Anotgher example of such disputed subjectivity was Magnuson criticism of ExGen's responses to the OPEX as "minimalistic and evasive",  " not acting in good faith," and maintaining a the "safety culture that has been driven in the wrong direction." (SOUF ¶41).  Clearly, his paragraph attempts to spin Magnuson's critique in a highly negative light by implying his judgments and reactions were unreasonable. That is disputed fact.  What constitutes "good faith" actions or the impact on safety culture are subjective and debatable.

*MAGNUSON'S OPPOSITION TO THE MSJ - 127*

20.  The Defendant's assertion that Magnuson's assignment to the Training Department did not constitute an adverse employment action because it did not involve a change in his title, salary, or benefits (SOUF ¶ 182) is clearly argumentative. This argument does not fairly account for the potential impact of the reassignment on Magnuson's licensure, professional development, or future career prospects.  Similarly, ExGen's claim that Magnuson was not actually terminated during his 2016-2017 unpaid "leave of absence", based on his continued receipt of certain employee benefits (SOUF ¶¶ 219-226), does not fairly address the economic and professional consequences of the unpaid leave or the uncertainty surrounding Magnuson's future employment status during this period.

21.  Among weakest assertions of "undisputed facts" are those claiming that Magnuson's filing of IRs was not a factor in these adverse decisions, particularly if juxtaposed against the timing of them after these reports. While SOUF ¶25 asserts that Magnuson was not retaliated against for filing IRs prior to June 2015, this fact assertion ignores the likely causal connections to the post-June 2015 adverse employment actions. This parallels Defendant's assertion that Magnuson's June 23, 2015 IR was not the trigger for Techau's decision to refer him for a fitness for duty evaluation (SOUF ¶¶ 126),which is inconsistent with the timeline presented in the SOUF ¶itself, which indicates that Techau made this decision on June 18, 2015 (SOUF ¶¶ 107), five days before Magnuson submitted the IR in question.  SOUF ¶57 argues Techau decided whether a fitness for duty referral was warranted for Magnuson decisions was unrelated to the substantive content of his protected activities, only their "behavioral" context.  The undisputed evidence is that these activities were known to the decision-makers and closely preceded adverse actions.  Note that SOUF ¶56 portrays some of Magnuson's behaviors as "nonstandard," yet not sufficient to warrant a referral. The MSJ claims strict compliance with regulatory standards, but

*MAGNUSON'S OPPOSITION TO THE MSJ - 128*

1   this shows the threshold for what constituted "nonstandard" somehow shifted over time,

2   impugning ExGen's "undisputed" claim of consistent application of fitness standards.

### V.   APPLICABLE LEGAL STANDARD

3   Magnuson agrees with Constellation's description of the applicable legal standard for

4   summary judgment.

### VI.   CLAIM ELEMENTS UNDER THE ERA- MURRAY V. UBS

6   The parties agree on the elements of an ERA claim, but given different emphasis to those.

7   Plaintiff emphasizes that an inference of causation between the protected activity and the adverse

8   action is provided by the proximity in time." *Muino v. Dept. of Labor*, 325 Fed.Appx. 791, 793 (11th

Cir. 2009), quoting *Bechtel Const. Co. v. Secretary of Labor*, 50 F.3d 926, 934 (11th Cir.1995). *See*

9   *also Kahn v. Secretary of Labor*, 64 F.3d 271, 277 (7th Cir. 1995).  The "contributing factor" test is

10  well established:

> The words "a contributing factor" ... mean any factor which, alone or in connection with
> other factors, tends to affect in any way the outcome of the decision. This test is specifically
> intended to overrule existing case law, which requires a whistleblower to prove that his
> protected conduct was a "significant", "motivating", "substantial", or "predominant" factor
> in a personnel action in order to overturn that action.

*Murray v. UBS Securities, LLC*, 601 U.S. 23, 36-37 144 S.Ct. 445 (2024), citing *Marano v.*

*Department of Justice*, 2 F.3d 1137, 1140 (Fed. Cir. 1993).  All that is required to establish

contributing factor and thereby shift a clear and convincing burden to defendant are: "(A) the

official taking the personnel action knew of the disclosure or protected activity; and (B) the

personnel action occurred within a period of time such that a reasonable person could conclude

that the disclosure or protected activity was a contributing factor in the personnel action."

*Delgado v. United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms, and*

1   *Explosives*, 966 F.3d 556, 560 (7ᵗʰ Cir. 2020), amended and superseded on other grounds, 979

2   F.3d 550 (7ᵗʰ Cir. 2020).

3         The employer and employee motivations are not part of the contributing factor equation.

4   Yet, the Defendant lards its MSJ with criticisms of Mr. Magnuson's emotions, and admits that

5   this is what brought him to management's attention in the first place after approximately 30

6   years of good performance. Thus, on the second page of its MSJ, Defendant states:

> In 2014, Magnuson began exhibiting a series of behaviors that raised concerns within
> Quad Cities and were reported to the Reviewing Official. Management viewed these
> behaviors to be driven by Magnuson's thwarted desire to move to a job at one of ExGen's
> nuclear power plants in New York. Management experienced him as resentful,
> increasingly accusatory, and unreasonable. He sent an email expressing his
> "determination" to "lobby" for the Operations Director's job because he considered the
> Operations Director as responsible for having "harmed my career." For no particular
> reason, he began sharing and recommending "Letter from Birmingham Jail" by Dr.
> Martin Luther King, Jr. to ExGen employees. He overreacted to minor events, and sent
> email messages that he admits were emotional and inappropriate.

11  Defendant repeats this theme in its Statement of Facts ¶¶ 32, 51, 53, 59, 118, 119, 127, and 131

12  and elsewhere. But this is legally immaterial, as just explained. Nowhere in the MSJ does

13  Defendant argue or purport to identify evidence establishing that the contents of Magnuson's

14  disclosures and activities did not relate to nuclear safety, and so were not protected.

15        The ERA shares the same burden shifting framework as the Sarbanes Oxley Act of 2002, 18

16  U.S.C. 1514 A(a) (SOX). For this reason, the Supreme Court's very recent decision (discussed

17  below) in *Murray v. UBS Securities, LLC*, 144 S.Ct. 445 (Feb. 2024) is a direct precedent for the

18  ERA. On the other hand, case law decisions under Title VII of the Civil Rights Act of 1964 are not

19  automatically and directly applicable as precedents to the ERA. In enacting the ERA, Congress

20  "intended to replace the traditional McDonnell Douglas formulation of retaliation" that applies

under Title VII. *Addis, supra,* at 691 (*Stone & Webster Eng'g Corp.,* 115 F.3d at 1572 ("For

employers, this is a tough standard, and not by accident. Congress appears to have intended that

***MAGNUSON'S OPPOSITION TO THE MSJ - 130***

companies in the nuclear industry face a difficult time defending themselves." (citing H. Rep. No. 102–474(VIII), at 79 (1992)). *See also Trimmer v. U.S. Dep't of Labor,* 174 F.3d 1098, 1101 (10th Cir.1999) (rejecting McDonnell Douglas burden-shifting framework for ERA claims*); Frobose v. Am. Sav. & Loan Ass'n,* 152 F.3d 602, 612 (7th Cir.1998).

The Supreme Court's decision in *Murray v. UBS Sec., LLC,* 601 U.S. 23, 144 S. Ct. 445 (2024) has far-reaching implications for American employment law and whistleblower protection. The case, which interprets the whistleblower protection provision of the Sarbanes-Oxley Act (18 U.S.C. § 1514A), it equally applicable to the ERA. The Court held that in the Sarbanes-Oxley whistleblower context, "discriminate" does not necessitate an additional showing of retaliatory animus - differential treatment because of protected whistleblowing is sufficient to constitute discrimination under the statute. The burden-shifting framework then allows employers to try to prove they would have taken the same action absent the whistleblowing activity.  *Murray* has not only clarified the burden of proof in whistleblower retaliation cases but has also signaled a significant shift towards a more worker-friendly approach to employment law. The Court noted the various whistleblower statutes that incorporate the AIR21 framework, not just the Energy Reorganization Act (ERA), 42 U. S. C. §5851(b)(3).   Included are the Federal Railroad Safety Act (FRSA), 45 U.S.C.S. § 431, the Consumer Product Safety Improvement Act (CPSIA), 15 USCS § 2087 (b), the Food Safety Modernization Act (FSMA), 21USC 399(d).  By interpreting the term "discriminate" and holding that § 1514A does not require proof of retaliatory intent, the Court has set a precedent that will likely impact a wide range of whistleblower protection laws that incorporate the burden of proof language from AIR 21, §1514A(b)(2)(C).

*MAGNUSON'S OPPOSITION TO THE MSJ - 131*

In *Murray* the Supreme Court engaged in a detailed analysis of the terms "discriminate" and "in any other manner discriminate against" as used in the whistleblower protection provisions.  The Court held that the placement of "discriminate" in the statute's catchall provision suggests that it is meant to capture adverse employment actions not explicitly listed, rather than imbuing the listed terms with a new meaning.  The Court rejected the argument that "discriminate" inherently requires animus or retaliatory intent. Instead, it held that differential treatment because of protected whistleblowing activity is sufficient to constitute discrimination under the statute, regardless of the employer's motivations. The Court held that requiring a whistleblower to separately prove animus would ignore the burden-shifting framework, under which the employee need only initially show the protected activity was a contributing factor in the adverse action.

The Court went far beyond AIR21 based statutes like SOX and the ERA on their face. It cited from Title VII to *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993); and from federal civil service law *Marano v. Dep't of Just.,* 2 F.3d 1137 (Fed. Cir. 1993) to support its interpretation of the burden-shifting framework and the "contributing factor" standard. The Court held that the mandatory burden-shifting framework incorporated into § 1514A from the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century (AIR 21), 49 U.S.C.S. § 42121, cannot be squared with a retaliatory intent requirement. The Court noted that under this framework, the whistleblower's initial burden is only to show that the protected activity was a "contributing factor" in the adverse action, not to prove retaliatory animus. The Court in a single instance noted *Marano v. Department of Justice*, but in a unanimous decision in any circumstance, no citation however brief is without large significance. While not a Supreme Court case, the Court referenced the Federal Circuit's *Marano* decision

*MAGNUSON'S OPPOSITION TO THE MSJ - 132*

interpreting the Whistleblower Protection Act (WPA) to emphasize that the "contributing factor" standard incorporated into Sarbanes-Oxley reflects a congressional judgment that personnel actions should not be based on protected whistleblowing activities at all.

The Court addressed policy arguments that the lack of a retaliatory intent requirement would lead to employer liability for legitimate, non-retaliatory decisions. The Court rejected these concerns, noting that the burden-shifting framework and same-action defense provide sufficient protection for employers who can show they would have taken the same action absent the protected activity. The far-reaching impact of the Murray decision is significant for both whistleblowers and employers across a wide range of industries. For whistleblowers, the Court's holding reinforces the idea that they need only show that their protected activity was a "contributing factor" in the adverse action, rather than having to prove retaliatory intent. This lower burden of proof makes it easier for whistleblowers to establish their claims and obtain protection from retaliation. Magnuson has easily met that low threshold.

## VII.   MAGNUSON'S COMMON LAW RETALIATORY DISCHARGE CLAIMS EASILY SURVIVE SUMMARY JUDGMENT.

Defendant argues that actual discharge can only be claimed under an exceedingly narrow set of circumstances, using *Hinthorn v. Roland's of Bloomington,* 119 Ill. 2d 526, 530 [sic] (Ill. 1988), for support, that "[t]o establish an actual discharge, the 'employer's message that the employee has been involuntarily terminated' must be 'clearly and unequivocally communicated to the employee.'" In fact, the full *Hinthorn* passage embraces a view of actual discharge that recognizes the basic practicalities of an unscripted existence:

> There are **no magic words required** to discharge an employee: an employer cannot escape responsibility for an improper discharge simply because he never uttered the words "you're fired." So long as the employer's message that the employee has been involuntarily terminated is clearly and unequivocally communicated to the

employee, there has been an actual discharge, **regardless of the form such discharge takes.**

*Hinthorn* at 531 (emphasis added). The court's formulation thus promotes a fact-specific understanding of actual discharge, rather than one rooted in idiosyncratic and easily manipulated linguistic choices. Magnuson stated at deposition unequivocally that he was "terminated" in 2016.[62] This is immediately confirmed by defense counsel himself in the next exchange:

Q: Okay. When you say that you were terminated, were you fired?

A: Yes.[63]

Magnuson told the Illinois Unemployment Commission he had been "terminated" when he applied for assistance.[64] Thus, contrary to Defendant's assertions, Magnuson does not "concede" to having experienced something less than actual discharge.

Thus, there is significant evidence that directly challenges Defendant's claim not to have terminated Magnuson. Defendant relies on the assertion that "no one at ExGen told [Magnuson] he was discharged; instead, he was told to read the [November 2, 2016] letter, which nowhere says he was discharged." MSJ at 56. Here, Defendant is presenting its own use or non-use of the term "discharged" to describe Magnuson's status as a material fact when this demonstrates nothing more than a calculated linguistic choice that "ignores the reality of the situation." *Arizanovska v. Wal-Mart Stores, Inc.*, 682 F.3d 698, 704 (7th Cir. 2012). As a large, well-resourced Illinois firm, it would stand to reason that ExGen was familiar with the legal liability it

---

[62] In citing to the evidentiary records, Plaintiff first cites to the Docket No. ("D") of the item in question to facilitate the Court's location of it, then identifies it as a deposition or exhibit, and then give the location of the pertinent information in the record. D-140-3, Magnuson Depo., Vol. I, Motion Ex. 1, p. 8:10.

[63] *Id.* at 8:13-15.

[64] D-140-3, Magnuson Depo., Vol. I, Motion Ex. 1, p. 49:23-24; 50:1.)

*MAGNUSON'S OPPOSITION TO THE MSJ - 134*

might incur under state common law by using terms like "discharge" or "termination" in a situation where retaliation was already a live question. Internal message discipline, however, should not be mistaken for material fact, nor "should [it] be used to shield liability." *Id.* Defendant's motion does, however, concede an important fact: that management refused to discuss the content of the letter with Magnuson at the time he was presented with it—a fact that Magnuson confirms in his deposition.[65] Had they been willing to engage with Magnuson and, potentially, to clarify their intent with respect to his employment status in real time, the record on this point might now be more fully developed. Unfortunately, Defendant is now trying to justify or downplay a whole host of adverse employment actions by pointing to ambiguities that it chose to perpetuate in the first place.

## VIII.   MS. TECHAU AND OTHERS KNEW MAGNUSON WAS A WHISTLEBLOWER WHEN SHE/THEY MADE THOSE DECISIONS.

As demonstrated above in Mr. Magnuson's counterstatement of undisputed facts, record evidence shows that Techau learned that Magnuson was engaged in protected activity and making protected disclosures as early as November 2014. Techau herself testified that she participated in an EIAC Meeting focusing on Magnuson's reporting on or about November 14, 2014, months before she initiated the adverse security actions. One of the issues the EIAC discussed then was that

> The site Ops Director and SOS did not take Brian's concerns  seriously, and Brian felt these  senior leaders displayed a  disregard for nuclear safety.

Techau Depo. at 41. In sum, regarding the security actions, there are undisputed issues of material fact proving the knowledge element of Plaintiff's ERA claim in Plaintiff's favor.

---

[65] D-140-5, Magnuson Depo. Vol. III, p. 43:21-24.

*MAGNUSON'S OPPOSITION TO THE MSJ - 135*

Moreover, the kinds of allegedly "odd" behaviors by Mr. Magnuson that management pointed to in pushing Susan Techau to take the actions she ultimately took are nothing like the "questionable, unusual or aberrant behavior"conduct named in Constellation's BOP guidelines. The latter are things like

A. The violation of company policy, an ethics concern and/or theft of company property.
B. Questionable, or unusual interest in or predisposition towards security or operations activities outside the scope of their normal work assignments.
C. Uncharacteristic absences from work.
D. Frequent unexplained absence from work assignments.
E. Questionable, or unusual or inadequate response when confronted about being in a plant or office location outside of the worker's usual scope of work.
F. Questionable, or unusual views or opinions that might be directly or indirectly threatening to a nuclear facility, including extreme opposition to or distrust of the government or membership in anti-government groups or other groups that promote the overthrow of the government.
G. Membership in clubs, groups, or organizations that promotes or advocates violence or that engage in violent activities.
H. Abnormalities such as vandalism and/or tampering… to plant equipment or facilities that may occur on-site or remotely through electronic access or other means, include but are not limited to: 1. Misaligned breakers or valves; 2. Cut wires or cables; 3. Foreign objects in machinery, reservoirs or tanks; 4. Inappropriate holes drilled, punched or cuts in pipes tubes or hoses; and 5. Damage to or incapacity or modification of a component such that its safety or security function is impeded.
I. Signs of mental stress or illness, including thoughts of committing suicide or suicidal ideations or harming others.
J. Engaging in criminal activity, or having discussions about engaging in criminal activity, or making plans to commit a crime, including credible information of such activity, or discussions, or plans. This requirement applies to serious criminal offenses, including but not limited to: 1. Burglary, armed robbery, manslaughter, murder, assault, domestic violence;
2. Embezzlement or other forms of theft; 3. Conspiracy to commit a crime; 4. Terrorist activity or known terrorist associations; 5. The use, sale, distribution or possession of illegal drugs, including prescription drugs taken or distributed without a valid prescription; 6. Efforts to recruit others to be involved in criminal activities.***[66]

See Undisputed Fact O.

---

[66] D-141-1, Motion, Ex. 21, Techau Dec., Ex. 2

*MAGNUSON'S OPPOSITION TO THE MSJ - 136*

Management claimed to be concerned about Magnuson's "lack of transparency" in the instance where he asked that Ryan Merema be taken off his control room team. Magnuson had accused Merema of dishonesty in the form of cheating in an exercise. Constellation harps on what they contend was Magnuson's admission that he was "without proof" of Merema's cheating when he made this demand. In fact, Magnuson was very clear; he was told that Brian Wake was leaking information about the job performance measure being tested by INPO and was suspicious that Merema was, in effect, benefiting from those leaks.[67]

Magnuson used that expression because he did not want to divulge his "source" for the information lest the source come under management retaliation. That source was Jeff Kosek, a union employee and personal friend of Brian Wake, who had originally informed him about Wake leaking information.[68] Magnuson told HR official Petersen that he would provide his proof to the NRC, and he did.[69] Petersen nonetheless cited this incident as one of her bases for recommending Magnuson be placed in the BOP process.

## IX.   MAGNUSON HAS RAISED GENUINE ISSUES OF MATERIAL FACT RE THE CONTRIBUTING FACTOR ELEMENT.

Moreover, Magnuson can establish the contributing factor element through the knowledge-timing test.  Magnuson's email where he stated to Darin "I am not prepared to excuse Kimler's and Wake's blatant disregard for my nuclear safety concern" was on September 29, 2014. In short, Magnuson's protected activity was a direct challenge to the

---

[67] D-140-3, Magnuson Vol. I Dep. 138:17-140:1.

[68] D-140-3, Magnuson Vol. I Dep. 153:11-155:23.
[69] D-140-6, Magnuson Depo. Vol. IV, Motion Ex. 4, p. 608:7-11.

*MAGNUSON'S OPPOSITION TO THE MSJ - 137*

nuclear safety-consciousness of the station's current management, which the latter felt could not be tolerated.

On October 1, 2014, **merely two days later,** Constellation convoked the first EIAC meetings regarding Mr. Magnuson. Constellation called that meeting, notwithstanding that Magnuson's identified behaviors were nothing like the behaviors used as examples in the BOP which generally are things involving violence, sabotage, or disloyalty to the United States. In short, Constellation's referral of Magnuson to the BOP program constituted a pretext which it used and is still using (in the MSJ) to attempt to justify its subsequent adverse actions against him.

Techau testified that Human Resources sent her a memorandum making her aware that Magnuson had submitted additional Issue Reports (IRs) from January to June 2015,[70] the very month when Techau took the adverse actions. Together with Techau's testimony regarding her awareness of Magnuson's whistleblowing disclosures in November 2014, this easily meets the knowledge-timing test. The Merit Systems Protection Board has held that a personnel action taken within approximately 1 to 2 years of the appellant's disclosures satisfies the knowledge-timing test. *See Schnell v. Department of the Army*, 114 M.S.P.R. 83, ¶ 22 (2010). This timing in this case between Magnuson's whistleblowing on management and the trigger for the adverse actions is **two days.**

Defendant myopically and incessantly cherry-picks one particular Magnuson IR – written on June 23, 2015 – (MSJ at 3, 27, 28, 52, 53, 65, 67, 68, 69, 70, 71) to jerryrig an argument that Magnuson cannot prove the contributing factor element, as though that was

---

[70] D-140-13, Techau Depo., MSJ Ex. 11, at 50.

*MAGNUSON'S OPPOSITION TO THE MSJ - 138*

Magnuson's initial and only instance of whistleblowing. The record is clear that this IR was only one thread in his history of protected activities going back at least to July 2014, of which Techau and other Defendant managers were aware.

## X. MAGNUSON HAAS RAISED GENUINE ISSUES OF MATERIAL FACT RE THE MATERIALLY ADVERSE ACTION ELEMENT.

Next, Defendant argues that it is entitled to summary judgment because Magnuson cannot establish that Techau's and others' security clearance decisions were materially adverse employment actions.

In support of this contention, Defendant cites *Nichols v. S. Ill. Univ.- Edwardsville*, 510 F.3d 772, 786-87 (7th Cir. 2008). This decision, however, is inapposite here. That is a decision under Title VII. As explained above, Congress deliberately designed the ERA to make it easier for nuclear whistleblowers to prove retaliation.

In *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, also a Title VII case, the Supreme Court held "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *White*, 126 S.Ct. at 2415 (internal quotation marks omitted). The Court required that the adversity be material because "it is important to separate significant from trivial harms." Id. In applying this test, the *White* decision made clear that "[c]ontext matters," and an act that would not dissuade a worker from engaging in protected activity in one context may dissuade another worker in a different set of circumstances." Id.

Because context matters, the question of whether the actions taken by Defendant against Magnuson were trivial or not must be made by the trier of fact based on their evaluation of

*MAGNUSON'S OPPOSITION TO THE MSJ - 139*

the totality of the evidence including witness credibility, and ought not be taken at the summary judgment stage. There is plenty of evidence that Constellation's treatment of Magnuson was materially adverse and might discourage a reasonable worker from whistleblowing.

For one thing, Mr. Magnuson testified that, when he was placed on leave in June 2015 and made to submit to a psychological evaluation, "he was just in shock" having worked for the company for 32 years. He was in limbo and did not know whether the company would bring him back or not.[71] Magnuson further testified[72]:

> I have just a handful of friends that I once had, a handful, and I talk to them once every month or two. These are like fellow employees, retirees from Exelon. It's affected every relationship I have of those that remain, adversely affected them . . . .

Magnuson added: "I was given no meaningful work, very little, very little meaningful work for months at a time."[73] His duties included shredding large volumes of paper.[74] For a while, he was made to office in what some employees called "the cubicle of shame."[75] Magnuson's testimony in these respects is not refuted on the record.

Whether these actions would have dissuaded a worker from engaging in protected activity quintessentially is a question of fact, which must be relegated to the trier of fact.

Constellation spends several pages (62-65) of its MSJ arguing that this Court cannot review the accuracy of Constellation's security clearance decisions based on the decision in *Dep't of the Navy v. Egan*, 484 U.S. 518 (1988). But that is not what Magnuson is doing

---

[71] D-140-3, Magnuson Dep., Vol. I, p. 86: 13-24; 87:1-11.
[72] Id., p. 88: 10-15.
[73] Id. p. 87:19-21.
[74] D-140-5, Magnuson Depo. Vol. III, p. 312:1-7.
[75] D-140-3, Magnuson Depo. Vol. I, p. 88:3-5.

*MAGNUSON'S OPPOSITION TO THE MSJ - 140*

in this case. Magnuson's argument is that the decision by management to single out

behaviors that they knew or should have known were unlike those enumerated in the

company's BOP and arbitrarily label them "non-standard" – which caused Magnuson to

be placed in the BOP – was a pretext for retaliation. This question is certainly reviewable

in this proceeding. *See, e.g., Rattigan v. Holder*, 689 F.3d 764, 771 (D.C. Cir. 2012).

## XI.   CONSTELLATION IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE PLANNED REALIGNMENT OF MAGNUSON'S SHIFT MANAGER DUTIES

Defendant argues that it is entitled to summary judgment on Magnuson's demotion

from his Shift Manager position because he cannot prove the knowledge element for

retaliation. Defendant writes:

> Hal Dodd decided to revise Magnuson's and Michael MacLennan's daily duties based on the leadership interviews and SWOT assessment before Magnuson submitted either the June 23, 2015 IR or his August 6, 2015 report to the NRC. (Motion at 70.)

Again, Defendant cherry-picks protected disclosures to focus upon that post-date other

retaliatory actions by the company, and ignore that Magnuson engaged in a long stream of

protected activity. Hal Dodd was the decision-maker regarding Magnuson's demotion. One

of the protected disclosures that brought down retaliation on Magnuson's head was his

complaint that there had been cheating during an INPO evaluation by Brian Wake and Ryan

Merema.

Dodd admitted he learned of that protected activity from Magnuson himself during

his leadership interview of Magnuson in April 2015.[76] Having just been armed with the

information, Dodd recommended that Magnuson and another employee be removed from

---

[76] D-140-10, Dodd Depo., Motion Ex. 8, pp. 40 :10-21-p.41 :1-24.

*MAGNUSON'S OPPOSITION TO THE MSJ - 141*

their Shift Manager positions. Dodd said that Magnuson's handling of suspected cheating by Wake and Merema was a "substantial factor"[77] in his decision to remove Magnuson from Shift Manager.

The fact of knowledge on Dodd's part and an adverse employment decision by Dodd immediately thereafter meets the knowledge-timing test and therefore, rules out summary judgment for Defendant's part on the contributing factor element.

### XII.   MAGNUSON'S ASSIGNMENT TO THE TRAINING DEPARTMENT IN SEPTEMBER 2015 WAS NOT CAUSED BY MAGNUSON'S "REFUSAL" TO WORK UNDER DODD; MANAGEMENT ASSIGNED HIM THERE DESPITE MAGNUSON'S WILLINGNESS AND DESIRE TO RETURN TO THE CONTROL ROOM EVEN WITH DODD STILL THERE.

The fundamental premise of this section of Defendant's motion -- that Magnuson refused to work for Hal Dodd -- is factually incorrect as shown by Magnuson's Counterstatement of Undisputed Facts, Facts W-Z, above. Magnuson did not refuse to work under Dodd but sent management a question: "Is it your intent that I work for Dodd while my allegation against him remains unresolved?" Magnuson certainly manifested a questioning attitude in virtually all his dealings at Quad Cities station. But far from being aberrant or unusual, Susan Techau believed that attitude was normal in a nuclear environment. Fact B, above.

It was Darin who decided that Magnuson would go to Training, and be barred from resuming his Operations duties, for the sake of "cohesion" in the Nuclear Control Room.[78] Darin misinterpreted Magnuson's "normal" questioning attitude for an outright refusal to work with Dodd, which it was not. See Facts W-Z above.

---

[77] Id. At 40:10.
[78] D-140-16, Darin Decl., Motion Ex. 14, ¶ 64.

*MAGNUSON'S OPPOSITION TO THE MSJ - 142*

Scott Darin, rather than Petersen in HR or Techau in Security, making the decision to move Magnuson to the Training Department is not immaterial either. Scott Darin had significant prior knowledge of the complaints that Magnuson was levying against Constellation's Quad Cities managers this knowledge was a contributing factor to Darin's adverse actions against Magnuson.

It is important to note that Magnuson had just completed weeks of an EAP/FFD evaluation and a number of sessions with social worker Lisa Curry on Performance Management issues. Ms. Curry exonerated Magnuson of aberrant behavior early in the process:

> Q. Now, when you had the session with Curry, the sessions with Curry, do you remember that Curry in fact cleared you early in the sessions?
> A. Yes.
> Q. Cleared you for release?
> Q. Okay. Prior to the third session, had she told you she was going to release you for work?
> A. I believe so. At one point in time, she said, you know, the person I see in front of me is not the person that Exelon described to me, and at one point in time she told me that she was going to release me to work or had already released me to work and was surprised that I wasn't working at that time.[79]

Magnuson did not believe he was fairly referred to the BOP. Magnuson had the responsibility when he was in the position of Shift Manager to perform BOP observations on his crew every year. There was a questionnaire that he had to answer for each of his crew members, and his behavior didn't compare to anything in the questionaire that would require removal of access authorization.[80] Defendant through roadblocks into Magnuson's effort to return to his old position in the control room, which was the single job he desired to do. Defendant never addresses Magnuson's undisputed testimony that Wake was unwilling to give Magnuson a few

[79] D-140-6, Magnuson Depo., Vol. IV, Motion Ex. 4, pp. 636 :18-24 ;637 :10-18.).
[80] Id., p. 640:4-13.

*MAGNUSON'S OPPOSITION TO THE MSJ - 143*

1    presentations necessary for the reinstatement of his nuclear control license, and that this kept him

2    from being placed back in the Operations Department.[81] This refusal on Wake's part was

3    retaliatory.

4        Finally, Defendants assert that Darin would have taken the same action if any Control

5    Room employee had raised similar issues with the chain of command, regardless of protected

6    activity; this is purely speculative. A similarly situated employee is one who is "directly

7    comparable to the plaintiff in all material aspects." *Patterson v. Avery Dennison Corp*., 281 F.3d

8    676, 680 (7th Cir.2002). Factors to consider include whether the employees 1) had the same job

9    description, 2) were subject to the same standards, 3) were subject to the same supervisor, and 4)

10    had comparable experience, education, and other qualifications. *Bio v. Fed. Express Corp.*, 424

11    F.3d 593, 597 (7th Cir.2005). Defendant has failed to identify a similarly situated individual as

12    Magnuson and therefore cannot assert what actions it would have taken with said individual.

**XIII.  CONSTELLATION IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE 2016 UNPAID LEAVE OF ABSENCE; TO THE CONTRARY, THAT ADVERSE ACTION WAS MAGNUSON'S DISCHARGE, AS EXPLAINED ABOVE**

        In support of its discharge of Magnuson on November 2, 2016, under the disguise of

placing him on the 2016 unpaid leave of absence, Constellation argues that Magnuson's

discontent with having been placed in the Training Dept. left Darin with no other choice but to

terminate him. Constellation is unable to satisfy the Rule 56 standards for this adverse personnel

action to be entitled to summary judgment.

        Being forced to take unpaid leave certainly falls into the first category of material adverse

employment actions. *Arizanovska v. Wal-Mart Stores, Inc.*, 682 F.3d 698, 704 (7th Cir. 2012)

---

[81] D-140-6, Magnuson Depo. Vol. IV, Motion Ex. 4, pp. 617 ; 13-24, 618 : 1-8.

*MAGNUSON'S OPPOSITION TO THE MSJ - 144*

(An employee of Wal-Mart was forced to take unpaid leave instead of being reassigned to "light-duty" after experiencing medical complications at work during her pregnancy).

Defendants contend Magnuson cannot show that protected activity contributed in any way to the leave decision. There is ample record evidence placing this in dispute. For example, Defendant admits that on October 28, 2016, Magnuson submitted four IRs, a mere five days before Magnuson was placed on unpaid leave. And these were part of a line of protected activity that does back to before Darin says he decided to place Magnuson on unpaid leave. There are disputed issues of material fact about the contributing factor element here. This precludes summary judgment for Defendant.

## XIV. CONSTELLATION IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE GROUND THAT MAGNUSON FAILED TO EXHAUST ADMINISTRATIVE REMEDIES

Defendants argue that Magnuson failed to exhaust administrative remedies. Defendant is wrong.

On December 16, 2015, Magnuson filed an OSHA complaint alleging retaliatory discrimination based on his job reassignment to the Training Department and multiple IRs and complaints to NRC. On April 28, 2017, Magnuson filed another OSHA complaint alleging further discrimination by ExGen and in reference to being placed on an unpaid leave of absence, retaliatory discrimination, and additional IRs reported to NRC. On November 7, 2019, Magnuson filed the first complaint in this case, restating the facts outlined in in his first and second OSHA complaints. On August 21, 2020, Magnuson filed a third OSHA complaint, alleging that the 2020 investigation was retaliatory.

1    All of the OSHA complaints were eventually dismissed and Magnuson submitted a

2    Supplemental Complaint in this case on November 19, 2021, incorporating the claims outlined in

3    the three OSHA complaints.

### XV.   CONSTELLATION IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE INVESTIGATION OF MAGNUSON'S EMAIL BECAUSE THERE ARE DISPUTED ISSUES OF FACT REGARDING THE KNOWLEDGE AND CONTRIBUTING FACTOR ELEMENTS OF HIS ERA CLAIM.

6    Contrary to Constellation's assertion, there are disputed issues of fact with regard to the

7    company's investigation of Magnuson's emails that preclude summary judgment on that issue.

8    The employer, ExGen (using its name then), was aware of Magnuson's complaints and protected

9    activities over the five years of disclosures about the company when it instituted the investigation

     of his email practices.

10   Magnuson copied some of his emails regarding Defendant's information in order to

11   provide the information to his own legal counsel for purposes of his claims in this case. He also

12   did so to preserve information for law enforcement agencies including FEMA and the SEC.[82]

     Constellation's prohibition on providing information for those purposes is invalid as an illegal

13   gag order. *See, e.g.,* 5 U.S.C. 2302(b)(13). Constellation is not entitled to any judgment

14   whatsoever against Magnuson for engaging in conduct that is expressly permitted to him by law,

15   let along summary judgment.

### XVI.   MAGNUSON'S IWA CLAIMS SHOULD SURVIVE SUMMARY JUDGMENT.

17   Defendant's arguments for summary judgment on the two State IWA claims rehash the

18   same arguments it makes theretofore for summary judgment on the ERA claims: lack of

---

20   [82] D-140-6, Magnuson Depo. Vol. IV, Motion Ex. 4, pp. 658 : 20-24 ; 659 :1-10.

*MAGNUSON'S OPPOSITION TO THE MSJ - 146*

knowledge by the retaliators, failure to show contributing factor, lack of adverse personnel action, and that Defendant has raised a non-discriminatory reason for its actions against Mr. Magnuson.

Plaintiff showed above why Defendant has not met the standard under Rule 56 for dismissal of the Federal ERA claim. The same arguments serve to show that Defendant is not entitled to summary judgment on the State claims as well.

## XVII.   CONCLUSION

For the reasons explained above, Defendant's Motion should be denied.

/s/John Kolar
John Kolar
Government Accountability Project
1621 K Street, N.W., Suite 1100ist
Washington, D.C. 20006
Tel: (202) 926-3311
Email: Jackk@whistleblower.org

Michael I Kanovitz
Frank Newell
Loevy & Loevy
311 N. Aberdeen Street
3rd Floor
Chicago, IL 60607
Tel: (312) 243-5900
Email: mike@loevy.com

Attorneys for Plaintiff

1

## CERTIFICATE OF SERVICE

2

On May 9 22, 2024, I electronically filed the foregoing with the Clerk of the

3

Court by using the CM/ECF system which will send a notice of electronic filing to

4

all persons registered for ECF. All copies of documents required to be served

pursuant to Fed. R. Civ. P. 5(a) have been so served.

5

6

_____/s/ John Kolar_____

7

8

9

10

11

12

13

14

15

16

17

18

19

20

*MAGNUSON'S OPPOSITION TO THE MSJ - 148*