UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | | |
|---|---|---|
| BRIAN MAGNUSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:21-cv-04142-SLD-JEH |
| | ) | |
| EXELON GENERATION COMPANY, | ) | |
| LLC,[1] | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

Plaintiff Brian Magnuson alleges that Defendant Exelon Generation Company, LLC ("ExGen") unlawfully discriminated and retaliated against him for disclosing health and safety threats and regulatory violations to company officials and government agencies. First Suppl. Compl. ¶ 1, ECF No. 79. Before the Court are ExGen's: (1) Rule 702 Motion to Bar Testimony of Jacqueline Garrick, ECF No. 136; (2) Rule 702 Motion to Bar Certain Testimony of Allen E. Jacque, ECF No. 137; (3) Motion for Leave to File a Reply Brief in Support of Its Rule 702 Motion to Bar Testimony of Jacqueline Garrick, ECF No. 155; (4) Motion for Leave to File a Reply Brief in Support of Its Rule 702 Motion to Bar Certain Testimony of Allen Jacque, ECF No. 156; (5) Motion for Summary Judgment, ECF No. 143; and (6) Motion for Leave to File Reply in Excess of Five Pages in Support of Motion for Summary Judgment, ECF No. 172. For the reasons that follow, ExGen's Motion for Summary Judgment and Motion for Leave to File an

---

[1] After Magnuson filed his first federal complaint, Exelon Generation Company, LLC's ("ExGen") parent company, Exelon Corporation, restructured, such that ExGen is now known as Constellation Energy Corporation. *See* Answer First Suppl. Compl. 1 n.1, ECF No. 87. The parties usually refer to Defendant as ExGen in their summary judgment briefing and the Court does the same for the sake of clarity.

Excess Reply in Support of Summary Judgment are GRANTED, and the other motions are MOOT.

## BACKGROUND

### I.  Factual Background

At summary judgment, a court must "constru[e] the record in the light most favorable to the nonmovant." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).  Unless otherwise noted, this factual background is drawn from the statement of undisputed material facts in ExGen's motion for summary judgment, Mot. Summ. J. 5–53, Magnuson's response thereto, Resp. Mot. Summ. J. 7–109, ECF No. 164, Magnuson's counterstatement of undisputed facts, *id.* at 109–20, and ExGen's replies thereto, Replies Resp. ExGen's Facts, Reply Mot. Summ. J. Ex. A, ECF No. 173-1; Reply Mot. Summ. J. 2–24, ECF No. 172-1.

The Court's Local Civil Rules state that "[e]ach claim of disputed fact must be supported by evidentiary documentation referenced by specific page," *see* Civil LR 7.1(D)(2)(b)(2), and provide that "[a] failure to respond to any numbered fact will be deemed an admission of the fact," *id.* 7.1(D)(2)(b)(6).  ExGen points out that many of Magnuson's responses fall short of these requirements.  *See, e.g.*, Reply Mot. Summ. J. 24–26.  For example, Magnuson disputes some facts by citing generally to his declaration, which consists of 248 paragraphs over 106 pages.  *See, e.g.*, Resp. Mot. Summ. J. 49 ("See Magnuson Declaration"); Magnuson Decl., Resp. Mot. Summ. J. Ex. 1, ECF No. 164-1.  Other disputes are simply left unfinished.  *See, e.g.*, Resp. Mot. Summ. J. 98 (designating a particular paragraph as disputed and material but failing to explain why, and simply offering the incomplete phrase "[d]isputed because" in response to another paragraph).  The Court granted five separate motions to extend Magnuson's deadline to file his response to ExGen's summary judgment motion.  *See, e.g.*, May 8, 2024 Text Order.

Courts are entitled to rely upon the parties' adherence to local rules which dictate the content and form of summary judgment briefing. *See McCurry v. Kenco Logistics Servs., LLC*, 942 F.3d 783, 786–87 (7th Cir. 2019); *Stevo v. Frasor*, 662 F.3d 880, 886–87 (7th Cir. 2011); *see also McKinney v. Off. of Sheriff of Whitley Cnty.*, 866 F.3d 803, 808 (7th Cir. 2017) ("A party opposing summary judgment does not meet this obligation by simply dropping a stack of paper into the court file (literally or electronically) and asserting that someone who reads the stack will find a genuine issue of material fact."). To the extent that Magnuson fails to properly dispute a particular fact—for example, by failing to provide a sufficiently specific citation or any explanation for his dispute—the Court deems that fact to be undisputed. *See* Civil LR 7.1(D)(2)(b).

Both the evidentiary record and the parties' briefing are replete with acronyms—the unabbreviated versions of many of these acronyms may be found in ExGen's summary judgment motion. *See* List of Acronyms, Mot. Summ. J. App. B, ECF No. 140-2.

### A. Regulatory Programs at ExGen's Quad Cities Nuclear Power Station

ExGen owned and operated nuclear power plants in Illinois, Pennsylvania, New York, and Maryland, with corporate offices in Kennett Square, Pennsylvania and Warrenville, Illinois. These power plants included ExGen's Quad Cities Nuclear Power Station ("the Station"), which was operated pursuant to an operating license issued by the United States Nuclear Regulatory Commission ("NRC"). As a licensee of the NRC, ExGen was required to follow the NRC's detailed regulations regarding the safe operation of nuclear power plants, in addition to the obligations which are generally imposed upon some employers by agencies like the Occupational Safety and Health Administration ("OSHA") and Department of Labor ("DOL"). ExGen was also subject to inspections by the Institute of Nuclear Power Operations ("INPO"), an

3

organization all nuclear power plant licensees belong to which seeks to promote the safe and reliable operations of those plants. Finally, the State of Illinois also imposed certain regulatory requirements upon nuclear power plant operators, such as requiring them to regularly provide certain information which is important for emergency preparedness to the Illinois Emergency Management Agency and Office of Homeland Security. *See, e.g.*, 420 ILCS 5/8(c).

The NRC required that licensees maintain certain programs and processes to ensure that only trusted individuals could access a nuclear power plant. More specifically, the NRC required licensees to maintain an access authorization process to determine the trustworthiness and reliability of someone who had unescorted access to the protected and vital areas of the plant. ExGen maintained programs to comply with these NRC requirements, including an Access Authorization Program ("AAP"), a Behavioral Observation Program ("BOP"), and Fitness for Duty Program ("FFD Program").

Under ExGen's BOP, individuals with unescorted access authorization were trained to observe and report immediately any behavior by any individual who held unescorted access authorization that the observer believed was aberrant, questionable, or unusual.[2] ExGen's BOP

---

[2] Magnuson argues that "bare belief from the observer" is insufficient as "the employee must be trained to conduct observation about particular questionable behavior, must engage in actual behavioral observation, and *must rely upon signs or indications to look for.*" Resp. Mot. Summ. J. 9–10 (quotation marks omitted); *see also id.* at 9 ("Behavioral observation must be performed by individuals who are trained under [10 C.F.R.] § 26.29 to detect behaviors . . . ." (emphasis removed) (quoting 10 C.F.R. § 26.33)). But ExGen does not claim that bare belief is sufficient—it provides the BOP's non-exhaustive examples of questionable, unusual or aberrant behavior, *see* Behavioral Observation Program § 3.2.4.2, Techau Decl. Ex. 2, Mot. Summ. J. Ex. 21, ECF No. 141-1 at 70–102, and Magnuson points to that same document in disputing ExGen's assertion, *see id.* at 10 (citing Behavioral Observation Program § 3.2.4). Magnuson appears to dispute the extent that ExGen trains its employees and which employees are trained to make these observations, but if so, his dispute is unspecific and unsupported. Multiple ExGen employees' testimony—including Magnuson's—and ExGen documents show that individuals with unescorted access authorization are trained on and are subject to the mandatory reporting requirements of ExGen's BOP. *See* Magnuson Dep. Vol. II 255:18–256:14, Mot. Summ. J. Ex. 2, ECF No. 140-4; Techau Dep. 24:16–26:2, Mot. Summ. J. Ex. 11, ECF No. 140-13; Petersen Dep. 15:16–16:2, Mot. Summ. J. Ex. 10, ECF No. 140-12; *see also* Behavioral Observation Program § 3.2.1 (specifying that individuals with unescorted access authorization are required to "successfully complete annual Fitness For Duty training" and be trained "[t]o detect and report questionable or aberrant behavior or changes in behavior that might reflect negatively on an individual's trustworthiness and reliability").

elaborated upon federal regulations, *see, e.g.*, 10 C.F.R. § 73.56(f)(2)–(3), to specify in a non-exhaustive list which behaviors qualified as aberrant, questionable, or unusual, *see* Behavioral Observation Program § 3.2.4.2, Techau Decl. Ex. 2, Mot. Summ. J. Ex. 21, ECF No. 141-1 at 70–102 ("Possible signs or indicators of questionable, unusual or aberrant behavior, issues or events . . . that be must be reported *include, but are not limited to*: . . . ." (emphasis added)).  For example, someone with BOP training who observed an individual displaying "unusual interest in or predisposition towards security or operations activities outside the scope of their normal work assignments" or "[s]igns of mental stress or illness" had to report that behavior.  *Id.* § 3.2.4.2(B), (I).  These observational and reporting requirements were also imposed upon supervisors and management, who were required to observe individual behavior over time, document behavioral problems, and act proactively to address those problems.

Reports of questionable behavior could be made through various channels, such as reporting to a supervisor or Human Resources ("HR").  Those reports were then sent to reviewing officials, meaning persons who have the authority "to grant, certify, deny, unfavorably terminate, maintain, or administratively withdraw an individual's unescorted access or unescorted access authorization status."  10 C.F.R. 73.56(h)(1)(i).  Those officials were then required to review the reported information to determine whether it needed to be referred to a health care professional designated by the BOP to make fitness determinations pursuant to NRC regulations.  ExGen's programs designated a Medical Review Officer ("MRO") to evaluate potential fitness issues, make recommendations to place a hold on an individual's unescorted access, refer individuals for an evaluation if necessary, and determine whether an individual was fit to safely and competently perform his duties.  ExGen was required by the NRC to implement any determination or recommendation that the MRO made as part of a fitness determination.

Referrals for evaluation were processed as part of the Employee Assistance Program ("EAP").  The EAP was meant to help employees with "anything from mental health to financial issues" or "drug abuse," and an employee could voluntarily avail himself of the EAP or could receive a mandatory referral to be evaluated through the EAP.  Petersen Dep. 13:2–14:12, Mot. Summ. J. Ex. 10, ECF No. 140-12.  ExGen also maintained an Employee Concerns Program, which provided an "alternative and confidential avenue for employees to raise nuclear safety or quality concerns" or any complaints of "harassment, intimidation, retaliation, or discrimination, for engaging in a protected activity as defined by the NRC."  Darrow Dep. 14:20–15:5, Mot. Summ. J. Ex. 7, ECF No. 140-9.  Leaders within ExGen—alongside employees from HR, the Employee Concerns Program, Legal, and other departments—would convene as the Executive Issue Advisory Committee ("EIAC") to discuss certain employee issues, which required a wide variety of outside opinion, authorize investigations, and make decisions regarding those issues. HR would organize the EIAC calls.

Finally, ExGen was required by the NRC to maintain a corrective action program by which a licensee would find, evaluate, and fix problems at the plant.  The program included a process for evaluating the safety significance of problems, setting priorities for corrective actions, and tracking problems until they were corrected.  It contained Issue Reports ("IRs"), which were written notifications of issues that were entered into the program by employees. Employees would also sometimes author Action Reports ("ARs") concerning those issues.  Each IR would be evaluated and classified for safety significance, assigned an employee who would research and address the issue, and tracked until it was addressed.  IRs were not uncommon: Between 2009 and 2015, more than 11,000 IRs concerning the Station were generated each year. Magnuson himself submitted more than 300 IRs between June 19, 2004 and November 20, 2015.

Employees in a nuclear environment were expected to be safety-conscious, including challenging and questioning each other to ensure safe operations.

### B.  Pre-April 2015 Activity[3]

#### 1.  Denial of Magnuson's Requested Transfer

Magnuson has been employed by ExGen—or its predecessors-in-interest—in nuclear-power-related positions since 1983 except for approximately one year between November 2016 and November 2017 when he was either placed on an unpaid leave of absence (ExGen's position, *see* Mot. Summ. J. ¶ 218) or terminated and rehired (Magnuson's position, *see* Resp. Mot. Summ. J. 7).  His career with ExGen began at the Station, where he achieved the position of Shift Manager in the Operations Department in 2006.  He was individually licensed by the NRC to direct the operation of two commercial nuclear reactors and was required to maintain unescorted access authorization subject to ExGen's AAP, BOP, and FFD Program.  In June 2014, Magnuson sought to further advance his career and began pursuing higher-level positions, such as the Manager of Safety and Security at ExGen's Nine Mile Point Nuclear Station ("NMP") in Oswego, New York.  That transfer required a release from Dave Kimler, who was then the Operations Director at the Station.

On August 20, 2014, Magnuson emailed Quad Cities Site Vice President Scott Darin, with whom he had a good working relationship.  *See, e.g.*, Darin Dep. 39:24–40:1, Mot. Summ. J. Ex. 6, ECF No. 140-8 ("And me and Brian had a very, very good relationship.").  He requested Darin's support in convincing Kimler to release him to pursue positions at NMP.  Kimler

---

[3] Aside from a general description of Magnuson's career, qualifications, desired career advancement, and the regulatory environment for nuclear power plants, the operative complaint in this action does not discuss the events in this section.  *See* First Suppl. Compl. ¶¶ 9–16.  Instead, the heading of "Protected Activities," *see id.* ¶¶ 17–46, describes a timeline of events that begins on April 13, 2015.  As discussed later, *see infra* Discussion, Section II.B.1, the Court holds that Magnuson cannot rely on pre-April 2015 activity as the protected activity for his Energy Reorganization Act claims.  The facts are nevertheless relevant to resolving the pending motions.

ultimately concluded that business conditions— specifically staffing shortages in the Operations Department—dictated that he would not release Magnuson to pursue these opportunities.  On August 28, 2014, after Magnuson had learned of Kimler's decision, Magnuson sent Darin another email, wherein he questioned Kimler's ability to "maintain a high level of performance for the department."  Aug. 28, 2014 Email from Brian Magnuson to Scott Darin, Mot. Summ. J. Ex. 27, ECF No. 141-7.  Magnuson wrote that he did "not forget that [Kimler] has harmed [his] career -and was allowed to," describing this fact as not indicative of "a vendetta" but instead "simply motivation."  *Id.*  As "the position at NMP d[id] not appear to be an option," Magnuson wrote that he would "lobby the [S]tation and corporation for Kimler's position."  *Id.*

### 2.  Monticello Operating Experience

On July 7, 2014, Magnuson forwarded a report on an operating experience ("OPEX") which occurred at another nuclear power plant in Monticello to Brian Wake, the Shift Operations Superintendent and Magnuson's supervisor at the time.  July 7, 2014 Email Thread Between Brian Magnuson and Brian Wake, Mot. Summ. J., Ex. 28, ECF No. 141-8 at 2–4.  Nick Johnson, a Programs Engineer, had initiated IR 1620692 in February 2014 to discuss and track the implications of the Monticello OPEX for the Station, specifically to ensure that employees would recognize that a particular leakage could be "a leak in the reactor coolant pressure boundary." *See* July 7, 2014 Email Thread Between Nicholas Johnson and Brian Magnuson, Mot. Summ. J. Ex. 28, ECF No. 141-8 at 2–3; Magnuson Dep. Vol. I 84:22–85:9, ECF No. 140-3.

Magnuson reached out to Johnson about the Monticello OPEX and IR 1620692 shortly after he forwarded the report to Wake.  After Johnson explained his reasons for submitting IR 1620692, Magnuson replied: "None of your Recommended Actions were acted upon.  The significance of Pressure Boundary Leakage was apparently lost."  July 7, 2014 Email Thread

Between Nicholas Johnson and Brian Magnuson.  Magnuson then reached back out to Wake, informing him that Johnson had filed IR 1620692 and asking him to consider escalating the IR's priority.  Wake demurred, replying that Johnson's IR was "the right way to initiate actions," but he also commended Magnuson's follow-through.  July 7, 2014 Email Thread Between Brian Magnuson and Brian Wake.  Magnuson pointed out that the IR had been filed in February and asked Wake if he wanted Magnuson to file a new IR.  Wake replied that "[i]f [he] ha[d] any doubts or concerns then [it was] always safer to write a new IR and get it addressed."  July 8, 2014 Email from Brian Wake to Brian Magnuson, Mot. Summ. J. Ex. 28, ECF No. 141-8 at 2.  Magnuson did not file a new IR at that time.  When he followed up with Wake about addressing the Monticello OPEX in mid-August of 2014, Wake did not recall the details of the Monticello OPEX.  Aug. 17, 2014 Email from Brian Wake to Brian Magnuson, Mot. Summ. J. Ex. 29, ECF No. 141-9 at 4.

In September of 2014, after Magnuson's request to be released to seek a transfer to NMP was denied, he escalated his concerns about the response to the Monticello OPEX, stating to Kimler and Wake that the NRC had forced Monticello to shut down to address the issue and that the Station's "OPEX Review IR d[id] not appear to be adequate."  Sept. 3, 2014 Email from Brian Magnuson to David Kimler and Brian Wake, Mot. Summ. J. Ex. 29, ECF No. 141-9 at 3–4.  He testified that he believed that the Station did not want to isolate the leak's source, as that knowledge would require them to shut down a reactor and harm their metrics on an industry performance indicator.  Magnuson Dep. Vol. I 78:23–79:23.  He did not receive a written response and looped in Darin eight days later, describing the handling of the Monticello OPEX as "minimalistic and evasive," and stating that the lack of good-faith response meant that the Station's "safety culture ha[d] been driven in the wrong direction."  Sept. 11, 2014 Email from

9

Brian Magnuson to Scott Darin, Mot. Summ. J. Ex. 29, ECF No. 141-9 at 3.  He reached out to

Wally Beck—the Quad Cities Regulatory Assurance Manager—to seek Beck's perspective.

Beck replied that, amongst other actions, he would ask Engineering to take a second look at the

Station's response to the Monticello OPEX to ensure "confiden[ce] in [the Station's] current

position."  Sept. 16, 2014 Email from Wally Beck to Brian Magnuson, Mot. Summ. J. Ex. 29,

ECF No. 141-9 at 2.

> He forwarded this response to Darin, stating that Beck was "inclined to minimize most of

this issue," describing this minimization as "a large part of the problem from the beginning," and

adding that "[a]nother part [wa]s more personal."  Sept. 19, 2014 Emails from Brian Magnuson

to Scott Darin, Mot. Summ. J. Ex. 29, ECF No. 141-9 at 2.  Days later, he clarified that he "did

not intend to question [Beck's] integrity," but added that "[a]s far as Kimler and Wake [we]re

concerned, they chose to ignore a nuclear safety concern."  Sept. 25, 2014 Email from Brian

Magnuson to Scott Darin, Mot. Summ. J. Ex. 30, ECF No. 141-10 at 2.  After discovering that a

IR for all of ExGen's nuclear power plants had been written about the leak at Monticello, he sent

another email to Darin, describing his previous assessment of the Station's response as "lenient"

and stating that he was "not prepared to excuse Kimler's and Wake's blatant disregard for [his]

nuclear safety concern."  Sept. 29, 2014 Email from Brian Magnuson to Scott Darin, Darin Decl.

Ex. 6, Mot. Summ. J. Ex. 14, ECF No. 140-16 at 43–44.

> Two days later, on October 1, 2014, an EIAC call was convened to discuss Magnuson's

recent behaviors, resulting in three action items: (1) Nate Darrow, the Employee Concerns

Program Manager at ExGen's corporate office in Warrenville, Illinois would conduct an

investigation of Magnuson's allegations that Kimler and Wake had disregarded Magnuson's

safety concerns stemming from the Monticello OPEX; (2) the Operations Department would

continue to monitor the pending IR related to the Monticello OPEX; and (3) ExGen would

engage in career mapping with Magnuson to outline future positions and the requirements to be

considered for those positions.  Darrow completed his investigation on or about November 21,

2014, and met with Magnuson that day to tell him that the investigation was closed with no

issues identified.  Magnuson requested that Darrow follow up with Kimler about the Monticello

OPEX, after initially declining Darrow's offer to do so.  Darrow Dep. 23:3–20.  Weeks later,

Magnuson questioned Darrow's findings as a whole, stating that "[t]he disregard of plant

condition specific OPEX [wa]s inarguably a lack of Technical Conscience" and was willful,

noting his belief that "[t]his [wa]s a matter of ethics."  Dec. 14, 2014 Email from Brian

Magnuson to Nathan Darrow, Mot. Summ. J. Ex. 35, ECF No. 141-15 at 2.  Darrow conducted a

follow-up investigation—including an interview with Kimler as Magnuson had requested—and

he informed Magnuson that his investigation still did not substantiate Magnuson's allegations of

wrongdoing on the part of Kimler or other employees.  Jan. 13, 2015 Email from Nathan Darrow

to Brian Magnuson, Mot. Summ. J. Ex. 40, ECF No. 141-20 at 2–3.  Magnuson replied that he

would "identify gaps and inconsistencies" in the findings "[a]s time permit[ted]."  Jan. 19, 2015

Email from Brian Magnuson to Nathan Darrow, Mot. Summ. J. Ex. 40, ECF No. 141-20 at 2.

### 3.  Letter from Birmingham Jail

In late October of 2014, Magnuson presented Darin with a copy of Dr. Martin Luther

King, Jr.'s seminal "Letter from Birmingham Jail," but he did not provide any contemporaneous

explanation as to why he wanted Darin to read it.  Darin thought this was "odd" and "strange."

Darin Dep. 37:12–16.[4]  Similarly, on Martin Luther King Day in 2015 and in a response to

---

[4] Magnuson testified that he was taking courses at Excelsior College at the time and that the letter was required
reading in a syllabus for a class the college offered.  Magnuson Dep. Vol. I 39:13–40:6.  Magnuson disputes Darin's
recollection of what he thought at the time, given their history and Darin's knowledge that Magnuson was taking

Darrow's email summarizing the results of his follow-up investigation, Magnuson requested that Darrow also read Dr. King's letter without a contemporaneous explanation as to why.

### 4. INPO Inspector Visit

Magnuson's reaction to criticisms of the Station's control room from Robert Pace—a Senior Evaluator from the INPO—was cited by Magnuson's supervisors as another example of his concerning behavior from this period.  In early fall 2014, Pace was brought into the control room as part of an inspection when Magnuson was not on shift.  But Magnuson testified that he heard from someone who was on shift that day that "the cleaning lady had just swept the floor on the control room, so there was a pile of sunflower seeds somewhere, like, real obvious when they entered the control room."  Magnuson Dep. Vol. I 101:8–102:7.  Pace mentioned the sunflower seeds in an early October 2014 meeting which was attended by Magnuson and Darin, stating that it was unprofessional to have them on the floor.  *See* Oct. 2, 2014 Email from Brian Magnuson to Andrew Mitchell, Darin Decl. Ex. 7, ECF No. 140-16 at 45–47 ("Did you tell the INPO Rep the cleaning lady had just swept the mess on the carpet?  He just said it was unprofessional.").  Darin testified that Pace "was making more of a global point, not so much about the seed itself, but about the behavior."  Darin Dep. 44:18–20; *see also id.* at 44:13–17 ("And if you have seeds on the floor, what else might you not be doing at excellence levels?  Or could that same behavior of seeds on the floor lead to other behaviors that might not be where they need to be?").

In an early November email to Darin, Magnuson: (1) stated that he given this incident more thought and concluded that Pace had "distorted the truth with the intent of damaging the [S]tation's reputation"; (2) described Pace's conduct as "unethical" and "particularly egregious" considering INPO's role in nuclear safety; and (3) stated that "[a]llowing it to go undeterred

---

courses.  Resp. Mot. Summ. J. 25–26.  Again, Magnuson's disputation of this fact is unsupported by any citation so the Court deems this fact undisputed.  *See* Civil LR 7.1(D)(2)(b).

[wa]s fundamentally wrong."  Nov. 3, 2014 Email from Brian Magnuson to Scott Darin, Mot. Summ. J. Ex. 32, ECF No. 141-12.

Quad Cities HR Manager Cindy Petersen prepared an email summarizing concerns that had been raised regarding Magnuson "'non-standard' interactions" with others, including Darin. These interactions included Magnuson's behaviors regarding the Monticello OPEX, the INPO inspector, the recommendations to read "Letter from Birmingham Jail," and Darin's concern that Magnuson had displayed "a lot of emotional responses" and "mood swings."  Nov. 13, 2014 Email from Cindy Petersen to Mary Jo Enrietta, Mot. Summ. J. Ex. 31, ECF No. 141-11 at 2–3. Petersen's email also noted that Magnuson had recently written an IR "[c]hallenging the instrument air supply system as it relate[d] to safety related equipment," to which "Engineering responded that they did not agree."  *Id.*  Beck edited Peterson's email prior to her sending it— adding "non-standard" was Beck's edit.  Petersen Dep. 44:17–24.

Another EIAC call was convened on November 18, 2014 to discuss these events. Included on the call was Susan Techau—ExGen's Access/FFD Manager and Access Authorization Reviewing Official—who was the official charged with deciding whether Magnuson's behaviors warranted a FFD referral to the MRO.  Although Techau found that some of Magnuson's behaviors were "nonstandard" and agreed that Magnuson's requests that others read the "Letter from Birmingham Jail" was "a little odd," she did not think there was a sufficient pattern of behavior to warrant a referral, instead recommending continued monitoring of Magnuson's behaviors.  Techau Dep. 41:17–42:15, 44:10–20, 45:12–25, Mot. Summ. J. Ex. 11, ECF No. 140-13.

### 5.  INPO Testing Incident

On January 3, 2015, Magnuson sent an email to Darin and Wake, alleging that Wake had leaked materials related to tests administered via the INPO to Ryan Merema, a member of Magnuson's crew.  Magnuson stated: "With no proof, I ask that Merema be removed from my crew immediately."  Jan. 3, 2015 Email from Brian Magnuson to Scott Darin, Mot. Summ. J. Ex. 36, ECF No. 141-16.  Darin forwarded Magnuson's accusation to Petersen, and both Darin and Petersen stated that it was "odd" to make such a serious accusation without any proof.  Jan. 3, 2015 Email Thread Between Scott Darin and Cindy Petersen, Mot. Summ. J. Ex. 37, ECF No. 141-17 at 2.  Petersen met with Magnuson that week to discuss his allegations and Magnuson declined to substantiate his allegations.  Following that meeting, Magnuson emailed Petersen to suggest that Merema's removal be "chalked up to a personality conflict."  Jan. 5, 2015 Email from Brian Magnuson to Cindy Petersen, Mot. Summ. J. Ex. 38, ECF No. 141-18 at 3; *see also* Magnuson Dep. Vol. I 155:21–23 ("[I]t appears to me that I offered up an excuse—an excuse for HR that they could use to remove Merema from my crew.").  In his deposition, Magnuson clarified that he had received information about Wake and Merema's alleged cheating from another operator, but there were interpersonal and union concerns associated with disclosing his sources.  Magnuson Dep. Vol. I 137:5–138:3.  He did not contemporaneously disclose this information as he "wanted Merema removed from [his] crew without [him] having to go through any ordeal to substantiate that cheating actually occurred."  *Id.* at 143:3–6.

Magnuson's behavior prompted Petersen to author another summary email, stating in her "professional opinion, [Magnuson] ha[d] performance deficiencies in his communication," that he "appear[ed] to lack transparency and [wa]s therefore preventing [ExGen] [from] find[ing] appropriate resolution to concerns raised to senior leadership," and that he had failed "to work

14

through conflict openly and honestly."  Jan. 5, 2015 Email from Cindy Petersen to Scott Darin, Mot. Summ. J. Ex. 38, ECF No. 141-18 at 2.  Petersen escalated her concerns within the HR Department and included Legal, seeking to discuss an appropriate course of action.  Later that month, another call was held with Techau to discuss Magnuson's accusations against Merema.  On that call, the participants discussed Kimler's denial of Magnuson's request to be released to seek a promotion at NMP and Magnuson's expressed sentiments towards Kimler.  Darrow also presented the findings of his investigation into the Monticello OPEX incident, noting that Magnuson's version of events was unsubstantiated.  Techau was concerned about Magnuson's emerging pattern of overreaction, serious accusations without factual bases, and his resentment towards Kimler.  She ultimately declined to refer Magnuson for a fitness for duty and EAP evaluation, as the participants decided to instead address Magnuson's career development concerns via career mapping.  They decided to continue to monitor Magnuson's behavior.

### C.  IR 2484352: Motor-Operated Valve

Earlier in March of 2015, Magnuson questioned the accuracy of an operations evaluation regarding the degradation of a motor-operated valve.  Mar. 28, 2015 Email from Brian Magnuson to Hal Dodd, Resp. Mot. Summ. J. Ex. 5, ECF No. 165 at 5.  He stated in a subsequent email that Rob Murray from the NRC had "asked these same questions."  Apr. 8, 2015 Email from Brian Magnuson to Hal Dodd et al., Resp. Mot. Summ. J. Ex. 5, ECF No. 165 at 4–5.  Within a week, on April 13, 2015, Murray approached Magnuson, which led Magnuson to submit IR 2484352 to document those questions.  In May of 2015, Magnuson reviewed the Equipment Apparent Cause Evaluation and alleged that it did not "identify the correct Apparent Cause."  May 25, 2015 Email from Brian Magnuson to Gary Knapp et al., Resp. Mot. Summ. J. Ex. 5, ECF No. 165 at 2–4.  He asserted that the apparent cause was not equipment related, but

instead stemmed from "the failure to perform a [Post-Maintenance Test] which was required to restore operability." *Id.* He escalated this concern to Ken Ohr—Plant Manager—who responded that he would let the Operations Department and Engineering address his concern. May 26, 2015 Email Thread Between Brian Magnuson and Kenneth Ohr, Resp. Mot. Summ. J. Ex. 5, ECF No. 165 at 1–2. The parties do not direct the Court to evidence showing whether any corrective actions were taken in response to Magnuson's IR.

### D. Security Clearance Decisions

#### 1. June 15 Out-of-the-Box Evaluation and "Bully" Accusations

During the week of June 15, 2015, Magnuson and others—including Harold Coers, Steve Daigneau, and Walt Coombs—participated in training exercises which were required by the NRC to retain their licenses, including an out-of-the-box simulation conducted on June 15 ("the June 15 OBE"). The June 15 OBE involved a simulated emergency event that required the crew to respond in accordance with the Station's operating procedures. At this point, Kimler had been replaced with a new Operations Director, Hal Dodd, who was serving as the Lead Evaluator for this OBE. The evaluators who observed the June 15 OBE also included Jed Ferdinand, an Operations Training Instructor. Each operators' performance during trainings would be rated by the evaluators. If an operator received a "Needs Improvement" ("NI") rating, his qualifications would be administratively suspended—his "quals" would be "pulled"—preventing him from standing shift in the control room. *E.g.*, Magnuson Dep. Vol. II 204:11, Mot. Summ. J. Ex. 2, ECF No. 140-4. Qualifications would not be restored until the operator completed a remediation plan to rectify the identified deficiencies. *E.g.*, *id.* at 191:23–192:7. Remediation would generally be completed during that training week and did not result in any loss of pay or other discipline.

16

The June 15 OBE led to two NI ratings for Magnuson's crew. The first NI rating related to whether the crew was appropriately conservative and maintained enough "margin" on certain indicators. *See* Williams Investigation Notes 952–53, 966, 969,[5] Resp. Mot. Summ. J. Ex. 13, ECF No. 165-4. As relevant to Magnuson's claims, there was some question as to whether Coers allowed a particular indicator to drop below the line. *Id.* at 968. Dodd did not think that the indicator went below the line. *Id.* at 952. Ferdinand, on the other hand, ran the numbers and thought that Coers had in fact crossed the line. *Id.* at 956. Ferdinand stated that Dodd told him to not tell the crew that he thought that Coers had crossed the line because Dodd thought that the crew had gotten the message and did not need more negative feedback. *Id.* at 957. He also stated that Magnuson told him: "You withheld important information," and "this information would have resulted in a crew failure." *Id.* Ferdinand disagreed that crossing the line would result in an automatic failure. *Id.*

The second NI rating related to the proper response during an Anticipated Transient Without Scram ("ATWS") scenario.[6] The technical details are complex but ultimately boil down to the following: There were two sets of responses that were available, each with their own risks, and ExGen's procedures designated one set of responses as preferred. During the June 2015 OBE, Magnuson's crew used an alternate system—Core Spray—without first verifying and communicating the unavailability of the preferred systems. *See* Williams Investigation Notes 953, 967–68. Magnuson vigorously disagreed with waiting before utilizing the alternate system.

---

[5] Page citations for unpaginated exhibits refer to the Bates number—omitting the preceding zeros—in the bottom-right corner of the document, when available.

[6] "An ATWS is one of the 'worst case' accidents, consideration of which frequently motivates the NRC to take regulatory action. Such an accident could happen if the scram system (which provides a highly reliable means of shutting down the reactor) fails to work during a reactor event (anticipated transient)." *Anticipated transient without scram (ATWS)*, U.S. Nuclear Regul. Comm'n, https://www.nrc.gov/reading-rm/basic-ref/glossary/anticipated-transient-without-scram-atws.html (Mar. 9, 2021). The NRC defines "transient" as "[a] change in the reactor coolant system temperature, pressure, or both, attributed to a change in the reactor's power output." *Transient*, U.S. Nuclear Regul. Comm'n, https://www.nrc.gov/reading-rm/basic-ref/glossary/transient.html (Mar. 9, 2021).

*See* AR 02518572 Report 5973, Darin Decl. Ex. 14, ECF No. 140-16 at 66–70 ("When questioned by the crew if [Dodd] intended they should wait for the reactor to depressurize 50 [pounds per square inch gauge], he answered: 'Yes.' (Doing so risks fuel damage.)"). Shortly thereafter, a subsequent review by Wake agreed with Dodd's instructions regarding the preferred system, *see id.* at 5974, as did seven others from the Emergency Procedures Committee who contemporaneously reviewed a similar scenario based on the IRs that Magnuson authored about the incident, *see* AR 02545522-02 10813–14, Darin Decl. Ex. 15., ECF No. 140-16 at 71–77.

A debrief was held as part of the June 15 OBE to allow for a discussion of the crew's performance and observations thereof. The crew's qualifications would be pulled pending remediation, as was the usual practice for crews receiving NI ratings. Magnuson and his crew did not realize that their qualifications had been pulled until the following day, June 16, 2015. *See* Magnuson Dep. Vol. II 193:5–195:16; Williams Investigation Notes 956. Magnuson and his crew disagreed that their qualifications should have been pulled, and Magnuson discussed the situation with Darin on June 16. That same day, Magnuson sent an email to his crew, wherein he asserted that Darin "agreed [that pulling their qualifications] was wrong," that Darin would speak with Dodd about it the next day, and that he "fully expect[ed] to have [their] quals reinstated without remediation." June 16, 2015 Email from Brian Magnuson to Stephen Daigneau et al., Mot. Summ. J. Ex. 41, ECF No. 141-21 at 3. He also added that he had "heard [Dodd]'s behavior characterized by the word bully on multiple occasions," that such bullying was "fundamentally wrong and in nuclear power it [wa]s dangerous," and instructed his crew to not "let it influence [their] decision making." *Id.*

The next morning, June 17, Magnuson sent an email to Dodd, Darin, and others, wherein he stated: "I have carefully reviewed the performance of my simulator crew. It did not warrant

18

removing quals.  In good conscience, I cannot develop a remediation when one is not warranted. If you provide me with a remediation plan, I will either comply or document my basis for not, in an IR."  June 17, 2015 Email from Brian Magnuson to Jason Smith et al., Darin Decl. Ex. 12, ECF No. 140-16 at 60–62.  Darin replied and encouraged him to talk to Wake and Dodd, stating that "[i]n the end it [wa]s [Wake] and [Dodd']s call as [Darin] stated last night [on June 16]." June 17, 2015 Email from Scott Darin to Brian Magnuson et al., Darin Decl. Ex. 13, ECF No. 140-16 at 63–65.

Dodd met with Magnuson and his crew on June 18 to discuss the NI ratings again.  The meeting became heated, and accounts vary as to what was said and done.[7]  An essential point of contention was whether Dodd had instructed the crew to wait until a certain pressure indicator changed by 50 pounds.  According to Dodd, at the first debrief on June 15, the crew demanded that he specify an amount of pressure which would determine how long they should wait before trying the alternate system, and after the crew was unsatisfied by his answer that it would depend upon system performance, he acquiesced to the crew's suggestion of 50 pounds.  Williams Meeting Notes 964.  He further asserted that during the second debrief, he admitted it was wrong to give a specific number and emphasized his primary point that the crew needed to try the preferred system first and give it a chance.  *Id.*  Coers disagreed that Dodd forthrightly admitted

---

[7] Williams' investigation notes contemporaneously captured paraphrased versions of these varying accounts.  *See* Williams Meeting Notes 954 (Dodd: "[Magnuson] was emotional: it was passionate; his face got red, point[ed] his finger a little bit"); *id.* at 962 (Magnuson: "[Dodd] said and barked out, 'I don't want to talk about the 50 lbs.[']"); *id.* at 967 (Coombs: "[Dodd] and [Magnuson] were going back/forth about the 50 lbs.  [Magnuson] is very passionate about that you don't wait 50 lbs.  It was so long, I started to tune things out. . . . [Magnuson] mentioned something about bullying"); *id.* at 969–70 (Coers: "[Dodd] and [Magnuson] were discussing the 50 lbs. . . . At one point, [Dodd] leaned over to [Magnuson], and [Dodd] said, '[Magnuson] I'm warning you.'  I can't tell you the words [that he said] afterwards. . . . [Magnuson] said, I feel you are being a bully[] and I'm not going to put up with it"); *see also* Magnuson Dep. Vol II 275:5–8 ("[Dodd] walked over to the desk or table that I was sitting at, put his fists on the desk right in front of me, leaned over and said, Brian, I don't want to hear the 50 pounds again."); *id.* at 275:9–277:10 (testifying that another employee told him to sit down after he stood up to accuse Dodd of suppressing information from his crew).

the error of giving a specific number.  *See id.* at 969 ("[Dodd] and [Magnuson] were discussing the 50 lbs.  To everyone in the room it was the wrong thing to do.  [Dodd] did [al]lude to it but never really said it.").  Magnuson stated that Dodd "misrepresented himself" at the second debrief and that Dodd in fact outright denied ever saying to wait until 50 pounds.  *Id.* at 962.[8] Darin and Dodd had never had an employee refuse to develop a remediation plan before, and Magnuson eventually submitted a remediation plan on or about June 19, which was approved and led to the reinstatement of the crew's qualifications.

### 2. Techau's Fitness for Duty Referral

Also on June 18, 2015, a teleconference with management, the Employee Concerns Program, HR, and Legal was held to discuss Magnuson's recent behaviors with Techau. Management briefed the other participants on what had transpired since the June 15 OBE. Specifically, Darin reported that Magnuson's June 16 email had mischaracterized the discussion that they had that day, and that he had not agreed that the decision to pull the crew's qualifications was wrong, nor that their qualifications would be restored without remediation. Management reported that Magnuson had accused Dodd of being a bully, and that Magnuson had not previously made such an accusation against Dodd.  They reported further that they found Magnuson's recent behavior to be like his previous concerning behaviors and described how Magnuson had become emotional, got out of his chair, stood, and made accusations against Dodd in front of his crew until he was told to sit down.  Another call was held on June 19, 2015,

---

[8] Magnuson asserts that he attempted to meet with HR after the second debrief and sent an email to HR on June 18, but he was unable to meet with anyone.  Resp. Mot. Summ. J. 117 (citing Ex. 21).  He failed to attach his supporting evidence, *see* Reply Mot. Summ. J. 18–19, which is an October 9, 2015 email chain between Magnuson and human resources, *see* Fichtel Decl. ¶ 21, ECF No. 164-1.  ExGen provided this email chain in its reply.  *See* Oct. 9, 2015 Email Chain Between Brian Magnuson and Heather Daniels, Reply Mot. Summ. J. Ex. F, ECF No. 173-6.  But it merely includes a months-later statement by Magnuson that he sent an email on June 18, which is inadmissible hearsay to prove that he in fact sent an email on June 18.  As Magnuson failed to support this fact with admissible evidence, the Court considers it no further.

wherein Magnuson and Dodd's performance were discussed.  Techau Decl. ¶ 42, Mot. Summ. J.
Ex. 21, ECF No. 141-1 at 1–27.

Techau decided on June 18, 2015 that she should refer Magnuson to the MRO for an FFD
evaluation.[9]  She had attended calls with management in November 2014, January 2015, and
June 2015, including EIAC calls, and she saw a pattern of behaviors which demonstrated
concerns about Magnuson's trustworthiness, reliability, and a tendency to make allegations
without providing supporting evidence.  On the June 19 call, she requested that HR prepare a
timeline of Magnuson's behaviors which she could present to the MRO.[10]  Management also
decided to investigate Magnuson's allegations that people had referred to Dodd as a bully.
Petersen prepared the timeline, and Toni Williams of HR conducted the investigation.  While
Techau was waiting for Petersen's timeline and after Magnuson had completed the required
remediation plan and his crew's qualifications were restored, Magnuson submitted IR 2518572
on June 23, 2015, to document his complaints about the June 15 OBE.  In addition to Wake and
the seven members of the Emergency Procedures Committee, the NRC later investigated the
issues raised by IR 2518572 and concluded that the Station and Dodd were correct.  Techau

---

[9] Magnuson disputes this fact—again without citing any evidence—by stating that "Plaintiff lacks personal knowledge of the claimed discussions, and given defendant relies solely on witness declarations for this point, credibility will be a key issue, properly evaluated at trial."  Resp. Mot. Summ. J. 56.  However, in Magnuson's counterstatement of undisputed facts, he states that "[o]n June 18, 2015, Techau decided that she should send Magnuson's behaviors to the MRO for an FFD evaluation."  Resp. Mot. Summ. J. 117.  Magnuson's lack of personal knowledge does not create a dispute as to when Techau made this decision.  As Magnuson fails to direct the Court to evidence disputing this fact and because he himself asserts that June 18 is when Techau made her decision to refer him to the MRO, the Court deems this fact to be undisputed.  *See* Civil LR 7.1(D)(2)(b).
[10] Magnuson asserts that this timeline was requested by the EIAC on or about June 25, 2015, after he had submitted IR 2518572, which documented his complaints about the June 15 OBE.  Resp. Mot. Summ. J. 56–57; *see also* AR 02518572.  He does not direct the Court to the evidence supporting his assertion, namely testimony that Techau supposedly gave to the NRC.  To support that the timeline was requested on June 19, 2015, Techau's declaration points to a June 24, 2015 email, wherein she stated that "on the call last Friday [June 19, 2015] there were actions that [we]re being taken and process that Ethics was reviewing then providing to [her] to go to MRO for review."  June 24, 2015 Email from Susan Techau to Cindy Petersen et al., Techau Decl. Ex. 7, ECF No. 141-1 at 277–80; Techau Decl. ¶ 43.  Considering this additional support and Magnuson's failure to direct the Court to the evidence which he argues creates a material dispute of fact, the Court deems this fact to be undisputed.  *See* Civil LR 7.1(D)(2)(b).

reviewed IR 2518572 as well as the review conducted by the Emergency Procedures Committee members and found that those materials reinforced her conclusion to refer Magnuson.

On June 25, 2015, Techau forwarded information that she had received from Petersen to Dr. Barbara Pohlman, the MRO. That information included the reviews of the June 15 OBE, Magnuson's August 28, 2014 email wherein he described his motivation to go after Kimler's job, emails from the Monticello OPEX incident, Magnuson's accusation that the INPO inspector was unethical for distorting the truth regarding the sunflower seeds on the control room floor, and his accusation that Wake had leaked INPO testing materials to Merema. Techau asked Dr. Pohlman if she could call her, stating that:

> It appears [Magnuson] has an inflated opinion of himself 'grandiose' type that he is the smartest person and has been accusing others of things without any facts, it appears to deflect the focus on him. This had been identified for a while now and the site has been working with him on his actions and sent him through a performance assessment. This started when he was not allowed to transfer to a new job. When there is a discussion, what was said and what he says was said are 2 different things?? Wondering if he has a problem with truthfulness?

June 25, 2015 Email from Susan Techau to Barbara Pohlman, Pohlman Decl. Ex. 3, Mot. Summ. J. Ex. 20, ECF No. 140-23 at 2. Techau and Dr. Pohlman had a call that same day, discussing the materials compiled by Petersen and Techau's assessment of Magnuson's behaviors. Dr. Pohlman concluded that "[t]he behavior of Brian Magnuson clearly ha[d] become disruptive to the secure nuclear work environment" and she "recommend[ed] that a Mandatory EAP Evaluation be completed on or before July 10, 2015." June 25, 2015 Email from Barbara Pohlman to Susan Techau, Pohlman Decl. Ex. 5, ECF No. 140-23 at 15. Techau was obligated by NRC regulations to implement Dr. Pohlman's fitness determinations by placing a temporary hold on Magnuson's unescorted access pending evaluation of his FFD, a final fitness determination, and completion of the AAP. That same day, Magnuson was placed on leave with

a temporary hold on his unescorted access.  Gaps in an individual's unescorted access

authorization are recorded in a database, the Personnel Access Database System ("PADS").

### 3.  Magnuson's EAP Referral

On June 30, 2015, Techau sent an email to Brooke Dumais—a consultant at Optum

Health, which was ExGen's contracted EAP medical provider—and Dr. Pohlman which outlined

the issues to be evaluated during Magnuson's EAP, namely his misrepresentations of facts and

conversations, stubbornness, self-assurance that he was always right, tendency to make

accusations without factual support, and overly emotional responses.  Dr. Pohlman agreed with

Techau's identified issues.  Techau stressed that "IR [2518572] [wa]s NOT the center or trigger

for this interview as the content is only one piece of continued type of behavior.  It was not that

he wrote the IR but the content [they were] concerned about that it was not factual."  June 30,

2015 Email from Susan Techau to Brooke Dumais and Barbara Pohlman, Pohlman Decl. Ex. 4,

ECF No. 140-23 at 12–13.[11]

Magnuson was referred to a social worker, Lisa Curry, for his required EAP evaluation.

On July 8, 2015, Pohlman received a report from Curry which stated that Magnuson had

completed three sessions with her and that she recommended that he be considered for return to

work while also attending three more outpatient sessions, noting that it would be ExGen's right

and responsibility to determine when and how Magnuson could return.  The report also included

two diagnoses for Magnuson: "Axis I: 309.3 Adjustment Disorder unspecified" and "Axis IV:

interpersonal/work."  July 8, 2015 Curry Report, Pohlman Decl. Ex. 8, ECF No. 140-23 at 21–

---

[11] Magnuson testified that an ExGen employee, "Ms. Yerkes," told him that his "security clearance [wa]s being removed or revoked, whatever."  Magnuson Dep. Vol. II 282:6–20.  He further asserts that Yerkes told him that ExGen was acting against his unescorted access authorization because he wrote "an emotionally driven IR."  Resp. Mot. Summ. J. 60 (citing Yerkes Conversation Log, June 25, 2015).  Magnuson fails to direct the Court to this conversation log, and such a log does not appear in any of the exhibits submitted by the parties.  The Court deems the fact that Techau said that Magnuson's IR was not the trigger of his referral to be undisputed.  *See* Civil LR 7.1(D)(2)(b).

23.  That same day, Dr. Pohlman determined Magnuson was fit for duty and that his unescorted access authorization should be reinstated, so long as he complied with the medical provider's treatment recommendations.  On July 29, 2015, Dr. Pohlman received a report from the EAP medical provider that Magnuson had completed his EAP recommendations, and Dr. Pohlman submitted an access authorization form which stated that Magnuson's treatment was completed and that she had no further recommendations.

A day later, on July 30, 2015, Techau spoke with Williams about the investigation into Magnuson's accusation that he had heard others refer to Dodd as a bully.  Although Coers characterized Dodd's behavior towards Magnuson as "bullying" and Magnuson said that he heard Daigneau use the word "bully" in some unspecified context, Williams Investigation Notes 959, 970, Magnuson had not provided any concrete details to support his accusation, *see id.* at 958–60 (recording that Magnuson stated: "At this point, I don't have any solid evidence").  Williams informed Techau that the results of the investigation were "inconclusive."  Techau Dep. 70:17–71:17.  Techau decided to give Magnuson the benefit of the doubt regarding his candor and chose not to render a denial of unescorted access in light of Magnuson's successful completion of his EAP requirements as well as Dr. Pohlman's determination that he was fit for duty.  Techau asked Dr. Pohlman to call Magnuson and reinforce the behavioral changes that ExGen expected from him.  Dr. Pohlman made that call and reported to Techau that she believed that Magnuson understood.  Techau then removed the temporary hold on Magnuson's unescorted access and cleared him to participate in the first available in-processing procedure, which was required to restore unescorted access authorization, on August 18, 2015.  He returned to work with reinstated unescorted access authorization the next day, August 19, 2015.  Upon his return to work, he informed ExGen that on August 6, 2015 he had submitted his concerns stemming

24

from the June 15 OBE and IR 2518572 to the NRC, alleging that ExGen was compromising the integrity of its operator-training program. *See* Answer First Suppl. Compl. ¶ 29, ECF No. 87. During the period of suspended unescorted access authorization, Magnuson received his full pay and continued to participate in ExGen's benefit plans. The eight-week gap in Magnuson's unescorted access authorization was recorded in PADS as being terminated favorably.

### E.  Planned Change of Shift Manager Duties

In late 2014 and early 2015, INPO conducted an evaluation of the Station which identified specific areas where the performance of the Operations Department could be improved. Once Dodd had replaced Kimler in April 2015, one of Dodd's first tasks as Operations Director was to review and address the areas of improvement which INPO had identified. The Operations Department assessed the Strengths, Weaknesses, Opportunities, and Talents ("SWOT Assessment") of everyone within the Operations Department. The SWOT Assessment included an interview via a structured interview guide and a process to assess leadership behaviors and competencies.

On April 15, 2015, Magnuson was interviewed by Dodd and an HR employee, Heather Daniels. At the end of the interview, Dodd and Daniels discussed their impressions of Magnuson and concluded that Magnuson's answers showed that he needed work to further his leadership development. They reached a consensus that Magnuson would likely not retain his full Shift Manager duties after the SWOT Assessment was completed. Dodd was not aware of, nor had he been involved in, any of the EIAC calls when he and Daniels interviewed Magnuson.[12] HR employees tallied the interviewees' assessment scores into a spreadsheet, and

---

[12] ExGen asserts that Dodd was also unaware of any of the issues that were addressed in the EIAC calls. Mot. Summ. J. 36. Magnuson does not properly dispute that Dodd was unaware of any of the issues discussed during the EIAC calls about Magnuson in his "Paragraph by Paragraph Response to ExGen's Statement of Undisputed Material Facts," *see* Resp. Mot. Summ. J. 77 (indicating that the fact was "Disputed, material" but failing to offer any

25

Magnuson was the lowest-rated employee.  The penultimate-rated employee was another Shift Manager, Michael MacLennan.  Dodd received a copy of this spreadsheet on or before June 15, 2015.  Dodd decided that both Magnuson and MacLennan would not retain their full Shift Manager responsibilities but would retain their Shift Manager title and compensation, based on those ratings and his assessment of their leadership development.  As part of the changes stemming from the SWOT Assessment, other Senior Reactor Operators would be moved to Shift Manager roles and crew compositions would be altered to rebalance each crew's leadership and technical skills.

ExGen decided to delay implementing Dodd's decision because Magnuson was on leave pending the results of his EAP evaluation.  ExGen told MacLennan about the changes in his duties in August 2015, and Magnuson was told about the changes in his duties on August 19, 2015, after his unescorted access authorization was in-processed.  Dodd intended that Magnuson and MacLennan would be able to work their way back into their full Shift Manager roles if they could address the identified leadership development issues.  Dodd's declaration states that when making his decisions, he did not consider any IRs or alleged nuclear safety complaints that any of the employees had raised, or any absence thereof.  Dodd Decl. ¶ 18, Mot. Summ. J. Ex. 16, ECF No. 140-18.  Magnuson testified that he was not aware of any protected activities engaged in by MacLennan that would have served as a basis for MacLennan's reassignment.  Magnuson Dep. Vol. II 298:8–15.

citations or further argument).  However, Magnuson described the INPO cheating incident during his interview with Dodd and Daniels.  *See* Dodd Dep. 40:6–41:24, Mot. Summ. J. Ex. 8, ECF No. 140-10. And Magnuson relies upon Dodd's knowledge of the INPO cheating incident in his argument section.  Resp. Mot. Summ. J. 141–42.  No evidence demonstrates that Dodd was aware of the topics discussed in the EIAC calls prior to his interview of Magnuson, but because Magnuson discussed it during the interview, the evidence shows that Dodd knew about at least the INPO cheating incident by the time he decided to reassign Magnuson's shift-manager duties.  *See* Dodd Dep. 40:6–41:24.

### F. Reassignment to Training Department

Upon Magnuson's return to work in August 2015, he spent several weeks in refresher training and test-taking which was necessary for him to resume licensed duties in the Station's control room. During this time, Magnuson was still reporting to Dodd, but had "very little, if any, contact with him." Magnuson Dep. Vol. IV 613:1–11, Mot. Summ. J. Ex. 4, ECF No. 140-6. Magnuson testified that ExGen was withholding training from him, and that Wake did not respond to Magnuson's emails requesting that Wake provide him with the final aspects of his training. *Id.* at 615:18–618:8. On September 16, 2015, Magnuson received an email stating that the plan was for him to work on two projects for a group within the Operations Department which, like all groups within the Operations Department, reported to Dodd. Magnuson replied: "Is it your intent that I work for Dodd while my allegation against him remains unresolved?" Sept. 16, 2015 Email from Brian Magnuson to Jeremy Bries et al., Mot. Summ. J. Ex. 45, ECF No. 141-25 at 2. Magnuson was referring to his August 6, 2015 complaint to the NRC which was based in part on Dodd's handling of the June 15 OBE.[13] Darin was shown Magnuson's response and Darin concluded that the need for split-second decisions and willingness to follow procedures precluded Magnuson from working in the Operations Department if he was unwilling to work for Dodd. Darin decided to temporarily assign Magnuson to the Training Department. Three considerations informed his decision: (1) the Training Department did not report to Dodd; (2) the Training Department was, at that point, relying upon contractors to supply the training,

---

[13] In his August 6, 2015 submission to the NRC, Magnuson stated:

> Nuclear safety is dependent upon the training and qualifications of licensed operators. I initiated IR 2518572 Lead Evaluator's Flawed Direction Left Unchecked by Training, based on compelling evidence our training department had been intimidated and suppressed, and as a result, they were, in effect, negligent and irresponsible—compromising the integrity of our accredited Licensed Operator Training and allowing negative direction to be propagated.

Answer First Suppl. Compl. ¶ 29.

skills, and knowledge of a Senior Reactor Operator like Magnuson; and (3) it was common for Operations Department employees to be assigned to the Training Department when needed.

Later that same day, Petersen replied to Magnuson, stating:

Your email suggests you have concerns about working with Hal Dodd while your pending allegations regarding his conduct and [ExGen]'s investigation of that conduct remain outstanding. We understand these concerns. I also understand that there is currently work available for you to do on a temporary basis in the Training Department and that you are scheduled to begin vacation on Friday, September 18 through the following week. . . . Upon your return from vacation you will maintain the temporary assignment in training until we evaluate further an appropriate assignment for you pending the resolution of your allegations.

Sept. 16, 2015 Email from Cindy Petersen to Brain Magnuson, Mot. Summ. J. Ex. 45, ECF No. 141-25 at 2. Magnuson did not correct Petersen on his willingness to work with Dodd, nor did he respond to this email.[14] He testified that it would "[p]robably not" have been in the best interest of the Station for him to be in a position working for Dodd. Magnuson Dep. Vol. II 305:23–306:5. During this period, Magnuson retained his Shift Manager title, salary, pay grade, management level classification, benefits, and bonus target. He was also allowed to participate in all senior reactor operator requalification training and exams, which were necessary to maintain his NRC license.

---

[14] Magnuson attempts to dispute that "he did nothing to correct ExGen's understanding that he was unwilling to work under Dodd at the time" by pointing to a record created by Darin of an October 20, 2016 conversation between Magnuson, Darin, and another employee. *See* Resp. Mot. Summ. J. 82 (citing Meeting Notes Digital Plant Opportunity, Mot. Summ. J. Ex. 50, ECF No. 141-30); *see also* Replies Resp. ExGen's Facts ¶ 204 (acknowledging the typographical error in the cited exhibit and that the meeting occurred in October of 2016). Based on this record, Magnuson asserts that he never said that he could not work for Dodd, but that it would merely be problematic. Resp. Mot. Summ. J. 82–83. Magnuson's selective quotation from this record omits Darin's reply, wherein Darin stated that he considered Magnuson's distinction to be one without a difference, in that he considered an outright refusal to work for Dodd and Wake and an opinion that such an arrangement to be problematic to be "the same thing as far as [Darin was] concerned." Meeting Notes Digital Plant Opportunity. In any event, Magnuson fails to dispute that he did not correct Petersen's impression that he was refusing to work for Dodd and Wake while his allegations against them remained outstanding. The Court deems this fact to be undisputed.

### G.  Unpaid Leave of Absence

In December 2015, Magnuson filed a complaint with OSHA, and OSHA informed ExGen of this complaint.  Answer First Suppl. Compl. ¶ 31.  Internally, Magnuson expressed his displeasure with being reassigned to the Training Department and being tasked with becoming a subject-matter expert.  He testified that while he was assigned to the Training Department, he was given "very little meaningful work for months at a time."  Magnuson Dep. Vol. III 87:15–21, Mot. Summ. J. Ex. 3, ECF No. 140-5.  Early on in his tenure in the Training Department, his duties for a few days involved nothing more than shredding paper.  Magnuson Dep. Vol. II 312:1–314:13.

Following an April 20, 2016 meeting between Magnuson, Darin, and HR Manager Drew Bush, he reaffirmed his statement that he was "not interested in a position in training" because he had "no experience, aptitude, or inclination" and "would consider it further retaliation."  Apr. 20, 2016 Email from Brian Magnuson to Scott Darin and Drew Bush, Mot. Summ. J. Ex. 47, ECF No. 141-27.  He further stated: "While I did say my career interests --Reg Assurance, Engineering, etc --have not changed, I want to make it clear: given the discriminatory actions [ExGen] has taken against me, I do not see any career path in [ExGen] without intervention and protection from the NRC and [DOL]."  *Id.*  On another occasion, he stated that "[i]nvoluntary re-assignments to a training position [we]re commonly made as disciplinary action for job related performance issues or events," and that he thought that "[t]his transfer to a position that [wa]s recognized to have a lesser status or be less desirable constitute[d] retaliation and discrimination."  May 12, 2016 Email from Brain Magnuson to Derek Drockelman et al., Mot. Summ. J. Ex. 48, ECF No. 141-28 at 2–3 (quotation marks omitted).

Various managers raised alternative assignments with Magnuson, without success.  For example, the Training Director, Edward Pannell, offered him a procedure-writing position on the NetPower Team, which would involve traveling to various ExGen locations and dealing with employees outside the nuclear fleet.  Magnuson stated in an email that he had replied to that offer by stating that he was "not a procedure writer and NetPower [wa]s not nuclear."  July 27, 2016 Email from Brain Magnuson to Edward Pannell, Mot. Summ. J. Ex. 48, ECF No. 141-28 at 4. He further stated: "While waiting for resolution [of my NRC and DOL complaints], I will do whatever job I am directed to do; however, I will not volunteer for reassignment or further discrimination."  *Id.*

During the week of September 26, 2016, Magnuson attended requalification training for his NRC operating license.  A September 28, 2016 training required Magnuson and the crew to which he was assigned to simulate operating actions to be taken in an emergent event.  This training was observed by Darin.  Magnuson served as the Unit Supervisor for the training. Magnuson Dep. Vol. II 341:8–11.  During the training, an instructor and a member of the crew coached Magnuson to take a certain action, which he did not do.  Darin joined the simulation debrief and found that Magnuson continued to be unreceptive to feedback.  Darin concluded that Magnuson failed to accept the coaching and did not sufficiently change his behavior or direction to the crew.[15]

---

[15] Magnuson disputes the accuracy of Darin's observations.  *See* Resp. Mot. Summ. J. 88–89.  However, during his deposition, he acknowledged that he decided to ignore the coaching to prioritize other issues.  *See* Magnuson Dep. Vol. II 342:20–343:3.  He also relies upon a portion of his declaration which consists largely of *ipse dixit* and a recitation of an email not included in the materials submitted to the Court.  *See* Magnuson Decl. ¶¶ 155–61.  Even the email does not support Magnuson's purported dispute, as that email allegedly confirmed that Magnuson was "reluctant" to act as coached and also did not act upon the crewmember's coaching.  *Id.* ¶ 159.  In any event, Magnuson's declaration does not create a material dispute regarding what Darin believed he observed and the conclusions which Darin drew from those observations about Magnuson's willingness to accept coaching from others, such that the Court deems this fact to be undisputed.

Shortly thereafter, Magnuson wrote on a form related to achieving qualification as a subject-matter expert: "I OBJECT TO BEING AN INSTRUCTOR.  I BELIEVE IT IS DISCRIMINATORY AND RETALIATORY."  Classroom Instructor Evaluation Form 4, Darin Decl. Ex. 20, ECF No. 140-16 at 88–92.  Magnuson wrote that statement on the form because he did not want to be in the Training Department.  Darin also learned that Magnuson stood in front of a training class and announced to the class that he did not want to work in the Training Department and that he considered the assignment to be retaliatory.  Magnuson testified that these were planned statements and that class "was the first and only class [he] ever taught as a . . . expert."  Magnuson Dep. Vol. II 321:18–322:18.  Darin concluded that Magnuson could no longer work in the Training Department because his behaviors and statements were interfering with the quality of ExGen's training program.  The Training Department was subject to audit by the NRC and INPO, such that retaining an employee who protested the assignment in a written document which was itself subject to audit risked the accredited status of ExGen's training program.  Darin also concluded that returning Magnuson to the Operations Department was not viable because of his issues with Dodd and his continued inflexibility with respect to coaching.

After these incidents, on October 20, 2016, Darin met with Magnuson to discuss an opportunity to join the Digital Plant Team, which was led by Nuclear Corporate Innovation and required someone with an operations background who could evaluate digital options and solutions.  Darin thought that he would be a good fit for the team, and he said that the assignment would enable him to maintain his NRC operator's license.  Magnuson stated that he did not want to consider volunteering for any job opportunities until the investigations into his allegations were complete.  He affirmed that it would be problematic to work under Wake and Dodd, to which Darin replied that he considered that sentiment to be the same as refusing to work under

31

Wake and Dodd.  Responding to Darin's inquiry, Magnuson stated that it would be more efficient for Darin to stop bringing him volunteer opportunities while his investigations were open and that he did not want to consider any opportunities besides his old position.  Magnuson declined to volunteer for the Digital Plant Team.

After that October 20 meeting, Darin decided that ExGen had exhausted its efforts to satisfy Magnuson and began to consider placing him on an unpaid leave of absence.  That absence would place the onus on Magnuson to seek out positions or assignments in which he was interested, as well as encouraging him to sign a written commitment to address the inappropriate behaviors which had resurfaced.  Darin had not decided to terminate Magnuson, which would have required an additional consensus process involving other decisionmakers.  Darin's decision to place Magnuson on an unpaid leave of absence was made before Magnuson submitted four IRs on October 28, 2016.

On November 2, 2016, Bush and another manager met with Magnuson and gave him a letter which informed him that he was being placed on an unpaid leave of absence.  The behaviors which had been the subject of his EAP referral had resurfaced and the letter explained that those behaviors were unacceptable in a nuclear power plant.  After recounting Magnuson's experiences in the Training Department and his decisions to not volunteer for other positions or projects, the letter informed him that he was "relieved from duties effective immediately."  Nov. 2, 2016 Letter from Drew Bush to Brian Magnuson 2, Mot. Summ. J. Ex. 52, ECF No. 141-32. It also informed him that if he wished to be considered for other job opportunities, he should contact Bush and that ExGen expected a "commitment from [him] to resolve [his] inappropriate behaviors by listening to and accepting the views of others and being flexible and adaptable in [his] interactions."  *Id.* at 3.

32

### H. Position with Corporate and Leaking Investigation

In or about November 2017, Magnuson returned to work in a position in ExGen's corporate office in Warrenville, Illinois.  He continued to hold the title of Shift Manager until March 1, 2018, when his title was changed to Manager-Developmental (E-4).  On March 1, 2019, his title was changed to Lead Emergency Preparedness Specialist (E-4), which is his current position with ExGen.  At some point, Magnuson reached out to the Federal Emergency Management Agency about potential regulatory and safety concerns.  On March 12, 2020, an ExGen employee received a forwarded email from the agency which revealed that Magnuson had used his personal email account to send ExGen information to an outside entity.  Mar. 12, 2020 Email from Dennis Moore to Michelle Draxton et al., Genualdi Decl. Ex. 7, Mot. Summ. J. Ex. 17, ECF No. 140-19 at 63–64 ("I noticed that Brian's first email originated from his personal email account.").  Vincenzo Genualdi, a Senior Security Specialist for Exelon Business Services Company, was assigned to investigate whether Magnuson had violated policies by sending confidential company information to and from his personal email address.  Genualdi had no knowledge of any complaints by Magnuson against ExGen about safety issue reports.

ExGen employees were prohibited by policy from sending confidential company information to or from their personal email addresses.  Magnuson completed training on Exelon Corporation's ("Exelon")[16] Corporate Code of Business, which required employees to comply with the policies against using personal email addresses, yearly between 2018 and 2020.  A digital forensic investigation identified that Magnuson had sent numerous emails from his company email address to his personal email address and at least one confidential and proprietary document.  A second digital forensic examination showed even more emails and

---

[16] At the time, Exelon was the parent corporation of ExGen.  *See supra* n.1.

attachments Magnuson sent.  Genualdi interviewed Magnuson by Skype alongside Exelon Senior

Security Specialist Pierre Petit.  Genauldi and Petit concluded that Magnuson had violated

ExGen's policies.  Genualdi sent Magnuson a standard attestation form asking him to execute

and return the document.  Magnuson did not sign the standard attestation form.  Instead, he

revised the form and submitted his own version.  He suffered no change to his employment

status, duties, or pay because of the leaking investigation's findings, nor because of his refusal to

sign the Attestation.  Indeed, he remains employed by ExGen.

## II.    Procedural History

As previously mentioned, Magnuson submitted to the NRC his concerns stemming from

the June 15 OBE and IR 2518572 in August 2015 and he informed ExGen that he had done so

when he returned to work that month.  On December 16, 2015, he filed a complaint with OSHA

alleging that the security clearance decisions, planned changes to his Shift Manager duties, and

assignment to the Training Department were discrimination and retaliation for IR 2518572 and

his complaints to the NRC.  On April 28, 2017, he filed a second OSHA complaint alleging that

his unpaid leave beginning in November 2016 was discrimination in retaliation for having filed

IRs in 2016 and for his prior complaints.  The NRC did not sustain Magnuson's claims, and

OSHA dismissed his first and second complaints.  He subsequently filed a third OSHA

complaint on August 21, 2020, alleging that the 2020 leaking investigation was retaliatory.  This

third OSHA complaint was also dismissed.

Magnuson filed a complaint in the United States District Court for the Northern District

of Illinois on November 7, 2019.  Compl. 1, ECF No. 1.  ExGen successfully sought to transfer

the case to this Court, over Magnuson's opposition.  *See* Aug. 30, 2021 Order, ECF No. 65

(Chang, J.).  Magnuson requested leave to file a supplemental complaint which asserted two

additional whistleblower protection claims and added Exelon as a defendant.  Mot. File First

Suppl. Compl. 1, ECF No. 73.  The only claim asserted against Exelon alleged that it violated the

whistleblower protection provision of the Sarbanes Oxley Act ("SOX"), 18 U.S.C. § 1514A.

First Suppl. Compl. ¶¶ 109–15.  The Court granted Magnuson leave to file the supplemental

complaint, over ExGen's opposition.  Feb. 1, 2022 Order, ECF No. 78 (Hawley, M.J.).  Exelon

and ExGen then successfully moved to dismiss with prejudice the SOX claims asserted against

them, and Exelon was terminated as a party to this case.  Feb. 28, 2023 Order 17, ECF No. 129.

Two federal claims and four state claims remain pending.  First Suppl. Compl. ¶¶ 89–

108, 116–59.  For his federal claims, Magnuson asserts two counts which allege that ExGen

violated the whistleblower protection provisions of the Energy Reorganization Act ("ERA"), 42

U.S.C. § 5851—the first count covering the protected activity and adverse actions described in

his first OSHA complaint, First Suppl. Compl. ¶¶ 95–101, and the second count covering the

protected activity and adverse actions described in his second and third OSHA complaints, *id.*

¶¶ 102–08.  Under Illinois law, he asserts that (1) ExGen violated the Illinois Whistleblower Act,

740 ILCS 174/1–30, by retaliating against him for his refusal to violate NRC rules and

regulations, *id.* ¶¶ 130–35; (2) ExGen violated the Illinois Whistleblower Act by retaliating

against him for reporting potential violations of NRC statutes, rules, regulations, orders, and/or

guidance, *id.* ¶¶ 136–41; (3) ExGen engaged in common law retaliatory discharge due to

Magnuson's reporting of health and safety violations which are not actionable under state or

federal whistleblower statutes, *id.* ¶¶ 142–51; and (4) ExGen engaged in common law retaliatory

discharge due to Magnuson's reporting of gross mismanagement and abuse of authority, *id.*

¶¶ 152–59.  The Court has subject matter jurisdiction over the federal claims pursuant to 28

U.S.C. § 1331 and supplemental jurisdiction over the state claims pursuant to 28 U.S.C. § 1367(a).

## DISCUSSION

### I.   Leave to File Excess Reply

ExGen seeks leave to file fifteen excess pages—twenty total—in the argument section of its reply supporting its motion for summary judgment.  Mot. Leave File Excess Reply 1.  The argument section of such a reply is normally limited to five double-spaced pages.  Civil LR 7.1(D)(5).  In support, ExGen notes that: (1) Magnuson's response is 147 pages, (2) his response repeatedly fails to comply with the procedures for properly raising material fact disputes which are articulated in Local Civil Rule 7.1(D)(2) and Federal Rule of Civil Procedure 56; (3) his theory of when his protected activity began differs significantly between his response and his operative complaint; and (4) on May 13, 2024—three days after he filed his response—he filed a Notice of Supplemental Authority re Defendant's Motion for Summary Judgment, ECF No. 169, which argues that the Supreme Court's April 17, 2024 decision in *Muldrow v. City of St. Louis*, 144 S. Ct. 967 (2024), overruled cases upon which ExGen had relied in its motion, Mot. Leave File Excess Reply 1–2.

The Court has previously given the parties leave to file excess pages in their summary judgment briefing.  *See* Feb. 22, 2024 Text Order (granting ExGen leave to file sixteen excess pages of argument); May 10, 2024 Text Order (granting Magnuson leave to file thirty-two excess pages of argument).  Magnuson has not indicated any opposition to ExGen's request to continue this practice in its reply.  The Court finds that Magnuson will not be prejudiced by affording ExGen the same space which he was granted in his response, *cf. Jones v. BNSF Ry. Co.*, 306 F.

Supp. 3d 1060, 1064 (C.D. Ill. 2017), and therefore the Motion for Leave to File Reply in Excess of Five Pages in Support of Motion for Summary Judgment is GRANTED.

## II.    Motion for Summary Judgment

### A.  Legal Standard

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant in a summary judgment motion bears the initial burden of production; it must point the court to the materials in the record that "demonstrate the absence of a genuine issue of material fact" for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the nonmovant bears the ultimate burden of persuasion on a particular issue, however, the movant can meet its initial burden by showing "that there is an absence of evidence to support the nonmoving party's case." *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013) (quotation marks omitted). Once the movant discharges its initial burden, the burden shifts to the nonmovant to "make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex*, 477 U.S. at 322. The court must construe the record in the light most favorable to the nonmovant, *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003), "resolving all factual disputes and drawing all reasonable inferences in favor of [the nonmovant]," *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017). The nonmovant "is not entitled to the benefit of inferences that are supported by only speculation or conjecture." *Nichols v. Mich. City Plant Plan. Dep't*, 755 F.3d 594, 599 (7th Cir. 2014) (quotation marks omitted). "[T]he mere existence of *some* alleged factual dispute is insufficient to defeat a motion for summary judgment," *Dawson v. Brown*, 803 F.3d 829, 833 (7th Cir. 2015) (quotation marks omitted), as

"there must be evidence on which the jury could reasonably find for the [nonmovant]," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

### B.  Analysis

#### 1.  Pre-April 2015 Conduct as Protected Activity

Before addressing the merits of Magnuson's claims, the Court considers whether Magnuson improperly attempted to expand the scope of his claims in his summary judgment response.  Magnuson's operative complaint designates the facts which he alleges show that he engaged in protected activity which caused him to be subjected to adverse employment actions. First Suppl. Compl. ¶¶ 17–43, 45–78.  This factual narrative begins on or about April 13, 2015. *Id.* ¶ 17.  However, his summary judgment response is substantially different from his operative complaint, asserting that the relevant protected activity began in 2014, *see, e.g.*, Resp. Mot. Summ. J. 21–23 (asserting that Magnuson's actions related to the Monticello OPEX were protected activity), as did ExGen's retaliation, *see id.* at 113 (asserting that the October 1, 2014 EIAC call was the "meeting [which] began the series of events constituting [ExGen]'s retaliation against Mr. Magnuson").  ExGen argues that Magnuson's summary judgment response is an improper attempt to amend his complaint.  Reply Mot. Summ. J. 32–34.

"Pleadings shape the litigation, including the scope and cost of discovery. . . . Many efficiencies are lost when claims or defenses are left out of pleadings and a party then attempts to assert them at later stages."  *Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473, 479 (7th Cir. 2019).  "It has long been established that a plaintiff 'may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment.'"  *Dennin v. Waypoint Res. Grp., LLC*, No. 1:19-cv-01012-JES-JEH, 2020 WL 6205836, at *3 (C.D. Ill. Oct. 22, 2020)

(quoting *Anderson v. Donahoe*, 699 F.3d 989, 997 (7th Cir. 2012)).  This long-established

principle requires distinguishing between factual and legal theories:

> When a new argument is made in summary judgment briefing, the correct first step
> is to consider whether it changes the complaint's factual theory, or just the legal
> theories plaintiff has pursued so far.  In the former situation, the plaintiff may be
> attempting in effect to amend its complaint, and the district court has discretion to
> deny the *de facto* amendment and to refuse to consider the new factual claims.  In
> the latter, the court should consider the consequences of allowing the plaintiff's
> new theory.  If it would, for example, cause unreasonable delay, or make it more
> costly or difficult to defend the suit, the district court can and should hold the
> plaintiff to his original theory.  The district judge who is managing the case is
> ordinarily in the best position to answer these questions and to exercise sound
> discretion.

*Chessie Logistics Co. v. Krinos Holdings, Inc.*, 867 F.3d 852, 860 (7th Cir. 2017) (citations

omitted) (quotation marks omitted).  "A claim is the set of operative facts that produce an

assertable right in court and create an entitlement to a remedy.  A theory of relief is the vehicle

for pursuing the claim . . . ."  *Roberts v. Smith & Wesson Brands, Inc.*, 98 F.4th 810, 815 (7th

Cir. 2024) (quotation marks omitted).

The Seventh Circuit's decision in *Abuelyaman v. Illinois State University*, 667 F.3d 800

(7th Cir. 2011), is instructive here.  In that case, a professor described three protected activities

for which he alleged a university discriminated and retaliated against him—a complaint about

using student evaluations; a complaint that another professor was the victim of discrimination;

and his participation in an investigation into another professor's complaint.  *Id.* at 806.  The

Seventh Circuit affirmed the district court's refusal to consider an entirely new fourth factual

basis for retaliation—his participation in an investigation into a different professor's complaint—

which the professor had raised for the first time in his summary judgment response.  *Id.* at 813–

14; *see also Retamozo v. U.S. Bancorp*, No. 21 CV 1652, 2023 WL 5334599, at *6 (N.D. Ill.

Aug. 18, 2023) (refusing to consider newly asserted accommodation requests which predated the

requests described in the plaintiff's complaint).  Conversely, where the plaintiff's factual

allegations consistently sought to impose liability upon the defendants based upon her

employment relationship with them, her change from alleging an agency theory to a joint

employer theory did not allow for the district court to ignore her newly asserted argument.

*Whitaker v. Milwaukee County*, 772 F.3d 802, 808 (7th Cir. 2014).

Although the events which transpired prior to April 2015 are not entirely new facts to the

parties, the characterization of those facts as protected activity is new in this lawsuit.

Magnuson's operative complaint does not describe the conduct and statements relevant to, for

example, the Monticello OPEX in July 2014 to September 2014, the INPO inspector's comments

about the sunflower seeds in fall 2014, and allegations of cheating on INPO testing in January of

2015.  Allowing Magnuson to recharacterize these incidents as protected activity would allow

him to rely upon "operative facts that produce an assertable right in court and create an

entitlement to a remedy" which were not included in his operative complaint—in other words, a

*de facto* amendment.  *See Roberts*, 98 F.4th at 815 (quotation marks omitted).  The Court has

discretion as to whether to allow such an amendment.  *See Chessie Logistics*, 867 F.3d at 860.

Magnuson has had a long career with ExGen, and many of his words and actions could

be characterized as protected activity.  Considering just IRs, he submitted more than 300

between June 19, 2004 and November 20, 2015.  Search of Blob OLE 1–28, Mot. Summ. J. Ex.

22, ECF No 141-2.  The operative complaint gave ExGen notice as to which of Magnuson's

actions over a long career he was arguing were the cause of his alleged retaliation.  Considering a

new starting point for his theory of retaliation would severely prejudice ExGen and the litigation

decisions it made in reliance upon his pleadings.  *See Reed*, 915 F.3d at 479.  The Court

exercises its discretion to hold Magnuson to the factual theory he laid out in his operative

complaint, and only considers activity prior to April 2015 to the extent it is consistent with his

operative complaint's factual theory of liability—that his protected activity began in April 2015,

not at some earlier date.

### 2.  ERA Claims

The ERA's antiretaliation provision provides that employees who believe that they have

been "discharged or otherwise discriminated against" for engaging in protected activity "may,

within 180 days after such violation occurs" file a complaint with the DOL.  42 U.S.C.

§ 5851(b)(1).  The DOL must then "notify the person named in the complaint" of the complaint's

filing, investigate, and reach a decision if no settlement is reached.  *Id.* § 5851(b)(1)–(2)(A).  If

the DOL "has not issued a final decision within 1 year after the filing of a complaint . . . and

there is no showing that such delay is due to the bad faith of the [employee]," the employee can

seek *de novo* review in federal court.  *Id.* § 5851(b)(4).

To establish a *prima facie* case for an ERA whistleblower retaliation claim, an employee

must show by a preponderance of the evidence that "(1) he engaged in a protected activity; (2)

the [employer] knew or suspected . . . that the employee engaged in the protected activity; (3)

[t]he employee suffered an adverse action; and (4) [t]he circumstances were sufficient to raise

the inference that the protected activity was a contributing factor in the adverse action."  *Sanders*

*v. Energy Nw.*, 812 F.3d 1193, 1197 (9th Cir. 2016) (all but first alteration in original) (quotation

marks omitted); *Addis v. Dep't of Lab.*, 575 F.3d 688, 690–91 (7th Cir. 2009) (similar).

Protected activities are those which "implicate safety definitively and specifically."  *Am. Nuclear*

*Res., Inc. v. U.S. Dep't of Lab.*, 134 F.3d 1292, 1295 (6th Cir. 1998).  "The statute explicitly

protects a few acts . . . [but] also includes a "catch-all provision that protects employees 'in any

other action [designed] to carry out the purposes of [the safety statutes]'" related to nuclear

energy.  *Id.* (alterations in original) (quoting 42 U.S.C. § 5851(a)(1)(F)).  Consistent with the

broad remedial purpose of the ERA, protected activity covers internal notifications of safety

concerns, such as complaints made directly to one's supervisor.  *See Kahn v. U.S. Sec'y of Lab.*,

64 F.3d 271, 274 n.3 (7th Cir. 1995), *as modified* (Sept. 7, 1995); *see also Bechtel Constr. Co. v.

Sec'y of Lab.*, 50 F.3d 926, 931–32 (11th Cir. 1995); *Mackowiak v. Univ. Nuclear Sys., Inc.*, 735

F.2d 1159, 1163 (9th Cir. 1984).  Adverse actions are those which affect an employee's

"compensation, terms, conditions, or privileges of employment."  42 U.S.C. § 5851(a)(1).

"Congress intended that ERA's contributing factor standard provide complainants a

lower hurdle to clear than the bar set by other employment statutes."  *Addis*, 575 F.3d at 690.  An

employee need not show that his employer acted with retaliatory intent to satisfy this standard.

*Murray v. UBS Securities, LLC*, 601 U.S. 23, 32 (2024).[17]  If an employee successfully shows a

*prima facie* case, "the burden shifts to the employer to demonstrat[e], by clear and convincing

evidence, that the employer would have taken the same unfavorable personnel action in the

absence of that behavior."  *Id.* at 36 (alteration in original) (quotation marks omitted); *see also* 42

U.S.C. § 5851(b)(3)(D) ("Relief may not be ordered . . . if the employer demonstrates by clear

and convincing evidence that it would have taken the same unfavorable personnel action in the

absence of such behavior.").

Magnuson's operative complaint identifies six categories of retaliation: (1) the Security

Clearance Decisions; (2) reassigning his Shift Manager duties; (3) assigning him to work in the

Training Department; (4) placing him on unpaid leave in November 2016; (5) reinstating him to

a different position at ExGen's corporate office in November 2017; and (6) investigating his

---

[17] The Supreme Court's opinion in *Murray* applies not just to SOX but also "similar whistleblower statutes that protect non-civil-service employees in industries where whistleblowing plays an especially important role in protecting the public welfare" such as the ERA.  *See Murray*. 601 U.S. at 28 & n.1.

personal email account usage and requiring him to sign a standard attestation form in 2020.  First Suppl. Compl. ¶¶ 47–48, 54, 56, 60–61, 63, 66, 71–72, 76.

### a.  Security Clearance Decisions

Magnuson's operative complaint describes as retaliatory five employment actions related to Techau referring him to Dr. Pohlman after the June 15 OBE: (1) placing him on paid leave; (2) suspending his unescorted access authorization; (3) requiring him to participate in a psychological evaluation in June 2015; (4) delaying his return after successfully completing that psychological evaluation; and (5) creating an eight-week gap in his PADS record (collectively "Security Clearance Decisions").  First Suppl. Compl. ¶¶ 47–48, 51–52.  These consequences flowed from Techau's decision to refer Magnuson to the MRO—Dr. Pohlman—for a FFD evaluation.  ExGen does not contest that Magnuson engaged in protected activity when he took actions like submitting IR 2518572, which concerned the June 15 OBE.  Instead, ExGen argues that Magnuson cannot make out a prima *face case* of retaliation under the ERA because, among other arguments, the Security Clearance Decisions were not adverse employment actions.  Mot. Summ. J. 65–68.  ExGen further argues that it has shown by clear and convincing evidence that it would have taken the same actions in the absence of any protected activity.  *Id.* at 68–70.

### i.  Adverse Employment Action

ExGen argues that the Security Clearance Decisions were not adverse employment actions.  Mot. Summ. J. 66–67.  The statutory text for retaliation claims under the ERA is borrowed from the substantive discrimination provisions of Title VII.  *See* 42 U.S.C. § 5851(a)(1) ("No employer may discharge any employee or otherwise discriminate against any employee with respect to his compensation, terms, conditions, or privileges of employment . . . ."); *id.* § 2000e-2(a)(1) (making it unlawful for an employer "to discriminate against any

individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin"); *see also Tenn. Valley Auth.*, 94 N.R.C. 61, 75 (Nov. 3, 2021) (enf't action) ("The language of ERA section 211 and 10 C.F.R. § 50.7 is virtually identical to the language of the substantive antidiscrimination provision of Title VII, not to the broader antiretaliation provision."). After ExGen submitted its summary judgment motion, the Supreme Court issued its decision in *Muldrow v. City of St. Louis*, 601 U.S. 346 (2024), which held that a plaintiff invoking Title VII's substantive antidiscrimination provisions need not show that a transfer subjected him to a harm that was "serious, or substantial, or any similar adjective suggesting that the disadvantage to the employee must exceed a heightened bar," *id.* at 355. Although the harm imposed by an employment action need not be "serious" under *Muldrow*, a plaintiff still needs to "show some harm respecting an identifiable term or condition of employment." *Id.*

In his summary judgment response, Magnuson argues that the Court should apply the Supreme Court's Title VII antiretaliation caselaw and that only a jury can decide whether a challenged action "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Resp. Mot. Summ. J. 139–40 (quoting *White*, 548 U.S. at 68). This is unavailing—the Supreme Court has acknowledged that "Title VII's substantive provision and its antiretaliation provision are not coterminous." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006). The antiretaliation provision covers a broader scope of adverse actions because the statute does not limit its reach to actions that affect the terms and conditions of employment. *Id.* at 64, 66. Because the ERA borrows from Title VII's substantive provision, which does limit its reach to actions that affect the terms and conditions of employment, it would be inappropriate for the Court to apply the Title VII antiretaliation adverse action standard. *See*

*Muldrow,* 601 U.S. at 357–58 (rejecting the city's argument that, for Title VII substantive antidiscrimination claims, the Supreme Court should use the "materially adverse" standard which applies to employment actions in the Title VII antiretaliation context (quoting *Burlington N.*, 548 U.S. at 68)).

Given the similarities in language used by the ERA's antiretaliation provision and Title VII's substantive antidiscrimination provision, the Court considers *Muldrow* in its analysis of whether Magnuson has satisfied his *prima facie* burden of showing that any of the Security Clearance Decisions constituted adverse employment actions. *Cf. United States v. Hansen*, 599 U.S. 762, 774 (2023) ("[W]hen Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word." (quotation marks omitted)).[18]

In a post-*Muldrow* decision, the Seventh Circuit found that a reassignment from one office to another was not an adverse employment action because "the reassignment did not change his position, job duties, salary, or benefits" and the plaintiff's other complaints "were mostly temporary inconveniences" which did not affect "the terms or conditions of his employment." *Phillips v. Baxter*, No. 23-1740, 2024 WL 1795859, at *3 (7th Cir. Apr. 25, 2024) (applying Title VII substantive antidiscrimination caselaw). Likewise, in the context of a Title VII retaliation claim, the Seventh Circuit affirmed the district court's grant of summary judgment in favor of an employer where that employer placed the plaintiff on "paid administrative leave pending the results of his fitness-for-duty psychological examinations"

---

[18] Inexplicably—because *Muldrow* was decided *before* he filed his response—Magnuson filed a notice of supplemental authority directing the Court to *Muldrow* three days after he filed his response and arguing that *Muldrow* "effectively overrule[d]" three cases relied upon by ExGen. *See* Not. Suppl. Authority 1–2, ECF No. 169. ExGen asserts that the rationale of those cases is still good law, despite the use of the "materially adverse" standard. Reply Mot. Summ. J. 38–41. The Court will consider *Muldrow*'s impact on any case that ExGen cites.

because the plaintiff did "not claim that his position, salary, or benefits were impacted by the paid administrative leave, and he concede[d] that the [employer] reinstated him to active duty upon receiving the results of his fitness-for-duty psychological examinations." *Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 786 (7th Cir. 2007). While *Nichols*'s antiretaliation analysis is not directly applicable to this case because the adverse action standard for purposes of Title VII's antiretaliation provision is different than the standard for proving an adverse action under the ERA, its analysis is informative. These cases show that where an employment action does not change things like pay, duties, or benefits, it is not an adverse action.

Starting with the period of paid leave, Magnuson fails to connect this alleged adverse action to the terms or conditions of his employment. *See* First Suppl. Compl. ¶¶ 47–49; Resp. Mot. Summ. J. 140. Magnuson testified that he continued to be paid while on leave. Magnuson Dep. Vol. II 252:9–24. He was eventually returned to work, and he does not point to any evidence which shows that his pay, duties, or benefits were changed. *See* Mot. Summ. J. 33, 37. He notes that he was shocked by being placed on paid leave, that he felt uncertain about his future with ExGen, and that his friendships with coworkers deteriorated, Resp. Mot. Summ. J. 140, but these mental and social circumstances are not terms or conditions of his employment. He also notes that his job duties were subsequently reduced and that he was "removed from his exciting control room leadership position," *id.* at 71, 140, but those changes were the result of the SWOT Assessment conducted in April 2015, not his period of paid leave from June 25, 2015 to August 18, 2015, Mot. Summ. J. 36–37. "Summary judgment is the put up or shut up time in litigation," *Brown v. CACH, LLC*, 94 F.4th 665, 667 (7th Cir. 2024) (quotation marks omitted), and Magnuson has failed to put up any evidence that his period of paid leave impacted the terms or conditions of his employment. Even under *Muldrow*, such a failure means that Magnuson's

period of paid leave cannot serve as the adverse employment action in his *prima facie* case.  *See*

*Phillips*, 2024 WL 1795859, at *3; *cf. Downer v. Prince George's Cnty. Bd. of Educ.*, No. 21-

1618-BAH, 2024 WL 3277563, at *11 (D. Md. July 2, 2024) ("[E]ven recognizing that the harm

need not be significant, the harm must, nevertheless, be alleged."), *appeal filed*, No. 24-1704

(4th Cir. July 29, 2024).

Similar reasoning applies to the remaining Security Clearance Decisions, which are the

suspension of his unescorted access authorization, the requirement to participate in a

psychological evaluation, the delay in his return after his completion of that evaluation, and the

eight-week gap in his PADS record.  One could certainly speculate that an inability to have

unescorted access to the Station constituted a change to Magnuson's job responsibilities and

affected his ability to receive overtime and shift premium pay.  *See, e.g.*, Magnuson Decl. ¶ 197.

But Magnuson does not direct the Court to any evidence which could transform such speculation

into fact.  Additionally, with respect to the eight-week gap of access in PADS, Magnuson's

understanding that ExGen recorded that the suspension of his unescorted access authorization

was terminated favorably on June 25, 2015—the same day that access was suspended—and

therefore never legitimately questioned his fitness for duty is based upon speculation, not

personal knowledge.  *See* Magnuson Decl. ¶¶ 27–30.  And evidence in the record conflicts with

his understanding.  *See* Anderson Decl. ¶¶ 9–14, Reply Mot. Summ. J. Ex. B, ECF No. 173-2 at

1–7 ("The PADS report generated on August 25, 2017 shows the information in PADS as of that

date (August 25, 2017); it does not show temporary information that was in PADS on June 25,

2015 and which subsequently changed, such as the temporary hold on Magnuson's access.").

His speculation that he was somehow harmed by the eight-week gap of access in his PADS

report is similarly unfounded.  *See* Resp. Mot. Summ. J. 72–73.[19]  Because Magnuson has failed

to proffer competent evidence that the Security Clearance Decisions affected the terms or

conditions of his employment, he has not made out a *prima facie* case of retaliation based upon

those actions.

### ii.  Same Actions in Absence of Protected Activity

Even if Magnuson could make out a *prima facie* case for the Security Clearance

Decisions, ExGen argues that it has shown by clear and convincing evidence that it would have

made the same Security Clearance Decisions even if Magnuson had not engaged in any protected

activity.  Mot. Summ. J. 68–69.  ExGen provides a chart based upon data from ExGen's access

authorization and FFD Program database regarding the 161 employees—identified by number

instead of name, *see* 10 C.F.R. § 73.56(m) (entitled "[p]rotection of information")—who had a

---

[19] Magnuson implies that a PADS report could impact any future employment decisions because another nuclear licensee could see that he had a gap in his unescorted access or he would have to self-report that he had temporarily lost access.  *See* Resp. Mot. Summ. J. 72.  But ExGen relies upon a PADS report for Magnuson and testimony from Magnuson and Techau to establish that only a nuclear licensees' security and access authorization personnel could view a PADS report and that HR personnel could not see or review the PADS report when making an employment decision.  *See* Mot. Summ. J. 33; Aug. 25, 2017 PADS Personnel Report, Anderson Decl. Ex. 1, Reply Mot. Summ. J. Ex. B, ECF No. 173-2 at 8–26.  Magnuson questions whether Techau can "credibly speak to what happens at other nuclear licensees," Resp. Mot. Summ. J. 72, but he points to no evidence to contradict her testimony about who can see PADS reports.  His argument that he would be required to self-disclose any gap in his access is based on a policy that he did not provide to the Court.  *See id.* at 71–73.  ExGen supplied the referenced policy along with its reply.  The policy does state that an applicant for access would have to disclose if they had been "denied or had unescorted access authorization terminated unfavorably . . . at any nuclear power point."  *See* NEI 03-01 [Revision 4]: Nuclear Power Plant Access Authorization Program 56, Reply Mot. Summ. J. Ex. D, ECF No. 173-4.  But Magnuson's argument that this would require him to disclose a temporary hold on his access is based on speculation.  First, it is evident that he does not have personal knowledge of how PADS functioned.  *See, e.g.*, Magnuson Dep. Vol. II 284:1–4 ("The favorable is basically if a person just chose to quit — *I'm just guessing* — just chose to quit and then go to work for somebody else or retire, something normal." (emphasis added)); Magnuson Decl. ¶ 27, ECF No. 164-1 ("On June 25, 2015 (and November 2, 2016), [ExGen] recorded in PADS, that my unescorted Access was 'Terminated Favorably.'").  An ExGen employee who regularly uses PADS, *see* Anderson Decl. ¶ 2, states in his declaration that the reason for a temporary hold would not be permanently recorded within PADS, that Magnuson would not need to self-disclose this favorably terminated gap in his unescorted access, and that Magnuson draws unsupportable inferences based upon speculation—not personal knowledge—from his PADS report generated in August of 2017, *see id.* ¶¶ 8–18.  The August 2017 PADS report does not reflect any unfavorable termination of Magnuson's access that he would have to report.  Once Magnuson's temporary hold was resolved, PADS was updated to reflect that his access was terminated favorably on the day he was put on leave—June 25, 2015.  *Id.* ¶¶ 13–15.  Because Magnuson's purported dispute is based upon speculation and not personal knowledge, the Court finds that these facts are undisputed.

temporary hold placed upon their access authorization during 2014 and 2015, including information like "the reason for the hold on their unescorted access, the hold date, the reason the hold was removed, and the removal date" of that hold.  Techau Decl. ¶¶ 62–63; Unescorted Access Hold Chart 1–4, Techau Decl. Ex. 18, ECF No. 141-1 at 335–38.  The reasons for a particular hold vary—Employee 28 had an "[i]nattentive issue (sleeping)"; Employee 33 had sent a "bizarre email"; Employee 46 engaged in "[a]bberrant [sic] behavior at work on 9/18/2015 (tossing books, punching cabintes [sic], cursing)"; Employee 49 thought "co-workers [were] spying on her work"; Employee 58 engaged in an "angry outburst" and was "argumentative"; Employee 75 was stressed because his "wife [was] very sick"; and Employee 115 made a post on Facebook stating that "Evil inside me grows more and more."  Unescorted Access Hold Chart 1– 3.  As to Magnuson—listed as Employee 87, Techau Decl. ¶ 63—the reason for his hold was simply "EAP referral per MRO," Unescorted Access Hold Chart 2.

By June 25, 2015, Techau and Dr. Pohlman knew of reports that Magnuson: (1) found the denial of his request to be released and seek a promotion at NMP to be "motivation" for his campaign to seek Kimler's position, Aug. 28, 2014 Email from Brian Magnuson to Scott Darin; (2) accused an INPO inspector of "unethical" and "particularly egregious" behavior for commenting upon sunflower seeds on the control room floor without providing the context that custodial staff was in the process of cleaning up those seeds, Nov. 3, 2014 Email from Brian Magnuson to Scott Darin; (3) requested that Darin and Darrow read "Letter from Birmingham Jail" without any contemporaneous explanation, which Darin found to be "quite odd," Darin Decl. ¶ 24, Mot. Summ. J. Ex. 14, ECF No. 140-16; Jan. 19, 2015 Email from Brian Magnuson to Nathan Darrow; (4) accused a member of his crew of cheating on INPO testing "[w]ith no proof," Jan. 3, 2015 Email from Brian Magnuson to Scott Darin; and (5) misrepresented what

Darin had told him about whether his qualification would be reinstated without remediation after the June 15 OBE, Darin Decl. ¶¶ 49, 53.  Techau and Dr. Pohlman aver that they applied the same processes and considered the same factors as they had in hundreds of previous referrals when evaluating Magnuson's behaviors.  Techau Decl. ¶ 70; Pohlman Decl. ¶¶ 33, 38, Mot. Summ. J. Ex. 20, ECF No. 140-22 at 1–13.

Magnuson does not properly dispute that he engaged in those behaviors nor that Techau and Dr. Pohlman adhered to the same processes and considered the same factors as they had with previous referrals.  *See* Resp. Mot. Summ. J. 74.  Instead, he argues that Techau and Dr. Pohlman should have concluded that his behavior was not questionable because it did not neatly align with a non-exhaustive list of behaviors and because he had evidence underlying his cheating allegations that he did not contemporaneously share with HR or his supervisors.  Resp. Mot. Summ. J. 136–37; *see also id.* at 122 ("That drunks and wife beaters and employees obsessed with terrorist attack are undoubtedly sent for evaluation does not demonstrate a consistent approach to whistleblower situations like Magnuson's.").  Magnuson's opinion about the propriety of Techau and Dr. Pohlman's conclusions does not create a material dispute of fact. *See Pilditch v. Bd. of Educ. of City of Chi.*, 3 F.3d 1113, 1119 (7th Cir. 1993) ("Mere subjective beliefs by the plaintiff—without the backing of hard evidence—cannot prove that an action was inspired by improper motivations.").

The Supreme Court's decision in *Murray* instructs courts to analyze whether the employer has met its burden of showing by clear and convincing evidence that it would have taken the same unfavorable personnel action in the absence of protected activity by asking "whether the employer would have 'retain[ed] an otherwise identical employee' who had not engaged in the protected activity."  *Murray*, 601 U.S. at 38 (alteration in original) (quoting

*Bostock v. Clayton County*, 590 U. S. 644, 660 (2020)).  "The right way to think about that kind of same-action causation analysis is to 'change one thing at a time and see if the outcome changes.'"  *Id.* (quoting *Bostock*, 590 U.S. at 656).  ExGen has shown by clear and convincing evidence that employees who engaged in behavior similar to Magnuson's that concerned management—strange emails, argumentative outbursts at work, and other signs of stress—could lead to a temporary hold on unescorted access authorization.  There is no evidence to suggest that these other employees also engaged in assumedly protected activity, and when the Court "change[s] one thing at a time," *i.e.*, the presence of protected activity, the "outcome," *i.e.*, a temporary hold on unescorted access authorization, does not change.  *See id.* at 38 (quotation marks omitted).

Once Techau and Dr. Pohlman concluded that Magnuson's pattern of behavior sufficiently cast doubt on his fitness for duty, they were required by NRC-mandated programs to temporarily suspend his unescorted access authorization and refer him for a psychological evaluation under the EAP.  *See* 10 C.F.R. § 26.23(b)–(c); *id.* § 26.35(a); *id.* § 73.56(b)(1)(i), (c), (e), (f)(1), (f)(3).  Further, federal regulations required ExGen to maintain records in a system like PADS regarding the gap in Magnuson's unescorted access authorization.  *See* 10 C.F.R. § 73.56(o); *Woodard-Hall v. STP Nuclear Operating Co.*, 473 F. Supp. 3d 740, 742–43 (S.D. Tex. 2020) (describing federal regulations related to access authorization).  Regarding the delay in returning him to work, Magnuson's return to work was processed on the next available date after Dr. Pohlman cleared him as fit for duty.  Mot. Summ. J. 32–33.  The Court finds that no reasonable jury could find that ExGen has not shown by clear and convincing evidence that it would have made the same Security Clearance Decisions in the absence of the protected activity described in Magnuson's operative complaint, and thus ExGen is entitled to summary judgment

regarding the Security Clearance Decisions on that basis as well.  *See Madison v. Dominion Energy, Inc.*, No. 3:18-cv-00036, 2020 WL 2857169, at *12 (W.D. Va. June 1, 2020) (finding that an employer had established by clear and convincing evidence that it would have fired the plaintiff in the absence of protected activity, noting that the plaintiff's supervisors had investigated him multiple times in the span of a few months, "substantiated his falsification of his time records," and substantiated that he was "falsely certifying that he was personally conducting walk-down safety checks"); *Riddle v. First Tenn. Bank*, No. 3:10-cv-0578, 2011 WL 4348298, at *9–10 (M.D. Tenn. Sept. 16, 2011) (finding that an employer had established by clear and convincing evidence that it would have terminated the plaintiff even absent protected activity where there was evidence that the defendant "decided to terminate [the p]laintiff only after he repeatedly exercised questionable judgment"), *aff'd sub nom. Riddle v. First Tenn. Bank, Nat. Ass'n*, 497 F. App'x 588 (6th Cir. 2012); *Tides v. Boeing Co.*, Nos. C08-1601-JCC, C08-1736-JCC, 2010 WL 537639, at *4 (W.D. Wash. Feb. 9, 2010) (finding that an employer had established by clear and convincing evidence that it would have dismissed the plaintiffs even absent protected activity where the plaintiffs did "not deny that they provided internal documents to a reporter"), *aff'd sub nom. Tides v. The Boeing Co.*, 644 F.3d 809 (9th Cir. 2011).[20]

---

[20] ExGen argues under the Supreme Court's decision in *Department of Navy v. Egan*, 484 U.S. 518 (1988), that the Security Clearance Decisions were the equivalent of unreviewable security clearance decisions made by the Executive Branch.  *See* Mot. Summ. J. 62–65; Reply Mot. Summ. J. 31–32.  While the propriety of security decisions made by Executive Branch corporations like the Tennessee Valley Authority is nonjusticiable, *see, e.g.*, *Goforth v. Tenn. Valley Auth.*, No. 1:20-cv-254, 2022 WL 1198213, at *8 (E.D. Tenn. Feb. 7, 2022), ExGen, as a private employer, has failed to persuade courts in this circuit that it enjoys the same immunity from judicial scrutiny regarding its access authorization decisions, *see Summerland v. Exelon Generation Co.*, 455 F. Supp. 3d 646, 654–56 (N.D. Ill. 2020); *Wrenn v. Exelon Generation, LLC*, No. 18 C 2524, 2019 WL 6253811, at *4 (N.D. Ill. Nov. 22, 2019); *Moore v. Exelon Generation Co., LLC*, No. 12 C 1955, 2012 WL 5304202, at *2–3 (N.D. Ill. Oct. 25, 2012). Because the Court grants ExGen's motion for summary judgment regarding the Security Clearance Decisions on other grounds, it need not resolve ExGen's arguments under *Egan*.

### b. Reassignment of Shift Manager Duties

ExGen argues that Magnuson cannot make out his *prima facie* case regarding the reassignment of his Shift Manager duties because: (1) Dodd decided to revise Magnuson's duties before Magnuson submitted IR 2484352, regarding the NRC's questions about the motor-operated valve, and IR 2518572, regarding the June 15 OBE, such that the relevant decisionmaker had no knowledge of Magnuson's assumedly protected activity; (2) the reassignment of his Shift Manager duties never actually happened—Magnuson was reassigned to the Training Department before those changes went into effect—and it was not an adverse employment action because he would have retained the same title and compensation; and (3) ExGen reassigned the duties of another low-scoring Shift Manager, MacLennan, which demonstrates that Magnuson's assumedly protected activity was not a contributing factor to the reassignment and further shows by clear and convincing evidence that it would have taken the same action in the absence of any assumedly protected activity from Magnuson.  Mot. Summ. J. 70–72.  Magnuson responds to ExGen's argument about Dodd's knowledge of Magnuson's assumedly protected activity by pointing to the INPO cheating incident but offers no response to ExGen's other arguments.  *See* Resp. Mot. Summ. J. 141–42; Reply Mot. Summ. J. 35–36.

As part of the SWOT Assessment conducted by Dodd and Daniels, Magnuson was interviewed via a structured process on April 15, 2015.  Dodd. Decl. ¶ 8; *see also* Targeted Selection Interview Guide, Dodd Decl. Ex. A, ECF No. 140-18 at 8–21.  During that interview, Magnuson described how he handled the INPO cheating incident, and Dodd testified that Magnuson's description of that incident was a "substantial factor" contributing to Dodd's conclusion that Magnuson exhibited poor leadership skills.  Dodd Dep. 40:6–21, Mot. Summ. J. Ex. 8, ECF No. 140-10.  After the interview, Dodd and Daniels concluded that Magnuson would

likely not retain his Shift Manager duties.  Dodd Decl. ¶¶ 10–13; Daniels Decl. ¶ 7, Mot. Summ.

J. Ex. 13, ECF No. 140-15.  Magnuson's scores on the SWOT Assessment were the lowest out of

all interviewees, with another Shift Manager, MacLennan, being the penultimate-rated employee.

Operations Leadership Assessment Data, Daniels Decl. Ex. A, ECF No. 140-15 at 7–11.  Both

MacLennan and Magnuson were informed of the changes to their Shift Manager duties in August

2015.  Dodd avers that his decision to reassign their duties "was based solely on the SWOT

[A]ssessment" and that he did not consider any IRs or alleged nuclear safety complaints that any

employees raised or did not raise.  Dodd Decl. ¶ 18.  Magnuson testified that he was unaware of

any protected activities engaged in by MacLennan, Magnuson Dep. Vol. II 298:8–15, and has

otherwise provided no evidence that MacLennan engaged in protected activities.

 Magnuson has failed to show that Dodd was aware of the protected activity described in

his operative complaint and therefore failed to make out the first element of his *prima facie* case

regarding the reassignment of his shift manager duties.  *See Lesiv v. Ill. Cent. R.R. Co.*, 39 F.4th

903, 915–16 (7th Cir. 2022) ("A supervisor simply cannot retaliate against an employee for

engaging in protected activity if the supervisor was not aware of the protected activity in the first

place.").  His assertion that Dodd relied upon the INPO cheating incident is immaterial because

that incident is not a part of his operative complaint.  *See supra* Section II.B.1.  Even if

Magnuson had made out his *prima face* case, that ExGen took the same actions against

MacLennan—another Shift Manager with similarly dismal scores for whom no evidence shows

that he engaged in any protected activity—is clear and convincing evidence that ExGen would

have taken the same action in the absence of Magnuson's assumedly protected activity.  *See*

*Murray*, 601 U.S. at 38.  The Court finds that no reasonable jury could conclude that Dodd was

aware of the assumedly protected activity described in Magnuson's operative complaint or that

ExGen would not have reassigned Magnuson's Shift Manager duties anyways, such that ExGen is entitled to summary judgment on this employment action as well.

### c. Assignment to the Training Department

ExGen argues that Magnuson cannot show that his September 2015 assignment to the Training Department was an adverse employment action caused by protected activity because Magnuson's refusal to work for Dodd was the cause of that assignment.  Mot. Summ. J. 72–74.  Magnuson disputes that he refused to work for Dodd and asserts that other ExGen employees misconstrued his communications.  Resp. Mot. Summ. J. 142.  On September 16, 2015, Magnuson received an email assigning him to two projects for a group within the Operations Department, to which he replied that same day: "Is it your intent that I work for Dodd while my allegation [related to the June 15 OBE and bullying] against him remains unresolved?"  Sept. 16, 2015 Email from Brian Magnuson to Jeremy Bries et al.; Mot. Summ. J. 39.  Petersen responded to Magnuson and stated that his email suggested that he had "concerns about working for Hal Dodd" and that ExGen would accommodate those concerns by giving him available work within the Training Department on a temporary basis.  Sept. 16, 2015 Email from Cindy Petersen to Brain Magnuson; Mot. Summ. J. 39–40.  Magnuson notes that he never stated that he outright refused to work for Dodd, but admits that he said nothing to correct ExGen's impression that he was unwilling to work for Dodd.  Resp. Mot. Summ. J. 119; Magnuson Dep. Vol. III 26:17–29:12; *see also supra* n.14 (describing Magnuson's statement to Darin that it would merely have been "problematic" for him to work for Dodd during this period, to which Darin replied that he considered that to be "the same thing" as an outright refusal).  He seeks to recharacterize his email as an expression of the normal and expected "questioning attitude" expected of ExGen employees in relation to operations issues and nuclear safety.  Resp. Mot. Summ. J. 109, 142

(citing Techau Dep. 45:1–3).  But that questioning attitude was expected for operational issues, not interpersonal conflicts or HR investigations.  *See* Techau Dep. 44:21–45:3 ("Just that everyone has a questioning attitude.  That's required of the *nuclear* environment." (emphasis added)).  The undisputed evidence shows that Magnuson did not correct ExGen's impression that he was unwilling to work for Dodd.

ExGen points to pre-*Muldrow* cases establishing that transfers "intended to respond to and resolve an employee's problems with another employee *do not constitute an adverse employment action*."  Mot. Summ. J. 73 (quoting *Kasprzak v. DaimlerChrysler Corp.*, 395 F. Supp. 2d 636, 642 (N.D. Ohio 2005)); *see also Simpson v. Borg-Warner Auto., Inc.*, 196 F.3d 873, 876 (7th Cir. 1999) (holding that the plaintiff failed to prove a materially adverse employment action where the plaintiff "sought her downgrade; indeed, she turned down [the defendant]'s offer of transfer to another (and hopefully more congenial) supervisory position"); *Wolf v. St. Anthony Hosp.*, No. 21 CV 3273, 2023 WL 7631015, at *7 (N.D. Ill. Nov. 14, 2023) ("An employee's voluntary decision cannot constitute an adverse employment action."); *Blackburn v. Shelby County*, 770 F. Supp. 2d 896, 923 (W.D. Tenn. 2011) (finding that a "transfer intended to respond to and resolve an employee's problems with her supervisors and her working conditions" was not an adverse employment action).  In the context of discussing *Muldrow*'s effect on this case, ExGen asserts that Magnuson's "temporary move to Training based on his own concerns was a common event and an accommodation of what the company took to be his concerns about reporting to Dodd; and he kept the same title and pay rate."  Reply Mot. Summ. J. 40–41.  But Magnuson does argue that he lost job responsibilities when he was transferred to the Training Department, Resp. Mot. Summ. J. 140, and his testimony to that effect was not refuted, *see* Magnuson Dep. Vol. II 312:1–314:13.

Regardless of whether the transfer would be considered an adverse action under

*Muldrow*, Magnuson fails to show that his protected activity contributed to the transfer.  ExGen

requested that Magnuson continue working under Dodd's supervision, and he responded by

pointing out that he had pending allegations against Dodd.  *See* Sept. 16, 2015 Email from Brian

Magnuson to Jeremy Bries et al.  ExGen's contemporaneous reply to his response stated that the

cause for his assignment to the Training Department was this expressed unwillingness to work

for Dodd.  Sept. 16, 2015 Email from Cindy Petersen to Brain Magnuson.  Darin's declaration

shows that he concluded that Magnuson's unwillingness to work for Dodd precluded Magnuson

from working in the control room due to the need for split-second decision and to follow

procedures meant to protect the public by ensuring safe operations.  Darin Decl. ¶ 64.  As all of

the Operations Department reported to Dodd, this unwillingness further precluded giving

Magnuson any assignment within the Operations Department.  *Id.*  Magnuson points out that

Darin was aware of his complaints against Dodd and asserts that therefore his protected activity

must have contributed to the decision to assign him to the Training Department.  Resp. Mot.

Summ. J. 143.  However, this argument conflates knowledge with causation—it is insufficient to

show that Darin was aware of protected activity as Magnuson's burden is to show that this

knowledge of assumedly protected activity contributed to the decision to assign him to Training

Department.  *See Sanders*, 812 F.3d at 1197.  Under the ERA, this required causal link is not a

high bar.  *See Murray*, 601 U.S. at 32; *Addis*, 575 F.3d at 690.  Still, aside from Darin's

knowledge, Magnuson does not direct the Court to any evidence suggesting that Magnuson's

assumedly protected activity—as opposed to his interpersonal issues with Dodd—contributed to

this employment action.  Only speculative inference could allow for a conclusion that

Magnuson's assumedly protected activity contributed to his assignment to the Training

Department, and his burden at this stage of the case is to produce something beyond hunches or suspicions. *See Brown*, 94 F.4th at 667. Because Magnuson has failed to show that his protected activity contributed to this employment action, ExGen is entitled to summary judgment on Magnuson's claim of retaliation related to his assignment to the Training Department.

Magnuson additionally argues that between August 2015 and September 2015, Wake was unresponsive to his requests that Wake give him the final bit of training, consisting of some presentations, which he needed to resume his duties in the control room. Resp. Mot. Summ. J. 143–44; Magnuson Dep. Vol. IV 617:13–618:8. He asserts that Wake's conduct was itself retaliatory and part of a broader conspiracy to slow-walk his return to the control room. *See* Resp. Mot. Summ. J. 144; First Suppl. Compl. ¶ 55; Magnuson Dep. Vol. IV 619:9–24. Magnuson's title, pay, management level classification, bonus target, and ability to maintain his NRC license were unaffected by this delay. *See* Darin Decl. ¶ 66; Magnuson Dep. Vol. II 290:19–22. To the extent that Magnuson is arguing this withholding of training is itself an adverse employment action, he again fails to connect this "temporary inconvenience[]" to any terms or conditions of his employment, and therefore fails to establish a *prima facie* case with respect to this withholding of training. *See Phillips*, 2024 WL 1795859, at *3.

### d.  Unpaid Leave of Absence

ExGen argues that Magnuson cannot make out his *prima facie* case with respect to his unpaid leave of absence from November 2016 to November 2017 because he cannot show that protected activity contributed to Darin's decision to put him on that unpaid leave of absence. Mot. Summ. J. 74–76. Magnuson responds that because he had submitted new IRs a mere five days before he was placed on unpaid leave—which "were part of a line of protected activity that [g]oes back to before Darin says he decided to place Magnuson on unpaid leave"—a reasonable

jury could conclude that protected activity contributed to this employment action.  Resp. Mot.

Summ. J. 144–45.  ExGen counters that no evidence demonstrates that Darin himself knew of the

four October 28, 2016 IRs, and that mere temporal proximity to other protected activity is

insufficient to establish causation.  Mot. Summ. J. 75–76; Reply Mot. Summ. J. 37–38.

Magnuson made clear that he was displeased with being placed in the Training

Department.  *See, e.g.*, Apr. 20, 2016 Email from Brian Magnuson to Scott Darin and Drew Bush

(stating that he was "not interested in a position in training" because he had "no experience,

aptitude, or inclination" and "would consider it further retaliation").  His position in the Training

Department gave him much less responsibility, and he testified that he felt like his new position

was not important.  *See, e.g.*, Magnuson Dep. Vol. II 311:10–312:7.  On October 6, 2016,

Magnuson wrote on his qualification form for becoming a subject-matter expert that he objected

to being an instructor.  Darin Decl. ¶ 73; Classroom Instructor Evaluation Form 4.  He also

informed a class that he was instructing that he did not want to be there and that he considered

his position in the Training Department to be retaliatory.  Darin Decl. ¶ 74; Magnuson Dep. Vol.

II 319:6–321:1.  He repeatedly refused invitations to volunteer for other positions, such as the

NetPower Team and Digital Plant Team, stating on October 20, 2016 that it would be more

efficient if Darin stopped asking him to volunteer for other positions as he was only interested in

his old position, which would require him to work for Dodd.  *See, e.g.*, July 27, 2016 Email from

Brain Magnuson to Edward Pannell; Meeting Notes Digital Plant Opportunity, Mot. Summ. J.

Ex. 50, ECF No. 141-30;[21] Magnuson Dep. Vol. III 70:13–71:23.  While Magnuson was still

able to engage in training exercises which were needed to maintain his NRC license, *see, e.g.*,

Darin Decl. ¶ 69, Darin observed him in a training exercise conducted on September 28, 2016,

---

[21] Although these notes record the date of this meeting as October 20, 2017, the meeting actually occurred on
October 20, 2016.  *See supra* n.14.

and concluded that he was still unwilling to accept coaching, *see* Sept. 28, 2016 Observation and Debrief of Operations Crew A, Darin Decl. Ex. 19, ECF No. 140-16 at 86–87.

Darin avers that by October 27, 2016—one day before Magnuson submitted four new IRs—he had decided to place Magnuson on an unpaid leave of absence. Darin Decl. ¶ 80. He felt that Magnuson's statements put the accredited status of ExGen's training program at risk, as that program was subject to audit by the NRC and INPO. *Id.* ¶ 75. He also felt that returning Magnuson to the Operations Department was not an option because Magnuson was still unwilling to work for Dodd and because of his observations of Magnuson's continued unwillingness to accept coaching at the September 28, 2016 training exercise. *Id.* ¶ 72. Magnuson does not properly dispute when Darin made the decision to place him on an unpaid leave of absence and he has not adduced any evidence that Darin knew about the four October 28, 2016 IRs when that decision was made. Resp. Mot. Summ. J. 94.[22] As Magnuson did not show that Darin knew of the four October 28, 2016 IRs when Darin placed him on unpaid leave of absence, that assumedly protected activity is immaterial to his *prima facie* case regarding that employment action. *See Lesiv*, 39 F.4th at 915–16; *Eaton v. J. H. Findorff & Son, Inc.*, 1 F.4th 508, 513 (7th Cir. 2021) ("It is not sufficient that a decision-maker could have or even should have known about the employee's complaint.").

---

[22] For reasons that remain unclear, Magnuson chose to not include in his summary judgment response any facts related to his complaints that Wake retaliated against him by wrongly failing him and wrongly passing another operator during a simulator training exercise. *See* First Suppl. Compl. ¶¶ 39–40; Magnuson Decl. ¶¶ 183–92; Nov. 2, 2016 Email from Brian Magnuson to Derek Drockelman, Resp. Mot. Summ. J. Ex. 12, ECF No. 165-3 at 12. Magnuson states that he emailed Darin the day before he was placed on unpaid leave, wherein he supposedly asserted that recent simulator training exercises were evaluated in a retaliatory fashion. *See* First Suppl. Compl. ¶ 39; Magnuson Decl. ¶ 188. That email is not before the Court and was not referenced in Magnuson's response. The Court considers these unsupported allegations no further. *See* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials . . . ."); *see also* 4th Mot. Extension File Opp'n Def.'s Mot. Summ. J. ¶ 5, ECF No. 159 (acknowledging that the Court would "not consider Plaintiff's declaration and exhibits unless they are incorporated into the argument . . . submit[ed] for [Magnuson's] case in opposition to summary judgment").

Magnuson fails to sufficiently argue that a different protected activity was a contributing factor to his unpaid leave.  Gesticulations towards a different "line of protected activity," *see* Resp. Mot. Summ. J. 145 (describing the October 2016 IRs as "part of a line of protected activity that [g]oes back to before Darin says he decided to place Magnuson on unpaid leave"), are insufficient to identify a genuine dispute of material fact, *cf. McKinney*, 866 F.3d at 808 (stating that assertions "that someone who reads [the record] will find a genuine issue of material fact" are insufficient).  Magnuson has not carried his burden of showing a genuine dispute of material fact regarding whether his assumedly protected activity was a contributing factor to his unpaid leave of absence.

Even if Magnuson had, ExGen has shown by clear and convincing evidence that it would have taken the same employment action against Magnuson in the absence of protected activity. Magnuson does not refute that he undermined ExGen's training program with his statements. Protected activity does not insulate an employee from the consequences of inappropriate workplace behavior.  *See Argyropoulos v. City of Alton*, 539 F.3d 724, 734 (7th Cir. 2008) ("[I]nappropriate workplace activities are not legitimized by an earlier-filed complaint of discrimination.").  He was still resisting working for Dodd and unwilling to accept coaching from others, making positions within the Operations Department unavailable.  Finally, he declined any other position which was offered to him.  These circumstances clearly and convincingly demonstrate that no reasonable jury could conclude that ExGen would not have placed Magnuson on an unpaid leave of absence, regardless of his assumedly protected activity, after he decided to actively undermine his job functions and refuse placements elsewhere within ExGen.  *See Guitron v. Wells Fargo Bank, N.A.*, No. C 10-3461 CW, 2012 WL 2708517, at *16–17 (N.D. Cal. July 6, 2012) (finding that the defendants clearly and convincingly established that

61

the employee's refusal to meet with her manager was a legitimate, non-retaliatory reason for the at-issue adverse employment action). The Court concludes that ExGen is entitled to summary judgment on this adverse employment action as well.

### e. Return to Work in 2017

ExGen argues that it cannot be held liable for returning Magnuson to work in 2017—albeit in a different role at its Warrenville corporate office instead of his prior role as an operator at the Station—because he failed to administratively exhaust any claims related to that employment action. Mot. Summ. J. 76–77. Plaintiffs are required to submit a complaint to the DOL or OSHA within 180 days of an allegedly discriminatory act. 42 U.S.C. § 5851(b)(1); *see also Tamosaitis v. URS Inc.*, 781 F.3d 468, 476–81 (9th Cir. 2015) (explaining the ERA's requirement of administrative exhaustion). Filing such an administrative complaint is a prerequisite to judicial review. 42 U.S.C. § 5851(b)(4); *see also Vander Boegh v. EnergySolutions, Inc.*, 772 F.3d 1056, 1068 (6th Cir. 2014) ("The ERA provides the only avenue by which a claimant may bring his original claim to district court." (citing 42 U.S.C. § 5851(b)(4))). Magnuson filed his second complaint with OSHA on April 28, 2017, he was returned to work in or about November 2017, and he filed his third OSHA complaint on August 21, 2020. Mot. Summ. J. 49, 53.

ExGen argues that this timeline establishes that Magnuson did not submit an administrative complaint related to his return to work in or about November 2017 and that his claim is therefore barred. *Id.* at 76. Magnuson does not directly respond to this argument. Resp. Mot. Summ. J. 145–46. He simply lays out the timeline of when he filed his complaints with OSHA and does not address the fact that he did not file a new complaint within 180 days of his reinstatement to work. *See id.* The Court concludes that Magnuson failed to administratively

exhaust his claim with respect to his return to work in or about November 2017 and that ExGen

is accordingly entitled to summary judgment on this employment action.

### f.   Personal Email Account Leaking Investigation

ExGen argues that Magnuson cannot establish his *prima facie* case with respect to the

2020 leaking investigation into whether he was using his personal email account in violation of

its policies because he suffered no adverse employment action because of that investigation.

Mot. Summ. J. 78.  It further argues that it has clearly and convincingly shown that it treated

Magnuson the same as dozens of other similarly situated employees who were suspected to have

violated the same policies.  *Id.* at 78–79.  Magnuson asserts that ExGen was aware of his

assumedly protected activity by 2020, and that the emails which violated company policy were

lawful communications.  Resp. Mot. Summ. J. 146.  By failing to respond to any of ExGen's

arguments, Magnuson has waived any argument that he can show an adverse employment action

arising out of the leaking investigation or that ExGen cannot establish that it would have taken

the same action absent any protected activity.  *See, e.g.*, *Mich. City Plant Plan. Dep't*, 755 F.3d

at 600 ("The non-moving party waives any arguments that were not raised in its response to the

moving party's motion for summary judgment.").

The record confirms that summary judgment is warranted as to this claim.  Exelon—

ExGen's then-parent corporation—had many policies which applied to ExGen employees

prohibiting employees from sending confidential company information to or from personal email

addresses.  *See* Acceptable Use Policy, Genualdi Decl. Ex. 1, ECF No. 140-19 at 9–18;

Corporate Standard: Email Usage and Retention, Genualdi Decl. Ex. 2, ECF No. 140-19 at 19–

26; Corporate Procedure: Protecting Exelon Information, Genualdi Decl. Ex. 3, ECF No. 140-19

at 27–46.  In 2018, 2019, and 2020, Magnuson completed an annual training on the Exelon Code

of Business Conduct and Security—this required training informed him that he had to comply

with company policies and security procedures related to email usage. *See* Training

Completions, Genualdi Decl. Ex. 6, ECF No. 140-19 at 54–56; Genualdi Dep. 19:13–20:1, Mot.

Summ. J. Ex. 9, ECF No. 140-11.

Digital forensic investigations revealed that Magnuson had involved his personal email

address—whether by forwarding, sending, or carbon copying that address—with hundreds of

emails and attachments, at least one of which was considered to be confidential. *See, e.g.*,

Executive Summary June 18, 2020 2, Genualdi Decl. Ex. 8, ECF No. 140-19 at 65–72 ("Many

emails, including documents (attachments), were considered to be confidential, restricted and/or

other sensitive information."). On June 10, 2020, Magnuson was interviewed by Genualdi, an

employee of Exelon affiliate Exelon Business Services, and Petit, an employee of Exelon.

Genualdi Decl. ¶ 15. Genualdi and Petit's concluded that Magnuson had violated ExGen's

policies. *Id.* ¶ 18; Executive Summary June 18, 2020 7. Magnuson was asked to sign a

standardized Attestation that he would delete documents from his personal email and follow the

policies regarding proper email use in the future. Harris Decl. ¶¶ 4–5, Mot. Summ. J. Ex. 18,

ECF No. 140-20 at 1–5; July 1, 2020 Email from Vincenzo Genualdi to Brian Magnuson, Harris

Decl. Ex. 2, ECF No. 140-20 at 14–18. He declined to sign it, instead sending his own signed

version. *See* Harris Decl. ¶ 5; Attestation and Acknowledgment, Harris Decl. Ex. 3, ECF No.

19–21. At least thirty-four other employees had signed the Attestation or a substantially similar

form following similar investigations. *See, e.g.*, Harris Decl. ¶¶ 8–9. Magnuson fails to

competently dispute that he was not subjected to any discipline—nor that his employment status,

duties, or pay remained unchanged—because of the leaking investigation or his refusal to sign

the Attestation.  *See* Daniels Decl. ¶ 25; Resp. Mot. Summ. J. 107 (citing no evidence for his

dispute).

Investigations that do not result in discipline or other consequences to the terms and

conditions of one's employment are not adverse employment actions.  *Kuhn v. Washtenaw

County*, 709 F.3d 612, 626 (6th Cir. 2013) (finding that investigation itself was not an adverse

employment action where the employee "suffered no disciplinary action, demotion, or change in

job responsibilities during the course of the investigation"); *Wolf*, 2023 WL 7631015, at *7

("[E]ven when the investigation found serious problems with [the plaintiff]'s leadership style,

the [defendant] did not discipline [the plaintiff]. . . . The investigation therefore was not an

adverse employment action.").  Magnuson therefore has failed to establish his *prima facie* case.

Even if he had, ExGen has clearly and convincingly shown that this enforcement of their own

policies is a routine and regular practice, which they would have subjected Magnuson to in the

absence of any assumedly protected activity.  *See* Harris Decl. ¶¶ 8–9.  The Court concludes that

ExGen is entitled to summary judgment on this employment action.

In sum, ExGen is entitled to summary judgment on each of Magnuson's claims under the

ERA.

### 2.  State Law Retaliatory Discharge Claims

Magnuson's operative complaint asserts two counts of common law retaliatory discharge

under Illinois law—Count 3 asserts that ExGen retaliatorily discharged him for reporting health

and safety violations which are not actionable under state or federal whistleblower statutes, First

Suppl. Compl. ¶¶ 142–51, and Count 4 asserts that ExGen retaliatorily discharged him for

reporting gross mismanagement and abuse of authority, *id.* ¶¶ 152–59.  ExGen argues that it is

entitled to summary judgment on both counts because Magnuson's unpaid leave from November

2016 to November 2017 was legally not a discharge.  Mot. Summ. J. 54–56.  Magnuson

responds that he believed that he had been discharged and that he was able to collect

unemployment compensation from Illinois.  Resp. Mot. Summ. J. 133–35.

"In Illinois, in order to establish a tort claim for retaliatory discharge, a plaintiff must

show (1) that she has been discharged; (2) in retaliation for her activities; and (3) that the

discharge violates a clear mandate of public policy."  *Rehfield v. Diocese of Joliet*, 182 N.E.3d

123, 132 (Ill. 2021) (quotation marks omitted).  This requires "actual discharge," not

constructive discharge.  *Id.* (quotation marks omitted); *see also Hartlein v. Ill. Power Co.*, 601

N.E.2d 720, 730 (Ill. 1992) (declining to extend this cause of action to constructive discharge).

The Illinois Supreme Court has declined to expand this tort "to circumstances in which an

employee suffers a loss of employment status or income or both, but is not terminated from her

employment altogether."  *Zimmerman v. Buchheit of Sparta, Inc.*, 645 N.E.2d 877, 882 (Ill.

1994); *Graham v. Commonwealth Edison Co.*, 742 N.E.2d 858, 864 (Ill. App. Ct. 2000)

(refusing "to expand the definition of 'discharge' to encompass the discharge from one position

to a lower position").  In *Graham*, the employee was not able to sustain a retaliatory discharge

claim against the defendant because the plaintiff "was not dismissed or terminated from

employment with [the defendant]," and in fact, he "continue[d] to work for [the defendant]" at

the time of the court's decision.

Magnuson argues that there "are no magic words required to discharge an employee."

Resp. Mot. Summ. J. 133–34 (quoting *Hinthorn v. Roland's of Bloomington, Inc.*, 519 N.E.2d

909, 912 (Ill. 1988)).  While true that "[t]here are no magic words required to discharge an

employee," the relevant inquiry as framed by *Hinthorn* whether "the employer's message that the

employee has been involuntarily terminated is clearly and unequivocally communicated to the

employee." *Hinthorn*, 519 N.E.2d at 912.  And here, the facts do not support that ExGen "clearly and unequivocally" communicated to Magnuson that he was fired.  Magnuson admits that nobody at ExGen told him that he was terminated.  Magnuson Dep. Vol. III 43:17–20.  In fact, he is still employed by ExGen to this day.  *See id.* at 75:19–76:11; Daniels Decl. ¶ 24.  Instead, he was told to read the November 2, 2016 letter which informed him that he was being placed on unpaid leave.  Magnuson Dep. Vol. III 43:21–24; Nov. 2, 2016 Letter from Drew Bush to Brian Magnuson 2.  While he lost job duties and income while he was on unpaid leave, that is not sufficient to show a termination from his employment.  *See Zimmerman*, 645 N.E.3d at 882.  ExGen identifies a litany of undisputed facts that are inconsistent with Magnuson being terminated: (1) he was still classified as a regular, full-time employee, Daniels Decl. ¶ 17; Jan. 24, 2017 Email from Heather Mae Daniels to Brian Magnuson, Mot. Summ. J. Ex. 54, ECF No. 141-34; (2) he was allowed to use his accrued vacation days instead of those days being cashed out in a lump sum, Daniels Decl. ¶¶ 13–14; (3) he received a bonus in 2017 which would not have been available if he had been terminated in 2016, *id.* ¶ 15; Earnings Statement 17343, Daniels Decl. Ex. B, ECF No. 140-15 at 12–14; (4) he remained in ExGen's health insurance and ExGen continued to pay its respective portion of the premiums, Magnuson Dep. Vol. III 44:1–19; and (5) he received a profit-sharing contribution to his 401(k) in 2017, Daniels Decl. ¶ 16; Earnings Statement 17343.

The only evidence Magnuson points to in support of his argument that he was discharged is his belief that he was terminated and that he told the Illinois Unemployment Commission he had been terminated.  Resp. Mot. Summ. J. 134.  Magnuson's subjective belief that he was fired itself is immaterial to whether he was discharged—again, the question is whether the employer clearly and unequivocally communicated that he was discharged.  Magnuson's apparent

admission that ambiguities remain, *id.* at 135, would seem to defeat his claim.  As to the reception of unemployment benefits, Magnuson gave equivocal testimony as to whether he told the Illinois Unemployment Commission that he had been terminated.  *See* Magnuson Dep. Vol. I 49:19–50:4 ("I believe I said I was terminated"); Magnuson Dep. Vol. III 85:13–86:6 ("I don't remember if I said placed on leave or terminated.").  Even if he had, such a statement would simply be further evidence of his subjective beliefs regarding whether he was terminated.  Moreover, his reception of unemployment benefits is consistent with a period of unpaid leave and does not demonstrate that he was actually discharged because termination is not a prerequisite to obtaining unemployment benefits, *see* 820 ILCS 405/239 (providing that an individual is "deemed unemployed in any week" where he receives no wages and performs no services and in "any week of less than full-time work if the wages payable to him" for that week "are less than his weekly benefit amount").  The Court concludes that Magnuson was never discharged under Illinois law, and therefore cannot maintain his claims for retaliatory discharge under Illinois common-law.  *See Zimmerman*, 645 N.E.2d at 882.  Accordingly, ExGen is entitled to summary judgment on both retaliatory discharge counts.

### 3.  Illinois Whistleblower Act Claims

Magnuson's operative complaint asserts two counts of violations of the Illinois Whistleblower Act ("IWA")—Count 1 asserts that ExGen retaliated against him for his refusal to write a remediation plan related to the June 15 OBE, First Suppl. Compl. ¶¶ 130–35, and Count 2 asserts that ExGen retaliated against him for his disclosures to the NRC and OSHA, *id.* ¶¶ 136–41.  Rather than directly respond to ExGen's arguments related to these state-law claims, Magnuson chose to rest on his arguments against the entry of summary judgment for his ERA claims.  Resp. Mot. Summ. J. 146–47.

### a.  IWA Count 1 Under 740 ILCS 174/20: Refusal to Write Remediation Plan

ExGen argues that Magnuson has failed to identify that Dodd's request that he write a remediation plan to address the deficiencies identified in the June 15 OBE violated a specific law, rule, or regulation.  Mot. Summ. J. 79–80.  To succeed on this claim, Magnuson "must establish that (1) he refused to participate in an activity that would result in a violation of a state or federal law, rule or regulation and (2) his employer retaliated against him because of the refusal."  *Corah v. Bruss Co.*, 77 N.E.3d 1038, 1043 (Ill. App. Ct. 2017); *see also* 740 ILCS 174/20 ("Retaliation for certain refusals prohibited.  An employer may not retaliate against an employee for refusing to participate in an activity that would result in a violation of a State or federal law, rule, or regulation . . . .").

Here, Magnuson has not identified that the requested remediation plan would have violated any law, statute, or regulation.  His operative complaint broadly asserts that the remediation plan would have violated some aspect of "10 CFR Parts 50 and 55," First Suppl. Compl. ¶ 133, which spans over 100 separate regulations.  The Court declines to survey these expansive portions of the Code of Federal Regulations to invent an argument on Magnuson's behalf.  *Cf. Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011) ("[O]ur judges are busy people. . . . [T]hey are not going to do the plaintiff's research and try to discover whether there might be something to say against the defendants' reasoning." (quotation marks omitted)).  Because Magnuson has failed to establish a genuine issue of material fact regarding whether he was asked to violate a law, statute, or regulation, ExGen is entitled to summary judgment on Magnuson's state-law Count 1.

b.  **IWA Count 2 Under 740 ILCS 174/15(b): Reports to NRC and OSHA**

ExGen advances multiple arguments to justify summary judgment on this claim, many of which echo the arguments it made in support of its request for summary judgment on the ERA claims.  Mot. Summ. J. 80–85.  Section 15(b) of the IWA states that "[a]n employer may not retaliate against an employee for disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of a State or federal law, rule, or regulation."  740 ILCS 174/15(b).  Illinois courts use a four-element test—a plaintiff must show "(1) an adverse employment action by his or her employer, (2) which was in retaliation (3) for the employee's disclosure to a government or law enforcement agency (4) of a suspected violation of an Illinois or federal law, rule, or regulation." *Sweeney v. City of Decatur*, 79 N.E.3d 184, 188 (Ill. App. Ct. 2017).  The third element distinguishes a section 15(b) claim from an ERA retaliation claim, as the report must be made to a government or law enforcement agency.  *See id.* at 190 ("[S]ection 15(b) of the Whistleblower Act does not protect an employee who simply notes the impropriety of conduct with the alleged wrongdoer . . . .").

ExGen argues that Magnuson's section 15(b) claim cannot survive with respect to the Security Clearance Decisions nor Dodd's reassignment of his Shift Manager duties because he did not make a sufficient disclosure a government or law enforcement agency.  Mot. Summ. J. 81–82.  By the time those decisions were made, the only potential disclosure to a government agency that Magnuson had made concerned the motor-operated valve discussed in IR 2484352, which was submitted on April 13, 2015.  *See* Magnuson Dep. Vol. I 157:1–7; *see also* Apr. 8, 2015 Email from Brian Magnuson to Hal Dodd et al. (stating that Rob Murray from the NRC was asking about a particular valve).  However, Magnuson stated in his deposition that he "did

not report [the issue underlying the April 13, 2015 IR] to the NRC." Magnuson Dep. Vol. I
157:10–18.  He elaborated that "[t]he NRC had questions about [the issue], so [Rob Murray from
the NRC] came to [his] office with . . . questions." *Id.* at 158:4–5.  Magnuson "shared some
information with [Murray] that [he] had regarding th[e] issue and then wrote th[e] IR after
discussing it with the NRC." *Id.* at 158:6–9.  Absent any argument from Magnuson, the Court
finds that the undisputed facts show that Magnuson did not make a disclosure to a government or
law enforcement agency prior to the Security Clearance Decisions and reassignment of his Shift
Manager Duties, so no reasonable jury could conclude that they were the result of retaliation for
a report to a government or law enforcement agency.

   As to the temporary reassignment to the Training Department, unpaid leave of absence,
and the leaking investigation, ExGen argues that it has offered legitimate, nondiscriminatory
reasons for each action and Magnuson cannot prove pretext.  Mot. Summ. J. 84–85.  Unlike the
ERA, "[i]n order to show whistleblower retaliation [under the IWA], a plaintiff must provide
some evidence that the employer had a retaliatory motive." *Williams v. Off. of Chief Judge of
Cook Cnty. Ill.*, 839 F.3d 617, 627 (7th Cir. 2016) (citing *Michael v. Precision Alliance Grp.,
LLC*, 952 N.E.2d 682, 688 (Ill. 2011)); *cf. Perez v. Staples Cont. & Com. LLC*, 31 F.4th 560, 575
(7th Cir. 2022) (affirming grant of summary judgment on section 20 IWA claim for lack of
retaliatory motive).  ExGen argues that Magnuson has failed to show any evidence that its
reasons for temporarily assigning him to the Training Department, placing him on unpaid leave,
and investigating his personal email use were pretextual and not motivated respectively by
Magnuson's own refusals to work for Dodd, active undermining of his job functions, and
standard enforcement of ExGen's policies regarding personal email use.  Mot. Summ. J. 84–85.
Magnuson has decided to stand on his arguments under his federal claims, and the Court has

already concluded that ExGen has shown by clear and convincing evidence that it would have

taken the same actions in the absence of any assumedly protected activity—in other words, that

those decisions were not the result of a retaliatory motive.  The Court concludes that ExGen is

entitled to summary judgment on these actions under section 15(b) as well.

The only aspect of the Court's reasoning that was unique to the federal context is

Magnuson's failure to exhaust his administrative remedies with respect to his return to work in

or about November 2017.  ExGen argues that this employment action was not a materially

adverse employment action.  *Id.* at 83.  ExGen asserts that the IWA imposes a materiality

requirement, in that an employment decision is actionable only if it would have "dissuaded a

reasonable worker from engaging in protected activity."  *Id.* (quoting *Ocampo v. Ill. Civ. Serv.*

*Comm'n*, 2024 IL App (1st) 230667-U, ¶ 44.  *Ocampo*—an unpublished decision—is ExGen's

only support for a materiality requirement, and *Ocampo* itself relied upon a federal court

decision for that requirement, not an Illinois court's decision.  *See Ocampo*, 2024 IL App (1st)

230667-U, ¶ 44 (citing *Del Signore v. Nokia of Am. Corp.*, 20 C 4019, 2023 WL 3292570, at *7

(N.D. Ill. May 5, 2023)).  The court in *Del Signore* simultaneously analyzed a slew of retaliation

claims asserted under not just the IWA, but also SOX, the False Claims Act, and the Illinois

False Claims Act.  *Del Signore*, 672 F. Supp. 3d at 567–68.  It acknowledged that the "materially

adverse" standard was "developed in the context of Title VII retaliation" and asserted that the

standard was "often applied under other retaliation and whistleblowing statutes."  *Id.* at 569–70.

The continuing viability of this reasoning is suspect in the wake of *Muldrow* and *Murray*.  Yet

the IWA provides that an employer's acts or omissions are retaliation under the IWA "if the act

or omission would be materially adverse to a reasonable employee and is because of the

employee disclosing or attempting to disclose public corruption or wrongdoing," 740 ILCS

174/20.1, and this requirement of materiality and focus on the reasonable worker echoes the Title VII antiretaliation standard, *see Burlington N.*, 548 U.S. at 57. Ultimately, the Court need not resolve whether the alleged adverse employment action must be materially adverse because Magnuson's claim fails no matter which standard applies.

ExGen argues that Magnuson's return to work was not a materially adverse employment action because Magnuson agreed to it and because it did not change his management responsibilities, supervision of subordinates, or any licensed nuclear plant responsibilities—those changes had already occurred because of his assignment to the Training Department. Mot. Summ. J. 77 & n. 7. Magnuson offers no argument as to how his agreement to take a position with the corporate office so he could return to work would qualify as a materially adverse employment action. No reasonable worker would be dissuaded by ExGen's decision to allow Magnuson to retain his employment and return to job responsibilities; therefore, this employment action was not materially adverse. *See Burlington N.*, 548 U.S. at 57. Even if there was no requirement of materiality, Magnuson's failure to connect this action to the terms and conditions of his employment is fatal under a *Muldrow*-style inquiry as well. *See Phillips*, 2024 WL 1795859, at *3. Magnuson's return to work cannot support a retaliation claim under section 15(b).

In sum, the Court concludes that ExGen is entitled to summary judgment on the IWA claims as well, and accordingly is entitled to summary judgment on all of Magnuson's claims.

## III.   Motions in Limine

Both of ExGen's motions *in limine* relate to remedial issues, not liability. *See* R. 702 Mot. Bar Testimony Garrick 1 (challenging the competency of Magnuson's expert's diagnosis that he suffers from "Whistleblower Retaliation PTSD"); R. 702 Mot. Bar Certain Testimony

Jacque (challenging Magnuson's expert's assumptions regarding Magnuson's entitlement to front pay).  Because the Court concludes that ExGen is not liable, these remedial issues are moot.

## CONCLUSION

Accordingly, Defendant Exelon Generation Company, LLC's Motion for Summary Judgment, ECF No. 143, and Motion for Leave to File Reply in Excess of Five Pages in Support of Motion for Summary Judgment, ECF No. 172, are GRANTED.  The Rule 702 Motion to Bar Testimony of Jacqueline Garrick, ECF No. 136, Rule 702 Motion to Bar Certain Testimony of Allen E. Jacque, ECF No. 137, Motion for Leave to File a Reply Brief in Support of Its Rule 702 Motion to Bar Testimony of Jacqueline Garrick, ECF No. 155, and Motion for Leave to File a Reply Brief in Support of Its Rule 702 Motion to Bar Certain Testimony of Allen Jacque, ECF No. 156, are MOOT.  The Clerk is directed to file the reply, ECF No. 172-1, on the docket, then enter judgment and close the case.


Entered this 27th day of September, 2024.

s/ Sara Darrow
_____
SARA DARROW
CHIEF UNITED STATES DISTRICT JUDGE